IN THE COURT OF COMMON PLEAS OF FRANKLIN COUNTY, OHIO

CRIMINAL DIVISION

- - -

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff, | : | |
| vs. | : | Case No. 13CR-1858 |
| Sefe A. Almedom, | : | Volume 1 |
| Defendant. | : | Pages 1 - 206 |

- - -

TRANSCRIPT OF PROCEEDINGS

Before Hon. David C. Young, Judge, and a jury, duly impaneled and sworn, on Monday, July 17, 2017 and Tuesday, July 18, 2017.

- - -

APPEARANCES:

Michael T. Hughes, Assistant Prosecuting Attorney,
On behalf of the State of Ohio, Plaintiff.

Frederick D. Benton,
On behalf of Sefe A. Almedom, Defendant.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858

0A893 - U34



INDEX TO THE PROCEEDINGS

Preliminary instructions by the Court . . . . 30

Opening statements by Mr. Hughes . . . . . . . . 41

Opening statements by Mr. Benton . . . . . . . . 54

- - -

**INDEX TO THE WITNESSES**

CALLED BY THE STATE: PAGE

**DAVID P. PHILLIPS**

Direct Examination by Mr. Hughes 60
Cross-Examination by Mr. Benton 103
Redirect Examination by Mr. Hughes 122
Recross-Examination by Mr. Benton 125

**DIANE LAMPKINS**

Voir Dire Examination by Mr. Hughes 130
Voir Dire Examination by Mr. Benton 135
Direct Examination by Mr. Hughes 141

- - -

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



**INDEX TO THE EXHIBITS**


| STATE'S EXHIBITS | | IDENTIFIED | ADMITTED |
|---|---|---|---|
| 4 | Photo card | 91 | |
| 5 | Photo | 91 | |
| 6 | Photo | 92 | |
| 7 | Photo | 93 | |
| 8 | Photo | 93 | |
| 9 | Photo | 93 | |
| 10 | Photo | 93 | |
| 11 | Photo | 93 | |
| 12 | Photo | 93 | |
| 13 | Photo | 94 | |
| 14 | Photo | 94 | |
| 15 | Photo | 95 | |
| 17 | Perrion Thompson forensic interview | 151 | |
| 18 | Mapquest map | 101 | |
| 19 | Mapquest map | 101 | |
| 20 | Mapquest map | 101 | |
| 21 | Resume of Diane Lampkins | 141 | |


- - -

Monday Morning Session,
July 17, 2017.
10:30, a.m.

- - -

THE COURT: The next matter is 13CR-1858, State of Ohio versus Sefe Asfadai Almedom. Will counsel enter their appearances?

MR. HUGHES: Michael Hughes, State of Ohio.

MR. BENTON: Your Honor, Frederick Benton on behalf of Sefe Almedom.

THE COURT: We are set for trial today. We have a panel downstairs. It was brought to my attention this morning that, Mr. Benton, you had filed two additional motions on Friday, or I think it was the 14th or 15th, on Saturday. One is a motion to suppress statements, and the second is a motion to dismiss indictment, or in the alternative, motion to compel an amended response to requested bill of particulars.

I don't know why we are filing these motions, but is there anything you would like to supplement?

First of all, has the State seen these additional motions?

MR. HUGHES: I have not, Your Honor. Mr.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Benton did e-mail me and indicate that he would be filing motions. I received notice this morning on my e-mail that they were filed, and they are untimely and I have not reviewed them.

THE COURT: Mr. Benton.

MR. BENTON: Yes, I did e-mail copies of the motions to both your bailiff and also to Mr. Hughes. And I recognize that -- and they were e-mailed on Friday, and I recognize that they were late.

But let's start with the easiest one. The reference to response to the State's bill of particulars was made after the State filed a bill of particulars pursuant to this Court's order. So that was a recent filing on behalf of the State.

But the motion to suppress the statements, evidently when I looked at the video before, I had missed a part of the video where there was a discussion with Mr. Almedom of his right to counsel.

And there are actually three statements here. He was interviewed twice at his residence and he was interviewed upon his arrest. Upon his arrest, he requested when they presented to him the rights waiver form, he said that he wanted to retain counsel, consult with counsel. Now, I will admit at the same time he also refused to sign the rights waiver form,

and he said, "Well, I will talk to you," in reference to the detective, "but I am not going to sign the rights waiver form." Then towards the conclusion of the interview, he again made an unequivocal declaration of his right to counsel.

As it relates to the other two matters, and as was revealed by the detective in his subsequent interviews with other individuals, Mr. Almedom, on the first occasion, not only -- and in fact, in the detective's words, "he was blitzed," he was that strongly under the influence of alcohol.

He also indicated that my client was extremely despondent, suicidal. And as a result, they ultimately contacted or had him taken to Netcare for evaluation. I believe he was held in Netcare for at least 24 hours, if not longer.

There was a second interview that was set up with the hopes that Mr. Almedom would be in a better state mentally. And again, the detective reiterates that he was even as bad, if not worse than he was the first time.

So essentially our arguments in those two matters are that he was of such a mental state both by way of his depression as well as his intoxication that he could not have engaged in a knowing understanding

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



or fully comprehending the gravity of the circumstances under which he was being interviewed for purposes of determining whether or not he needs to assert his right to counsel or whether or not he needs to assert his right to remain silent.

Granted, at the time of his interview at his residence, he was not in custody. But our focus as it relates to those interviews is the voluntariness of his confession or his statements.

THE COURT: Anything on behalf of the State?

MR. HUGHES: Well, in addition to being untimely, Your Honor, Mr. Benton has been the attorney of record for quite sometime, including handling the entire appeal of this matter. So he can't really make an argument that he was somehow unaware of this issue for the last three years as counsel.

And I don't know if he is trying to solidify an ineffective claim right now by filing something at the last minute and saying he hasn't had a chance or opportunity or didn't catch something in discovery. But the State has provided everything to Mr. Benton throughout this entire case. And as I mentioned, he has also been the attorney of record in the entire appeal process. So he has essentially had discovery before we have even restarted this entire trial

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



process, and these things have been known to him the entire time. Thank you.

MR. BENTON: Your Honor, I am not trying to engage in any trickery here. I am very candid with the Court in terms of the -- as you prepare for trial, as I was working on this and reviewing everything, sometimes some things you catch the first time around, some things you discover on subsequent reviews.

THE COURT: Does the State intend on using any statements by Mr. Almedom?

MR. HUGHES: The State reserves the right to do that, Your Honor. Alcohol plays a large factor in this case, and I think the detective will testify that he did attempt to speak with the defendant on occasions and he was too drunk and they did not conduct an interview, and that his mental state was questionable.

And ultimately during one of the interviews, which the State may or may not play, he ultimately admitted to getting so drunk that he doesn't remember what he did or what he would do if he drank so much, indicating abusing the girls. So that is a factor in the case.

Those interviews have been recorded. They have been part of the record for three years now and

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



they are known and came up in the original trial as well. Matter of fact, Mr. Benton was previously aware of that because in one of his 12 pretrial motions to exclude testimony, he asked this Court to exclude, quote, "prior bad acts." And what he called prior bad acts were his client's abuse and use of alcohol to the point where he would not remember what he would do to these young girls. So, yes, the State may put on that evidence.

THE COURT: Do we need a motion hearing for this? I mean, I don't know why we are --

MR. HUGHES: My argument would be it is res judicata. The Court has already ruled on his motion to suppress these issues previously.

MR. BENTON: Your Honor, I don't know that -- one, I think it is just simply a matter of, I mean, I can point the Court directly to -- I don't think the State is disputing what I am saying in reference to the videotaped interview while he was in custody.

If the Court needs to see that, I can point the Court to that in about two seconds in which that discussion takes place. On the others --

THE COURT: I don't want to deprive your client of his Constitutional rights. And if we need to continue this matter -- I don't know why we are

today doing this. But, you know, if you need a motion hearing, I will give you a motion hearing. If you want to do it today, I mean, we can do it today. We have got the jurors. We have got all week set. I mean, it is up to you, your call.

MR. BENTON: I am asking for a motion hearing, but I am also suggesting to the Court and counsel, I don't think it would be long because it is just two quick issues that should not be in dispute in terms of what took place.

THE COURT: Remember, I have not seen or heard any of these statements. I don't even know what is going on. So if you want to direct me, if that is how you want to proceed, if you want a motion hearing, if you want to bring the detective in --

MR. HUGHES: I mean, again, Your Honor, it puts the State at a disadvantage because we are scheduled for trial.

THE COURT: I understand, and I will give you an opportunity to do whatever. I know you have got out-of-state witnesses, I know the expense to the State of Ohio.

MR. HUGHES: The girls are scheduled --

THE COURT: I appreciate all of that. But, you know, Mr. Almedom is the one on trial, and I am

going to enforce his Constitutional rights.

MR. HUGHES: Well, I would suggest then, Your Honor, that I call the detective as soon as he is available. He could take the stand, testify to this video. The Court could make its ruling. If it is suppressed, you know, we have the right to appeal it or not; and if it isn't, then we can move on with the trial.

THE COURT: Can you get him down here today?

MR. HUGHES: I have been in contact with him. So if the Court will give me a brief recess to call him, he may be available within the next few hours, quite frankly. I don't see any issue with that.

THE COURT: Do you want to proceed with jury selection prior to this issue?

MR. BENTON: That is fine with me, Your Honor.

MR. HUGHES: Sure, Your Honor.

THE COURT: You can get him down here over lunch. All I have to do is instruct the jury. But I don't want to swear them in until we get all of the issues in the matter resolved. So if you can get him down here, I would prefer just to start with jury selection at 1:30 as opposed to trying to screw around

or trying to mess around with it this morning.

MR. HUGHES: If the Court would give me leave to contact the detective to see if he is available to come to court today or first thing tomorrow morning, what his schedule is like. He did e-mail me this morning and said he had to go out of state briefly to pick up a prisoner or a fugitive and to let him know what the Court's schedule was so he could make sure he was here. I have to contact him and see, you know, when he is going to go get that fugitive and come back.

THE COURT: How long is this case going to take?

MR. HUGHES: Well, Your Honor, if we start it tomorrow, I would be done by Thursday. I have the interviewers. There is at least three Children's Hospital personnel, one, possibly two police officers, the children and their mother.

THE COURT: Okay. Not to hold you to anything. How many witnesses potentially may you call?

MR. BENTON: Your Honor, at this point in time we just anticipate calling Mr. Almedom to testify, I think.

THE COURT: Because I am taking off for

Florida next Tuesday, so, hopefully we can get it done before then.

MR. HUGHES: I don't see any reason the jury wouldn't have it by Thursday or Friday, Judge.

THE COURT: Okay. Well, find out what is going on. Let me know.

(Brief recess was taken.)

THE BAILIFF: All rise.

THE COURT: Everyone can have a seat. What's going on?

MR. HUGHES: Thank you, Your Honor. May it please the Court. I have been unable to reach the detective in our brief recess. I sent him an e-mail and tried calling his cell phone and it just goes directly to voice-mail.

As I indicated, he did let me know that he had to travel out of town to pick up a fugitive and he didn't want it to interfere with the trial. I told him we were picking a jury today and I wouldn't need him until tomorrow morning. I don't know where he is.

THE COURT: How do you guys suggest we proceed?

MR. HUGHES: Well, the two options from my perspective, Judge, I am in a distinct disadvantage because of this untimely motion. Again, I mean, this

isn't a surprise. These are the facts that have been known to the parties for three years. And I have not, I guess -- you know, I am familiar with the facts of the case, obviously, as I was the trial attorney in the beginning. But I do feel like I am at somewhat of a disadvantage, having to essentially respond to and put on a motion hearing, not having even seen or read his motion yet on the day of trial.

That being said, if I can get the detective here prior to swearing in the jury and any testimony in the case, we could still have the hearing presumably tomorrow; and if the Court overrules Mr. Benton's motion, we can proceed to trial. If the Court grants his motion, I believe I have got the right under the rules to file an interlocutory appeal and then go from there.

So from my perspective, I am actually no worse off than if I agree to continue the case for another month to respond to his motions in writing or we handle it on an appeals basis. So that having been said, and knowing the case as well as I do, I would be able to proceed forward as the detective is available.

THE COURT: Mr. Benton?

MR. BENTON: I have no problem with what has been suggested in terms of how we proceed.

THE COURT: I think what I am going to do is let's just begin picking the jury. We will swear them in, you know, and I will deal with that issue whenever the detective becomes available. I don't have many days to -- I would either have to continue it for another month, or we can go today. So I am suggesting we pick the jury, and whenever we get a chance to deal with the detective and your motion to suppress, we will just take a break from the jury and have that hearing then.

MR. HUGHES: All right. Thank you, Your Honor.

THE COURT: Be back at 1:30.

MR. BENTON: Okay. Thank you.

\- - -

Thereupon, at 11:10 a.m., a recess was taken until 1:30 p.m.

\- - -

Monday Afternoon Session,
July 17, 2017,
1:30 p.m.

- - -

THE COURT: Back on the record, 13CR-1858, State of Ohio versus Sefe Almedom. Is there anything we need to put on the record prior to beginning voir dire?

MR. HUGHES: I don't believe so, Your Honor, other than my earlier objections to the late filed motions as res judicata; but the State is otherwise prepared.

MR. BENTON: Your Honor, just that I did -- there were discussions with respect to a plea resolution. I did engage my client with those discussions, and my client has declined to accept any offers that had been proposed.

THE COURT: All right. Go get the jury.

THE BAILIFF: All rise.

- - -

Thereupon, the prospective jurors entered the courtroom.

- - -

THE COURT: Everyone can have a seat. Good afternoon, everyone. Hope you had an engaging

morning. I don't know what judge spoke to you, gave you all of your words of wisdom to be a good juror.

Ladies and gentlemen, my name is Judge David Young. I am going to welcome each and every one of you to Courtroom 7-A. It is good to have responsible, good citizens who come down here on jury duty.

Let me introduce some of the people. You obviously met Courtney Corrova, she is my bailiff. She will be the liaison between the jury and whoever is selected and the Court. And if Ms. Corrova is not available, then you have Linda Shupe. She is my court reporter, she is recording everything. And she tells all of the lawyers and witnesses, slow down so everyone can hear. And if Ms. Corrova is not available, go to Ms. Shupe.

I hope that all of you will enjoy your jury service and that it will be an educational as well as informative experience. I realize that serving as a juror does inconvenience you as well as your friends and family. However, your participation as you will discover is essential to the American court system.

The case that is pending before this Court is a criminal case involving charges filed by the State of Ohio against Sefe Almedom. He is the defendant in this case. Mr. Almedom is represented by

Frederick Benton. He is a lawyer who practices here.

MR. BENTON: Good afternoon.

THE COURT: And the State of Ohio is represented by Michael Hughes in this case. He is an Assistant Prosecuting Attorney.

MR. HUGHES: Good afternoon, ladies and gentlemen.

THE JURY: Good afternoon.

THE COURT: The defendant is charged with four counts of gross sexual imposition and 11 counts of rape under the Ohio Revised Code. Both the State and the defendant are entitled to have jurors who approach this case with open minds and agree to keep their minds open until a verdict is reached.

Jurors must be as free as humanly possible from bias, prejudice or sympathy, and not be influenced by any preconceived ideas either as to the facts or of the law.

Each of you is undoubtedly qualified to serve as a juror. However, there may be something that could disqualify you in this particular case. Although you have been called as a prospective juror, only 12 of you may serve as trial jurors in this case.

The next order of business we will go through is jury selection, and we will probably keep

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



two alternate jurors.

Do you want to administer the oath?

THE BAILIFF: Just raise your right hand, please.

- - -

Thereupon, the voir dire oath was administered to the prospective members of the jury.

* * * * * * *

Thereupon, voir dire was held; however, it was not transcribed and made a part of this record.

* * * * * * *

Thereupon, at 4:55 p.m., Monday, July 17, 2017, the further trial of this cause was adjourned until 9:00 o'clock, a.m., Tuesday, July 18, 2017.

- - -

0A893 - U52

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Tuesday Morning Session,
July 18, 2017,
9:05 a.m.

- - -

Thereupon, the further trial of this cause was resumed pursuant to adjournment.

- - -

THE COURT: Back on the record, 13CR-1858, State of Ohio versus Sefe Almedom.

Will counsel enter their appearances?

MR. HUGHES: Michael Hughes, State of Ohio.

MR. BENTON: Your Honor, Frederick Benton here on behalf of Mr. Almedom.

THE COURT: And is there anything we need to put on the record prior to continuing with voir dire in this matter?

MR. HUGHES: I don't believe so.

MR. BENTON: I just ask for a separation of witnesses. I will do it now in case I forget later.

THE COURT: And State's position?

MR. HUGHES: Well, the detective -- well, he was in here, but that's fine.

THE COURT: I want to just get through voir dire and then we can deal with the motion to suppress issue.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



MR. BENTON: Okay.

THE COURT: Did you guys all get the new seating chart?

MR. HUGHES: Yes, Judge. That is very helpful.

THE COURT: Go get the jury.

THE BAILIFF: All rise.

- - -

Thereupon, the jury resumed their seats in the jury box.

* * * * * * *

Thereupon, voir dire continued; however, it was not transcribed and made a part of this record.

* * * * * * *

Thereupon, at 11:00 o'clock, a.m., the prospective jurors exited the courtroom and the following proceedings were held in open court, in the presence of the defendant:

THE COURT: All right. With respect to the motion to dismiss indictment, or in the alternative, motion to compel amended response to bill of particulars, I will deny that motion.

As to the motion to suppress statements, how do you wish to proceed?

MR. HUGHES: Thank you, Your Honor. And

just to make a record, the State still respectfully objects to the filing of this motion and the nature of this hearing, since it is not under the rule 14 days prior to trial. And also that, in part, it is res judicata.

I do have the detective here this morning. I will respond orally to this motion based on the short notice I had to respond to it. I can outline for the Court what I believe are the three issues here, Judge.

First off, there is an interview of Mr. Almedom which was conducted at his residence on or about March 9th of 2013. The detective went to the home, along with another detective, and knocked on the door. He was invited in. They talk at length and had an hour long discussion. So that is an audio recording. It is just a little bit over an hour. That is the first, I think, set of statements.

The second set of statements, Judge, I believe, that Mr. Benton's motion addresses is a follow-up interview done the next day on March 10th of 2013. The detective returns for a follow-up interview. And, in part, because the way the interview went the day before, by agreement of all of the parties, Mr. Almedom indicated that he would not

drink that day until the detective came about 3:30 in the afternoon, because Mr. Almedom had been drinking, was drinking.

And so the second interview is scheduled and the detectives showed up at 3:30 or approximately 3:00 something in the afternoon, as he indicated he would, and Mr. Almedom appeared again to have already been drinking that day.

Mr. Almedom consented to an interview, invited the detectives, came into the house. So this is noncustodial Your Honor, commonly known as a knock and talk sort of an interview. Matter of fact, the first interview leaves off with them making arrangements for the follow-up interview the next day.

Mr. Almedom even indicates he was going to cook Detective Phillips dinner, asked him what his favorite foods are, says, "You are welcome back. I would love to make you some dinner. Come back tomorrow."

The detective indicates that he doesn't get on until 3:00, so he would try to come over about 3:30, which he did. And when the detectives arrived on 3-10, Mr. Almedom again had been drinking, but also still was able to engage in a conversation and interview and made statements throughout the course of

that interview.

Ultimately, at the end of that interview, Mr. Almedom made statements about harming himself, including committing suicide. He had indicated he had previously tried to kill himself, he was under much stress. And the detective, in the interest of Mr. Almedom's safety, actually contacted Netcare and had someone respond and come to the house.

Mr. Almedom on his own volition voluntarily did accede to go and get Netcare services for mental health that evening. After this hour-and-a-half-long conversation between Mr. Almedom and the detective, that is how that ended.

And then we have the arrest, which happened 3-27. And that was a custodial arrest. So I do agree that that is entirely different as far as the legal standard applies where Mr. Almedom was in custody. Mr. Almedom was presented a rights waiver. He did refuse to sign the rights waiver.

However, during the course of the interview, he indicated he just was not comfortable in signing everything. So the detectives continued to talk to him about whether or not he wanted to give statements. He volunteered information. He volunteered statements. And at the very end of the interview, he

then said, "Yes, I want to talk to my lawyer."

So the fact that he did not sign a rights waiver is just not indicative of him not willing to talk to the police.

So I mention those are three separate interviews, Judge. And I mention them separately for the following reasons. The State in its case in chief does not seek to introduce the recorded interview at the police station on 3-27. That is the DVD.

Now, the State reserves a right to use that to cross-examine the defendant if he were to take the stand, of course; but I will not seek to introduce that in my case in chief, Your Honor.

As it relates to the two interviews on 3-9 and 3-10, those are audio only. They are not video. They are only audio recordings. And the State, after reviewing the recordings again, the evidence in the case, the trial transcript, et cetera, and after consulting with Detective Phillips, the State will also not seek to play those interviews in their entirety or portions of them in the State's case in chief either.

So it may render Mr. Benton's motions to suppress moot in the sense that I do not intend to offer any one of these three interviews in my case in

chief. However, I do believe and I understand that I would be able to use any statements to cross-examine the defendant if he were to take the stand, and that would not require a suppression hearing on those statements. That is the State's position on it.

And secondly, the State's position is that Detective Phillips, without eliciting -- and I will elicit no responses for Mr. Almedom during those audio-taped interviews. I will not ask him what Mr. Almedom said to him or stated to him. And I expect Mr. Benton wouldn't do the same either, because it is his client's statements he is trying to exclude.

But the detective -- I don't believe covered in the motion to suppress, the detective would be able to as part of his investigation testify about going to the house, observing Mr. Almedom, his demeanor, him being under the influence of alcohol, the numerous alcohol bottles that he had personally observed in the house, the fact that he had to terminate the interview at some point because it wasn't going anywhere because of his intoxicated state, and that he had rescheduled it; and that they came back again and they had an hour-and-a-half long conversation resulting in him being transported to Netcare over concerns of suicide.

None of those things that I just summarized

are statements of Mr. Almedom and should be suppressed. But the State would intend to elicit that testimony from Detective Phillips, and so I want to be clear that the Court doesn't consider that as part of the motion to suppress. Because otherwise, the State then believes the motion is moot if I don't intend to play each one of these interviews before the Court, which I do not after further review at this stage.

MR. BENTON: Your Honor, just a few brief points. The State will be correct that the motions will be rendered moot if the interviews are not played. However, I would make clear for the record that as it relates to the custodial interview, Mr. Almedom did invoke his right to counsel as well as refuse to sign the rights waiver form at the very beginning of that interview.

With respect to whether or not the State can elicit testimony as to the state of his intoxication or his mental state at the time of the home visit, that becomes another issue; not necessarily a suppression issue, but it becomes another issue with respect to relevancy. Because these were interviews that were made in March of, I believe it was 2010, if I am not mistaken. I believe it was March 9th and March 10th -- or March 10th and March 11th, somewhere

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



within that neighborhood.

To present to this jury the fact that he had so many alcoholic beverages in his house, that he was under a level of intoxication, and that he was ultimately transported to Netcare, I would argue, one, bears no relevancy. Two, to the extent that it is relevant, its prejudicial value is outweighed by the substantial risk of prejudice to my client's right to a fair trial and confusion to the jury as a distraction from the true issues that are here.

THE COURT: Given that the State is not going to be playing the tapes, I will render the motion to suppress statements moot in this matter.

I will at the appropriate time when you make the objection as to relevancy as to what the detective says, I don't see what relevancy him going to Netcare is; but I believe that the detective can say I went over to his house and he was drunk or he was, you know, intoxicated. We will address that when we address that.

But I don't see why you would want or care to want the transportation to Netcare. You know, they may -- that opens up a whole new thing as to whether they have medical records at Netcare. And I don't know what they concluded or what they didn't conclude.

But the detective clearly can say I went over to his house, and I know that is part of your case. So we will address that, make the appropriate objections at the appropriate time.

MR. BENTON: Thank you, Your Honor.

MR. HUGHES: Thank you, Judge.

MR. BENTON: We are back at --

THE COURT: 11:45.

\- - -

Thereupon, at 11:15 a.m., a recess was taken until 11:45 a.m.

\- - -

THE BAILIFF: All rise.

\- - -

Thereupon, the jury resumed their seats in the jury box.

\- - -

THE COURT: Everyone can have a seat. We have our jury. Do you want to swear them in?

\- - -

Thereupon, the bailiff administered the oath to the 12 regular members of the jury.

\- - -

THE BAILIFF: Okay. Now if Anne and Peri could raise your right hand as alternates.

- - -

Thereupon, the bailiff administered the oath to the two alternate members of the jury.

- - -

THE COURT: Ladies and gentlemen in the first row, again, thank you so much for being responsible citizens coming down here, and we will send you back downstairs to the pool. Thank you so much.

(Remaining prospective jurors were excused.)

Everyone can have a seat. Ladies and gentlemen, what I am going to do now is give you some warnings and admonitions and then we will break for lunch.

Then from now on, they report up here, correct? And you can take them back in the jury room and you will get to see the guy that climbs that big crane out there. It is amazing every day.

At this time the Court is going to give certain warnings and admonitions. It is important that you be fair and attentive during trial. Do not discuss this case among yourselves or with anyone else. Do not permit anyone to discuss it with you or in your presence. Do not form or express any opinion in the case until it is finally submitted to you.

What that is essentially telling you -- and I talk to all of the jurors. And when someone testifies and we take a break, you are going to have a natural feeling to go and say: Did you see what he said? Did you see how she responded to that question? But this is saying you cannot do that until after the entire case is over. More difficult for you to understand is you may not discuss this case among yourselves until it is finally submitted you.

You will receive the opening statements, the evidence, the arguments, and the law, in that order. It would be unfair to discuss the case among yourselves before you receive everything necessary for your decision. You must explain this rule to your family and friends. When the trial is over, you will be released from this instruction. At that time you may discuss the case and your experiences as a juror, but you are not required to do so.

Until that moment, you must control your natural desire to discuss the case both here and at home. Do not talk with the attorneys, parties or witnesses during the trial. Likewise, the participants in the trial must not talk to you. If anyone should attempt to discuss this case with you, report the incident to the Court or the bailiff

immediately.

You may not investigate or attempt to obtain information on this case outside of the courtroom. This would include any research on the Internet, in libraries, in the newspapers, or in any other way, or make any investigation on this case on your own.

Do not visit or view anyplace discussed in this case, and do not use Internet Maps or Google Earth or other program or device to search for or to view any place discussed in the testimony. Also do not research any information about this case, the law or the people involved, including the parties, the witnesses, the lawyers or the judge by using a computer or Smartphone, iPad or any other device or application that accesses the Internet or any social media site such as Facebook, Twitter or Instagram.

Do not read any news stories or articles in print or on the Internet or in any blog about this case or about anyone involved with it, or listen to any radio or television reports about it or about anyone involved with it, or let anyone tell you anything of any such news reports.

If you want, you can have your spouse or a friend clip out any stories and set them aside and give them to you after the trial is over. I assure

you that when you have heard all of the evidence, you will know more about this case than anyone will learn through the media, and it will be more accurate.

In short, you may not investigate or attempt to obtain information on this case outside of the courtroom. It is highly improper for any one of you to attempt to do so. Any violation of these orders may cause a new trial or may require a penalty for disobedience.

In the event that you experience a personal problem, you may explain the matter to the bailiff or the court reporter. The message will be conveyed to the Court.

At each recess, I will repeat these warnings; but if I should forget to do so, you should remember them and apply them to your conduct throughout the trial. I am not going to read all of this, but I will say, "Remember the instructions I gave you."

If at any time you discover that you cannot hear or understand a witness or a lawyer, please speak up so that the problem may be corrected.

Before we hear opening statements of counsel and begin to take evidence, I believe it would be helpful if you were to have some preliminary

instructions to follow in listening to and considering the evidence which you will hear in this case. Later after you have heard all of the evidence and closing arguments of counsel, I will give you further instructions covering additional law which you are to follow in this case.

It is the duty of the judge to instruct you in the law and it is your duty to follow the law as I will state it to you both now and at the conclusion of the evidence.

First of all, it is your exclusive duty to decide all questions of fact submitted to you. In connection with this duty you must determine the effect and value of the evidence. You must not be influenced in your decision by sympathy, prejudice or passion towards any party, witness or attorney in the case.

The attorneys for the parties will, of course, have active roles in the trial. They will make opening statements to you, raise questions, make objections, and finally argue the case as the last step before you hear my final instructions and commence your deliberations. Remember that attorneys are not witnesses.

And since it is your duty to decide the case

solely on the evidence which you see or hear in the case, you must not consider as evidence any statement of any attorney made during the trial. There is an exception, and that is if the attorneys agree to any fact, such agreements, stipulation or admission of fact will be brought to your attention and you may then regard such fact as being conclusively proved without the necessity of further evidence.

If a question is asked and an objection to the question is sustained, you will then not hear the answer and you must not speculate as to what the answer might have been or as to the reason for the objection. If an answer is given to a question and the Court grants a motion to strike the answer, you are to completely disregard such question and answer and not consider them for any purpose. A question in and of itself is not evidence and may be considered by you only as it supplies meaning to the answer.

As jurors you have the sole and exclusive duty to decide the credibility of the witnesses who testify in this case, which simply means that you must decide whether to believe or disbelieve a particular witness.

In determining these questions, you will apply the tests of truthfulness which you apply in

your daily lives. These tests include: The appearance of each witness on the stand; his or her manner of testifying; the reasonableness of the testimony; the opportunity he or she had to see, hear and know the things concerning which he or she testified; accuracy of memory; frankness, or lack of it; intelligence, interest and bias, if any; together with all of the facts and circumstances surrounding the testimony. Applying these tests you will assign to the testimony of each witness such weight as you deem proper.

You are not required to believe the testimony of any witness simply because it was given under oath. You may believe or disbelieve all or any part of the testimony of any witness.

You should not decide any issue of fact merely on the basis of the number of witnesses who testify on each side. Rather, the final test in judging evidence should be the force and weight of the evidence regardless of the number of witnesses on each side of an issue.

The testimony of one witness believed by you is sufficient to prove any fact.

Also, a discrepancy in a witness' testimony or between his testimony and that of others, if there

are any, does not necessarily mean that you should disbelieve the witness, as people commonly forget facts or recollect them erroneously after the passage of time.

You are all certainly aware of the fact that two persons who are witnesses to an incident may often see or hear it differently. In considering a discrepancy in a witness' testimony, you must consider whether such discrepancy concerns an important fact or a trivial one.

If you conclude that a witness has willfully lied in his or her testimony, you then have the right to reject all of that testimony unless from all of the evidence you believe that a probability of truth favors the testimony in other particulars.

This concludes my preliminary instructions to you. I hope they will be of some assistance to you in listening to and considering the evidence. Please keep these instructions in mind as you listen to the evidence and statements of counsel. I will give you additional instructions during the trial. When the evidence and closing arguments are concluded, I will give you additional instructions on the law which you are to follow.

Next I would like to highlight the

procedures of the trial. First each attorney will be given an opportunity to tell you what they expect their evidence will be. This part of the trial is called opening statements. The opening statements are not evidence, but they are a preview of the claims of each party designed to help you follow the evidence as it is presented.

After the opening statements the State of Ohio will be permitted to present its evidence, and then the defense may offer evidence if the defense desires. If the defense does provide evidence, the State of Ohio may present what is called rebuttal evidence. After the evidence is presented, then each attorney will be given an opportunity to make final arguments to you. Then the Court will give you instructions on the law. And after that, you will retire to the jury room and deliberate on your verdicts.

We are going to take a break. If you can be back here at 1:15, we are going to try to get started about 1:30. And Ms. Corrova will show you where you are going to report now and not down with the jury commissioner. All right?

THE BAILIFF: All rise.

THE COURT: Have an enjoyable lunch.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



- - -

Thereupon, at 12:00 o'clock, p.m., a lunch recess was taken until 1:30 p.m.

- - -

Tuesday Afternoon Session,
July 18, 2017,
1:32 p.m.

- - -

Thereupon, the further trial of this cause was resumed following the lunch recess.

- - -

THE COURT: Do we need to put anything on the record prior to bringing in the jury?

MR. HUGHES: No, Your Honor.

MR. BENTON: No, Your Honor.

THE COURT: Okay. Go get the jury.

MR. BENTON: Your Honor, there is a separation of witnesses. I would ask that the detective be excused during opening.

MR. HUGHES: Your Honor, I'd just argue that opening is not evidence. There is no testimony.

THE COURT: He can step out in the room. You could designate him as your investigator.

MR. HUGHES: I wouldn't want to put him through sitting through the whole trial. I almost filed a 615 motion, but -- wait, is there still time to file one, Fred?

MR. BENTON: Never too late.

THE BAILIFF: All rise.

\- - -

Thereupon, the jury resumed their seats in the jury box.

\- - -

THE COURT: Everyone can have a seat. Hope everyone had a nice lunch.

Is there any opening statement by the State of Ohio?

MR. HUGHES: Oh, yes, Your Honor, there will be. Thank you very much.

Mr. Benton, Mr. Sefe Asfadai Almedom, good afternoon. Ladies and gentlemen of the jury, good afternoon. Thank you for your patience in the selection process. Obviously it is a very important part of any trial, and I just want to thank you for your patience and cooperation.

So, here we are, this is the trial part. Wow, everything is different now, but not really. So what I'm going to ask you is to please pay close attention over the next two or three days.

As everyone has heard the Judge read the various charges as alleged in the indictment, and there are 15 total. That is a lot for any one person to keep track of, I guess, in their head when you are thinking about 15 different allegations. I can help

to break that down for you by illustrating some of the things that I believe that you should look for in this trial, or at least pay attention for.

As Mr. Benton alluded to, the State -- and the expectation is that evidence will be presented by the State that will meet, fulfill and satisfy those obligations for you to be able to find that Mr. Almedom has, in fact, committed these violations of law.

So as you sit here, what is this trial going to be about? Well, this trial is going to be about, and it is about, and it has been about since the abuse in 2009 and '10, two young girls, Perrion Thompson and Tiona Arnold. They are both the daughters of Shatyra Henderson.

You will hear from Shatyra Henderson, their mother. She will come in, she will talk to you about them and she will also explain to you her relationship with Sefe Almedom and how she met him and had been involved with him for sometime. She trusted her children in his care as a single mother. And that is a mistake, I think you will hear from her that's something that is difficult to deal with even today, the betrayal that she feels about leaving her young daughters in his care and his custody, alone with him

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



during the time that they were dating and seeing one another.

Perrion Thompson, born September 2nd, 2000, she is the older of the two. Tiona Arnold, about three years younger, born in February. So first off, as you keep in mind during the course of this case, there are 15 counts. And the first eight counts have to do with Perrion Thompson, the older girl. The remaining counts have to do with the abuse involving Tiona Arnold.

The first two counts in the case are allegations of gross sexual imposition. And if I could have the laptop on the screen, this is the general definition of "sexual contact." So I put this up here because you don't have notes. At the end of the trial, the Judge will give you legal instructions of law, and they will contain the definitions. This is the standard definition contained for sexual contact.

So during the course of this trial as you hear Perrion testify and as you hear her also talk to medical examiners at Children's Hospital, keep in mind what sort of sexual contact she is indicating that occurred to her. Sexual contact means any touching of an erogenous zone of another, including, without

limitation, the thigh, genitals, buttocks, pubic region; or if the person is a female, it also includes the breasts, for the purpose of sexually gratifying either person.

So that is one thing to keep in the back of your head. What are these witnesses telling me about what happened that meets the definition of sexual contact?

And there are two counts of gross sexual imposition relating to Perrion Thompson, and there are two counts of gross sexual imposition also relating to Tiona Arnold. And at each one of their interviews at Children's Hospital and on the stand they will relate to you instances of inappropriate touching that meets this definition of sexual contact.

It is up to you as jurors to decide when, where, and how that touching occurred and if the touching that they describe, in fact, meets that legal definition. And the Judge will give you that definition at the end of the trial. I think it is important to bring up now so you have an idea, you know, what is important testimony as we listen to these girls.

The remaining counts involve counts of rape. Now in Ohio, if you are under the age of 13, you

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



cannot by law consent to sexual intercourse, so it is called rape.

Rape has a broad definition, and it includes sexual conduct. Sexual conduct means any vaginal intercourse between a male and female, anal intercourse, fellatio and cunnilingus between persons regardless of sex; and without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus or other object into the vaginal or anal cavity of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

We talked about the first two charges against Mr. Almedom involving gross sexual imposition. The third charge -- and you will receive jury instructions at the end of this case which will be typewritten and the Judge will read them to you as well -- involves vaginal intercourse with Perrion Thompson when she was 11 years old. Count 4 involves vaginal intercourse, also with Perrion Thompson, when she was 11 or 12 years old.

The next count involving Perrion Thompson, Count 5, involves fellatio. That involves a person's mouth and a penis. That occurred also when Perrion Thompson was between the ages of 10 and 12 years of

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



age.

The next count you are asked to consider, Count 6, another count of fellatio involving Perrion Thompson when she was 10 or 12 years of age. Count 7 involves vaginal intercourse with Perrion Thompson when she was 12 years old. Count 8 involves fellatio with Perrion Thompson when she was 12 years old.

And as I mentioned, the remaining counts beginning with Count 9 involve Tiona. And Tiona, the first two counts likewise involve gross sexual imposition, and that's sexual contact, the first definition I highlighted for you. Then Count 11 regards fellatio with Tiona Arnold when she was between seven and nine years old, so she was under the age of ten when she says that she was engaged in fellatio with Mr. Almedom. Tiona Arnold will also relate to you fellatio also occurring when she was eight or nine years old with the defendant.

Count 13, that is vaginal intercourse, and that was when she was also eight or nine years old. Count 14 involves vaginal intercourse, again when Tiona Arnold was eight or nine years old.

And then lastly, Count 15, and she will recount to you, as she did to the treating nurses and medical personnel at Children's Hospital, an instance

of anal intercourse when she was approximately eight or nine years old and Mr. Almedom penetrated her anally. And those are all of the counts.

And they also involve the use of force or the threat of use of force. These children will tell you about how Mr. Almedom indicated that he would kill them if they ever told anybody. He would make sure that they were dead, or their mother was dead and their family was dead. They had reason to believe his threats. They didn't tell because they were threatened. Mr. Almedom used his position as a parental figure as well as the threat of physical harm so these girls didn't and wouldn't talk for years.

Until finally one of the girls did decide to disclose what had happened, and she relayed that to her mother. And her mother reacted as any mother would, in disbelief, distraught, frenzy. She immediately moves out from Mr. Almedom. She starts to live in a hotel immediately upon this disclosure.

And then the other daughter comes forward and she tells, because her sister finally told what had been happening, so she tells everything that had been happening, going on to her as well, and she discloses the abuse that had been occurring for years.

There are three different residences here.

So that is why I am going through this slowly, because there are sort of a lot of, quote, "moving parts." We have two children. We have charges involving each child, several counts of rape and gross sexual imposition each, and then we have three residences also. We have a 3399 Beachworth residence. We also have a Lakeside residence. That would be Mr. Almedom's residence where he lived. And we also have Dublin-Granville Road, which is a residence that Shatyra Henderson lived at with her girls for some period.

And you will hear the girls talk about being abused by Mr. Almedom in each one of those various locations over the years, ranging from ages, as I mentioned, seven, eight, nine, ten, all of the way up to almost 13 years of age. Now, these girls as they come in here today are much older, 16 and 13 approximately.

When the mother found out that this had been happening, she immediately reported it to the police. You are going to hear from Detective Phillips. He is going to come in here, he will be the first witness I call to the stand. He will tell you a little bit about his investigation, what he did off the bat.

This is going all of the way back to March

of 2013. He investigated it. He went and spoke with Mr. Almedom. He went to his apartment. He consulted with personnel at Children's Hospital and obtained copies of all of their medical records to review as part of this case. He spoke with the mother. He put together the information that he was able to obtain in this case, and ultimately ended up arresting and charging Mr. Almedom for these crimes in March of 2013. And he was shortly indicted thereafter, and the case has been pending ever since.

Mr. Phillips will come in and he will tell you a little bit about this investigation. But was Mr. Phillips at any one of those apartments when the abuse was occurring? No. Is Mr. Phillips an eyewitness to any of that? No. Much like any other, the police really can only come and take a report. Right? If you get into a car wreck and you call the police, they come, they write a report about what happened.

So the police in circumstances can do an investigation, but they are somewhat limited because he is receiving information well after it happened as well. So he does what he can to put together as much information as he can to be able to make a determination about whether or not he can pursue a

case or file charges, which he did.

A large part of that investigation, he relies on the medical records. You are going to hear from two registered nurses and forensic interviewers -- you are going to hear from registered nurses at Children's Hospital who finally conducted a medical exam on each one of these girls after having been interviewed pursuant to these allegations. It is called a forensic interview.

And I will let each one of those witnesses talk a little bit about what they do. But when children report abuse, they are referred to Children's Hospital. In this case, their mother made the arrangements on her own to schedule a time to take her daughters to have them examined, to speak with medical personnel and to explain everything that had happened. That interview is video-recorded, so you will be able to go back in time to 2013 and see these girls as they report and disclose everything having just happened as recently as a month or two prior to them talking to the personnel at Children's Hospital.

Now, of course, here we are three or four years later. But you will have that video of that interview. And those girls sit and they discuss everything. There is a medical care provider there to

take notes and to ask questions, to help ascertain what sort of injuries or trauma that the child may have experienced; and that includes mental trauma as well.

And then that interview that you will see is relied on by both law enforcement, other treating personnel, mental health professionals later. That becomes part of that child's medical record. And that is relied on by other treating physicians and doctors over the course of these girls' lives. And that is evidence that you will view and you will see here in court.

Everything that happens in this room is evidence. A lot of people think, well, unless there is a little red sticker on it that says evidence, or if we are not in the jury room and we can't look at it, like it is a picture, it must not count.

Well, there are types of evidence that you can take back with you, like a pen or a picture. But then there is also memories that you can take back with you. The things that you observe and hear in this courtroom are evidence. Everything that happens on that witness stand is evidence in this case. Everything that a witness testifies to that is up on that screen that they know about, that they can

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



explain or participate in is evidence. You may not be able to ultimately take that back or have that, but the fact that it goes on here in the courtroom means that it is evidence in the case for your consideration.

So all things that are evidentiary, are evidence in a case don't necessarily have to have a sticker on it and you can't necessarily hold it in your hand. And I say that because in my years of experience I have had many jurors, especially in cases such as this that can involve so many charges over a span of time, often ask for --

MR. BENTON: I object to this as being argumentative.

THE COURT: You may approach.

- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

THE COURT: Basis?

MR. BENTON: I am making an objection. This is argumentative.

MR. HUGHES: I'm just explaining they won't receive a copy of a transcript of witness statements and they should pay attention to what the witnesses

say.

MR. BENTON: Well, I object to going into discussions about what is evidence, what is not evidence and the like, and what prior experiences were with other jurors.

THE COURT: Just move along from that.

MR. HUGHES: Okay. I will just pick up where I left off.

\- - -

MR. HUGHES: As I was saying, ladies and gentlemen, you will not receive a transcript of the proceedings, so it is up to you to listen to what the witnesses have to say on the stand, because there is no playing it back, reading it back, those things you see on TV oftentimes. So it is important to listen to the witnesses as they testify in this case.

And at the end of this case, it will be no surprise, as I mentioned in voir dire, I am going to ask each one of you, after carefully considering and deliberating on what each one of these girls comes in here and tells you happened to them, that you sign a guilty verdict form on each and every count for Mr. Sefe Asfadai Almedom and the crimes that he is alleged to have committed. Thank you.

THE COURT: Mr. Benton?

MR. BENTON: Thank you, Your Honor.

If it please the Court, Mr. Almedom, Mr. Hughes, ladies and gentlemen of the jury. Good afternoon to you. This is the opportunity for each side to present a summary or overview of the evidence that you will see during the course of the upcoming days.

In having my discussions with you at this point in time, do not at any point in time assume that I have a burden of proof on behalf of Mr. Almedom. As you listen to the testimony, as you listen to the witnesses who testify, remember that the State of Ohio bears the burden of proof as to each count, each element to each count, and each and every one of the accusations that are made. And ultimately you will have a final responsibility in evaluating each of the 15 counts in determining whether or not the State of Ohio has met its burden of proof.

Now, as has been suggested before, we anticipate this will be a difficult case just because of the nature of the allegations. But in summary, this indictment which involves 15 counts relates to two individuals. Perrion Thompson, Counts 1 through 8, and the allegation will be that as to those counts, they occurred somewhere in the time frame where she

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



was between 10 and 12. Again, whether it happened at all is up to you to decide. When it happened, if at all, is up to you to decide.

It is ultimately up to the State to prove as to Tiona Arnold, the remaining Counts 9 through 15, they relate to a time frame of which it will be alleged that these offenses occurred between the ages of eight and nine. The dates, the times, the locations are all matters that you must evaluate in assessing whether or not the State of Ohio has met their burden of proof.

Now, what you will hear is that no specific dates, no specific times, and I would even suggest to you, no specific locations are identified. You will hear testimony about an extremely broad range of events occurring from 2010 through 2013. You are not going to be told a specific date. You are not going to be told a specific time.

And what you will hear is a lot of testimony, perhaps emotionally charged testimony about very broad accusations, but with no specifics, no details. With Tiona Arnold, these are the time frames. To give you a comparison, this is as to Perrion Thompson, from September 2010 until March of 2013. Tiona Arnold, from April 2012 through

March 1st, 2013.

Whatever the motivation might be with respect to why these accusations are being made, again, it is not my responsibility to prove, but we will present to you or through cross-examination primarily reasons as to why these girls have been making these accusations.

Now, as was indicated, you will also hear testimony about three locations that were principally or will be principally identified by these young girls as to where these series of events supposedly took place. And again, we emphasize, "supposedly." The Beachworth Drive address, the East Dublin-Granville Road address, and the Lakeside Street South address.

You will hear evidence about those locations, who lived at those locations, who frequented those locations, and you will also see photographs as it relates to at least one of these locations that will present some information that will be worthy for your consideration in evaluating the credibility of the State's case.

Now, you will find that during this three-year period, September 4th, 2010 through March 1st of 2013, these girls were in constant contact with mother, father, family members, teachers, ministers,

neighbors, police, physicians, social workers. And not once during this 13-year period was there ever a report made of any alleged activity, nor did any of these individuals make any observation that raised any concerns that one would suspect to be present of children who are being abused as has been claimed.

You will find that this case has no evidence. Again, you will hear a lot of testimony. And how you respond to that testimony will ultimately be up to you. And there will be offers or attempts to make to explain the absence of evidence. But you will find that there is no forensic evidence. You will have folks that come in and say they are forensic examiners. You will have nurses come in to testify. But in the final analysis, they have no conclusions that they can offer to establish that any of these accusations, any of these events have ever occurred.

You will find that the detective had an opportunity to collect sources of potential DNA evidence, and he chose not to do so. You will find that the detective had an opportunity to collect and have evaluated certain physical evidence, but he chose not to do so.

And again, as we told you before, with these broad, vague accusations, no definitive date, no

definitive time, and no corroboration.

You will also find -- we have talked about DNA evidence and physical evidence. You will also hear testimony about potential witnesses or a potential witness that the detective was given information that would help sort out these accusations. And again the detective chose not to pursue that lead.

Now you are going to hear testimony that -- from the detective that he is trying to be fair, he is trying to conduct a thorough and complete investigation. But the facts will challenge that particular declaration.

Finally, you will also note that Mr. Almedom from day one --

MR. HUGHES: Objection, Your Honor.

THE COURT: Approach.

- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

THE COURT: I thought you didn't want his statements in.

MR. BENTON: I was representing his not guilty plea.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



MR. HUGHES: That is not what that says.

MR. BENTON: Okay.

- - -

THE COURT: Sustained as to that.

MR. BENTON: As to these accusations, Mr. Almedom has pled not guilty as to Count 1, Count 2, Count 3, Count 4 Count 5, Count 6, Count 7, Count 8, Count 9 Count 10, Count 11, Count 12, Count 13, Count 14, and Count 15.

At the conclusion of this trial, we are going to come back and talk in great detail about this case and what you have heard over the course of the upcoming days. And we will ask that you find Mr. Almedom not guilty because, indeed, he is not guilty of the offenses for which he has been charged. Thank you very much.

THE COURT: You can call your first witness.

MR. HUGHES: Yes, Your Honor, the State will call Detective Phillips to the stand.

THE COURT: Detective, will you raise your right hand?

(Witness sworn.)

Have a seat.

Counsel, you may inquire.

MR. HUGHES: Thank you, Your Honor.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



- - -

DAVID P. PHILLIPS

Called as a witness by the State of Ohio, being first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HUGHES:

Q. Good afternoon, Detective.

A. Good afternoon.

Q. Could you please begin by just introducing yourself to the ladies and gentlemen here in the jury, tell them your name and where you work, sir?

A. My name is David Patrick Phillips, and I work in the Columbus Division of Police.

Q. All right, sir. How long have you been a police officer?

A. About 22 years.

Q. Okay. Does that entire 22 years involve the department in Columbus?

A. It does.

Q. Can you tell everyone here a little bit about your background and training during that 22 years that led up to where you are now?

A. It began with training in our police academy, which is a six-month training academy; and from there we have had various in-service trainings

throughout the years.

Q. And as part of that training, what was your, I guess, progression through the department, or what sort of jobs have you had within the department?

A. I was on patrol for the first six years. After that I went to the sexual abuse unit.

Q. Let me stop you there. As patrol we think of officers driving around in a uniform in a marked cruiser. Is that how you characterize patrol?

A. That is correct, it is.

Q. And was that different than a role as a detective?

A. It is.

Q. All right. You indicated after your six years on patrol you moved into a separate unit?

A. I did.

Q. What is that?

A. That was the sexual abuse unit.

Q. And how long did you work in the sexual abuse unit?

A. On and off a total of about 10 years.

Q. All right. So as an investigator, and specifically focusing on sexual abuse cases, what sort of training did you have throughout those 10 years?

A. Again, we had different in-service training,

different type of trainings involving interviewing the victims, interviewing the suspects, and just different trainings that were more specialized.

Q. When you speak of sexual abuse, would this involve children or also adult sexual nature crimes?

A. The particular unit I was in at that time was specifically children.

Q. All right. When you were in that unit, do you recall what your case load was like or how many cases you would have handled as a detective within that unit focusing on children?

A. On average I handled around 100 to 125 cases per year.

Q. And how many sexual assault detectives were in that unit along with you?

A. There were a total of 16 detectives, eight on first shift and eight on second shift.

Q. All right. Now, you said you worked there for how many years, eight?

A. A total of about ten.

Q. Ten years, okay. And then after those 10 years, what did you do next?

A. I left there and I went to the domestic violence unit for about a year. And then I left the domestic violence unit and went to the adult sexual

assault unit for two years.

Q. So same sort of nature of crimes, but no longer children, dealing with adults in that manner?

A. Correct.

Q. And then where are you now?

A. After returning to the juvenile sexual abuse unit for several years, I then went to the robbery unit, which is where I currently am and have been for the last three years.

Q. May I ask why you made these changes, you know, out of the child sexual abuse cases into domestic violence, and then you ended up going back at one point?

A. The Columbus Division of Police is a large department, there is a lot of different opportunities, and I like to explore different opportunities.

Q. So you are of free will, you sort of change, I guess, lateral moves in the department?

A. They are all lateral.

Q. And you get to try something else or work a different field or area of expertise and then come back?

A. Yes.

Q. Did you have an opportunity to review the Sefe Asfadai Almedom file prior to coming in today?

A. I did.
Q. Do you recall how this case first came to your attention?
A. Yes. On March 6th, 2013, I was assigned this case. Perrion Thompson and Tiona Arnold had appointments scheduled at -- then it was called the Child Advocacy Center, and I was assigned as the lead detective.
Q. Explain your role once you are informed of a referral about abuse or a child gets scheduled for a medical interview. How does that then dovetail in your role as an investigator?
A. In this particular case, I was informed that their appointments had already been scheduled, meaning they were already going to be forensically interviewed. My first responsibility at that point was to attend the Child Advocacy Center forensic interview, which I did.
Q. When you attend an interview, do you sit in the room with the child and ask them questions?
A. I do not.
Q. And why not?
A. There is a trained forensic interviewer whose responsibility it is to talk to the child.
Q. If in the course of your investigation you

believe it's necessary to talk to a child, would you follow up with additional interviews or questions of a child?

A. Yes.

Q. Have you done that in other instances where you reviewed medical records, but as an investigator, you needed to still clarify things with the particular child?

A. Yes.

Q. And in this case, with Ms. Perrion Thompson, did you feel the need to separately, independently interview her?

A. I did not.

Q. And why is that?

A. I felt that the forensic interview was done well and done competently.

Q. And what about when it came to Tiona Arnold, in reviewing her interview, did you feel it necessary to conduct a second or third follow-up interview to clarify any issues or points that you had as an investigator?

A. I did not.

Q. Could you if you wanted to?

A. Yes.

Q. All right. You had left off where you

became informed that the children had scheduled interviews at Children's Hospital to be seen by treating medical personnel, but you do not participate in that process. Can you tell the jurors a little bit about that and how that information comes to you?

A. In this particular instance, my sergeant assigned me this case. The interviews were going to be conducted at the same time, so I had another detective assist me by watching the interview that occurred with Perrion Thompson while I watched the interview with Tiona Arnold.

The way the process works is myself, along with people from the other disciplines, such as nurses, social workers, Children's Services workers, we are in a separate room from where the child was being interviewed and we would watch on the video feed, a live video feed on the television.

Q. Now, are those video feeds recorded so you can review them later and additionally?

A. They are.

Q. So even if you were not watching Tiona's, you had an opportunity to review everything that she said and all of the statements that she made?

A. I did.

Q. As you watch, do you conduct the interview?

A. No.
Q. Do you tell anybody what to say or what to do?
A. No.
Q. So if you described yourself, would it be as a passive observer?
A. Correct.
Q. After the interview is complete, what do you do with that information that is disclosed in the interview?
A. Well, it depends on what was disclosed. So every case is somewhat different. But on this particular case, at the conclusion of the interview, I decided that I was going to attempt what is called a controlled recorded phone call between Perrion Thompson and Sefe Almedom.
Q. You had mentioned every instance is different. Have you observed instances where children are scheduled to meet with medical personnel to report what happened and then you do not follow up on it from a law enforcement perspective?
A. If they don't disclose any sexual abuse, or cases where there is not a lot more follow-up to be done, correct.
Q. Does that happen?

A. It does happen.
Q. In this case, was that the case where there was not enough information to follow up on?
A. There was additional information that needed to be followed up on.
MR. BENTON: Objection, calls for hearsay.
MR. HUGHES: There is no statement. I am just asking --
THE COURT: Can you read back the question?
(Question read.)
Overruled. You can answer.
Q. (By Mr. Hughes) You can answer.
A. Yeah, there was additional information that needed to be followed up on.
Q. Okay. You said with the information that you had, you decided to do something called a controlled phone call?
A. Correct.
Q. What is the purpose, just generally speaking, of a controlled phone call?
A. Generally speaking is to gather corroboration if a child or if a person is alleging something happened to them.
Q. All right. Is sometimes that successful in getting an admission or corroboration in a case?

A. Yes.
Q. Is sometimes it not successful in developing any additional information?
A. Yes.
Q. Okay. After you arranged for that in this particular case, what is the next step you did?
A. The next step was to go visit Mr. Almedom.
Q. Would that be a normal course, to visit a suspect or a possible person of interest?
A. It is.
Q. Based on the information that you had at the time you decided to go visit Mr. Almedom, did you have any other known suspects in this case?
A. No.
Q. Was there any other person ever indicated by any of the children as having abused them?
A. No.
Q. Was there any other person in any way in your investigation that you thought could be a potential person that could have done these things that the girls alleged?
A. There was not.
Q. What did you do to set up or go to speak with Mr. Almedom?
A. It is what we call just a knock and talk.

He was not aware that we were coming, and myself and another detective just showed up at his house and knocked on his door.

Q. Is that a common practice?

A. It is.

Q. Is that something that you need a search warrant for or anything?

A. No.

Q. Could Mr. Almedom have told you to leave or go away, I don't want to talk to you?

A. I would have left.

Q. In this case, do you recall the date that you went to speak to Mr. Almedom at his residence?

A. It was March 9th, 2013.

Q. Do you remember how many days that would have been after the girls disclosed what had happened to them at Children's Hospital?

A. Three.

Q. So three days later, so that is three days into your investigation, you are talking or attempting to speak with Mr. Almedom?

A. Correct.

Q. When you get to his residence, what do you recall about where he lived and what it was like? Can you describe it for the jurors, if you remember?

A. It is an apartment complex near South Hamilton Road. It is on Lakeside Drive South, I believe is the street name. It is an apartment complex. I don't know how many units, but fairly decent size.

Q. You said you and another detective went to knock on his door?

A. Correct.

Q. And did you do that?

A. Yes.

Q. Prior to speaking with Mr. Almedom, did you speak with the children's mother, Shatyra Henderson?

A. I did.

Q. And for what purpose did you talk to her?

A. Just to gather additional information about her daughters and their living arrangements when they lived together and various additional information.

Q. Did that inform you at all about what you might expect if you go to Mr. Almedom's house and form the basis of any questions you might also want to ask him?

A. It did.

Q. When you get to the door, did Mr. Almedom answer?

A. Yes.

Q. Okay. Well, what happened after he answered the door?

A. We introduced ourselves and asked if we could come in and speak with him.

Q. And what happened then?

A. He invited us inside.

Q. Did you have an opportunity -- about how long did you and Mr. Almedom talk with one another?

A. That was about an hour.

Q. All right. During this hour-long conversation, do you recall what rooms of his residence you were in?

A. We were in the kitchen area. Myself and Detective Haas were sitting more to the inside. Mr. Almedom was sitting out towards where the front door is.

Q. Now at that time you indicated that you did not have a search warrant?

A. Correct.

Q. But he wasn't -- he invited you in?

A. Yes.

Q. Did you think to take pictures or process the scene, so to speak, at that time during this first meeting?

A. Not at that point.

Q. Why not?

A. We were not to that point yet. This was just our first attempt to speak with Mr. Almedom and advise him of the nature of the allegations and seek some type of a response from him.

Q. During this hour-long conversation, did you make any observations about the interior of his living space?

A. Yes. Again, since this was an unannounced visit, the house was not necessarily clean. But probably more significant to me was there were a lot of --

MR. BENTON: Objection, Your Honor. May I approach?

THE COURT: You may.

- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

THE COURT: I assume this is where you are going to try to get into the alcohol bottles and --

MR. HUGHES: Yes. It is germane to my case. I'm not introducing any statements.

MR. BENTON: Your Honor, this is essentially the State's intent to try to suggest that Mr. Almedom

Case: 2:22-cv-02229-MHW-MRM Doc #: 9-1 Filed: 09/15/22 Page: 74 of 205 PAGEID #: 573



was an alcoholic. Mr. Almedom has not introduced his character into evidence, so this would be not only irrelevant, but to the extent that it has any probative value, it is outweighed by a risk of prejudice to my client's right to a fair trial.

THE COURT: Overruled. I'll allow whatever he is going to say.

MR. BENTON: While we are here, Your Honor, the State elicited testimony from Detective Phillips about a controlled call. Now, in that controlled call -- and the premise for that was that sometimes these calls are made in an attempt to see if there is any sort of admissions made by the person who they are calling, and it is left at that.

I want the opportunity to be able to go into the fact that during that controlled call, Mr. Almedom denied the accusations. Now, it is limited only to that call. Of course, the way it stands now, the jury has no way of knowing the outcome of that controlled call, and I think it is unfair to my client's entitlement to a full presentation of the contents of that call.

MR. HUGHES: Well, they won't know the outcome of his hour-long conversation with him that he is testifying about now, or his hour-and-a-half

conversation tomorrow or his conversation at the arrest. And the defendant can't introduce his own statement that he made denying the offense. It is hearsay. He can take the stand and say it, and that is why I specifically did not go into anything said.

He is going to take the tact that the detective did not do a good job, which he is testifying in linear progression everything he has done in this case so far as part of his investigation.

THE COURT: I will think about that.

MR. BENTON: Okay, all right.

- - -

THE COURT: Detective, you can answer, if you can remember the question.

THE WITNESS: Can you ask the question again, please?

Q. Yes. I believe it was your personal observations of the interior of Mr. Almedom's apartment or living area?

A. Well, again, in addition to it just being generally unkept, but again, it was a surprise visit. I did note that there was a lot of empty liquor bottles, vodka bottles, whiskey bottles. I didn't count, but just from looking, they were on the floor, they were on tables. There looked to be certainly

double digits in terms of empty liquor bottles throughout the house, just in the one room.

MR. BENTON: Objection, Your Honor.

THE COURT: Objection noted.

Q. Double digits, meaning more than ten empty liquor bottles?

A. Yes.

Q. What if anything else did you notice when you were there speaking with Mr. Almedom?

A. Mr. Almedom himself appeared to be intoxicated at that point.

MR. BENTON: Objection, Your Honor.

THE COURT: Overruled.

A. He appeared to be intoxicated.

Q. How long did you continue to talk to Mr. Almedom approximately?

A. We spoke for about an hour.

Q. And what if anything then ended that conversation?

A. As we were speaking, Mr. Almedom was still drinking. He was drinking vodka --

MR. BENTON: Objection, Your Honor.

A. -- straight vodka. So as the interview progressed --

THE COURT: Overruled.

A. As the interview progressed, I made the determination I would like to continue the interview the next day if possible. So I asked Mr. Almedom if he would be willing to have us come back on the following day.

Q. Did you give a date and a time that you would return to speak with him again?

A. Yes. We agreed that I would come back, myself and the other detective would come back at 3:30 the following day.

Q. And then that concluded that visit?

A. Almost. Before leaving, I asked if he would be willing to not drink and stay sober for our next meeting.

Q. Did you return the next day at approximately 3:30 in the afternoon?

A. I did.

Q. Okay. Same address?

A. Yes.

Q. Same residence?

A. Yes.

Q. And what did you do on this occasion?

A. Same thing. I knocked on the door and Mr. Almedom answered and he invited us inside.

Q. Once inside, did you have an opportunity to

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



speak with him?

A. I did.

Q. And did you make any observations this time on your second visit?

A. Mr. Almedom was clearly intoxicated.

MR. BENTON: Again, objection, Your Honor.

THE COURT: Objection noted. Overruled.

Q. Continue.

A. And again, he was continuing to drink vodka as we interviewed him.

MR. BENTON: Same objection.

THE COURT: Overruled.

Q. Did you notice anything about his living space being different?

A. At that time it looked fairly similar.

Q. Were the liquor bottles still around?

A. There were still liquor bottles at that point.

MR. BENTON: Same objection.

THE COURT: Overruled.

Q. How long did this conversation last, approximately?

A. I believe this was a little bit longer. It was closer to an hour-and-a-half.

Q. During the course of this conversation did

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



he show you any marks on his body?

A. He did.

Q. And --

MR. BENTON: Objection, Your Honor. May we approach?

THE COURT: You may approach, yes.

- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

MR. BENTON: I anticipate that the testimony will be that my client had some lacerations on his body and that my client was unable to recall how those lacerations occurred. Again, the State seems to present that line of testimony to suggest that my client has memory lapses based upon his --

THE COURT: Has what?

MR. BENTON: Has memory lapses based upon his level of intoxication. And I would argue the relevance.

THE COURT: How is that relevant?

MR. HUGHES: Ms. Henderson is going to come in and testify about an incident that Mr. Almedom tried to harm and hurt himself. And her testimony will be that he doesn't recall or didn't know that

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



those scars are there. And he calls her --

THE COURT: She can't say they're the same lacerations.

MR. HUGHES: Well, they are like if you drag a knife or scissor across yourself, so, yes, you could call them lacerations, you could call them deep scratches.

THE COURT: Is she going to testify that she saw him do it?

MR. HUGHES: Yes. She is going to testify that he didn't remember doing it and she told him, "You did this."

He will attack her credibility. This witness can say, "I saw those same marks." So when she comes in later and says, "I saw him do it" -- I mean, I could just wait and call him back.

THE COURT: You are permitted to be able to say that he saw the lacerations.

MR. HUGHES: That's all I'm asking. I'm not getting into the details.

THE COURT: I'm not going to let you go into the mental health and going over to Netcare and all of that stuff.

MR. HUGHES: Okay.

MR. BENTON: Your Honor, my position is how

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



are the lacerations relevant? Because even with the proposed testimony from Ms. Henderson, that would not be relevant in terms of whether or not she made any observations of how he cut himself. And, in fact, I don't anticipate any testimony that --

THE COURT: It could be that she made the observation --

MR. BENTON: That she saw the outcome, but not the actual event.

THE COURT: Could identify him, that, you know, she saw these lacerations.

MR. HUGHES: Again, it's an observation, not a statement.

MR. BENTON: It has nothing to do with the case.

THE COURT: For identification purposes. I would think she is going to identify him as to different marks.

MR. BENTON: She is going to be able to identify my client because she had a relationship with him.

THE COURT: I know. But if they want to bolster their identification to say he has a tattoo on his back, they are permitted, they can do that.

MR. BENTON: Judge, I would contend that

even that is the basis for the relevancy, the probative value is outweighed by the potential prejudice to my client's right to a fair trial.

THE COURT: Okay. Overruled.

MR. HUGHES: Thank you, Your Honor.

\- - -

Q. (By Mr. Hughes) Detective, at some point did you ask to observe parts of Mr. Almedom's body?

A. Yes.

Q. And do you recall what parts or portions you asked to look at?

A. His stomach.

Q. And what did you see then when he showed -- or did he show you his stomach area?

A. He did.

Q. What did you see at that point?

A. It was like a scar.

Q. After this, did you continue to speak with Mr. Almedom at his residence?

A. I did.

Q. And at some point then did you leave?

A. Yes.

Q. Okay. How would you describe Mr. Almedom's state when you left versus when you first got there?

A. It had gotten progressively worse.

MR. BENTON: Objection.

THE COURT: Sustained as to this.

MR. BENTON: Move to strike.

THE COURT: Move to strike.

Q. Was Mr. Almedom drinking during this interaction?

A. He was.

MR. BENTON: Same objection, Your Honor.

THE COURT: Overruled.

Q. And he drank throughout?

A. He drank vodka throughout the interview.

Q. And at some point you did leave, conclude your discussion, whatever you were talking about and left?

A. Yes.

Q. What did you then do next in this case, Detective?

A. I approached a judge and requested a search warrant for the residence.

Q. And did you get a valid, signed search warrant in this matter?

A. I did.

Q. And using that search warrant, did you return to the residence?

A. Yes.

Q. And when you returned to the residence, what did you do?
A. I returned to the residence, I photographed the interior of the residence, and I collected various items.
Q. Okay. I want to talk about those. What was the purpose of your photographs?
A. Just to generally show the layout of the house and also to show the items that I collected and the state they were in before I left.
Q. Was Mr. Sefe Asfadai Almedom present when you executed this warrant?
A. I don't believe he was.
Q. And I am going to approach with what has been marked as State's Exhibits 4 through 14, previously disclosed to counsel.
May I approach?
THE COURT: You may.
Q. Please take a moment, Detective, to go over these to yourself and let me know when you are finished.
A. Okay.
Q. All right. Do you recognize these photographs?
A. I do.

Q. And from where?

A. That was from the residence on Lakeside Drive South.

Q. And is that in Columbus, Ohio?

A. It is.

Q. Franklin County?

A. It is.

Q. And whose address or residence did you understand 4519 Lakeside to be?

A. That is Mr. Almedom's.

MR. HUGHES: Permission to publish 4 through 15?

THE COURT: Any objection?

MR. BENTON: No, sir, no.

THE COURT: All right. You may.

MR. BENTON: Your Honor, may we approach?

THE COURT: You may.

- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

MR. BENTON: These photographs were taken February 15th, correct?

MR. HUGHES: I think he wrote down the wrong --

MR. BENTON: Because he says he secured a search warrant and he did not. The search warrant was secured by Jennifer Haas.

MR. HUGHES: Right, who was accompanying him. I can clarify that if you like.

MR. BENTON: He wasn't there.

MR. HUGHES: 3-15, it is a -- I believe that it is a typo.

MR. BENTON: I'm saying, he wasn't there during the search warrant. And in the officer's report it indicates that it was Officer Haas and another officer. There's no indication that he was even present.

THE COURT: He can testify if he was present.

MR. HUGHES: Let me clarify that. I mean, point taken.

MR. BENTON: Your Honor, it would seem to me that this detective, who should know better, should stop talking when there is an objection. He tries to force his answers in there.

THE COURT: Okay.

- - -

(Discussion held off the record.)

Q. (By Mr. Hughes) Detective, I am going to

approach you with a copy of the warrant that you just discussed there. And that would be marked as State's Exhibit 27. First I will ask you to review it, if you will. It comprises one, two, three, four, five pages. Please take your time and review those.

A. Okay.

Q. All right.

MR. BENTON: Excuse me, Your Honor. Your Honor, with the Court's permission, may I move the podium?

MR. HUGHES: No objection.

THE COURT: Yes, you may.

(Discussion off the record.)

MR. HUGHES: Thank you, Your Honor. May I continue?

Q. Detective Phillips, do you recognize State's Exhibit 27?

A. I do.

Q. Can you describe what each page is? First, looking at page 1 of State's Exhibit 27, what is that, sir?

A. That is basically the cover page of the search warrant.

Q. What is page 2, sir?

A. Page 2 is the reading of the search warrant

that outlines the residence in this case that was to be searched.

Q. The next page?

A. It is a search warrant affidavit. It is the portion where the detective -- I'm sorry, this is out of order.

Q. Is there something missing?

A. No, it is fine. This is the portion where the detective signs the warrant in the presence of the judge.

Q. And were you working with any detectives on this case?

A. Detective Haas.

Q. Did any other detective assist you in this case?

A. Detective Haas was the detective that actually obtained this search warrant. Detective Sheline and Sergeant McSweeney assisted in the execution of the search warrant at Mr. Almedom's residence.

Q. Did Officer Sheline assist you at some point in talking to Mr. Almedom?

A. He did.

Q. Was Detective Haas present with you when you went to Mr. Almedom's house those two occasions you

just described to talk to him?

A. She was.

Q. She was present, she would have had the same observations or been able --

MR. BENTON: Objection to what she would have seen.

THE COURT: Sustained as to that.

Q. She was with you the entire time?

A. Yes.

Q. Sat next to you?

A. Yes.

Q. Okay. In the same room?

A. Yes.

Q. All right. Continue with what the pages you have in front of you are, sir.

A. The next page is the attachment. That is the page that the judge reads that forms the basis of our probable cause. And then the last page is the return inventory sheet. That is where we document any items that we would remove from the house.

Q. And that means that the warrant was executed?

A. Correct.

Q. And they are not good forever; you can't get a warrant and hold on to it for seven years or

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



something, right?
A. Yes, that is right, three days.
Q. And so was this warrant executed in a timely fashion?
A. Yes.
Q. And it was signed by a judge?
A. Yes.
Q. Is your name on any of those documents?
A. No.
Q. All right. Does that mean that you were not present when the warrant was executed?
A. No, I was present.
Q. And did you note that in your progress notes in your investigation, that you were present?
A. I did.
Q. And your name appears on these photographs, does it not, on the card, State's Exhibit 4?
A. Yes.
Q. Okay. I am going to point you to the date on State's Exhibit 4, Detective.
A. Okay.
Q. What is the date listed there on the photograph?
A. The date is the 15th of February.
Q. Okay. How is that possible?

A. I don't know. Whoever wrote this card might have written the date wrong.

Q. So you didn't travel back in time and take these pictures?

A. I did not.

Q. But State's Exhibits 5 through 15, are these true and accurate depictions of Mr. Almedom's residence as you were present when the search warrant was executed?

A. Yes.

MR. HUGHES: All right. Permission to publish?

THE COURT: You may.

Q. All right. So State's Exhibit 4, you indicate that is the photo card with the typo regarding the date; is that correct, sir?

A. Correct.

Q. All right. The next matter, State's Exhibit 5, what are we looking at here? What is depicted here?

A. That is an empty bottle of vodka.

Q. Now --

MR. BENTON: Your Honor, may we approach?

THE COURT: You may.

- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

MR. BENTON: To the extent that the photographs contain any depictions of alcohol bottles, beverages, I am going to object.

THE COURT: Okay.

MR. BENTON: Obviously you will let it in, but --

THE COURT: Yes. And I will note your continuing objection to that.

MR. BENTON: All right. Thank you.

- - -

Q. (By Mr. Hughes) Detective, why was this photograph taken?

A. At that point in time, that was the only bottle of vodka that was present in the home, unlike the other times I had visited, so I wanted to photograph and collect it for that reason.

Q. What about the next exhibit, State's Exhibit 6, what is this a photograph of?

A. That is a photo of a medicine cabinet in the bathroom.

Q. Why was this taken, if you know?

A. There were two bottles of lubricant, one on

the bottom shelf and one on the top, and I also collected those.

Q. And what would be the basis of looking for a bottle of anything that could be used as a lubricant?

A. These decisions I made were based in large part based on the interviews of the two girls.

Q. Next, State's Exhibit No. 7, what was this photograph? What is depicted here?

A. I believe that is Mr. Almedom's bedroom and there are two butcher knives underneath the end table.

Q. Next exhibit, State's Exhibit 8?

A. Again, another bedroom. I believe that is the bedroom where the girls slept.

Q. Next exhibit is State's Exhibit No. 9?

A. Another picture of the bathroom.

Q. Okay. State's Exhibit 10?

A. The staircase.

Q. State's Exhibit 11?

A. Staircase.

Q. Okay. Now, State's Exhibit 12, what is this area?

A. It is just the common living area.

Q. And what is depicted in that photograph?

A. That is his couch. You can see the kitchen table in the background, the table in front.

Q. All right. Is the scene here, this picture in this photograph, how is it different from when you went to speak with him on the 9th or the 10th?

A. The house had been -- the apartment had been cleaned pretty thoroughly.

Q. So when you described it previously as disheveled, this is not how it looked when you first did your surprise visit?

A. No.

Q. State's Exhibit 13, that same couch area, is that correct, sir?

A. That is correct.

Q. And why did you take various angles of photographs of the couch?

A. At some point in time if a case were to go to trial, it is also a way for a child to be able to look at a residence and point out various locations.

Q. State's Exhibit 14, another view?

A. Another view of the living room and kitchen.

Q. All right. When you went to the residence on March 9th, where did you sit in the residence when you spoke with them for about an hour?

A. We sat back towards that kitchen and we were facing out, so we were facing out towards the front door and Mr. Almedom was facing us with his back to

the front door.

Q. So for purposes of the record, would that be the furthest red and black chair would be you and Detective Haas in one of those three chairs?

A. Yes.

Q. And Mr. Almedom would have been seated facing opposite or towards the kitchen?

A. Correct.

Q. And then also 4519 depicted in Exhibit 15, what is that?

A. That is the address of the Lakeside Drive South apartment.

Q. What other physical items were there that you were looking for?

A. An orange blanket.

Q. What else?

A. I believe on the search warrant -- let me double-check. We were also looking for duct tape in addition to the orange blanket.

Q. Okay. Did you locate or see any duct tape at the scene?

A. We did not.

Q. Did you have any items that you collected tested for DNA?

A. No.

Q. Why wouldn't you do that?

A. In this particular case, they all lived in that particular apartment together, so I would expect everyone's DNA to be present throughout the house.

Q. Would the presence or absence of DNA on any object be dispositive for you in your investigation?

A. No.

Q. After this warrant was executed, what was the next step in your investigation? Did you have any other suspects or persons of interest to speak to?

A. I did not.

Q. Did you feel the need to re-interview or talk to the girls again?

A. I didn't.

Q. Did you speak with Ms. Henderson about the status of the case or what was going on with your investigation?

A. I believe I did.

Q. At some point then did you conclude your investigation?

A. Yes.

Q. And on what basis did you believe that you could conclude or finish your investigation?

A. I felt that I had established what is known as probable cause, which is more reason than not to

believe somebody committed the --

MR. BENTON: Objection, Your Honor.

THE COURT: I am going to sustain.

MR. BENTON: Move to strike.

THE COURT: As to that, move to strike.

Q. So you obtained information, okay, and based on that information, what did you decide to do?

A. I filed a warrant for Mr. Almedom's arrest.

Q. And did that happen? Was Mr. Almedom arrested?

A. Yes.

Q. Do you recall the date he was arrested?

A. It was the 27th of March, 2013.

Q. And after he was arrested, did you do any other, I guess, investigation or speak to any other witnesses in the case after he was arrested for these charges?

A. Other than him, no.

Q. Okay. And what did you do with all of that information after he was arrested?

A. I compiled the information and I sent all of the information to the prosecutor's office for presentation to a grand jury.

Q. All right. Do you know what date they returned an indictment?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



A. It was the 4th of April, 2013.
Q. Would you say then that this case was approximately a month long in your investigation?
A. That would be correct.
Q. Was there anything that now in hindsight years later you would have done any different?
MR. BENTON: Objection on relevancy.
THE COURT: Overruled.
A. No.
Q. Okay. During the course of your investigation, you executed a warrant at 4519 Lakeside. Were you aware of any other incidences or locations where sexual abuse was reported to have occurred?
A. Yes.
Q. And from whom did you obtain that information?
MR. BENTON: Objection.
THE COURT: Sustained as to that question.
Q. How did you obtain the information about other locations?
A. From my interviews of --
MR. BENTON: Objection.
MR. HUGHES: There is no statement being offered.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



THE COURT: Approach.

- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

THE COURT: You just want to show the other two addresses, correct?

MR. HUGHES: Correct.

THE COURT: As a result of your investigation --

MR. HUGHES: Correct.

THE COURT: -- did you get other addresses?

MR. HUGHES: Correct.

THE COURT: I mean, I will allow that.

MR. HUGHES: I didn't want to lead him too much. He would object if I lead.

MR. BENTON: You are asking the source of the information as opposed to --

MR. HUGHES: The source is okay. I am not asking for a statement. I am asking --

THE COURT: You just want to get the --

MR. HUGHES: Correct.

THE COURT: If you can limit it to that.

MR. HUGHES: Sure.

- - -

Q. (By Mr. Hughes) Detective, there were two other locations in addition to Lakeside that you had reason to believe sexual abuse occurred. Is that correct?

A. Yes.

Q. All right. Do you recall independently those two locations?

A. Yes.

Q. All right. And what were they?

A. One was, I believe it is called Homecroft Road, and the other one was East Dublin-Granville Road.

MR. HUGHES: Can I approach with State's Exhibits 18 and 19?

Q. Would you have noted those anywhere in your investigation, those addresses?

A. Yes.

Q. Okay. Where would you have noted those in your investigation?

A. In the progress --

Q. Could I approach you with what has been marked as page 1 of your progress notes?

THE COURT: You may approach.

Q. Detective, I will direct you to the sixth paragraph, which is the larger paragraph down towards

the bottom. Please take a moment to read that to yourself.

A. Okay.

Q. All right? Does that refresh your recollection as to those addresses or locations where this occurred?

A. Yes.

Q. And which ones were those, sir?

A. One was at 3399 Beachworth Drive, Apartment D, as in "David," within the City of Columbus, in Franklin County. And the second one is 877 Dublin-Granville Road, Apartment E, as in "Edward," also in the City of Columbus, in Franklin County.

Q. All right. In addition to Lakeside?

A. In addition to Lakeside Drive South.

Q. I am going to ask you to look at State's Exhibits 18, 19 and 20. And do you recognize what is depicted in 18, 19 and 20, sir?

A. I do.

Q. What are those?

A. Those are the Mapquest printouts of the addresses that we just discussed.

Q. Thank you. Did you ever visit those other locations that you just described?

A. I did not.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Q. Why not?

A. Those were older -- those were earlier on in this abuse, so I visited the last residence.

Q. The most recent residence?

A. The most recent residence, correct.

Q. And I'm sorry, the reason again you did not go to either the Dublin-Granville Road residence or the Beachworth residence?

A. Nobody lived there anymore that was a part of this, either the girls or Mr. Almedom. They had moved.

Q. So did you believe there would be anything of evidentiary value at that point in time?

A. I did not.

MR. HUGHES: Detective, I don't have any further questions at this time. Mr. Benton, I'm sure, does.

THE COURT: Ladies and gentlemen, we are going to take our afternoon break. We will break until 3:00 o'clock.

Do not discuss the case among yourselves. Do not permit anyone to discuss it with you or in your presence. It is your duty not to form or express an opinion in the case until it is finally submitted to you.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



THE BAILIFF: All rise.

\- - -

Thereupon, at 2:47 p.m., a recess was taken until 3:02 p.m.

\- - -

THE COURT: Do we need to put anything on the record prior to bringing in the jury?

MR. HUGHES: No.

THE COURT: Get the jury.

\- - -

Thereupon, the jury resumed their seats in the jury box.

\- - -

THE COURT: Everyone can have a seat. Detective, you are still under oath.

THE WITNESS: Yes.

THE COURT: Any cross-examination?

MR. BENTON: Yes, Your Honor.

\- - -

CROSS-EXAMINATION

BY MR. BENTON:

Q. Good afternoon, Detective.

A. Good afternoon.

Q. You were the lead detective assigned to this investigation?

A. Correct.

Q. So that meant that you pretty much controlled or had the final say with respect to what direction the investigation took place?

A. Yes.

Q. What evidence should be collected?

A. Yes.

Q. What evidence should not be collected?

A. Yes.

Q. And what witnesses are to be interviewed?

A. Yes.

Q. And it was your intent or purpose as a seasoned detective to conduct as thorough and as complete an investigation as possible?

A. Yes.

Q. And a fair investigation?

A. Absolutely.

Q. And in some cases you might have a lot of evidence, correct?

A. Yes.

Q. And then other cases you don't have that much to go on, correct?

A. Yes.

Q. And in either situation, decisions have to be made as to what the outcome of that investigation

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



should be; is that a fair statement?

A. That is correct.

Q. And there are a number of investigative techniques that are employed to assist you in your investigation?

A. Yes.

Q. And one of the things that you told this jury about is a controlled call. Do you remember that testimony?

A. I do.

Q. And a controlled call is a call that is made where you have an individual call a suspect, and you might even suggest to them what they should say?

A. Yes.

Q. And the call is made under circumstances to try to disguise the purpose of the call?

A. Yes.

Q. And sometimes to try to disguise where the call is coming from?

A. Correct.

Q. And while this call is being made, you are listening to the conversation. Is that a fair statement?

A. In some cases it is possible. In other cases we are always with them, but we can't always

hear the other side.

Q. In this case there was a controlled call by Perrion Thompson?

A. That is correct.

Q. To Mr. Almedom?

A. Yes.

Q. You listened to that conversation?

A. I listened to the conversation after it was completed. I had to play it back on a recorder.

Q. And you said on direct examination that you engaged in this particular technique with the hopes that it will sometimes cause a suspect or capture a suspect making certain admissions?

A. Correct.

Q. And that is what you were looking for with this controlled call?

A. The main purpose of the phone call.

Q. And to see if Mr. Almedom would make any sort of an incriminating admission relative to this investigation?

A. Yes.

Q. And this call as it relates to that purpose was not successful; is that a fair statement?

A. Yes.

Q. Now, you also said that when you first went

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



to the Lakeside South apartment, you did not process the scene?

A. Correct.

Q. Didn't take any photographs, you didn't collect any evidence?

A. No.

Q. Now, you were not refused an opportunity, you just made that decision not to take that opportunity to pursue that particular process. Is that a fair statement?

A. That is correct, yes.

Q. You then said you came back a second time, that ultimately there was a return by detectives pursuant to a search warrant?

A. Yes.

Q. Now, you did not approach the judge to get that search warrant; that was an error on your part?

A. Correct.

Q. There were other detectives who had filled out the affidavit, prepared the search warrant and made the presentation to the judge?

A. That is correct.

Q. And when the inventory was taken relative to the search warrant, the inventory reflects the names of two detectives, none of which includes you,

correct?

A. Yes.

Q. Now, you did say that you took some photographs, and with respect to those photographs, there was a date that was wrong?

A. Yes.

Q. And that was a document that you had completed?

A. No.

Q. You did not complete that document?

A. No.

MR. BENTON: Okay. So if I may approach again, Your Honor?

Q. Again I am showing you what has been marked for identification purposes as State's Exhibit 4. And this is a photo card, correct?

A. It is.

Q. And the purpose of a photo card is to show the subject of the investigation?

A. Yes.

Q. And the location at which these photographs are being taken, correct?

A. That is correct.

Q. And it also includes the date and the time?

A. Yes.

Q. And it has the photographer, Phillips, that would be you?

A. That is me.

Q. So did you take the photographs or did someone else take the photographs?

A. I took the photographs.

Q. Okay. But somebody else -- do you know who filled out this card?

A. That looks like Brian Sheline's handwriting.

Q. Now with reference to this photograph, you talked about based upon your investigation you wanted to gather certain information or collect certain items. And I am going to show you what has been briefly published as State's Exhibit 6. And you said that you collected these two bottles?

A. Correct.

Q. One here and one here?

A. I believe so, yes.

Q. And you said that you collected those because they were lubricants, correct?

A. Yes.

Q. Those bottles were ultimately turned over to the prosecutor's office?

A. They were turned into the police property room.

Q. Do you know if they were ever surrendered to the prosecutor's office?
A. I don't know.
Q. Do you know if the prosecutor's office was made aware of the fact that these items were collected?
A. They were.
Q. Now, you describe these bottles as lubricants. Isn't it a fact that these are bottles of cologne?
A. I don't know if that is -- I don't believe that is a fact, no.
Q. Did you open the bottles?
A. No.
Q. Just for demonstrative purposes, if I can do this -- and I have shown you these bottles before.
A. Yes.
Q. Would you agree that these bottles are similar to the bottles that are depicted in State's Exhibit 6?
A. They are similar.
Q. And there were liquids inside the bottle?
A. Yes.
Q. And you never opened the bottle to see --
A. I did not.

Q. -- how this was applied, even smelled the bottle, anything like that?

A. No, I did not.

Q. Okay. When you made the second visit to Mr. Almedom's home, you said that it appeared to be in the same condition as the first time?

A. Similar, yes.

Q. And that was the day following your first visit?

A. That is correct.

Q. And that was at a date and time that had been previously arranged with Mr. Almedom?

A. Yes.

Q. The search warrant, if I remember correctly, was executed several weeks later?

A. Days.

Q. Days later, several days later. And you said that the condition was much cleaner then than it was the first two days?

A. That is correct.

Q. And you are not here to suggest that he tried to destroy anything or compromise any evidence?

A. No.

Q. It just was cleaned up?

A. It was cleaned up.

Q. And you don't know whether or not the condition of his apartment when you first went there versus the last time that you were there represents how he would normally maintain his apartment?

A. I don't know, correct.

Q. In your description of this apartment you described it -- and correct me if I am wrong -- as being a one-bedroom or a two-bedroom?

A. I believe I did describe it as a two-bedroom.

Q. Isn't it a fact this is a one-bedroom apartment?

A. It could be.

Q. And you were asked questions with respect to the other locations. There were three addresses that were the subject of your investigation. Fair enough?

A. Yes.

Q. And you said that as to the other two locations, you did not go there because of the fact that, I think you said one apartment was vacant?

A. I didn't say it was vacant. I just said nobody lives there anymore that was in relation to this case.

Q. So there would not have been anything that would have prohibited you from going to these

locations and requesting permission of the occupants to take photographs of the interior?

A. No, there would not be.

Q. And with respect to the Lakeside apartment, while you collected the bottles that we saw in the photograph, you collected, I believe, a blanket?

A. Yes.

Q. And you did not collect anything else, is that --

A. I think we might have taken that bottle of vodka as well.

Q. I'm sorry, and a bottle of vodka. Now, in investigating allegations of sexual abuse, rape, gross sexual imposition, one of the things that you are looking for forensically is potential DNA evidence, correct?

A. In some cases.

Q. Evidence of semen?

A. In some cases.

Q. Evidence of vaginal fluids?

A. In some cases, yes.

Q. And that would be critical to your investigation in assisting and confirming or contradicting representations that are made to you which encompass the subject of your investigation?

A. In some cases, correct.

Q. Now you keep saying, "some cases." Let me ask you this question.

A. Okay.

Q. Would not DNA be desirable in all cases?

A. No.

Q. It would not be?

A. No.

Q. Why not?

A. In this particular case, all of the DNA that we have been trying to acquire from within the residence could easily be explained because he lives in the residence. And that includes bodily fluids and anything else I could potentially find. I wouldn't find that particularly incriminating or exculpatory if I were to find that evidence.

Q. Before you make that evaluation, would it not at least be important to see if you can gather that information?

A. Again, in this particular instance, they all lived in that home. I saw no legitimate legal purpose to try to find DNA. I didn't think it would help or hurt the case.

Q. So when you gathered the blanket, you did not gather the blanket for DNA analysis?

A. That is correct.
Q. You never submitted it for DNA analysis?
A. I did not.
Q. You didn't grab any cushion from the sofa?
A. No.
Q. Or no bedding?
A. I did not.
Q. And again, if -- let's take it out of the realm of this case. If there are cases in which your investigation would suggest that there might be the presence of vaginal semen, that would be relevant?
A. The term, "vaginal semen," can you explain?
Q. Vaginal fluid, excuse me.
A. There again, yes, there's definitely cases where that is relevant.
Q. But again, in your investigation, you were not looking for that type of information as relates to this case?
A. That is correct.
Q. The forensic interview that you observed was conducted by social workers associated with Children's Hospital or the Child Advocacy Center; is that correct?
A. That is correct.
Q. You did not know them to be physicians?

A. The person who conducts the interview is not a physician.

Q. And you don't know them to be nurses?

A. They are, correct, they are not nurses.

Q. And they are conducting this interview from a prosecutorial perspective to assist your investigation?

A. I don't believe that is the primary purpose. We do attend the interview and observe it, but I think there is multiple purposes of the interview.

Q. Do you define the scope or the purpose of the interview?

A. I do not.

Q. And you sit there and you make your observations?

A. That is correct.

Q. Nor do you determine who participates in that interview; is that correct?

A. That is correct.

Q. But ultimately these interviews or the interviewers will report to you what they have uncovered?

A. I am watching it as they are doing it, so there is really no need to directly report it. They do type up a summary that I typically include in my

file; but I am usually there to take my own notes and observe as it is going on.

Q. Okay. Do you recall during your investigation stating that or becoming aware that there might be some underwear of the children that might be relevant?

A. There might be some --

Q. Underwear?

A. No.

Q. You don't recall that?

A. No.

Q. Did you ever collect any underwear?

A. I did not.

Q. In the investigation of sexual abuse, sexual assault, sometimes the gathering of undergarments can become important?

A. Yes.

Q. Because that might contain bodily substances of both the accuser and the accused?

A. Yes.

Q. And in that regard, that may certainly be worthy of consideration for DNA analysis?

A. Yes.

Q. You would consider that item to be important to an investigation?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



A. It could be.

Q. In your investigation were you ever provided information as to potential witnesses who could assist you or provide some information to assist you in your investigation?

A. No.

Q. Were you ever made aware of a potential babysitter?

A. No.

Q. Did you in the scope of your investigation think it important to understand who else may have occupied any one of these three residences?

A. No.

Q. Now you are dealing with, I mean, you are familiar with the indictment in this case?

A. Yes.

Q. And you understand that we are dealing with an extremely broad range of time?

A. Yes.

Q. Spanning a three-year period. And is that a yes?

A. That is a yes.

Q. Okay. And as much as you would like, and despite your investigative efforts, you can't narrow that time frame down. Is that a fair statement?

A. I am not sure what you mean, I can't narrow it down.

Q. Well, instead of saying from -- let's say September. Instead of saying from September 4, 2010 through March 1st, 2013, I would assume that it is your desire to be able to point to a specific date?

A. I see what you are asking. Yeah, that is preferable, yes.

Q. And it is also your desire to be able to establish a specific time?

A. Yes.

Q. And again, the exactness of the date, the exactness of the time certainly assists in terms of your investigation?

A. It does.

Q. You can find out what witnesses may be present?

A. Yes.

Q. You might be able to assess whether or not there is any corroborating evidence?

A. Yes.

Q. You might be able to assess whether or not there is any exculpatory evidence?

A. Yes.

Q. Or evidence that might point to either

someone else --

A. Uh-huh.

Q. Is that a yes?

A. That's a yes.

Q. Or point to the innocence of the accused?

A. Yes.

Q. And the same thing would hold true with respect to the number of charges that are filed. Is that correct?

MR. HUGHES: Objection, Your Honor. That is for the grand jury to decide.

THE COURT: Approach.

- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

THE COURT: What was the question, Linda?

(Question read.)

MR. BENTON: He did file the initial criminal complaint, and he also testified to the grand jury. Now, I can ask for a suppression if that is an issue.

THE COURT: Why don't you rephrase the question?

MR. HUGHES: Just for the record, it is

normal for a detective to file one rape charge and present an entire packet. It is misleading to let the jury think that they only had one count and now somehow there's more.

MR. BENTON: No, that is not where I was going.

THE COURT: All right.

- - -

Q. (By Mr. Benton) Detective, in the course of your investigation in trying to assess whether or not you are dealing with one offense versus multiple offenses, again, the more specificity you have, the more accurate you can be in determining the outcome of your investigation; is that a fair statement?

A. That is fair.

Q. And the same would hold true with respect to the types of offenses that you are investigating, in other words, whether or not you are investigating a gross sexual imposition versus that of a kidnapping?

A. Yes.

Q. And in this instance, you had to rely upon information provided to you principally by two children?

A. That is correct.

Q. How long have you been in law enforcement?

A. Almost 22 years.

Q. In your 22 years of experience, I am assuming this is not your first case involving children?

A. It is not.

Q. Have you ever had circumstances in which children have lied to you?

A. Yes.

Q. Have you ever had circumstances in which children have exaggerated?

A. Yes.

MR. BENTON: I have nothing further. Thank you, Your Honor.

THE COURT: Any rebuttal?

MR. HUGHES: Yes, thank you, Your Honor.

- - -

REDIRECT EXAMINATION

BY MR. HUGHES:

Q. Have you had instances where you have been able to confirm children telling the truth?

A. Yes.

Q. In your experience, do children note dates and times that trauma occurs to them?

A. They do not.

Q. And why not or how not, based on your

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



experience?

A. Oftentimes it is based on their age or perception of time. And a lot of times when things happen on a recurring basis, things tend to blend together, so they are not good with dates.

Q. Is that common in your experience?

A. Very common.

Q. What about also times, not just dates, but what about time frame?

A. Times are also troubling.

Q. You are talking about children under 12 or 13?

A. Yes.

Q. Okay. Do you have a window of opportunity if you have a report of abuse or trauma, is there a certain window that you would generally collect physical evidence from a child if they allege abuse?

A. Yes.

Q. What is that?

A. 72 hours.

Q. So at that time when you're working as an investigator within a 72-hour window, if a child would report something, there would be, what? What would you do differently than you did in this case?

A. If it was during business hours, it would go

to the same facility, but a different type -- the examination would involve the collection of what is called a sexual assault kit, which involves trying to collect bodily fluids and different types of evidence. After 72 hours it has been deemed that that is not possible, so --

Q. Do you recall what the latest or most recent date and time was when you became involved, what the most recent incident was, approximately?

A. I think it was about two weeks before.

Q. So several weeks before was the last reported incident of contact with Mr. Almedom?

A. Yes.

Q. Do you see Sefe Asfadai Almedom sitting here in court today?

A. Yes, I do.

Q. Same person you have been testifying about previously?

A. Yes.

MR. HUGHES: Your Honor, let the record reflect that the witness has identified the defendant.

THE COURT: The record shall so reflect.

Q. And as part of your investigative packet Mr. Benton asked you several questions about these different locations. Did you rely on the girls'

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



medical records and reports to confirm those locations?

A. Did I rely?

Q. Mr. Benton was asking you about --

A. How I established those, yes, that was from their testimony.

Q. And did you also confirm their living arrangements with their mother?

A. I did.

MR. HUGHES: No other questions. Thank you.

THE COURT: Any questions as a result of those questions?

MR. BENTON: Yes, thank you, Your Honor.

THE COURT: All right, Detective, you can step down.

MR. BENTON: Oh, no, Your Honor, I said yes.

THE COURT: I thought you said no.

MR. BENTON: Oh, no, no, no, no, no.

- - -

RECROSS-EXAMINATION

BY MR. BENTON:

Q. You talked about this 72-hour window. But that is in reference to the examination of the child itself?

A. Yes.

Q. That does not relate to the gathering of physical evidence such as underwear, sofa cushions or anything else like that?

A. Correct.

Q. And, in fact, being an experienced detective, you know that DNA can oftentimes last for years?

A. Yes.

MR. BENTON: Nothing further.

THE COURT: Okay. You can step down.

(Witness excused.)

You can call your next witness.

MR. HUGHES: The State will call Ms. Diane Lampkins to the stand.

MR. BENTON: Your Honor, before he does so, may we approach?

THE COURT: You may.

\- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

MR. BENTON: The Court is aware from prior motions and what I have also shared with Mr. Hughes, I have a number of objections that I anticipate will be coming forth based upon Ms. Lampkins' testimony, as

well as that of another similar examiner.

First of all, the videotape contains a number of hearsay statements, and I have marked those and identified those for purposes of assisting Mr. Hughes.

Likewise, I would object to the playing of the videotape because I don't believe it meets any exception. My guess, based upon the history of this case, the State will try to argue that it's some sort of medical diagnosis, but I don't believe the State will be able to establish that foundation.

So what I am requesting is the Court to grant, outside the presence of the jury, allow me to voir dire this witness as to the foundation as to whether or not this was for the purpose of medical diagnosis.

MR. HUGHES: I thought this was the basis of his motion that the Court previously addressed. I have no objection to voir-diring her as part of his cross-examination, but not to base admissibility of the interview or not.

MR. BENTON: Your Honor, I believe in the Court's ruling you indicated that you would address this situation at the time of trial.

THE COURT: Yes, the CD.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



MR. HUGHES: It's a DVD.

THE COURT: Do you want to do it before she takes the stand?

MR. BENTON: Well, I don't want her testifying --

THE COURT: Because if it's what I think it is, I probably will deem it admissible, but I don't see anything --

MR. BENTON: And my purpose of voir dire is to establish a foundation so I can at least make the record to argue that this is not an exception as a medical diagnosis.

THE COURT: Do you want to do that outside of the presence of the jury right now?

MR. BENTON: I would, yes.

THE COURT: Okay, that is fine. How long are you going to need?

MR. HUGHES: She is here.

THE COURT: No, I am saying, how long will your voir dire be?

MR. BENTON: I don't think it is going to be 15 minutes maybe, so --

THE COURT: Okay. Are you going to be able to get her in?

MR. HUGHES: Yeah, I think we will, I think.

- - -

THE COURT: Ladies and gentlemen, we are going to take another 15-minute recess. Be back here at 3:45.

Do not discuss the case among yourselves. Do not permit anyone to discuss it with you or in your presence. It is your duty not to form or express an opinion in the case until it is finally submitted to you.

THE BAILIFF: All rise.

- - -

Thereupon, the jurors recessed to the jury room, and the following proceedings were held in open court outside their presence and hearing:

THE COURT: If you want to call your witness.

MR. HUGHES: Yes, Judge, I will get Ms. Diane Lampkins.

THE COURT: Come around here, this little maze. Raise your right hand.

(Witness sworn.)

All right. Have a seat. And how -- do you want to inquire?

MR. HUGHES: I think we can both voir dire the witness, Your Honor, if I can start and lay down

foundation and qualifications and Mr. Benton can follow up. Thank you, Your Honor.

- - -

DIANE LAMPKINS

Called as a witness for voir dire examination, being first duly sworn, testified as follows:

VOIR DIRE EXAMINATION

BY MR. HUGHES:

Q. Good afternoon, Ms. Lampkins.

A. Good afternoon.

Q. My name is Michael Hughes. I am an assistant prosecutor. I have a series of questions to ask you this afternoon.

Can you please state your first and last name for the record and spell both of those?

A. Diane, D-I-A-N-E, Lampkins, L-A-M-P-K-I-N-S.

Q. Ms. or Mrs. Lampkins?

A. Ms.

Q. Ms. Lampkins, can you talk briefly about your background, your education?

A. I have a Master's in clinical education and clinical social work.

Q. And do you have any licensure in the State of Ohio?

A. Yes, I am a LSW, licensed social worker.

Q. Since when or how long?

A. Oh, since Ohio -- at least 20 years, since I moved here.

Q. Were you involved in social work in this field before you moved to the Columbus area?

A. Yes.

Q. And for how long and what did you do?

A. In Michigan, since 1983.

Q. And what did you do in Michigan?

A. I have worked various jobs. Prior to coming to Columbus I worked with the Franklin County prosecutor -- no, the Wayne County prosecutor's office in Detroit.

Q. And then when you moved to Columbus, where did you work?

A. Hannah Neil Center for Children, St. Vincent's.

Q. And where else?

A. Children's Hospital.

Q. All right. Can you recall when you started at Children's Hospital what your role was there?

A. Forensic interviewer.

Q. Please describe that. What is a forensic interviewer, and how long have you been doing it?

A. Let's see. Over 10 years. Forensic

interviewer is a specially trained social worker or a clinical counselor who receives a week-long training on fact-finding interviews of children in regards to sexual abuse, physical abuse. You continue to get ongoing training every year.

And there is a certification that comes or a certificate you get at completion.

Q. How long have you been a person that interviews traumatized or abused kids?

A. Oh, since about 2000 and -- at least 10 years ago.

Q. About 10 years?

A. Yes.

Q. And all of this time at Children's Hospital?

A. Yes.

Q. And could you approximate how many of these interviews you have conducted?

A. Oh, hundreds.

Q. Hundreds?

A. Many. It is probably hundreds per year. There is like three interviews a day, so I would say, you know, 600.

Q. Hundreds?

A. Many hundreds, yes.

Q. Greater than 500?

A. Probably, yes.

Q. All right. What is the purpose of these interviews?

A. The purpose of it again is to be fact-finding, to provide information to the medical provider who is going to do their exam, medical diagnosis and treatment.

Q. How many people are part of this multi-disciplinary team?

A. There is the interviewer, there is a mental health advocate, Children's Services usually, and detectives and medical providers, so like five.

Q. Why don't five people just interview the same child five different times?

A. Research shows that it is traumatizing to re-interview children over and over. So that is why child assessment centers were created, to reduce the number of interviews, reduce the trauma of children having to tell their story over and over.

Q. Do you make that information available to law enforcement at their request or to provide it to assist them?

A. Yes.

Q. Do you do it for them or on their behalf where they tell you what to do in an interview?

A. No.

Q. In this particular case, did you conduct an interview of Perrion Thompson based on some revelations of sexual abuse?

A. Yes.

Q. All right. And did you follow all of the same protocols that you just described that apply to every other interview that you have conducted for medical diagnosis or treatment?

A. Yes.

Q. And have you testified before as an expert in the area of forensic interviewing of children?

A. Yes.

Q. Approximately how many times have you testified in that capacity?

A. About four or five.

Q. Have those been here in Franklin County?

A. Yes.

MR. HUGHES: So, Your Honor, at this time that concludes my voir dire of this particular witness for her qualifications.

THE COURT: Okay. Mr. Benton?

MR. BENTON: Thank you, Your Honor.

\- - -

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



VOIR DIRE EXAMINATION

BY MR. BENTON:

Q. Good afternoon. How are you?

A. Fine. How are you?

Q. Good, good. The purpose of a forensic interview is to gather facts to assist in a police investigation; is that a fair statement?

A. No.

Q. Do you interact with law enforcement with respect to your interviews?

A. Yes. They are in the room.

Q. Pardon me?

A. They are usually in the room watching.

Q. And these interviews when they are conducted are oftentimes conducted upon a request by law enforcement or a referral from law enforcement?

A. They can be referred any way, like pediatrician, you can self-refer; but Children's Services and the police will also make referrals, that is correct.

Q. And in your capacity, you said that you have a background in social work?

A. Yes.

Q. And that includes not only on your educational background, but also your experience and

certification?

A. Yes.

Q. You have no training in medicine?

A. That is correct.

Q. And you are not qualified to render a medical opinion?

A. That is correct.

Q. And you are not qualified to render a medical diagnosis?

A. Correct.

Q. And in the course of a forensic interview, you are gathering information, as you said, to avoid a child being interviewed by multiple people?

A. Yes.

Q. And that would include the police?

A. Yes.

Q. As relates to the interview that is the subject of this trial, do you have any idea as to whether or not the medical personnel or a doctor or a nurse relied upon your interview for purposes of forming a diagnosis?

A. Yes. So we take a break and we meet with the medical professional before they do the interview, I mean, before they do the exam to share the disclosure so they know how to proceed with the exam.

Q. Okay. And again, what you are sharing with them are the narratives provided by the child in response to questions that have been presented to them?

A. I am sharing, like, disclosures, like digital, genital, or if there is oral, I give that type of detail about what, you know, happened.

Q. And so your examination of a child assists police as well as medical personnel?

A. The information could assist in a further investigation.

Q. You talked about avoiding multiple interviews. That would also include interviews by law enforcement; am I correct?

A. Yes, it is to avoid them having to be interviewed by further people, law enforcement, Children's Services, people who are not trained.

Q. And this is pursuant to an investigation of an allegation of abuse?

A. Yes, the kids come there due to allegations. Sometimes it is witnessing or exposure to domestic violence. There is a number of reasons they come; but, yes, sexual abuse was this case.

Q. And in the course of this particular interview, this was pursuant to an investigation

initiated by the Columbus police department. Is that a fair statement?

A. So I can't recall who initiated it. So when I get the information, I get a notice to say, hey, I have a patient. And I don't know if it was Columbus police or not, to be honest.

Q. Let me ask it another way.

A. Okay.

Q. You would not conduct a forensic interview for a child coming into the hospital who claims of suffering from a broken leg from having fallen while playing, correct?

A. Correct.

Q. So it is not every situation involving a child's contact with medical personnel that would trigger your involvement?

A. Correct.

Q. Your involvement only comes into play when there is a potential for criminal prosecution; is that a fair statement?

A. No. So on the team that I work with, we work on a child abuse team. The doctors are in the hospital and they work on the child abuse team. Sometimes we will get cases where we are interviewing children for abuse, physical, witnessing a parent

being murdered. So whatever the child abuse team, along with any referrals can come in from the community. I can get a referral from a pediatrician's office.

Anyone can call and say, you know, "I have concerns something is happening." If it is reasonable to believe, our intake coordinator will schedule it. It is not just like for prosecution.

Q. The idea, though, is that these are interviews that are conducted with an eye towards the fact that it may involve some sort of court proceeding, whether it be in terms of juvenile court, criminal court, or dependency and neglect actions. Is that a fair statement?

A. It is not, because most of the times they don't go to court.

Q. They don't go to court because they are not substantiated?

A. I can't say why they don't go. A lot of times they just don't. I don't have -- it's not in my scope to say why they don't go. They just don't.

MR. BENTON: I have nothing further. Thank you, Your Honor.

THE COURT: All right. Do you want to just keep her here? Do you want to call her?

MR. HUGHES: I can call her as the first witness. She can stay as the first witness. Do you want to stay here or walk in in a grand entrance?

THE WITNESS: No.

THE COURT: Do we need to put anything on the record?

MR. BENTON: Well, your ruling.

THE COURT: She is permitted to testify.

MR. HUGHES: Judge, I won't belabor it, but I will have to go through all of those things in front of the jury again.

THE COURT: I know. I am very familiar.

THE BAILIFF: All rise.

\- - -

Thereupon, at 3:50 p.m., the jury resumed their seats in the jury box.

\- - -

THE COURT: Everyone can have a seat.

You can call your next witness.

MR. HUGHES: Thank you, Your Honor. The State will call Ms. Diane Lampkins to the stand.

THE COURT: Ms. Lampkins, will you raise your right hand?

(Witness sworn.)

Have a seat.

Counsel, you may inquire.

MR. HUGHES: Thank you, Your Honor.

- - -

DIANE LAMPKINS

Called as a witness by the State of Ohio, being first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HUGHES:

Q. Good afternoon, Ms. Lampkins.

A. Good afternoon.

Q. Can you tell the ladies and gentlemen here in the jury, spell your first and last name just for the record?

A. Diane, D-I-A-N-E, Lampkins, L-A-M-P-K-I-N-S.

Q. Ms. Lampkins, where do you work?

A. Nationwide Children's Hospital.

Q. How long have you worked there?

A. Thirteen years.

Q. I am going to approach with what has been marked as State's Exhibit 21. And do you recognize what that is?

A. Yes.

Q. And what is that?

A. It is a copy of -- actually, this is my resume.

MR. HUGHES: Permission to publish this, Your Honor?

THE WITNESS: Yes.

THE COURT: Well, you don't get to rule. I get to rule.

THE WITNESS: Oh, sorry.

MR. HUGHES: I thought she was saying yes, it is her resume.

Q. (By Mr. Hughes) All right. Ms. Lampkins, I am going to start at the last page of this document. Can you describe what is listed here? What is this? What do these three lines, "a member of the Professional Society on Abuse of Children," what is that about?

A. APSAC, that is the professional organization that provides ongoing training, mentorship under -- they have a professional conference every year. So it is an organization that supports child abuse.

Q. Supports child abuse?

A. Well, supports ending child abuse.

Q. What about the second line, Child Development Council, Franklin County Policy Council, what's that?

A. Policy Council is through Head Start, and they look at providing education, ongoing education

for parents whose children are in the Head Start program.

Q. Can you explain a little bit about Rise Sister Rise and your involvement?

A. Rise Sister Rise is a program in Columbus that is specifically targeted to reduce trauma to black girls. And so they look at increasing resilience. Rather than looking at girls that are traumatized, they help them to become resilient.

Q. How long have you been involved with that?

A. About six years.

Q. What is some of your background and experience related to your field of practice, starting back in 1989 through '92?

A. I was employed in the prosecutor's office in Detroit as a victim advocate, worked in a child abuse unit, worked in the Kids in Court program.

Q. And then after you left the Wayne County area in Michigan, did you come to Columbus?

A. Yes.

Q. And what did you do here?

A. I worked at Hannah Neil Center, which is a part of Star Commonwealth Schools; was also in Michigan and did foster care, training foster parents, provided supervision of children in foster care and

counseling.

Q. And then on to St. Vincent's, was it?

A. Yes.

Q. What did you do for St. Vincent?

A. For St. Vincent's, I worked in their Community in Schools program through several schools in Columbus, provided classroom support, counseling groups, things of that nature.

Q. At some point then did you make a move to Children's Hospital?

A. Yes.

Q. And describe that and what education you have that relates to what you do there?

A. I have a Master's degree in counseling, and I went to Children's Hospital to become a forensic interviewer, so I spent a week-long training at Cincinnati Children's in their program where they provided forensic interview training. And I have continued to keep up licensure training in that area.

Q. How many years have you conducted these sort of interviews with children?

A. At least 10 years.

Q. Do you have any licensure in Ohio?

A. I'm a licensed social worker for the State of Ohio.

Case: 2:22-cv-02229-MHW-MRM Doc #: 9-1 Filed: 09/15/22 Page: 145 of 205 PAGEID #: 644


Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Q. Describe to me a little bit about what your role is at Children's Hospital as a person who interviews children?

A. So with the forensic interviewer, I am given cases that involve physical abuse, sexual abuse, exposure to violence. And we interview the children to gather the information and share it with the medical team.

Q. And when you say, "we," are there other interviewers that work there that do the same thing that you do?

A. Yes.

Q. And how many are there?

A. There is currently about nine.

Q. Typically how many children do you see per week?

A. So typically about anywhere from 10 to 12.

Q. You, personally, of the nine?

A. So personally, I am no longer an interviewer. I'm a supervisor of the interviewers, so I don't see --

Q. Were you an interviewer back in 2013 when you were involved in this case that we have asked you to testify about?

A. Yes.

Q. But now you are in a management level position related to the forensic interviewing team?

A. Yes.

Q. Now as a manager of those people doing those interviews, what is the typical case load like per week?

A. Per week, again, they see about three cases a day each and sometimes more. So anywhere from 10 to 13 cases.

Q. A week?

A. A week.

Q. Per interviewer?

A. Per interviewer.

Q. And that would be about what you would have been doing in 2013, approximately?

A. Yes.

Q. Do you know how many interviews you conducted with children over your years just at Children's Hospital, not before then with other agencies?

A. I could say approximately. I would say around 600 or so.

Q. Probably 600 interviews with children? Have you testified before in the capacity as a forensic interviewer of children?

A. Yes.
Q. Approximately how many times?
A. Oh, many. I can't count.
Q. More than three?
A. Definitely.
Q. All right. In court?
A. Yes.
Q. Here in Franklin County?
A. Yes.
MR. HUGHES: Your Honor, at this time I would like to recognize Ms. Lampkins as an expert in the area of child forensic interviewing.
THE COURT: All right.
MR. BENTON: May we approach?
THE COURT: What?
MR. BENTON: May we approach?
THE COURT: You may.

- - -

MR. BENTON: Your Honor, I would have an objection to anyone being declared an expert. With the Court's declaration of a person being an expert, one, it gives the jury the impression that this person's testimony is somehow superior to any other testimony they might hear.
And secondly, with the Court's proclamation

of this person as an expert, it then suggests to the jury that the Court has somehow endorsed or supported the testimony that's being provided.

THE COURT: You don't need to even ask that question.

MR. HUGHES: Well --

THE COURT: Whether I declare her as an expert. You just --

MR. HUGHES: Well, I was asking that --

THE COURT: -- ask as to training, expert experience and so on. So --

MR. HUGHES: Well, I guess the question begs an answer.

THE COURT: You can still get into all of what she is doing. That is the only reason you ask that.

MR. HUGHES: Well, so there is a jury instruction specifically addressing expert testimony.

THE COURT: Well, she can come in as an expert.

MR. HUGHES: So the Court intends to include expert testimony in the jury instruction?

THE COURT: Yes. But I don't need to stand up in court and say -- in most civil cases they don't even want the judge to. They get mad.

MR. HUGHES: I understand that, Judge. Then I won't do that with the next witness. I didn't want to be excluded from having an expert witness instruction in.

THE COURT: They are all experts.

MR. HUGHES: Okay. Thank you, sir.

\- - -

THE COURT: You may continue.

MR. HUGHES: Thank you, Your Honor.

Q. (By Mr. Hughes) Ms. Lampkins, please continue to tell us a little bit about your experience, your training, your background.

You said you have interviewed hundreds of kids. When did you stop doing that on a daily basis and kind of moved to a management role?

A. In about 2015.

Q. So the last two years or so?

A. Yes.

Q. Can you explain that to the ladies and gentlemen here in the jury? What is the purpose of the Family Center for Safety and Healing as it relates to kids who have reported trauma of some kind?

A. So the purpose is to provide an assessment, and then from the assessment determine what type of treatment to reduce the trauma that children are

describing. So that once they are trying to go on with their lives, if they are able to cope in school and their daily functioning, to help them to learn how to deal with the trauma that they have experienced.

Q. When you say "trauma," could you define that term from your perspective as a treating --

A. Trauma could be anything that has resulted in an impairment in their normal functioning, whether it is stopping them from sleeping at night, causing difficulty eating, concentrating, focus. So it could be witnessing neighborhood violence. It could be sexual abuse. It could be witnessing domestic violence. It could be seeing someone hurt or harm their sibling, anything of that nature.

Q. So all of those sorts of trauma would fall under the care of Children's Hospital?

A. Yes.

Q. Not just children who have alleged sexual abuse or physical abuse, but a wide spectrum of trauma and abuse?

A. That is correct.

Q. I want to talk specifically then about an instance where you had an opportunity to conduct an examination with a child by the name of Perrion Thompson. Did you have an opportunity to review any

of those notes prior to today's testimony?

A. Yes.

Q. Do you review or create any medical records relating to your interaction with your patients?

A. Yes.

Q. And what do you do?

MR. BENTON: I object to the characterization, Your Honor, of medical records.

THE COURT: Overruled.

A. I provide a written or typewritten report and there is a recording, a video recording.

Q. Okay. And that would conclude then your participation in that particular patient's visit or treatment at Children's Hospital for your involvement?

A. Yes.

Q. And did you do that with Ms. Perrion Thompson?

A. Yes.

MR. HUGHES: Your Honor, at this point I would like to play that interview for the jury.

THE COURT: And I will note your objection.

You may.

MR. HUGHES: And for the record, I will mark it. It is also State's Exhibit 17, and it should be this computer right here. For the record, it is

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



approximately 38 minutes long.

MR. BENTON: Your Honor, approach?

THE COURT: You may.

- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

MR. BENTON: I just want to make sure the record is clear that my objection includes also the fact that this is not medical testimony. The State intends to call each of these girls to come testify. So they get the benefit of basically having the girls testify twice in the course of this trial, which is unfair to my client.

I also will point out to the Court that approximately seven minutes into this video, there is statements about a sister telling the mother about these accusations, and that sister once was the subject of one of the counts in the indictment, and that count has subsequently been dismissed. There is also a similar reference at about 33 minutes into this video.

So I don't think either one of us wants a mistrial if this jury hears about testimony from a third person not called to testify in this case as to

these accusations.

MR. HUGHES: I mean, it is a certified medical record. This witness would testify, I mean, it is part of --

THE COURT: It's hard to redact?

MR. HUGHES: The question -- I mean, I don't know what the response is. First of all, I would say it is non-testimonial, because it is actually, under 803(4), it is an exception to hearsay. It is non-testimonial in nature, so it's not testimony.

THE COURT: Yes, but it is other acts, I mean, under 404(B), isn't it, when you have got a third person --

MR. HUGHES: Well, it's not other acts. Mr. Benton had an opportunity to voir dire this witness about the importance. She talked about violence in the family, exposure to violence, and that includes siblings' exposure to violence.

THE COURT: How long is it?

MR. BENTON: It's about 38 minutes.

THE COURT: No, I know the tape; but where the Count 16 gal is on there? Is there any way we can redact it real quick? Do you know what he is referring to?

MR. HUGHES: I do.

THE COURT: That is the only issue. I am letting everything else come in.

MR. BENTON: And I shared this --

MR. HUGHES: Yes, he did.

THE COURT: Where are you --

MR. HUGHES: Tiona, I think, is a different argument. We will get to that later, but that is a whole separate issue.

MR. BENTON: Her sister is Kanijah.

MR. HUGHES: But Tiona's disclosure is about sexual abuse that occurred with the two of them together, in the bathroom together. So she is actually recounting what her and Kanijah, what was happening to them together, and that is a present sense impression.

THE COURT: I don't like Kanijah being involved in this at all. I mean --

MR. HUGHES: When it comes to Tiona, Tiona --

THE COURT: Perrion --

MR. HUGHES: Perrion is who we are talking about now.

THE COURT: I don't have a problem with that. I have a problem with Kanijah.

MR. HUGHES: Okay. When Tiona's interview

is played with the next witness, Kerri Marshall, this discussion is relevant -- and this part is left out, Judge. But this portion is happening to the both of them.

So after she says, the interviewer says, "You also said Kanijah told you that he touched her," and then she told us sometimes. Then, "me and Perri" -- the two of them are together in the bathroom. She is relating to the interviewer that her and Kanijah are both being abused in the bathroom by Mr. Almedom. She is not saying, "Kanijah told me this."

THE COURT: You also say, "Kanijah told me that he touched her."

MR. HUGHES: Correct. I don't disagree with that. But then the rest of this is actually part of a conversation about Tiona discussing when the two of them, her and Kanijah both being abused in the bathroom at the same time. So it is not something Kanijah said. It is something that actually happened to Tiona. But for that statement, I don't really disagree with 1602, but the rest of it is not in context.

So, I mean, I can turn that off, Judge, just hit the mute button.

THE COURT: Yes, but that's tomorrow, right?

MR. HUGHES: That's tomorrow.

THE COURT: I mean, we want to get this in.

MR. BENTON: With respect to the little sister --

THE COURT: That comes in, all Perrion's, as long as it doesn't deal with Kanijah. I don't know who's little sister or who's big sister.

MR. BENTON: Okay. The Court will note my objection.

THE COURT: Okay.

- - -

Thereupon, State's Exhibit No. 17, the forensic interview of Perrion Thompson by Diane Lampkins, forensic interviewer, was played for the jury, as follows:

FORENSIC INTERVIEWER: Perrion, my name is Diane.

PERRION THOMPSON: Okay.

FORENSIC INTERVIEWER: And I talk to young people like yourself about things that happen, so we're just going to talk today, okay?

A. Okay.

Q. When we are all done talking, you'll have a check-up with a nurse, but your mom can be with you.

They just do a head-to-toe check-up. They check your eyes, your ears, listen to your heart, check your whole body to make sure you're okay. All right?

But because what we talk about is really important, I take notes, so I'm going to write some things down. If you hear me get something wrong, I want you to correct me.

PERRION THOMPSON: Okay.

FORENSIC INTERVIEWER: To make sure I get it right. Like, if I had said, you told me you were 15 years old, what would you say?

PERRION THOMPSON: I'm 12.

FORENSIC INTERVIEWER: Thank you. I just want you to correct me and make sure I get things right. If I ask you anything today that you don't know the answer to, it's okay to say you don't know. I don't want you to guess. Only tell me things you know about.

PERRION THOMPSON: Okay.

FORENSIC INTERVIEWER: But if you do know, even if it's hard to talk about, I want you to try and tell me. And if you're having a hard time, I will try and ask it in a different way. Okay?

So tell me a little bit about, you know, you, what grade you're in, how old you are, before we

talk about why you're here. Okay?

So tell me a little bit about your family, too. I want to know a little bit about your family.

PERRION THOMPSON: Okay. Well, I go to CHATA, Columbus Humanities Arts and Technology Academy.

FORENSIC INTERVIEWER: Wow, that's a lot. What's it called?

PERRION THOMPSON: CHATA, Columbus Humanities Arts and Technology Academy.

FORENSIC INTERVIEWER: They call it CHAT?

PERRION THOMPSON: CHATA.

FORENSIC INTERVIEWER: CHATA for short. And what grade are you in there?

PERRION THOMPSON: Sixth.

FORENSIC INTERVIEWER: Sixth grade?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Tell me about that. Do you like it there?

PERRION THOMPSON: Uh-huh. I have lots of friends there. And my teacher there is very nice and understanding when I need help.

FORENSIC INTERVIEWER: That's good. How long have you been at CHATA?

PERRION THOMPSON: Since last year, August.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



FORENSIC INTERVIEWER: So you were there in fifth grade too?

PERRION THOMPSON: No. Sixth grade.

FORENSIC INTERVIEWER: So all of sixth grade?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Okay. You said August of this past --

PERRION THOMPSON: They had already started when we came. They started in August.

FORENSIC INTERVIEWER: Okay. And you're 12 years old, so that's sixth grade. Tell me about your family.

PERRION THOMPSON: My family? My mom is 29 and my sisters, my little sisters -- I have two little sisters. Tiona is nine and Kanijah is five. And they mean a lot to me.

FORENSIC INTERVIEWER: How do I spell Kanijah?

PERRION THOMPSON: K-A-N-I-J-A-H.

FORENSIC INTERVIEWER: And you said she is five and they mean a lot to you. Tell me about that.

PERRION THOMPSON: Well, I like having them around me. They make me happy.

FORENSIC INTERVIEWER: That's good. How

about -- what's your dad's name?

PERRION THOMPSON: Brad.

FORENSIC INTERVIEWER: Brad?

PERRION THOMPSON: And I have a little brother with him. His name is Skyler, and he's one.

FORENSIC INTERVIEWER: Is Brad's name Thompson?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: And Skyler --

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: -- Skyler is one?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: And do you know his mom's name?

PERRION THOMPSON: Candice.

FORENSIC INTERVIEWER: Okay.

PERRION THOMPSON: Everybody call her "Candi."

FORENSIC INTERVIEWER: Okay. So Skyler is one year old, and Brad. Is Brad the dad of Tiona and Kanijah?

PERRION THOMPSON: No.

FORENSIC INTERVIEWER: No? What's their dad's name?

PERRION THOMPSON: Tiona's dad's name is --

his short name was JR, but I think his first name is -- I forgot.

FORENSIC INTERVIEWER: We'll go with JR. That's okay if you don't know.

PERRION THOMPSON: And Kanijah's dad's name is Sakar.

FORENSIC INTERVIEWER: Sakar?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Okay. Do you guys have any pets or anything like that?

PERRION THOMPSON: No.

FORENSIC INTERVIEWER: No? Tell me something you like about your mom.

PERRION THOMPSON: That she's very loving and nice to me, and if I need to talk to her, I can talk to her.

FORENSIC INTERVIEWER: Okay. How about dad? What do you like about dad?

PERRION THOMPSON: He is very funny and he plays a lot. He makes me feel comfortable when I come and that I'm loved.

FORENSIC INTERVIEWER: That's awesome. Okay.

PERRION THOMPSON: I have dogs at his house.

FORENSIC INTERVIEWER: You do? What kind of

dogs do you have over there?

PERRION THOMPSON: I have a baby boxer. His name is Diesel. And then there is a poodle. Her name is Izzy.

FORENSIC INTERVIEWER: Izzy the poodle, and the boxer.

PERRION THOMPSON: And my stepsister, she has a cat, and her name is Little Mama.

FORENSIC INTERVIEWER: The cat?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Little Mama. So what's your stepsister's name?

PERRION THOMPSON: Destiny.

FORENSIC INTERVIEWER: Destiny.

PERRION THOMPSON: And my stepbrother's name is Elijah.

FORENSIC INTERVIEWER: Elijah? Do you know how old they are?

PERRION THOMPSON: Destiny is 15, I think, and Elijah is 11.

FORENSIC INTERVIEWER: Okay. And they live with Skyler, Candice and your dad?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Okay. And what happens to you, Perrion, if you get in trouble or

something?

PERRION THOMPSON: In trouble?

FORENSIC INTERVIEWER: Uh-huh.

PERRION THOMPSON: When I get in trouble my mom just tells me like, she tells me not to do it again and I get consequences of like I don't get to play on my games or something like that.

FORENSIC INTERVIEWER: Okay. Lose some privileges?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Do you ever get a spanking or whipped or anything like that?

PERRION THOMPSON: If I do something really bad.

FORENSIC INTERVIEWER: Like really bad? Okay. And who would spank you?

PERRION THOMPSON: My mom.

FORENSIC INTERVIEWER: Okay. What kinds of -- what would she spank you with?

PERRION THOMPSON: Just like she would hit my hand or something like that.

FORENSIC INTERVIEWER: With her hand?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Okay. Have you ever seen grownups fighting or hurting each other?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



PERRION THOMPSON: No. My mom would fight some before with her boyfriend, the one she used to be with. He would just try to push her and she would walk away.

FORENSIC INTERVIEWER: Okay.

PERRION THOMPSON: That's all.

FORENSIC INTERVIEWER: Okay. And talk to me a little bit about why you're here today.

PERRION THOMPSON: Because the man my mom lived with before she found out that he used to touch me and stuff and tried to make me feel like I was his girlfriend and everything.

FORENSIC INTERVIEWER: Tell me about that.

PERRION THOMPSON: He tried -- he has touched me and tried to get me to show him my body parts and stuff. He's -- has sexual intercourse with me. He's made me -- forced me to when he said threatening things to me, that he would kill my parents and my sisters and my uncle, and I'm really close to my uncle. And so he tried to -- he said he would kill them if I spoke up or anything.

FORENSIC INTERVIEWER: Okay. And tell me, who is this person?

PERRION THOMPSON: Sefe. His name is Sefe.

FORENSIC INTERVIEWER: Sefe?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: And how do you know Sefe?

PERRION THOMPSON: He was my mom's boyfriend before we told our mom.

FORENSIC INTERVIEWER: And when was that?

PERRION THOMPSON: I think -- I'm not sure, because my little sister told my mom and then my mom came to me.

\- - -

MR. BENTON: Objection.

THE COURT: Overruled.

\- - -

FORENSIC INTERVIEWER: Okay. So about --

PERRION THOMPSON: I'd say two weeks ago, I want to say.

FORENSIC INTERVIEWER: Maybe two weeks ago? You say maybe two weeks ago?

So your little sister told?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Which little sister?

PERRION THOMPSON: Tiona. She told that he was touching me and her, so my mom told -- we got out of the house and then she started asking us more questions. And when she found out what happened, she

made a police report about it and they told us --

FORENSIC INTERVIEWER: So Tiona told your mom, and your mom questioned you guys about it and then the police came?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Okay. Who told the police, your mom or --

PERRION THOMPSON: Me and my mom.

FORENSIC INTERVIEWER: You and your mom?

PERRION THOMPSON: Uh-huh. They -- she called them and told them -- asked them what she did and stuff, what she has to do, and then they came out and they asked us questions, what he did and stuff.

FORENSIC INTERVIEWER: Okay. So the police came?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: And were you guys still at home or somewhere else?

PERRION THOMPSON: We had went to a hotel to get away from him, from his house.

FORENSIC INTERVIEWER: Okay. So it was his house?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Okay. All right. And tell me what you told the police.

PERRION THOMPSON: I told them that he started, like when I was like ten, he would try to start it slowly and slowly. He would blow kisses at me and stuff, and then he would start touching my breasts, and then he moves his finger in me and stuff, and then he just started doing sexual intercourse.

FORENSIC INTERVIEWER: Okay. So you said in the beginning when you were ten --

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: -- it was just like blowing kisses --

PERRION THOMPSON: Yeah, and he would kind of look at me weird, like he liked me and stuff and flirty.

FORENSIC INTERVIEWER: So he would look at you weird like he liked you?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Okay. Now, when you say flirty, like, what would he do?

PERRION THOMPSON: He would wink at me sometimes.

FORENSIC INTERVIEWER: Okay. Were there other things that happened?

PERRION THOMPSON: Yes. He just did the same thing over and over. He would blow kisses at me

and then he would -- he would -- sometimes he woke me up in the middle of the night, 2:00 in the morning there, and tried to make me do nasty things with him.

FORENSIC INTERVIEWER: Tell me about that.

PERRION THOMPSON: That's when he made me -- he would make me take all my clothes off and he would just have sexual intercourse with me.

FORENSIC INTERVIEWER: So he would wake you up in the middle of the night. Tell me like -- so what was the first thing you remember when he would wake you up?

PERRION THOMPSON: He would just wake me up, whisper in my ear so that he didn't wake my little sisters up, because we all slept in the same bed in the room. And then he would tell me to come downstairs. Then I would get scared and stuff and try to tell him, "No, get away from me."

And then he would threaten me and stuff, like saying he would kill my parents, and if I didn't, he would hurt my sisters if I didn't and stuff.

FORENSIC INTERVIEWER: So he said he would kill your parents?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Or hurt your sisters?

PERRION THOMPSON: Uh-huh. And he said he

would kill our mom while we were asleep.

FORENSIC INTERVIEWER: Okay. Tell me, when he would say that, tell me what would he say?

PERRION THOMPSON: He would tell me, he would say, "If you don't, I'm gonna kill your parents and everybody that's close to you." And he would just keep threatening me.

FORENSIC INTERVIEWER: Okay. So when you said he would whisper in your ear, what would he say?

PERRION THOMPSON: He would tell me to wake up with him, "It's me," and stuff. And then I would look up and I would be scared, and then he would pull me, like do this to my arm like this, and make me come.

FORENSIC INTERVIEWER: Okay. And you said you would go downstairs?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Tell me like what was downstairs?

PERRION THOMPSON: In the living room. In the living room on the couch.

FORENSIC INTERVIEWER: Okay. And what happened down there?

PERRION THOMPSON: That's when he made me undress myself, and he would push me down on the couch

and then he would get on me and start.

FORENSIC INTERVIEWER: So he would make you get undressed? Like, tell me about that.

PERRION THOMPSON: Like he would keep threatening me, threatening me. Sometimes he would just pull my clothes off.

FORENSIC INTERVIEWER: Okay. This is still when you were ten?

PERRION THOMPSON: No, it happened through -- to up until my mom found out. So, 10, 11 and while I was 12 some.

FORENSIC INTERVIEWER: Okay.

PERRION THOMPSON: And then that's when my mom found out.

FORENSIC INTERVIEWER: Okay. So the stuff you talked about, him pushing you down on the couch and pulling you, making you take your clothes off or him taking them off, do you think you're still ten, or were you another age?

PERRION THOMPSON: Eleven, I'd say around 11.

FORENSIC INTERVIEWER: Eleven? Okay. And you said he would do what else to you?

PERRION THOMPSON: That's when he would get on top of me and stuff and make me -- he would cover

my mouth and I would be scratching him, pushing him and everything, trying to get him off of me, and trying to get my sisters to wake up and stuff. And he would always cover me to keep the sound from traveling --

FORENSIC INTERVIEWER: And so he would cover your mouth?

PERRION THOMPSON: -- and stuff, and he would get covers and put them over me, over him and stuff and over me.

FORENSIC INTERVIEWER: Okay. How about his clothes? What -- what would he --

PERRION THOMPSON: Yeah, he took all of his clothes off most of the time.

FORENSIC INTERVIEWER: I know you talked about your sisters being there. Was anybody else in the house?

PERRION THOMPSON: No.

FORENSIC INTERVIEWER: No? Where would your mom be?

PERRION THOMPSON: She would be at work.

FORENSIC INTERVIEWER: Okay.

PERRION THOMPSON: But sometimes she would be at the grocery store or she would go out and get her hair done sometimes.

FORENSIC INTERVIEWER: Okay. So this time when -- these times when you talk about he would make you go downstairs on the couch and he would get on top of you --

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: -- is his body doing anything to your body?

PERRION THOMPSON: Yes.

FORENSIC INTERVIEWER: Tell me about that.

PERRION THOMPSON: He would make his -- his middle part, he would put it in me and stuff, and then he would start moving.

FORENSIC INTERVIEWER: So you say he would put his middle part --

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: -- in you?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: And start moving?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Where does he put his middle part?

PERRION THOMPSON: Inside my middle part.

FORENSIC INTERVIEWER: Okay. Would he do other things to your body?

PERRION THOMPSON: He would touch my boobs.

FORENSIC INTERVIEWER: Touching your boobs?
PERRION THOMPSON: Uh-huh.
FORENSIC INTERVIEWER: What does he touch it with?
PERRION THOMPSON: His hands.
FORENSIC INTERVIEWER: Okay. What would happen next?
PERRION THOMPSON: Then after he was done, he would just make me go back, put my clothes on and leave, tell me to go.
FORENSIC INTERVIEWER: And like how -- when you said he was done, like, how would you know he was done?
PERRION THOMPSON: He would move off of me and go to the bathroom.
FORENSIC INTERVIEWER: Okay. I'm going to show you a picture of a girl. It is a picture -- and this girl doesn't have clothes on. When you say your middle part, I want to make sure I know what you are talking about. So this is the back and this is the front. Can you show me where --
PERRION THOMPSON: Here.
FORENSIC INTERVIEWER: Right here?
PERRION THOMPSON: Uh-huh.
FORENSIC INTERVIEWER: Okay. Do you have

any other names you call that?

PERRION THOMPSON: My pee-pee.

FORENSIC INTERVIEWER: Okay. I've heard that. And I'm gonna show you a boy, because you also said his middle part, so I want to make sure that we're talking about the same part. This is the back and this is the front. Can you show me on here?

PERRION THOMPSON: This.

FORENSIC INTERVIEWER: And do you have a name for that?

PERRION THOMPSON: Middle part, or pee-pee.

FORENSIC INTERVIEWER: Okay. Pee-pee or middle part. Okay. And I know you talked about -- so you said it went inside of you?

PERRION THOMPSON: Yes.

FORENSIC INTERVIEWER: Tell me about that. Like --

PERRION THOMPSON: It was -- he would just move that and stuff, and then it would hurt me.

FORENSIC INTERVIEWER: Did it hurt you?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Did you ever feel or see anything come out of his middle part?

PERRION THOMPSON: No, I never felt anything, but when he would move, there was stuff come

out of it.

FORENSIC INTERVIEWER: When he would move?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Tell me about that.

PERRION THOMPSON: It would just -- there was stuff -- it was like liquid stuff come out.

FORENSIC INTERVIEWER: And where would the liquid stuff go?

PERRION THOMPSON: On his stomach or he would put it on his hand like that.

FORENSIC INTERVIEWER: Show me that again. You said on his stomach or what?

PERRION THOMPSON: He would push his middle part towards his stomach so it gets on him or he would put it in his hand.

FORENSIC INTERVIEWER: In his hand?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Would he ever say anything when he was doing this or any sounds or any -- what do you remember about the stuff?

PERRION THOMPSON: Nothing. He would just do it and then when he was done, he would run to -- go to the restroom, the bathroom and stuff and I would hear water running.

FORENSIC INTERVIEWER: How long do you think

it would last?

PERRION THOMPSON: For like a couple of minutes.

FORENSIC INTERVIEWER: Do you know if he ever had anything on his pee-pee, like --

PERRION THOMPSON: No. I know that he just had -- like there would be like wet stuff or oily stuff.

FORENSIC INTERVIEWER: So wet stuff?

PERRION THOMPSON: Uh-huh. That he would put on before he put his middle part in.

FORENSIC INTERVIEWER: Did you ever see him put the stuff on there? Tell me about that.

PERRION THOMPSON: There was bottle of stuff that said K-Y something, K-Y jelly.

FORENSIC INTERVIEWER: K-Y jelly?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: And where would the bottles of that be?

PERRION THOMPSON: He would put them in the -- there's a cabinet that he had. He would get them out of there.

FORENSIC INTERVIEWER: Okay. So there is K-Y jelly. Were there other bottles of stuff?

PERRION THOMPSON: (Shakes head.)

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



FORENSIC INTERVIEWER: Okay. And so you told me about this would happen. Did it happen any place else besides the couch --

PERRION THOMPSON: No.

FORENSIC INTERVIEWER: -- downstairs? Okay. And you said this would happen for a few minutes. So after this he would run to the bathroom, and then what would --

PERRION THOMPSON: Before he would go he would tell me to put my stuff on and go back upstairs.

FORENSIC INTERVIEWER: Okay. Okay. Are there other times that things happened that was different than this?

PERRION THOMPSON: No.

FORENSIC INTERVIEWER: How often did something like that happen to you?

PERRION THOMPSON: On his old house on Beachworth, it happened mostly every night.

FORENSIC INTERVIEWER: On Beachworth?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: It was mostly every night?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: And when you say, "mostly every night," what was he doing on Beachworth?

PERRION THOMPSON: The same thing. That's when he would wake me up on school nights, sometimes on the weekends and make me come downstairs with him.

FORENSIC INTERVIEWER: Uh-huh. And you said your mom would be --

PERRION THOMPSON: At work.

FORENSIC INTERVIEWER: -- at work. Do you remember where she worked at?

PERRION THOMPSON: I think it was -- I don't remember where she worked at at that time.

FORENSIC INTERVIEWER: Okay.

PERRION THOMPSON: But the second place was our house that we had moved out of to his house because we had -- she said she had got evicted, my mom, her note on the door had said it, so we moved into his house with him.

FORENSIC INTERVIEWER: And so it happened at your mom's house?

PERRION THOMPSON: Yes.

FORENSIC INTERVIEWER: What happened --

PERRION THOMPSON: It happened once at my mom's house. And at that time she was working at Broadview -- it was called Broadview Health and Rehabilitation Center at the time, but they changed their name and now I don't know the new name of it.

FORENSIC INTERVIEWER: Okay. So one time at that house when she worked there. Do you remember that house address?

PERRION THOMPSON: It was 877 East Dublin-Granville Road, and our number was Apartment E.

FORENSIC INTERVIEWER: Apartment E?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: So tell me about when it happened at that place.

PERRION THOMPSON: The same thing. He would make me come down when they weren't around or anything, or we had a computer at the time, and he would make them -- he would tell them, "Look at the computer and don't look back at me or anything," or they would get in trouble if they look or anything. And he would make me sit on the couch by him and he would do it that way, too.

FORENSIC INTERVIEWER: So sometimes they would be in the room?

PERRION THOMPSON: Yes.

FORENSIC INTERVIEWER: Tell me about that.

PERRION THOMPSON: We were in the living room and the TV was on, and then he told them to play games on the computer and stuff and he made me lay in front of him and he pulled my pants down and stuff and

he did it.

FORENSIC INTERVIEWER: So you would lay in front of him?

PERRION THOMPSON: He would make me lay in front of him.

FORENSIC INTERVIEWER: Is this still on the couch or tell me about that.

PERRION THOMPSON: Yes. On the couch in the living room, because that's where the computer was.

FORENSIC INTERVIEWER: In the living room?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: What about clothes and, like was your clothes on, or --

PERRION THOMPSON: Yeah, I would have my shirt on, and he would make me pull my pants down to my ankles or sometimes just take one leg out.

FORENSIC INTERVIEWER: So he would pull your pants down to your ankles or make you take one leg out?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: What about his clothes?

PERRION THOMPSON: He would do the same.

FORENSIC INTERVIEWER: And so you're on the couch. Could they see, like, what you guys were

doing, or --

PERRION THOMPSON: No, because he told them to -- don't look at him or me.

FORENSIC INTERVIEWER: To don't look?

PERRION THOMPSON: Or they would get in trouble.

FORENSIC INTERVIEWER: And did they know what was going on?

PERRION THOMPSON: I'm not sure.

FORENSIC INTERVIEWER: You said the TV's on?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: And they are playing games?

PERRION THOMPSON: On the computer.

FORENSIC INTERVIEWER: So are you just there with your shirt on and your pants down --

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: -- or is there other things, is there -- I know you said before that he had -- did you tell me he would cover up or something?

PERRION THOMPSON: Yeah. He would put a cover over him and me so that they couldn't see anything.

FORENSIC INTERVIEWER: So when this is happening, is he still doing things to your body?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Tell me about that.

PERRION THOMPSON: He would still make -- enter his middle part into mine.

FORENSIC INTERVIEWER: So -- but you're in front of him?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: And so how is he doing that?

PERRION THOMPSON: He would make me lift one of my legs up and do it that way.

FORENSIC INTERVIEWER: And you said his -- so his middle part, the one you told me was the pee-pee --

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: -- it was going inside of your middle part, your pee-pee?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Has his pee-pee touched any other parts of your body?

PERRION THOMPSON: No.

FORENSIC INTERVIEWER: Okay.

PERRION THOMPSON: Well, yeah, actually he has made me put his middle part in my mouth before.

FORENSIC INTERVIEWER: You said he made you

put his middle part in your mouth?

PERRION THOMPSON: Uh-huh. And I would try to move and he would force my head down so I couldn't move it out. He would hold my neck and my head.

FORENSIC INTERVIEWER: And so tell me about that. Is this when -- at the same time this other stuff is happening, or --

PERRION THOMPSON: No. At my mom's house where he had came before he -- that's where he just did the thing, made me lay in front of him. But at his old house he would make me -- he would do the thing where he made -- entered his middle part into me, or he would -- or he would make me put his middle part in my mouth or he would just do both.

FORENSIC INTERVIEWER: Okay. So sometimes he would do both. And you said he would hold your neck and your head. Like how would he do that?

PERRION THOMPSON: Like this, with force and stuff so I couldn't move my head at all. And sometimes he would make -- he would just grab my hand and make me touch his middle part.

FORENSIC INTERVIEWER: Okay. Can you show me, like how he would grab your hand?

PERRION THOMPSON: Like he would pull my hand like this, and then put my hand in his pants.

FORENSIC INTERVIEWER: He would take your hand --

PERRION THOMPSON: Yeah. Pull my hand like this with his, and then he would make me put my hands in his pants.

FORENSIC INTERVIEWER: Into his hand?

PERRION THOMPSON: Huh?

FORENSIC INTERVIEWER: He would take your hand?

PERRION THOMPSON: Uh-huh. And then pull it and put it in his pants.

FORENSIC INTERVIEWER: In his pants?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: So when your hands were in his pants, are you feeling his middle part --

PERRION THOMPSON: Yeah, he would make me.

FORENSIC INTERVIEWER: -- on top of -- he would make you do that?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Would you feel it like on underwear or is it like --

PERRION THOMPSON: No. Inside. It was without --

FORENSIC INTERVIEWER: So you're feeling skin?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Tell me about that.

PERRION THOMPSON: He would just make me move my hands like this (indicating).

FORENSIC INTERVIEWER: Like this (indicating)?

PERRION THOMPSON: Yes. Up and down.

FORENSIC INTERVIEWER: And like how long would that last or --

PERRION THOMPSON: For a while. Long periods of time.

FORENSIC INTERVIEWER: Long periods of time? Like how did it stop?

PERRION THOMPSON: He would just have me go back to where I was sitting. Then it was something like, he would tell me, "Let's go," or something.

FORENSIC INTERVIEWER: Did you ever feel or see anything come out --

PERRION THOMPSON: No.

FORENSIC INTERVIEWER: -- of his middle part when you did that?

PERRION THOMPSON: No.

FORENSIC INTERVIEWER: No? What about when he would hold your neck and your head and put it in your mouth, did you ever feel or see anything come

out?

PERRION THOMPSON: I felt stuff come out before.

FORENSIC INTERVIEWER: Tell me about that.

PERRION THOMPSON: It would just come out and then have -- it would -- then it would feel like liquid stuff and it would taste nasty. I could taste it. It was nasty.

FORENSIC INTERVIEWER: So there was liquid stuff?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Can you describe it, or --

PERRION THOMPSON: It was just nasty.

FORENSIC INTERVIEWER: Did you ever see it? Tell me about that.

PERRION THOMPSON: Yes. It was just like the same stuff that came out after he was done entering the middle part into me. He would move when he said -- he said he felt he about to cum or something like that. He would move -- he said he would move before he came, he would cum.

FORENSIC INTERVIEWER: And what would you see?

PERRION THOMPSON: Stuff squirting out.

FORENSIC INTERVIEWER: And you said it was liquid stuff. Do you remember what color or what it --

PERRION THOMPSON: Kind of like a weird yellowish, like dirty yellowish color.

FORENSIC INTERVIEWER: Okay. And is that the same stuff you said that was nasty that would sometimes be in your mouth?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Okay. How many times did something like that happen?

PERRION THOMPSON: I'd say probably about like five times.

FORENSIC INTERVIEWER: Like five times where it would be in your mouth?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: When's the last time something happened?

PERRION THOMPSON: The last time was my mom had went to get her hair done, and it was like two weeks before my sister told. That's when he would -- he entered his male part into me. Because my little sisters had fell asleep, so he -- and we all fell asleep, and then I woke up and he was up and I tried to act like I was asleep again so he wouldn't touch

me. And he saw me, I guess, and he made me come over there with him.

FORENSIC INTERVIEWER: And where did he make you go?

PERRION THOMPSON: On the couch, on the opposite couch of where me and my sisters were.

FORENSIC INTERVIEWER: So this was still in the living room?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: You said your mom had went to get her hair done?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: So was it like a school day or a weekend?

PERRION THOMPSON: No, it was on the weekend. I think it was a Saturday. She had went to go get her hair done and she also went to take her resume, I think it was, to a job that she had recently filled out an application on.

FORENSIC INTERVIEWER: Okay. So this was like daytime?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: You were on the couch?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: And he --

PERRION THOMPSON: Me and my sisters were all on one couch, and like this was the couch we was on and then there was a couch over there, like that.

FORENSIC INTERVIEWER: Okay. So they are on the opposite side. Okay. You said that he saw you was woke and he made you come.

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: And what did he do that day?

PERRION THOMPSON: He made me pull -- the same thing, pull my pants down and get under cover with him and then he entered his middle part into me.

FORENSIC INTERVIEWER: Okay. I know you told me about him making you touch his middle part. Did he ever do other touches to your body?

PERRION THOMPSON: Yes. He would just -- he fingered me, he did it with his hands. He said he would put his hands into me.

FORENSIC INTERVIEWER: Tell me about that.

PERRION THOMPSON: He just did -- he kept putting his hands in and out like that.

FORENSIC INTERVIEWER: His whole hand or --

PERRION THOMPSON: Sometimes his whole hand or just like two fingers.

FORENSIC INTERVIEWER: Sometimes whole hand and sometimes fingers?
PERRION THOMPSON: Uh-huh.
FORENSIC INTERVIEWER: You said two fingers?
PERRION THOMPSON: Uh-huh.
FORENSIC INTERVIEWER: And were there any kisses or anything like that?
PERRION THOMPSON: Yes, he did kiss me. He has kissed me.
FORENSIC INTERVIEWER: Tell me about that.
PERRION THOMPSON: Well, he kissed me on his lips and tried putting his tongue in my mouth one time.
FORENSIC INTERVIEWER: Did his tongue ever go in your mouth?
PERRION THOMPSON: Yes, but I had bit him and moved.
FORENSIC INTERVIEWER: Okay. And you told me about him touching -- did you say he touched your boobs or he asked to see them?
PERRION THOMPSON: He would touch them.
FORENSIC INTERVIEWER: He would touch them?
PERRION THOMPSON: Uh-huh.
FORENSIC INTERVIEWER: Tell me --
PERRION THOMPSON: Make me pull my shirt up

and my bra and my T-shirt, all my shirts that I had on, he would make me pull it up and then he would touch them.

FORENSIC INTERVIEWER: So he's touching you on skin?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Besides his hand, has anything else ever touched your boobs?

PERRION THOMPSON: No.

FORENSIC INTERVIEWER: Okay. Has something ever touched or went inside your butt?

PERRION THOMPSON: No.

FORENSIC INTERVIEWER: Okay.

PERRION THOMPSON: He has -- with his hands he has just touched my butt. Other than that, nothing --

FORENSIC INTERVIEWER: His hands just touched your butt?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: On top of your clothes or skin?

PERRION THOMPSON: Sometimes it would be skin and sometimes it would just be clothes.

FORENSIC INTERVIEWER: So when he's touching your butt, like what's his hands doing?

PERRION THOMPSON: Just rubbing my butt.

FORENSIC INTERVIEWER: Rubbing?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Okay. And I know you told me about the threats. Did he ever say anything else? I know you talked about him saying he would flirt with you?

PERRION THOMPSON: Yeah, he said that he would kill my uncle and everybody that I really, really loved.

FORENSIC INTERVIEWER: Your uncle and everybody close to you?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Did he ever tell you he did this to anybody else?

PERRION THOMPSON: No. He used to say things like he -- he said -- he used to say things -- he would tell stories like he had fought people before, he used to kill animals back in -- when he was a little kid in Africa or stuff.

FORENSIC INTERVIEWER: So he would tell stories about killing animals --

PERRION THOMPSON: Animals.

FORENSIC INTERVIEWER: -- in Africa?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Okay. Did he ever give you gifts or --

PERRION THOMPSON: No.

FORENSIC INTERVIEWER: -- like money or anything like that for --

PERRION THOMPSON: No. He's gave me money before, but my mom knew about it. He told my mom to give me $20 before because my dad, he was supposed to pick me up one day, but he had got called in to work, so -- he lives in Cincinnati, so it takes him awhile to get here, so he said he didn't -- he would have been late to work and probably got in trouble for that.

He said he would come pick me up another day. And so he had, I guess he had to know about it, so he -- I guess he had knew about it and so he told my mom to give me that because he felt bad that my mom had said that it happened to me because he saw that I was sad. I was crying.

FORENSIC INTERVIEWER: Okay. But no other time?

PERRION THOMPSON: Huh-uh.

FORENSIC INTERVIEWER: Is there anything else about what happened that you think is important that I didn't ask?

PERRION THOMPSON: (Shakes head.)

FORENSIC INTERVIEWER: No? So your mom found out because your sister told?

PERRION THOMPSON: Yes.

\- - -

MR. BENTON: Objection.

THE COURT: Overruled.

\- - -

FORENSIC INTERVIEWER: And had your sister ever said anything to you about it?

PERRION THOMPSON: No.

FORENSIC INTERVIEWER: Had you ever seen him do anything to her, or --

PERRION THOMPSON: One day I did. I saw -- me and my little sister, Kanijah, we were walking -- we were coming -- she had went downstairs and I was playing with Kanijah's hair, I was just playing with her hair, like brushing it and stuff.

And then we had went down there, and then when we went down there, she kind of jumped and moved, and then it looked like she was pulling her pants up in the back or something.

FORENSIC INTERVIEWER: How long ago do you think that was?

PERRION THOMPSON: It was at his new house

on the lake -- on Eastland on the Lake.

FORENSIC INTERVIEWER: Eastland on the Lake?

PERRION THOMPSON: Uh-huh. And the address was, I think, 4519 Lakeside Street South.

FORENSIC INTERVIEWER: Okay. Is that where you guys were staying before your mom left?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Okay. So what happened at that house?

PERRION THOMPSON: The same thing. He would ask me to do more if my mom ever went to work or she left to get her hair done or something, that's when he would try to do it.

\- - -

MR. BENTON: Approach?

THE COURT: Do you want to stop it?

(Tape paused.)

\- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

MR. BENTON: I just want to make sure I didn't miss anything. When she talked about coming downstairs and seeing her sister jump up and pull her pants, it is your understanding she is referring

to who?

MR. HUGHES: I don't know. I would have to listen to it.

MR. BENTON: Because if that was a reference to -- and I don't remember either.

THE COURT: Her sister, too?

MR. HUGHES: Yeah, her little sister.

MR. BENTON: Right. So if it was a reference to her sister and that is not what the reference was to Kanijah, that is another issue. I think it was in reference to Tiona, but I would like to have the opportunity, I mean, at the break to review that again.

THE COURT: Okay. She is coming back tomorrow.

MR. BENTON: And if there is a reference to Kanijah, then I would move to strike that portion of the videotape.

THE COURT: Okay. I don't know who -- I mean, she said "sister." To me, that's all I know.

MR. HUGHES: I mean, the cure is to ask Perrion when she testifies if she remembers seeing her sister being abused, and who was it.

MR. BENTON: Well, I mean, that is not a cure, but --

THE COURT: And then after you play this tape, are you going to have any further questions?

MR. HUGHES: No. I am just going to ask her about what the middle parts mean, to define penis and vagina for --

THE COURT: Okay. Make it quick.

MR. BENTON: Well, are you asking her to interpret what the child meant?

MR. HUGHES: Yes, that is her job.

MR. BENTON: It's not her job to testify what she means.

THE COURT: Are you moving the diagrams?

MR. HUGHES: No, but it is an element of the offense. It involves a penis and a vagina and it is part of what she testified about.

MR. BENTON: If the question is what did the child know about that, that is for the child to testify to as to what she meant by a middle part.

MR. HUGHES: She indicated it --

THE COURT: She circled something.

MR. HUGHES: Yes.

- - -

Thereupon, the playing of State's Exhibit 17, the forensic interview, resumed as follows:

FORENSIC INTERVIEWER: Most of it happened

on Beachworth? Okay. Besides what you told me about Sefe, has someone else ever done things to you --

PERRION THOMPSON: No.

FORENSIC INTERVIEWER: -- or tried to touch you, or -- no? Okay. Has someone ever tried to show you pictures or movies of people like naked with no clothes on?

PERRION THOMPSON: He's tried to show me porn before, but my little sisters had walked by or whatever and he tried to say he was showing me a jacket or something.

FORENSIC INTERVIEWER: Tell me about that, when he tried to show you porn.

PERRION THOMPSON: So I was in the kitchen and washing my dishes, and he was on the computer and my mom was at work. And my sisters were in the living room watching TV. And he had said, "Perri, come here. I want to show you a jacket on there."

And I came because I thought it was really a jacket, and then it had -- I saw a picture of a naked person, so I just walked back away, and then that's when my sister came, and they said they wanted to see it, and he jumped up and tried -- he hid the computer screen and exited out of it.

FORENSIC INTERVIEWER: Because they came and

they wanted to see it?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Okay. Is that the only time?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: And when was that? Do you remember?

PERRION THOMPSON: On Dublin, 877, in that house.

FORENSIC INTERVIEWER: Okay. Okay.

PERRION THOMPSON: And the only thing, none of his friends tried to touch me, but there was a -- his name was Isaac, it's kind of like his brother. He had left, I think he had left his wallet or something in our house. And I had saw it, and my mom was in the shower, so I ran out there before he left, because him -- Mr. Sefe was walking him out, saying bye to him, so I ran it to him. And he kind of said like a flirty comment to me. He said that if I was grown, I wouldn't even know, or something like that. And he said I was beautiful.

FORENSIC INTERVIEWER: So Isaac kind of flirts with you?

PERRION THOMPSON: Uh-huh. That was the only time he said something. But other than that,

he's never looked at me weird, never tried to touch me or anything.

FORENSIC INTERVIEWER: Okay. And only that one time you think you saw -- was it Tiona jump?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: And that was the only time you've ever seen anything?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Okay. I don't think I have any other questions, Perrion. Do you have questions for me? No?

It is really important, like you guys told your mom, if somebody ever else -- anyone else tries to touch you, even if they tell you they are going to hurt you or threaten you, that you tell somebody you can trust, like someone at school, you can tell a teacher or -- are there other people you think you can trust that you can tell? Like besides your mom, like, who else could you tell?

PERRION THOMPSON: My mom told me, she said text my dad and tell him to try to --

FORENSIC INTERVIEWER: Text your dad?

PERRION THOMPSON: -- so he can tell my mom.

FORENSIC INTERVIEWER: Okay.

PERRION THOMPSON: She said if I don't feel

comfortable, to tell the principal or somebody at school that I feel comfortable with.

FORENSIC INTERVIEWER: Okay. A principal is a good person.

PERRION THOMPSON: She said -- she said or if we're ever out of the house away from that person, like at the store or something, to tell her then.

FORENSIC INTERVIEWER: Tell her at a different time?

PERRION THOMPSON: Uh-huh.

FORENSIC INTERVIEWER: Okay. That is a good, if you can tell, like you said, your dad. As long as you have somebody that you know you can tell.

I'm going to see if the doctor is ready for you checkup. Do you want your mom with you for your checkup? It doesn't matter. Okay. I'll be right back, and then we'll get you scheduled for your check-up. Thank you for talking to me.

PERRION THOMPSON: You're welcome.

FORENSIC INTERVIEWER: Okay? I'll be right back. Do you want a piece of paper to draw or write? No? Okay. I'll be right back.

- - -

Thereupon, the videotape concluded.

- - -

Q. (By Mr. Hughes) All right. Ms. Lampkins, was that a true and accurate copy of the interview you conducted of Perrion Thompson?

A. Yes.

Q. Okay. Just a few follow-up questions. One of those is why do you ask such open-ended questions, like, "tell me about that" and, "what happened?" Why do you ask those type of questions?

A. So that they can fill in, it is not leading, so they can tell their story.

Q. And do you recall a portion during your interview when the child referred to a middle part?

A. Yes.

Q. Can you explain to the jurors that process or procedure as it relates to forensic interview techniques and why you ask children what terms they use and identify with those?

A. Yes. So children often are not comfortable using anatomical parts, and they will use terms that they have been told. And so we will often use a drawing to help just verify that they are talking about the part that I think they are talking about.

Q. Is it common for children to use, I guess, other words to describe anatomical parts?

A. Yes. We have heard everything from

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



"butterfly" to (inaudible), whatever parts they have been told. So they will use different names for body parts and have nicknames for body parts as well.

Q. Why is it important for you to clarify what they are talking about?

A. So that the doctor knows when they are doing the examination what part of the body to treat or explore and check out.

Q. Do you use that same terminology that the child uses to refer to those body parts?

A. Yes.

Q. Why?

A. So that they feel comfortable talking about -- and they have given that disclosure, and it is their disclosure.

Q. And in this case, did you clarify what "middle part" meant with Ms. Thompson?

A. Yes.

Q. And how did you do that?

A. I used an anatomical drawing.

Q. And when you used the drawing of the female body, what part did she indicate to you was the middle part?

A. The vagina.

Q. All right. Did you produce and show her an

anatomical drawing of a male or a boy?

A. I did.

Q. And did she describe what she called a middle part in that drawing?

A. Yes, the penis.

MR. HUGHES: Thank you. No other questions.

THE COURT: Ladies and gentlemen, we are going to take our break this evening. Do not discuss the case among yourselves. Do not permit anyone to discuss it with you or in your presence. It is your duty not to form or express an opinion in the case until it is finally submitted to you. Go have a good evening.

THE BAILIFF: All rise.

(Thereupon, the jury exited the courtroom.)

THE COURT: Ms. Lampkins, we get to see you again tomorrow. Sorry. We will start up at 9:00 then.

Do we need to put anything on the record?

MR. HUGHES: Not this evening, no, Your Honor.

THE COURT: Have a good evening.

- - -

Thereupon, at 4:45 p.m., Tuesday, July 18, 2017, the further trial of this cause was adjourned until Wednesday, July 19, 2017 at 9:00 o'clock, a.m.

\- - -