Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858





IN THE COURT OF COMMON PLEAS OF FRANKLIN COUNTY, OHIO

CRIMINAL DIVISION

- - -

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff, | : | |
| vs. | : | Case No. 13CR-1858 |
| Sefe A. Almedom, | : | Volume 2 |
| Defendant. | : | Pages 206 - 389 |

- - -

TRANSCRIPT OF PROCEEDINGS

Before Hon. David C. Young, Judge, and a jury, duly impaneled and sworn, on Wednesday, July 19, 2017.

- - -

APPEARANCES:

Michael T. Hughes, Assistant Prosecuting Attorney,
On behalf of the State of Ohio, Plaintiff.

Frederick D. Benton,
On behalf of Sefe A. Almedom, Defendant.

*LINDA S. SHUPE, RPR, RMR*
*Assistant Official Court Reporter*
*(614) 525-4434*

Case: 2:22-cv-02229-MHW-MRM Doc #: 9-2 Filed: 09/15/22 Page: 2 of 184 PAGEID #: 706

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



**INDEX TO THE WITNESSES**


| CALLED BY THE STATE: | PAGE |
|---|---|
| **DIANE LAMPKINS** | |
| Direct Examination by Mr. Hughes (7/18/17) | 141 |
| Cross-Examination by Mr. Benton | 210 |
| Redirect Examination by Mr. Hughes | 216 |
| **GAIL HORNOR** | |
| Direct Examination by Mr. Hughes | 232 |
| Cross-Examination by Mr. Benton | 254 |
| Redirect Examination by Mr. Hughes | 273 |
| Recross-Examination by Mr. Benton | 276 |
| **SHATYRA HENDERSON** | |
| Direct Examination by Mr. Hughes | 288 |
| Cross-Examination by Mr. Benton | 325 |
| Redirect Examination by Mr. Hughes | 379 |
| Recross-Examination by Mr. Benton | 383 |


- - -

**INDEX TO THE EXHIBITS**


| STATE'S EXHIBITS | | IDENTIFIED | ADMITTED |
|---|---|---|---|
| 23 | Gail Hornor C.V. | 233 | |

- - -

| DEFENDANT'S EXHIBITS | | IDENTIFIED | ADMITTED |
|---|---|---|---|
| B | Property inventory report | 223 | |


- - -

Wednesday Morning Session,
July 19, 2017,
9:20 a.m.

- - -

Thereupon, the further trial of this cause was resumed pursuant to adjournment.

- - -

THE COURT: Back on the record, 13CR-1858, State of Ohio versus Sefe Almedom. Is there anything we need to put on the record prior to bringing in the jury?

MR. HUGHES: Not at this time. I think Diane Lampkins is here.

MR. BENTON: Yes, Your Honor. The Court may recall I approached the bench with an objection or at least a concern as to whether or not the portion of the recorded interview related to comments from the youngest child, Kanijah.

In reviewing my notes and also based upon the later comments that were made within that same interview, I'm satisfied that the references to the report being made by the younger sister was a reference to Tiona. So I just want to clarify that for the record.

THE COURT: Okay. Go get the jury.

Ms. Lampkins, do you want to come on up and we will get you all situated?

THE BAILIFF: All rise.

\- - -

Thereupon, the jury resumed their seats in the jury box.

\- - -

THE COURT: Everyone can have a seat. Everyone have a good evening last night?

THE JURY: Yes.

THE COURT: Good. It's starting to get hot out there for the Jazz and Rib Festival.

You are still under oath, Ms. Lampkins.

Any cross-examination?

MR. BENTON: I believe Mr. Hughes didn't finish.

MR. HUGHES: Yes, Your Honor, I did finish my direct.

MR. BENTON: You did?

\- - -

CROSS-EXAMINATION

BY MR. BENTON:

Q. Ms. Lampkins, good morning.

A. Good morning.

Q. The interview that this jury saw yesterday

was what I believe you characterized as a forensic interview?

A. Yes.

Q. Okay. And you are, as a licensed social worker, both by virtue of your education, training and practice, are an experienced forensic interviewer?

A. Yes.

Q. This was not a medical exam, this was an investigative interview. Is that a fair statement?

A. Not investigative, but fact-finding, yes.

Q. And, in fact, I believe the tape mentioned that or showed where you mentioned to the child that there would be a later exam conducted by medical personnel; is that correct?

A. Yes.

Q. And so when the prosecutor references your medical records, these were not medical records that you had compiled, these were your notes based upon that interview; is that a fair statement?

A. Those are my notes, but it is considered a part of the medical records.

Q. Your notes, themselves, are not considered a medical record; is that a fair statement?

A. My notes, yes, because I am not a medical professional; but it goes under medical records.

Q. It goes to somewhere else that is part of a larger set of records. Is that a fair statement?

A. It is attached with the medical providers, the other social worker notes, yes.

Q. And so from your examination, you don't provide a diagnosis?

A. No.

Q. Okay. You don't prescribe medication?

A. No.

Q. You don't engage in any treatment?

A. That is correct.

Q. Okay. Now, in this interview you have, I believe you said there were other folks that were involved in observing the interview?

A. Yes.

Q. And that would include law enforcement?

A. Yes.

Q. At the time that this interview was taking place, you were aware that there was an ongoing police investigation relating to the subject matter, the person that you were dealing with; is that a fair statement?

A. No. So every time we assemble, potentially there's police. Sometimes there isn't. So I never know if there is going to be an investigation or not.

Q. Well, on this particular occasion --
A. I was not aware.
Q. You were not aware that the police were reviewing this?
A. I knew they were present observing, yes.
Q. Okay. Now -- and again, you are saying that you are engaged in a fact-finding process?
A. Yes.
Q. This is not designed to cross-examine the child?
A. Correct.
Q. But you are interested in any information that might be relevant to your investigation; is that a fair statement?
A. In my assessment, yes.
Q. Would it be relevant to you as to -- and as you heard said, that there were different locations in which these alleged events were to have taken place, would it have been important to you to know relative to your assessment or your evaluation who might have otherwise occupied those, been occupants at those locations?
A. No.
Q. So it would not be of any relevance to you that there may have been other individuals who were

staying at these locations?

A. No.

Q. It would not have been relevant to you or would it have been relevant to you as to whether or not this young lady was subject to some associated influence that might serve to cause these accusations to come about?

A. In terms of, like, alcohol? No.

Q. No, no, no, no, no. I am speaking, say, for example, in all of the -- I think you said you did something like 600 interviews?

A. Right.

Q. Have you ever had an occasion in which during those interviews you uncover information either at the time or later where the child was making accusations because there is some sort of conflict within the home?

A. So, I don't have to determine whether it is true or not. That is not a part of my role.

Q. Okay. You just take at face value what is being said to you?

A. Yes.

Q. And whether or not those statements are being made because they are influenced by some sort of a motivation perhaps maybe to lie, that is not your

responsibility to assess?

A. That is not my responsibility.

Q. And do you as part of your assessment, do you engage in any process that would require you to corroborate what is being said?

A. No.

Q. So again, for the most part your job is done once that interview has been completed; is that a fair statement?

A. That is right.

Q. And then whatever happens from there is --

A. I never know.

Q. You don't even know?

A. I don't.

Q. And whether it is true or whether it is false, that is a determination for other people to make. Is that a fair statement?

A. That is true.

MR. BENTON: Okay. Thank you very much, Your Honor.

THE COURT: Any redirect?

MR. HUGHES: Two notes.

- - -

REDIRECT EXAMINATION

BY MR. HUGHES:

Q. Ms. Lampkins, you indicated that you took some notes during the course of this interview.

A. Yes.

Q. And did you ultimately take those notes in the interview and then type them up into some written report?

A. Yes.

Q. And in that written report did those pages within the written report contain a MRN number?

A. Yes.

Q. And what does a MRN number stand for if it is found on the pages in your report?

A. Medical record number.

Q. And the children that you interview, including Perrion Thompson, are they compelled to sit through this interview with you?

A. No.

Q. Can a child choose not to do this interview?

A. Certainly. A lot of them do.

Q. Did Ms. Perrion Thompson ever stop the interview?

A. No.

Q. Did she indicate to you that she didn't want

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858





to talk to you about what had happened?

A. No.

MR. HUGHES: No other questions. Thank you.

THE COURT: All right. You can step down. Thank you.

(Witness excused.)

MR. HUGHES: Your Honor, if I may check to see if my next witness is here, and then I would like to approach the bench, please.

THE COURT: All right.

- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

MR. HUGHES: Judge, I am going to call Gail Hornor, the forensic nurse now. I told her 9:40 to 9:45. She is not outside yet, but actually we would like to address something with the Court relative to Detective Phillips' testimony yesterday and some of Fred's questions.

THE COURT: Okay. I will take a break.

- - -

THE COURT: Ladies and gentlemen, as I said, unexpected things happen. We are going to take a 15-minute break and so we will come and get you.

Hold on. Do not discuss the case among yourselves. Do not permit anyone to discuss it with you or in your presence. It is your duty not to form or express an opinion in the case until it is finally submitted to you.

THE BAILIFF: All rise.

- - -

Thereupon, the jurors exited the courtroom and the following proceedings were held in open court, in the presence of the defendant:

THE COURT: Everyone can have a seat.

MR. HUGHES: Judge, if I may go on the record, after yesterday's proceedings, I was working in my office. I left my office around 6:30 to 7:00, and I received a phone call from Detective Phillips. He had actually texted me earlier and said, "call me when you get a chance," and I returned his call. He just testified yesterday.

He indicated to me in a phone call that after Mr. Benton had cross-examined him about underwear -- you may recall that -- he decided to go back and look through his files since it has been so many years. And he, in fact, did discover a sheet where after Mr. Almedom had been convicted, the property was destroyed.

So I think that is important to bring to Mr. Benton's attention and also the Court's attention. And the detective came back this morning. I don't know how that changes things, but in the interest of full disclosure, the detective brought that to my attention and I want to bring that to the Court's attention this morning.

THE COURT: So all of the evidence that they -- the vodka bottle and all that --

MR. HUGHES: Correct, has been destroyed. There is a sheet indicating, I think, looks like July 13 of 2015, it updates the status to destroy, updated on 7-31, '15.

THE COURT: Mr. Benton?

MR. BENTON: Your Honor, at this time, in light of this, I would move for a mistrial. The detective testified that if there were an item, a garment -- and I specifically asked him about underwear, as to whether or not that would be a significant piece of evidence with respect to his investigation.

With this item having been destroyed -- I mean, I was always under the impression these items were never collected. So now I am learning for the first time not only were they collected, but now they

have been destroyed. Had I been made aware that they were collected, I would have certainly had requested an opportunity to have those items or clothing examined by a DNA expert to make an assessment as to whether or not there was any relevant evidence that could be obtained from those items. I cannot make that assessment. That is potentially exculpatory evidence typically to show -- potentially exculpatory evidence for a variety of different reasons.

My client's right to a fair trial and due process has now been irreparably harmed because of the fact that these items were destroyed. So I am compelled in the interest of my client's right to a fair trial and his right to due process and the effective assistance of counsel to move that the Court declare a mistrial over the destruction of this evidence.

THE COURT: Hold on. Did he collect underwear? I just thought whatever he collected --

MR. HUGHES: Apparently he did, yes, Your Honor. The record shows that he did collect underwear, never submitted it for testing. And after the conclusion of the case and the conviction, and I guess a year or two had lapsed, then he -- I don't know what his role was in having it destroyed or not,

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



but it was destroyed after the conviction in the case.

DETECTIVE PHILLIPS: That is correct.

MR. BENTON: Your Honor, you know, obviously this is a very serious matter. Quite honestly, I would like even more time to be able to research this issue to further supplement any concerns or arguments. But that is my position at this point in time, Your Honor. I am asking the Court for a mistrial.

THE COURT: Anything on behalf of the State of Ohio?

MR. HUGHES: No. I mean, the fact speaks for itself. Again, the detective contacted me and indicated that at the expiration of the case the items sat in property.

THE COURT: What are the items? I don't know.

MR. HUGHES: It indicates three pair of underwear. And it appears there is a property sheet, letter sent to owner, January 3rd, 2015. And here it says, "status, destroyed, July 13 of 2015."

THE COURT: Was the collection given over in discovery?

MR. HUGHES: I don't believe that it was, Your Honor.

MR. BENTON: No, no.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



MR. HUGHES: I don't think it is listed on an inventory sheet, no.

MR. BENTON: And, Your Honor, I will point out --

MR. HUGHES: The detective is here for the Court to do whatever.

THE COURT: It is what it is, I mean.

MR. BENTON: Your Honor, again, I was just handed these documents here today. But if -- I believe, Your Honor, that if I am not mistaken, the appellant filed his notice, Mr. Almedom filed his notice of appeal on June 10th of 2017 -- that is not correct.

MR. HUGHES: The conviction was returned on April 24th of 2014.

MR. BENTON: The notice of appeal was filed September 10th, 2015. It appears these items were destroyed.

MR. HUGHES: We had to file a notice within 30 days. It wouldn't have been a year-and-a-half later.

THE COURT: I will let you guys figure that out.

MR. BENTON: It appears that the items were destroyed on July 13, 2015.

THE COURT: Okay.

MR. BENTON: And I would like to mark these documents as an exhibit.

THE COURT: All right.

MR. BENTON: And this would be property inventory report number 130-06559. And attached to this would be a form, well, property number -- they all bear the same property number. But it is a three-page document that is also recorded as part of this document. So I would mark this as Defense Exhibit, I think, A. I don't think I have anything else.

THE COURT: Okay. Just mark them Defendant's Exhibit A.

MR. BENTON: I think I did mark an A. Let me mark this Defendant's Exhibit B.

(Brief recess taken.)

THE BAILIFF: All rise.

THE COURT: Everyone can have a seat. What is the State's position as to this? Do you agree with the mistrial, or -- I am going to, for the record, not find it was purposely done on behalf of the prosecuting attorney.

MR. HUGHES: Well, that is the State's position, Your Honor, as I mentioned. It is an

accurate summary. This just came to my attention. I am obviously obligated to bring it to the Court and defense attorney's attention.

The State's argument would be, Your Honor, that a mistrial is not warranted. Again, I have not really had adequate time to prepare this or research it. But my view on the subject is these particular items were apparently at some point in the custody of the police officer, police department. I don't dispute that. They were at the officer's discretion not tested, for whatever purpose. They were subsequently destroyed.

I think the defense counsel's argument is that they could have been tested and they could have had exculpatory, you know, evidence in them, presumably or speculatively. Well, that's actually true of any -- there is nothing -- if you look at the case and the evidence presented, the lack of this item does not inculpate or exculpate the defendant. It doesn't have a bearing on guilt or innocence.

If, in fact, this item -- there are many items that could be tested. I mean, the detective could have seized every clothing item in that house and tested it.

My understanding is that these items

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



received by the detective, the mother, like, just showed up and dropped it off to them or handed it to them personally. He did not get these items as pursuant to a warrant. He did not get these items when he executed the warrant, and that somehow the mother provided them to him during the course of the case. And that is why they were not in the normal course or chain of, I guess, custody or business in the matter.

So the State's argument is, Your Honor, that the absence of these particular items does not bear on guilt or innocence. Assuming, arguendo, Mr. Benton's position calls for an immense amount of speculation. If you look at the evidence that's been presented in the case, and the subsequent evidence will be the same, which is the testimony of the sister and the interview of the sister, which is pretty much exactly what the Court has already seen. That comprises the entire evidence in the case.

Additionally, as Mr. Benton brought up with the detective, other items were taken in this case, including a blanket and some items from the home, and the detective indicated that in his experience, he would expect to find the defendant's DNA present in other items in the house because they all lived

together. It is not uncommon -- I mean, you can put your underwear off on the floor in a room that has your skin cells on it. It is called transference, and your DNA will end up on somebody else's underwear. And I have had defendants argue that in other cases, where their DNA is present in a child's underwear. So I don't believe that has a bearing, its entire absence. So that would be the State's position in this case, Your Honor. Thank you.

MR. BENTON: Your Honor, first I would say that, obviously, this is a very critical, important matter. I certainly would like at least a few hours to be able to research this, consult with some other individuals with respect to how to respond to this matter and certainly appropriately document it.

Having said that, the State's argument is in and of itself speculative. For the State to say, well, it is a matter of speculation as to the importance of this, and the fact that it would not be exculpatory is a matter of speculation on the State's behalf.

It also contradicts the detective's testimony. He said if you had an item of undergarment as it relates to a charge of sexual assault, rape, gross sexual imposition -- I believe those were my

specific points that I made in my question to him -- he said that would be a critical piece of evidence for purposes of his investigation. So if the detective terms it would have been critical, for the State to now try to water that down and say, well, no harm, no foul, essentially it is simply just a matter of speculation, is incorrect.

The other thing is, is that this is also a matter of a Brady violation. Because, again -- it's certainly a Rule 16 violation because the acquisition of the underwear was never disclosed to counsel. So it is not about counsel speculating as to what would have been done. Counsel could not have acted without knowledge that these items of property were, in fact, seized by the detective. And certainly that would have granted us the opportunity to seek leave to have these garments. Even though it was never submitted by the State for purposes of examination, that doesn't tie the defense's hands in terms of their opportunity in preparing the defense to have these undergarments examined.

So again, it is a matter of speculation on the State's behalf, not on the defense's behalf in terms of how they would have responded had it been disclosed that these items were, in fact, secured.

And by the State's own admission, they were not disclosed as part of the discovery in this case. So you have evidence that the lead detective says would have been important. You have an item that has not been disclosed. And now they are told that this matter has been destroyed, but it is no harm, no foul.

Your Honor, we do believe that a mistrial is warranted in this cause. And again, if the Court would indulge counsel, I would like until maybe 1:30 to further research this, to provide the Court with further documentation.

THE COURT: You know, I am going to at minimum allow you to obviously recross, open up the cross-examination of Detective Phillips. I don't know the answer as to whether -- I do not believe that Mr. Hughes purposely intended to have a prosecutor intentionally try to mistry this case, whereby jeopardy may or may not attach. I don't know. I don't know the answer to those questions.

If I grant the mistrial, I don't know whether jeopardy attaches or doesn't attach in this matter. Obviously I will give you what time you need in order to prepare, but maybe Detective Phillips will be available tomorrow.

MR. HUGHES: I am sure he is, Your Honor.

THE COURT: You can talk to whatever colleagues. I had to go talk to other judges on this issue, not having had it before me. And I will give you whatever time necessary to prepare on this matter, and I am going to reserve my ruling as to the motion for mistrial at the present time. Maybe we can get more facts out. But make Detective Phillips at least available either today -- I think you are going to need more time to research it.

MR. BENTON: I think so, Your Honor.

THE COURT: And so at least make him available tomorrow and Friday if we need to.

MR. HUGHES: Yes, Your Honor.

THE COURT: And that should give you adequate time and also give me and my staff attorney adequate time to research the issue.

MR. BENTON: Thank you, Your Honor. Appreciate it.

THE COURT: All right. Is Ms. Hornor here yet?

MR. HUGHES: She is here, yes.

THE COURT: We will proceed with trial and know that this issue is out there.

MR. HUGHES: All right, Your Honor. The State is prepared.

MR. BENTON: I guess I am trying to figure out how I am going to have the time to research if we are still in trial.

THE COURT: All night. I have been a trial lawyer.

MR. BENTON: Well, I am saying, part of my concern, my thought is I would like to consult other counsel regarding this, and I don't know that I will be able to do so, but, I mean --

THE COURT: Obviously, we just proceed and then give you the opportunity at lunch and then all tonight to meet with anybody; because, you know, I am leaving for Florida next Tuesday.

MR. HUGHES: There isn't a reason the Court can't revisit this issue tomorrow and make its ruling. And if it's a mistrial, it's a mistrial. But if it is not, then we are ready to work.

THE COURT: But you obviously can get your staff and find out the issue as to what a proper response is. But do you need time right now?

MR. BENTON: I mean, because I don't have staff that I can say research this for me while I am in trial. The prosecutor has that advantage, and that is my concern.

THE COURT: I understand your position. I

have been in your position. We will proceed. If we need to break early today, we will break early today.

MR. HUGHES: Thank you.

THE COURT: Go get the jury.

THE BAILIFF: All rise.

\- - -

Thereupon, the jury resumed their seats in the jury box.

\- - -

THE COURT: Everyone can have a seat. You can call your next witness.

MR. HUGHES: Thank you, Your Honor. The State will call Gail Hornor to the stand.

THE COURT: Good morning. Raise your right hand.

(Witness sworn.)

You may proceed.

MR. HUGHES: Thank you, Your Honor.

THE COURT: You may inquire.

MR. HUGHES: Thank you, Your Honor.

\- - -

GAIL HORNOR

Called as a witness by the State of Ohio, being first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HUGHES:

Q. Good morning, ma'am.
A. Hi.
Q. Can you tell the ladies and gentlemen here in the jury your full name and then also spell that for the court reporter?
A. Gail Hornor, H-O-R-N-O-R.
Q. And your first name?
A. Gail, G-A-I-L.
Q. Not Y-L-E?
A. No.
Q. Ms. Horner, can you tell us a little bit about where you work?
A. I work at Nationwide Children's Hospital in the Center for Family Safety and Healing, and then also part of my time is in the emergency department coordinating a team of sexual assault nurse examiners.
Q. And how long have you worked at Children's Hospital as an employee there?
A. I have worked at Children's Hospital for 37 years.

Q. I am going to approach you with a document marked as State's Exhibit 23 and ask if you can identify that?

A. This is my curriculum vitae.

Q. Would that contain your background, education, and qualifications?

A. Yes.

MR. HUGHES: All right. Permission to publish, Your Honor?

THE COURT: You may.

MR. BENTON: Objection.

THE COURT: Counsel approach?

\- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

THE COURT: Did you need to voir dire her?

MR. BENTON: No, no, but I would object to the publication of the C. V.

THE COURT: I will note that. Overruled.

\- - -

THE COURT: You can continue.

MR. HUGHES: Thank you, Your Honor.

Q. (By Mr. Hughes) All right. I am going to direct your attention to page 1 here. Can we talk a

little bit about your education and background, please? I am going to move it so your address isn't public.

A. Yes. I have a diploma in nursing from Mount Carmel School of Nursing, a Bachelor's in nursing from Franklin University, a Master's in nursing from Wright State University, a post Master's certificate to practice as a pediatric nurse practitioner from Ohio State University, and a Doctorate of Nursing Practice from Ohio State University.

Q. And what sort of licensure do you have in the State of Ohio?

A. I have a license to practice as a registered nurse and also a certificate of authority to practice as a nurse practitioner.

Q. All right. There are some letters behind your name, including RNC. What does that stand for?

A. Registered Nurse Certified.

Q. And what about DNP?

A. Doctor of Nursing Practice.

Q. And what about CPNP?

A. Certified Pediatric Nurse Practitioner.

Q. And what about S-A-N-E hyphen P?

A. Sexual Assault Nurse Examiner-Pediatrics.

Q. Can we talk a little bit about your

experience as it relates to pediatric treatment and/or conducting sexual assault examinations on children, your experience related to that?

A. Oh. I have examined over 3,000 children where there has been a concern of sexual abuse or physical abuse, primarily sexual abuse, both in our Child Advocacy Center and also when it was an outpatient clinic that has kind of evolved into the Child Advocacy Center, and also in the emergency department.

Q. All right. And have you testified about those previous examinations of children?

A. Yes, I have.

Q. And approximately how many times have you testified in a court of law regarding this area of examining children?

A. Probably well over 300, if not in the 400s.

Q. In your entire lifetime practice?

A. Yes, yes, yes.

Q. With that, Ms. Hornor, I'm going to ask you specifically about some children that you would have seen or examined in 2013. Are you familiar with the case for which you are here for to testify about today?

A. Yes.

Q. Did you have an opportunity to review those children's medical records prior to coming into court today?

A. Yes, I did.

Q. All right. Can you explain for the ladies and gentlemen of the jury what is the purpose of conducting a medical exam on a child that relates trauma?

A. Well, our assessments are kind of multi-disciplinary. And you heard from Diane Lampkins, who is a forensic interviewer, so that piece is important to know what the child is saying what happened to their body, so that when myself or one of the other medical providers performs a physical exam, we know, that information guides, for instance, do we need to test for sexually transmitted infections. Because in knowing, like, if a penis went in the mouth, the vagina or an anus, then we know we need to test for sexually transmitted infection.

So the medical assessment consists of a head-to-toe physical exam. You are looking in the eyes, the ears, listening to the heart, and also a look at the, for a little girl, a look at the outside of her vagina and the outside of her anus. We use an instrument that is called a colposcope that kind of

magnifies things so that you can more clearly see if there is any kind of trauma, any bruising, any tearing, any scarring. So that is the main part of the medical assessment.

But, honestly, 99 percent of the time the purpose is to reassure the child and their parent or caregiver that despite what has happened to them, that their body is normal. Because certainly the majority of the time their bodies are going to be normal after what happened to them, so we can provide reassurance that despite what has happened, their bodies look normal.

Q. Is there a difference between treating an emergency or an emergent care case or something you would describe as acute versus a latent disclosure?

A. Yes. If a child presents to care within 72 hours of the latest incident of sexual abuse, then it would be important for us to gather forensic evidence, to complete a rape evidence kit looking for semen, saliva or cells from the perpetrator's body or the child's body or clothing.

But after 72 hours, if it has been more than 72 hours since something has happened to the child, many studies have shown there is no point in collecting evidence because you are not going to find

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858





anything, it has washed off or worn off of the body.

Q. Is that standard practice or protocol that if that abuse is disclosed outside of that window or having occurred outside of that window, the evidence is not collected?

A. Yes.

Q. So in this case with Perrion Thompson, was an evidence collection kit administered?

A. No. It was not.

Q. Do you recall Ms. Perrion Thompson's birth date or how old she would have been when you saw her?

A. Perrion was 12.

Q. At 12 years old can you explain what is happening in a young girl's body involving the presence of estrogen and changes at that point in a woman's life?

A. Certainly. Perrion had started having periods when she was 11. And so estrogen had been released, and it had been released prior to age 11, because estrogen is actually released and you see changes in the hymen or the tissue around the opening to the vagina, like even a couple of years before a girl actually starts having periods.

So estrogen is released, really kind of preparing the body for sexual activity. So this

estrogen, when talking about the genital area, it makes the hymen and the other genital structures more elastic, lets it stretch without tearing. It also makes it such that you can touch the hymen and the genital structure and it doesn't hurt. Prior to the release of estrogen, it does hurt if you touch a hymen. So this estrogen is kind of preparing the body for sex. So it makes all of the structures more elastic, makes it less sensitive to touch, no longer hurt.

And, in fact, I have examined more adolescent girls, like pregnant adolescent girls that I have examined, more of them have normal hymens and genital structures than those who have tears or scarring of the hymen.

Q. Let's talk a little bit about that hymen. Is that just -- is that a solid or a semi-permeable membrane that covers the entire opening to the vaginal cavity?

A. No. Everyone should be born with a hymenal opening. It is kind of a ring of tissue around an opening to the vagina. In fact, you can be born without an opening, and then that is a problem. You have to -- because then when you get older and you start having periods, then the menses can't escape

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858





from the body. So there actually has to be a surgical procedure performed so that girls can have normal periods.

So the typical, the normal presentation is that there is a hymenal opening.

Q. So as a medical provider, can you simply look at a vaginal cavity and tell if that person has ever experienced penetration or not, or if they might, quote, be a virgin or not?

A. No. I mean, there are times when there are tears of the hymen, missing tissue of the hymen.

Q. And what would that be indicative of if you saw tears and missing tissue?

A. Penetration.

Q. Okay. Can you have penetration and not have these traumatic tears or portions gone from the hymen?

A. Oh, the majority of the time you do. If you look at the literature, less than 10 percent of children who are sexually abused have any physical findings, any missing hymen or tears of the hymen or any of the other genital structures on exam.

Now, if you examine them within, excuse me, 72 hours of the latest incident, that number will go up to about 20, 21 percent of the kids will have physical findings that are diagnostic of penetration.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



And we see this in the patients that we see in the emergency department, because we are seeing them within 72 hours, and then we typically have them come back to the Child Advocacy Center in two weeks just to make sure that things are healing.

For instance, a few months ago I saw a ten-year-old little girl in the emergency department.

MR. BENTON: Objection.

THE COURT: Basis?

MR. BENTON: Hearsay.

THE COURT: Overruled.

A. I saw a ten-year-old little girl --

MR. BENTON: Relevancy, Your Honor. May I approach?

THE COURT: Yes.

- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

MR. BENTON: Your Honor, objection both as to relevance and also hearsay. She previously testified and I believe she is going to recount again about having an experience with a ten-year-old girl she saw in the emergency room which was less than 24 hours from when she was abused; how the child gave a

history of her uncle, who was an adult male, put his penis in her vagina. So that she was seeing her within 24 hours and that she had clear evidence of penetration, her hymen was torn, there was bruising and it was swollen; there was a little bit of leaking. None of that has any relevance to this case.

THE COURT: How does that relate to this case? I don't know what the --

MR. HUGHES: I mean, I think as an expert in this area, she is going to opine about personal instances where she has observed children who received trauma that she has been able to look at.

THE COURT: I assume there is no evidence of any trauma in this case?

MR. HUGHES: That is correct. And that child subsequently appeared to be healed on the next visit or a month later. And so it is not normal -- I mean, she has personal experience of seeing torn hymens and then months later, there is --

THE COURT: I don't think that goes to a hearsay exception and that is the reason I overruled it.

MR. BENTON: It goes to the issue of relevancy. And assuming that it is relevant, I think that the risk of prejudice and compromising my

client's right to a fair trial is certainly an issue.

She has already testified that she has had examinations of when there has been no evidence of physical trauma. I don't think she needs to go into this level of detail in order to continually --

THE COURT: I think as an expert she is going through her basis for forming an opinion or not opining as to the issue. I am going to overrule it, but keep it narrow and do not get into that.

\- - -

MR. HUGHES: May I continue, Judge, then? Thank you.

Q. (By Mr. Hughes) Ms. Hornor, we sort of left off with my question about any personal experiences that you may have had. And you don't have to, I guess, pick a particular patient or a particular person. But if you could opine based on your general experience, have you treated children who you have personally observed what you would describe as acute trauma?

A. Oh, yes, girls.

Q. And would that include tearing as you described it earlier or some injury having occurred within a short period of time, let's say, 72 hours?

A. Tearing and bruising, yes.

Q. All right. Have you in your experience then had an opportunity to have subsequent follow-up visits or treatments with that same patient at a later date?

A. Yes. Two weeks later.

Q. All right. And on such occasions when you visit again with that patient who you personally observed tearing and trauma, what were the results of your subsequent follow-up examinations of that same vaginal cavity?

A. The exam was normal. Bruising was gone. The tear had healed to the point that it was a shallow notch, and so two weeks later I would have to have said that this girl had a normal anogenital exam.

Q. Even though you personally had seen tearing on previous occasions?

A. Tearing and bruising, yes.

Q. You discussed at some point girls begin this estrogenization process. If you were to touch the hymen in a girl that is younger that hasn't started this process, is there a difference between that child's reaction and an older child?

A. Oh, it hurts. Before a girl starts to enter puberty, the hymen is very sensitive to touch. We used to have to -- when testing for sexually transmitted infections, now we can collect urine. We

used to have to pass a Q-tip through the hymenal opening and swab the floor of the vagina. If the little girl would move and I would accidentally touch the hymen, it would hurt and she would indicate that it really hurt her.

Q. So there is a point when young girls begin puberty that the vaginal area is less susceptible to pain?

A. Correct.

Q. Okay. Can you describe that opening, why in your experience based on your medical training and knowledge are there no medical findings regarding a penetration in the vaginal cavity?

A. I think there could be several reasons. First of all, acute trauma heals quickly, within two weeks without any, most often -- I mean, there are times that there is scarring and remnants. But most often, without any physical findings that would let you know that that trauma existed two weeks ago.

So you have healing of acute trauma without residual injury. You have that sensitivity of the hymen so that when a perpetrator is sexually abusing a child, he doesn't want to hurt the child because, first of all, he wants the child to engage in the behavior again. And then also he doesn't want to --

MR. BENTON: Objection, speculation, Your Honor.

THE COURT: Overruled.

A. -- tear something, cause injury, cause bleeding and risk being detected, so that is a reason.

And also the anogenital structures, the hymen, the labia, they are elastic. Even in a pre-pubertal girl, even a girl before estrogen is released, they are somewhat elastic that will stretch without tearing. And then once estrogen is released, they are very elastic and will stretch without tearing.

24and then if you think of an anus, it is kind of designed to open up to let stool come out without tearing. So certainly the opposite can happen. There can be penetration or at least partial penetration without tearing.

And then when I am talking about the sensitivity of the hymen, the pain of the hymen in a young girl. So I think most often what happens is that there's penetration of the labia to the point of touching the hymen, but maybe full penetration as to what you and I would think of doesn't occur because of that fear of causing pain to the child --

MR. BENTON: Objection, Your Honor.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



A. -- causing injury.

THE COURT: Approach.

\- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

THE COURT: Ask questions. Don't let her just sit here and --

MR. HUGHES: Okay.

THE COURT: It will be sustained as to that.

\- - -

Q. (By Mr. Hughes) Ms. Hornor, you were talking about the elasticity of that vaginal area?

A. Uh-huh.

Q. Is there any medical process or procedure that you can determine if somebody's mouth has been penetrated by any object on a previous occasion?

A. No. Physical findings in the mouth are extremely rare. There are rare case reports of tearing of the frenula, the little, like, piece of tissue on your lips and under your tongue, with forced penetration; but those are very few and far between. I have never seen it in the over 3,000 children that I have examined, I have never seen any trauma to the mouth acutely or chronically.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Q. Even in children who have disclosed that their mouth may have involved some penetration of some object or some foreign object inserted into their mouths?

A. In infants, in young children, typically infants with forced feeding, bottle feeding, you can have tears of the frenulum, but from sexual abuse I have never seen.

Q. Is there any medical procedure or process you can do to try to determine that?

A. No. You just examine it. You just look at it.

Q. Okay. Back to Ms. Perrion Thompson, did you conduct an examination on her when she came to your office to visit in 2013?

A. Yes, I did.

Q. When you examine a child, does the child have to go through a medical exam?

A. No. Certainly if it is too difficult for the child and they just can't tolerate it, the child always has the right to refuse the exam.

Q. Can a parent force you to do an exam on their child?

A. No, they cannot.

Q. Can a patient stop the exam at any time?

A. Yes.

Q. Does the patient have to consent to the exam being done?

A. Yes.

Q. Have you ever been present in instances where children have interviewed and disclosed abuse and then chosen not to have an examination done?

A. Well, certainly, many times.

Q. All right. Have you also been present where children do elect to have you review and look at their bodies?

A. Certainly.

Q. And what did Ms. Perrion Thompson say about the medical examination to you?

MR. BENTON: Objection.

THE COURT: Rephrase the question.

Q. Did you seek Perrion Thompson's consent for a medical exam?

A. Yes. I always do. I always explain to the child what I am going to do and that they have the right to refuse any part of it.

Q. Did she refuse that exam?

A. No, she did not.

Q. Can you describe what you did involving examination of Ms. Thompson?

A. It was a head-to-toe physical exam. I looked in her eyes and her ears, listened into her heart, examined her abdomen and her skin. It was normal. And then I performed an external anogenital exam.

There was a medical assistant in the room with me assisting. So I looked at the outside of her anus and the outside of her vagina or genital area with this instrument, it is called a colposcope. It magnifies the genitalia. We are able to photo document with this instrument.

I also performed testing for chlamydia, gonorrhea, Trichomonas, HIV, Hepatitis B and syphilis. And so we collected a urine specimen and I swabbed her mouth and collected a blood specimen.

Q. And those are all standard procedures you would do on examination of a child that had reported or disclosed what she did?

A. Yes, based on the disclosures shared with me from the forensic interview, that guided my exam.

Q. Do you know the results of any of those tests?

A. She tested negative.

Q. Would that have concluded your examination of Ms. Thompson then?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



A. Yes. I mean, I would have reassured the child that her body was normal despite what had happened. And I typically say, "You did the right thing by telling, and none of this was your fault." But, yes.

Q. All right. What do these findings indicate to you as a medical professional?

A. The findings are certainly consistent with the history that she gave of sexual abuse. She gave a very detailed history of ongoing sexual abuse.

MR. BENTON: I would object, Your Honor.

THE COURT: Overruled.

A. And her physical exam certainly does not negate the very detailed history that she gave.

Q. Did you have an opportunity to examine any other children out of the same report or incidents that day?

A. Yes, I examined her sister, Tiona.

Q. Can you talk a little bit about Tiona's examination? Did you have the same, I guess, rapport building or discussion with her about options about having the examination?

A. Yes.

Q. And did she have the option to not go through with it if she chose?

A. Yes.
Q. Did you end up conducting an examination on Tiona Arnold?
A. Yes, I did.
Q. Do you recall how old Tiona was when you examined her?
A. She was nine.
Q. As a nine-year-old was Tiona's developmental stage different than Perrion's?
A. Yes. Perrion was having periods. Her hymen was estrogenized. And so in order to really visualize the hymen, I had to touch it with a Q-tip, kind of run the rim of the hymen to make sure there were no tears.
Whereas Tiona was nine and she was kind of starting to develop, there was some estrogenized changes of her hymen, and she had a little bump on her hymen at, like, I think it was 4:00 or 5:00 o'clock; but it was a normal exam.
Q. And how, if anything, is the vaginal cavity or area different developmentally than it was in Perrion?
A. The hymen was different. It wasn't as estrogenized, so it would not have been as elastic. It would have still been sensitive to touch, so I did not touch her hymen with a Q-tip.

Q. Did you have an opportunity to consult with the interviewer about what Tiona had disclosed had occurred to her?

A. Yes, I did.

Q. Did that help guide and base your examination of the patient?

A. Yes, it did. So for Tiona, since she had also talked about a penis going in her butt --

MR. BENTON: Objection.

THE COURT: Overruled. It's for purposes of the medical diagnosis.

A. -- I swabbed, in addition to her mouth and the urine test, I swabbed her anus with a Q-tip for chlamydia and gonorrhea. And she also had the blood work completed.

Q. All right. Do you know the results of any of those tests?

A. Her testing was negative as well.

Q. And ultimately did you render any findings as it related to Tiona in your examination?

A. It was a normal anogenital exam, but it certainly did not negate, again, the detailed history that she gave of ongoing sexual abuse.

MR. BENTON: Objection.

THE COURT: Overruled.

MR. HUGHES: All right. I have no further questions at this time. Mr. Benton may have some questions for you, Ms. Hornor. Thank you.

THE COURT: Mr. Benton, cross?

- - -

CROSS-EXAMINATION

BY MR. BENTON:

Q. Ms. Hornor, good morning.

A. Hi.

Q. You conducted, I think you said 3,000 examinations over the course of your lifetime?

A. That would be a rough number, yes.

Q. And when you reference those 3,000 examinations, you were talking about examinations in which there had been a claim of sexual abuse of some sort. Is that a fair statement?

A. A concern. Certainly not all of those children when they are interviewed are giving history of sexual abuse, but for some reason there is a concern.

Q. But the concern related to an allegation or a suspicion about sexual abuse?

A. Yes.

Q. And in the course of those examinations, you would conduct an interview with the child with

reference to their accusations?

A. The children are talked to or interviewed by our forensic interviewer.

Q. I know that. I say, do you talk to the children about their accusations?

A. I'm sorry. No, I do not.

Q. In the 3,000 interviews that you have conducted, have you ever been made aware or known of an occasion where a child has lied about these accusations?

A. That is not our role as --

Q. So your answer is no?

A. -- medical provider, right, no.

Q. You rely upon what someone else reported with reference to those accusations?

A. I rely on what the child is saying to the interviewer, yes.

Q. And the interviewer is not you?

A. Correct.

Q. And so you take at face value the information as provided to the interviewer in the course of conducting your evaluation; is that a fair statement?

A. From the child, just like if a --

Q. Is that a fair statement?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



A. Yes.

Q. Now, you talk about -- you would agree with me, would you not, that if an evaluation is not properly conducted, that becomes problematic; is that correct?

A. I don't think I understand your question.

Q. Okay. Serious ramifications can develop if or when sexual abuse is diagnosed erroneously. Is that a fair statement?

A. Certainly, yes.

Q. And that means that in those instances, the consequences that can flow from an erroneous diagnosis, children can be removed from the home, correct?

A. Yes, there certainly can be negative consequences.

Q. And an innocent person can be prosecuted?

MR. HUGHES: Objection.

THE COURT: Overruled.

Q. Correct?

A. That could happen.

Q. Those are your words, am I correct?

A. Yes.

Q. Now, in this case, you report that you believe that sexual abuse has been substantiated as to

both children. Is that a fair statement?

A. Our role is not to substantiate. I made the diagnosis of sexual abuse.

Q. Okay. So you are not here to say that the allegations of sexual abuse are substantiated; is that correct?

A. That's verbiage used by Child Protective Services.

Q. That is not your declaration?

A. A health care provider doesn't substantiate or unsubstantiate. I make the diagnosis of sexual abuse. So I think sexual abuse occurred, or I would not make the diagnosis of sexual abuse.

Q. But you are not here to declare sexual abuse has been substantiated. Is that a fair statement?

A. Correct.

Q. Now, your diagnosis based upon your findings was that there was sexual abuse?

A. Correct.

Q. Your diagnosis is based upon findings that have negative outcomes. Am I correct?

A. My diagnosis of sexual abuse was based on the very detailed histories of ongoing sexual abuse that both girls gave to the forensic interviewer.

Q. I am talking about your role as a nurse.

You made negative findings; am I correct?

A. They had normal anogenital exams.

MR. HUGHES: Objection, argumentative.

THE COURT: Overruled.

Q. My question is, you made negative findings?

THE COURT: Re-ask the question.

Q. You reached negative conclusions as a result of your examination; am I correct?

A. I really don't think I understand what you are asking me.

Q. You said you found no evidence of tears, correct, as to both girls?

A. Their exams were normal, but the diagnosis of sexual abuse is not made on just the exam.

Q. My question is, you found no evidence of tears as to both girls; am I correct?

A. Correct.

Q. You found no evidence of bruising, am I correct, as to both girls?

A. Correct.

Q. You found no evidence of discoloration as to both girls; am I correct? Abnormal discoloration, am I correct?

A. Correct.

Q. You found no evidence of sexually

transmitted disease; am I correct?
A. Correct.
Q. You found no evidence of old wounds that had been healed; am I correct?
A. Correct.
Q. So from your examination, you concluded that it was a normal exam; am I correct?
A. Correct. The anogenital exam was normal.
Q. As that was as to both girls; am I correct?
A. Yes.
Q. Now, and this is a forensic examination?
A. It is an examination for the purposes of sexual abuse. We don't necessarily call it a forensic examination. It is a health care examination.
Q. And you are a practicing health care provider; am I correct?
A. Correct.
Q. You're a registered nurse?
A. Yes.
Q. Your responsibility is to conduct an objective exam; is that correct?
A. Yes, it is.
Q. You are not supposed to be conducting an exam or arrive at a conclusion because you think it is going to help the prosecution; am I correct?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



A. Correct.

Q. You said earlier something about -- and I don't know whether this was within your experience or within a history of examinations of a similar ink, that of those exams, only 10 percent of the time there is evidence of sexual abuse.

A. Actually less than 10 percent of the time.

Q. In fact, you previously said 4 percent; am I correct?

A. Between 4 and 10 percent, yes.

Q. Okay. So that means that somewhere between 96 percent or 90 percent of exams that are conducted, they are all found to be normal?

A. Correct.

Q. And is it your opinion that even though those exams are normal, normal exams still substantiate or still confirm a diagnosis of sexual abuse? Is that your testimony?

A. The diagnosis --

Q. Is that your testimony?

MR. HUGHES: Objection, Your Honor.

MR. BENTON: It is a "yes" or "no" question, Your Honor.

MR. HUGHES: Not the way it is phrased.

THE COURT: Overruled. She can answer.

Q. Is that your testimony?
A. I can't answer the question in its -- we use different verbiage.
Q. You said that in only 4 to 6 percent of examinations that are conducted -- and let me ask you this question. Are those examinations that you conducted, or you are talking across the board among all of the professionals?
A. That is really across the literature. But our findings within locally in our CAC are pretty much in tune with the national statistics.
Q. So you fall within the national statistics?
A. Uh-huh.
Q. Let's talk about the 3,000 exams that you conducted. In the 3,000 exams that you conducted, somewhere between 4 to 6 percent of those exams, you were able to find evidence, physical, objective evidence of sexual abuse. Am I correct?
A. Abnormal anogenital exams that are consistent with penetration, yes.
Q. Therefore, 94, 96 percent at a high, 90 percent at a low, you found no evidence?
A. Normal exam, correct.
Q. And yet in every one of those cases you made a finding of sexual abuse. Am I correct?

A. Oh, no. I do not make the diagnosis of sexual abuse for every child I see. In fact, looking at our statistics in our Child Advocacy Center, we are only reporting concerns of sexual abuse on about 60 percent of the children that we see. 40 percent of the time we are saying we have no concern of sexual abuse.

Q. I am not concerned about "we." I am concerned about "you."

A. I would fall in that 60/40 as well.

Q. And in those findings where there is no physical signs, you still conclude, you -- I am not talking about anybody else. You still conclude that there is evidence of sexual abuse?

A. The diagnosis of sexual abuse is made on more than just the anogenital exam.

Q. That is not my question. My question is, on those numbers where you find no evidence, no physical evidence, you still conclude that there is evidence of sexual abuse? Is that a yes or no?

A. 60 percent of the time I do. 40 percent of the time there are no concerns of sexual abuse.

Q. And in those 60 percent of the times in which you have made such a finding, there still is no physical evidence that you were able to note from your

examination; is that correct?

A. Yes. I mean, maybe not -- maybe you would say 56 percent of the time, but, yes.

Q. And with respect to your findings that you made notwithstanding the absence of physical evidence, you rely upon the forensic interview to assist you in your ultimate conclusion?

A. Yes. That information is crucial to making the diagnosis of sexual abuse.

Q. Okay. But the forensic examination is not done by medical professionals, you would agree?

A. You mean forensic interview?

Q. Forensic interview.

A. Yes, they are a health care professional. They are social workers, healthcare social workers.

Q. A social worker doesn't render a medical diagnosis, do they?

A. No.

Q. A social worker does not prescribe medication?

A. No.

Q. A social worker does not engage in treatment, medical treatment of a client, correct?

A. Correct.

Q. A social worker doesn't go to medical

school, correct?

A. Correct.

Q. A social worker doesn't go to nursing school?

A. Correct.

Q. Now, let me ask you this. You said that the hymen is very painful up until a certain age. What was that age again?

A. Very sensitive to touch until estrogen begins to be released.

Q. Approximately what age?

A. It is different for every child.

Q. Approximately what age is that?

A. Honestly, it is different for every child because menses are starting earlier. Approximately, I can see changes starting from like eight to nine to ten to eleven. Some girls not until later. Some girls don't start having periods until they are 16, so they might be 12, 13, or 14. So there is no age when that happens.

Q. Were you able to determine -- not at the moment of your examination. But were you able to determine at what point in time Perrion Thompson began to estrogenize, however you say it?

A. No.

Q. So you don't know?

A. Correct.

Q. Right?

A. Right. I don't know.

Q. Were you able to determine from your examination at what age Tiona Arnold began to estrogenize?

A. No. I began -- I saw some changes in her hymen when I examined her.

Q. Now, if, in fact, they have not begun that process -- I am not going to struggle with that word. If they had not begun that process where estrogen is developing, presumably, if I understand your testimony, the hymen becomes very sensitive to touch?

A. It is sensitive to touch, yes.

Q. Very painful?

A. Yes.

Q. And we say, "sensitive to touch." Sensitive to touch to the point where even inserting a Q-tip can be problematic?

A. Yes.

Q. Now, let's say you have a circumstance in which the hymen is at that stage of its acute sensitivity and there is an incident of penetration, whether it be digitally, penile-wise or what have you.

That will cause that child a lot of pain; am I correct?

A. It would hurt, yes.

Q. Not just hurt, a lot of pain; am I correct?

A. It would hurt. But let's face it, everyone is a little bit more different in their pain tolerance. But it would hurt, yes.

Q. Are you denying that it would cause a lot of pain?

A. It would cause pain, yes.

Q. That is not my question. Are you denying that it would not cause a lot of pain?

A. It would cause pain.

Q. That is not my question. Would it cause a lot of pain?

MR. HUGHES: Objection, Your Honor. She can't --

MR. BENTON: She didn't answer my question.

MR. HUGHES: She can't know what a patient can feel.

THE COURT: If she can answer.

A. It would cause pain.

Q. An example you gave of where a Q-tip was inserted in a child's hymen, that was a lot of pain for that child; am I correct?

A. Uh-huh, uh-huh.

Q. Is that a yes or no?

A. Yes.

Q. Now, would the pain -- you would agree with me, would you not, that the pain would be of such a nature and such a duration that that child would be in obvious pain for sometime after the penetration?

A. No. I can't agree with that.

Q. So the pain immediately goes away?

A. The experience of pain is different for every individual.

Q. Okay.

A. And so I can't guess as to how long pain exists for any particular individual.

Q. Based upon your experience, your qualifications and the number of examinations that you have engaged in, would the pain be beyond just a few moments?

A. I know with a Q-tip the pain is just for that second that the Q-tip is touching the hymen.

Q. We are not talking about a Q-tip. We are talking about a penile or digital penetration.

A. I examine girls in the emergency department who are giving history of something happening to them a few hours ago, and --

Q. And are they still in pain at that moment?

A. Not necessarily.

Q. In all of your examinations at the emergency room, did you ever have a patient complain of being in pain at that moment?

A. Oh, certainly; but I also had them that did not.

Q. I am not talking about those that did not. I am talking about those that were in pain at the time of your evaluation when they were in the emergency room. How long ago time-wise were they in pain in relationship to their allegation as to when the event took place?

A. It would vary. I mean, it may be a few hours, it may be yesterday.

Q. And in those instances the child is in obvious pain. Is that a fair statement, based upon your experience?

A. Sometimes, or sometimes the child is saying they are in pain and you can't -- like I said, everyone's pain experience is different. Some kids will be in obvious pain, they will be even walking funny. Other kids they will say they are in pain, but they seem to be, you know, they are walking fine, they are urinating fine. Everyone is different.

Q. Well, the ones who complain that you described as being in obvious pain, you say, first of all, they tell you that they are in pain, correct?

A. Yes.

Q. You also make observations of them walking funny, correct?

A. There are children, yes.

Q. And I am saying, in your experience you have seen some --

A. I have seen kids, yes.

Q. -- circumstances?

A. Yes, yes.

Q. In those circumstances in which you made observations of obvious pain, what other observations were you making that led you to conclude that that child was in obvious pain?

A. Those are children that oftentimes on exam may have a finding like a bruising of the hymen or the tearing of the posterior fourchette.

Q. Aside from the physical exam in terms of just a visual observation, what else are you seeing that would lead you to conclude that a child is in obvious pain?

A. Honestly, not much more than that.

Q. When you examined -- and I will be specific.

When you examined Perrion Thompson and Tiona Arnold, it was not your role to ask them questions as to, for example, who else may have been living in their household; is that correct?

A. Correct.

Q. It is not your responsibility to ask them questions as to who else they may have spoken to with respect to these accusations; is that correct?

A. Correct.

Q. It is not your role to try to assess or determine whether or not these accusations may have been influenced by external sources; am I correct?

A. Correct.

Q. Your responsibility is to take at face value the forensic examination and then for you to conduct a physical examination from that point on; is that correct?

A. I am sorry, do you mean the forensic interviewer, to talk with the forensic interviewer and find out what the child is disclosing?

Q. Yes, ma'am.

A. And then do the physical exam, yes.

Q. You don't go back to the forensic examiner and ask them to present additional questions to the child, do you?

A. At the time of the physical exam?

Q. Yes.

A. No, I do not. If there is ever any need for clarification of something that the child said during the forensic interview, there are times that I, as the medical provider, might ask a few clarifying questions.

Q. And you did not do that with respect to either Perrion or as to Tiona Arnold; is that correct?

A. No. They gave very detailed histories of ongoing sexual abuse during their forensic interviews, so it wasn't necessary.

Q. And you did not seek to gather information that may have suggested or may have been designed to test the credibility of the accusations; is that a fair statement?

A. That is not part of what a healthcare provider does.

Q. That is not your role?

A. No. If someone comes to me and says their throat hurts, I believe their throat hurts and I will probably swab it for strep. It is kind of the same concept, that when a patient comes to a healthcare provider, you take at face value, you believe what they say is going on with their body.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



And it is the same with children who have been sexually abused. When they are saying that things have happened to their body, we believe them. Just like when a child comes to me and says their ear hurts or their stomach hurts, I look for reasons why their ear and their stomach is hurting.

Q. So you take a medical history?

A. When I am seeing a child for an earache or, yes.

Q. And when you take a history, you take a history that oftentimes is essentially based upon subjective information being provided to you?

A. Yes. Like you can't see stomach pain.

Q. And you are not there to, in the taking of that subjective history, you are not there to test the credibility of what is being told to you. Is that a fair statement?

A. Correct.

MR. BENTON: Nothing further, Your Honor.

THE COURT: Any redirect?

MR. HUGHES: Thank you, Your Honor.

\- - -

REDIRECT EXAMINATION

BY MR. HUGHES:

Q. Ms. Hornor, when you make your diagnoses, do you focus solely on the results of your medical exam that you conduct?

A. Oh, no. The history given by the child -- making the diagnosis of sexual abuse is kind of based on two things: the history that the child gives or does not give of sexual abuse and the physical exam, including the anogenital exam; and, of course, any testing for infections.

Q. And have you rendered opinions of non-abuse in your examinations?

A. Oh, yes. Over, I mean, 40 percent of the time I am saying no, I don't feel that sexual abuse has occurred.

Just yesterday there were two or three children, there were no concerns of sexual abuse.

Q. Even though they came to the center and relayed some information and you examined them?

A. Correct.

Q. You came up with a finding of no abuse from a medical perspective?

A. Correct.

Q. Okay. And in this case, what were your

ultimate medical conclusions regarding Perrion Thompson?

A. I made the diagnosis of sexual abuse for both girls.

Q. And finally, there is --

MR. BENTON: Objection, Your Honor, for the record.

THE COURT: Overruled.

Q. And finally, there was much discussion about this estrogenization process within the vaginal canal or cavity. Does this process as girls get older introduce the ability to excrete fluids other than menses from the vaginal area?

A. Well, certainly there is lubrication, as I said, preparing a girl for sexual activity so that it will no longer be painful.

Q. Is that a normal biological response to puberty or maturing within females?

A. Yes, it is.

Q. Is there any way that that can be supplemented externally if there is not enough naturally produced lubrication?

A. Oh, certainly, with, I mean, in both these girls --

MR. BENTON: Objection, outside the scope of

cross.

THE COURT: I'm sorry?

MR. BENTON: Objection as to it being outside the scope of cross.

THE COURT: Overruled.

Q. (By Mr. Hughes) You may answer.

A. You can use lubricants. Oils can be used. And certainly both of these little girls gave history of a lubricant being used.

MR. BENTON: Objection, Your Honor.

THE COURT: I will sustain as to that.

Q. (By Mr. Hughes) Were these girls to the developmental stage where they would be able to excrete sufficient amount of vaginal lubricant to facilitate penetration at their age?

MR. BENTON: Objection.

THE COURT: Basis?

MR. BENTON: Outside the scope.

THE COURT: Overruled.

A. Perrion definitely and Tiona was beginning to have changes. So definitely Perrion. Tiona, I don't know. It would be hard to tell.

MR. HUGHES: Okay. Thank you so much.

THE COURT: Okay. Any questions as a result of those questions?

MR. BENTON: Yes.

- - -

RECROSS-EXAMINATION

BY MR. BENTON:

Q. Again, Ms. Hornor, the findings that you made obviously were limited to your physical examination of the children at the time of that exam. Is that a fair statement?

A. My diagnosis is based on the history that the children give in their forensic interview and also the anogenital and physical exam in general.

Q. And I am focusing on the physical exam. The findings you made from the physical exam are based upon your evaluation of the children at the time, correct?

A. Yes.

Q. Now, have you ever made a misdiagnosis?

A. Pardon?

Q. Have you ever been wrong? Have you ever made a misdiagnosis?

A. I suppose everyone has been wrong.

MR. BENTON: Okay. Nothing further. Thank you.

THE COURT: All right. You can step down.

(Witness excused.)

Counsel, you may approach.

- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

THE COURT: Who is your next witness?

MR. HUGHES: I have Kerri Marshall, who interviewed the other child, and then the other video.

MR. BENTON: Did she change her name?

MR. HUGHES: She was Marshall. Now she is Wilkerson.

THE COURT: Are you going to need -- we can break until 1:30 for you to take a look at Criminal Rule 33. That is your issue.

MR. BENTON: Yes, yes, yes, yes, sir.

THE COURT: That will give you two-and-a-half hours or whatever and maybe we can bring her back at 1:30.

MR. HUGHES: Okay. That works great. Thank you.

- - -

THE COURT: Ladies and gentlemen, we are going to take our lunch break early, so you can go out and enjoy that 91-degree day. Be back at 1:15. All right?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Do not discuss the case among yourselves. Do not permit anyone to discuss it with you or in your presence. It is your duty not to form or express an opinion in the case until it is finally submitted to you. Have a good lunch.

A JUROR: What time?

THE COURT: 1:15.

THE BAILIFF: All rise.

THE COURT: All right. We will start back up at 1:30.

MR. HUGHES: Thank you, Your Honor.

\- - -

Thereupon, at 11:00 o'clock, a.m., a lunch recess was taken until 1:30 p.m.

\- - -

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Wednesday Afternoon Session,
July 19, 2017,
2:10 p.m.

\- - -

Thereupon, the further trial of this cause was resumed following the lunch recess.

\- - -

Thereupon, the following proceedings were held in open court before the jurors resumed their places in the jury box:

THE COURT: Are you going to want to voir dire this next witness?

MR. BENTON: No.

MR. HUGHES: So, Judge, I know before we took the break I indicated I intended to call Kerri Marshall back. But due to the girls' and the mother's scheduling, I had asked Kerri Marshall to come back first thing tomorrow morning. The girls have a flight scheduled, would like to be back in New York before tomorrow morning. I would like to proceed with them if the Court is inclined to continue with them because of their schedule.

THE COURT: However you want to do it.

MR. HUGHES: I am letting the Court know. I represented I was going to call her first, and I

intended to do that before lunch. But since we broke early, that changed things schedule-wise.

THE COURT: Okay. "Whether a mistrial should be ordered in a criminal case is within the discretion of the trial court. It should be granted only when a fair trial is no longer possible." *State v. Fair 2014, Ohio 2788,* at paragraph 31.

Criminal Rule 16 governs discovery in criminal prosecutions.

The defendant has alleged a violation of Criminal Rule 16 for nondisclosure. Even though the Court finds that the prosecution did violate Criminal Rule 16, upon review of the record, the Court finds that the prosecution's failure to disclose was not willful.

Further, the defendant will not suffer prejudice. The detective will be recalled on cross-examination in either the State's case in chief, or if you want, Mr. Benton, to call him in your case in chief as on cross, I will permit that.

Further, the detective will be recalled in order to give the defendant's counsel an opportunity to cross him regarding this evidence and the destruction thereof. Under the circumstances, the Court finds that this is a just remedy.

Finally, any reference to the State's obligation under a Brady violation is irrelevant. *Brady* only applies when a defendant discovers post trial that the State has withheld exculpatory evidence. *State v. Fair*, at paragraph 33. That is not the case here.

Further, if the evidence is disclosed during the trial, there is no Brady violation. *State v. Payne, 10 Ohio, 1018*, at paragraph 3. Here the defendant became aware of the evidence during trial, so no Brady violation occurred.

Anything else we need to put on the record prior to calling in the jury?

MR. HUGHES: No, Your Honor. Essentially in my research over the lunch hour, Your Honor, the State was going to suggest what the Court's finding is, that pursuant to *State v. Daniels*, which is a Tenth District case, citing also *State v. Geeslin, 116 Ohio State 3d, 252*, the Court should determine whether evidence is potentially useful or whether it is materially exculpable. And if only further testing would have been required, whether the evidence favors the defendant or not, unless the criminal defendant can show, in fact, bad faith on the part of the police to preserve such potentially useful evidence, it does

not constitute denial of due process of law.

And that the remedy the State would suggest, Your Honor, is that which the Court has come to, which is to recall the detective. The State is willing to do that on its own and, of course, subject to cross-examination so Mr. Benton can confront him on all of these issues in front of the jury.

Nothing would be gained by a mistrial, as the underwear can never be retested at this point, and it would not alter that fact, and does not have a bearing otherwise on the other evidence which is admissible in this case and/or does not alter or change the testimony of the girls or the evidence that has been admitted.

And so that is just simply the State's position, Your Honor. My reading from the law sounds very similar to what the Court has already concluded. Thank you, sir.

MR. BENTON: Your Honor, first all I would ask the Court to memorialize its decision. And secondly, I was under the impression that I would have until later to file my motion, which I will still file with all of the citations.

I would point out to the Court -- and I am looking at the case of *State versus Rox*, R-O-X. And

this is 2007 Ohio 613 at 89244. And in that case the issue was in analyzing failure to preserve or the destruction of evidence against a criminal defendant, a clear distinction is drawn between materially exculpatory and potentially useful evidence. And it cites *Brady versus Maryland*, *Arizona versus Youngblood, 488 U.S. 51*. "If the evidence is material, a due process violation occurs regardless of whether the prosecution acted in good faith."

And in that instance it cites the case of *State versus Johnston*, a 1988 decision, *39 Ohio St. 3d, 48*. It states: "Evidence is deemed material only if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." And again, quoting in that case the decision of *United States versus Bagley*, 473 U.S. 667, at page 682.

I don't know how anyone can say this is not material in light of the detective's own admission that such evidence would have been material with respect to the investigation.

Secondly, the opportunity to recall the detective, whether it be upon cross or direct

examination, does nothing for the defense because, again, the defense does not have the opportunity to examine the underwear, nor does the defense have the opportunity to submit those items or property to a qualified expert to determine its evaluation.

And it is significant because, one, it would determine whether or not the allegations that have been made -- and these are very serious allegations -- would confirm or disaffirm some of the statements that these children have made. Not only just with respect to one child, but also the Court will hear testimony -- in fact, the Court has already heard testimony that some of these alleged incidents purportedly occurred in the presence of the other child.

So again, it would allow the defense an opportunity to challenge the representations made as to both children, even as it relates to representations that are made with respect to someone other than the child itself.

I believe that -- I am never aware -- this is the first time I ever heard that Brady is not applicable until post-trial, because Criminal Rule 16 as well as the language within Brady says that the State not only has an obligation to disclose, but

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



there is a continuing obligation to disclose. And it is not -- there is no material distinction between whether the nondisclosure is on behalf of law enforcement or directly on behalf of the State of Ohio.

And in making this argument, I would also point out that the -- and there is a case of *Kyles versus Whitley*, a U. S. Supreme Court decision, 514 United States 419, a 1995 decision. And in that case the Court looked at a number of things. One, whether or not the favorable evidence is material. And we would suggest that it is material, again, relying upon the testimony presented by the detective where he acknowledges such evidence would, in fact, have been material.

Secondly, the Court said there is not a sufficiency of evidence test. One does not show a Brady violation by demonstrating that some of the culpatory evidence should have been excluded, but by showing that favorable evidence could reasonably be taken to put the whole case in such a significant light as to undermine confidence in the verdict.

And again, in this case, the confidence or the ability of the defense to challenge the jurors' confidence in any representations made by the State

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



have now been completely obliterated because we do not have the opportunity to have this item of evidence evaluated.

Then the Court went on to say that because there is a Constitutional standard for materiality under *Bagley*, again citing *United States versus Bagley, 473 U.S. 667*, that under *Bagley* it imposes a higher burden than the harmless error standard as was articulated.

And finally it says that the State's disclosure obligation turns on the cumulative effect of all suppressed evidence favorable to the defense, not on evidence considered item by item. Thus, the prosecutor, who alone can know what is undisclosed, must be assigned the responsibility to gauge the likely net effect of all such evidence and make disclosure when a point of reasonable probability is reached. Moreover, the responsibility remains regardless of any failure by the police to bring favorable evidence to the prosecution's attention. To hold otherwise would amount to a serious change of course from the Brady line of cases."

So with that -- and in that case, the Court overturned the conviction because there was a failure on the part of the government to disclose witnesses or

0A893 - X22
Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



statements, previous statements from eye-witnesses.

So again, I would argue this is, in fact, material; that good faith is not at issue, and it is not determinative of whether or not a mistrial should be granted, and we would ask that the Court grant the same.

THE COURT: I will deny your motion for a mistrial. I do not find untested panties to be either exculpatory or inculpatory.

Anything further we need to put on the record?

MR. HUGHES: I will have the detective here first thing in the morning for the Court, Your Honor.

THE COURT: Do you want to call him in your case in chief or their case in chief? You think about it. However you want to do it.

Go get the jury.

THE BAILIFF: All rise.

- - -

Thereupon, the jury resumed their seats in the jury box.

- - -

THE COURT: Everyone can have a seat. I bet you in your personal life you would want those kind of three-hour lunches. Just remember when you are not

here, we are still working very diligently through the docket.

You can call your next witness.

MR. HUGHES: Thank you, Your Honor. The State will call Shatyra Henderson to the stand next.

(Witness sworn.)

THE COURT: Have a seat. Pull yourself up close to the microphone, and you may inquire.

MR. HUGHES: Thank you, Your Honor.

\- - -

SHATYRA HENDERSON

Called as a witness by the State of Ohio, being first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HUGHES:

Q. Good afternoon.

A. Hi.

Q. Can you tell the ladies and gentlemen here in the jury, please introduce yourself to them by giving everybody your name?

A. Okay. I am Shatyra Henderson.

Q. All right. Ms. Henderson, can you spell your first and last name for the court reporter?

A. S-H-A-T-Y-R-A, Henderson, H-E-N-D-E-R-S-O-N.

Q. All right. Ms. Henderson, just a little bit

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



of background information about yourself. Where were you born and where did you grow up?
A. I was born in Bronx, New York, and I grew up in Ohio.
Q. How long had you lived in Ohio?
A. Since I was about 13, I believe.
Q. Okay. And what year did you move away from Ohio?
A. 2014, I believe.
Q. All right. And without giving me an exact address, where have you been residing since around 2014?
A. In New York.
Q. Okay. Who do you live with in New York?
A. I live with myself and three children.
Q. All right. Can you give us the names of your children?
A. Yes. My oldest, Perrion Thompson, the next one is Tiona Arnold, and then the youngest is Kanijah Thompson.
Q. And did they ever live with you here in Columbus?
A. Yes.
Q. Can you describe that situation when they were living here in Columbus, some of your different

residences going back to maybe 2010?

A. Okay. In 2010 we lived here in Columbus. We lived at a couple of addresses. One of them, Beachworth.

Q. Describe that one. So do you remember the exact number on Beachworth?

A. 3399 Beachworth Drive, 43229.

Q. You remember the Zip code even?

A. Uh-huh.

Q. When you lived there, what sort of residence was it, a house, an apartment, what?

A. An apartment.

Q. And that apartment, how many bedrooms were there?

A. Two.

Q. All right. And was it you and your three girls at that apartment?

A. Yes, as well as Sefe.

Q. For the record, you sort of pointed in the direction away from you. Do you see the person you have identified as Sefe?

A. Uh-huh.

MR. HUGHES: Let the record reflect the identification of the defendant.

THE COURT: The record shall so reflect.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Q. At this first address you said you moved there sometime in 2010. And do you remember how long you stayed there?

A. I was there until 2011 of July.

Q. All right. So the summer months of 2011?

A. Uh-huh.

Q. Would you say that was about less than a year then?

A. Yeah.

Q. Okay. At that residence. What precipitated -- or did you move from that residence and why?

A. I can't remember the exact details at that time, but he was moving.

Q. Who?

A. Sefe was moving as well. We were having our little issues, normal things like arguing, and I had never lived with a man anyway. I have always had my own place. So I ended up moving to a shelter; and from there I got my own apartment on Dublin-Granville Road.

Q. Do you remember that address on Dublin-Granville Road?

A. I want to say 829 or 729 East Dublin-Granville Road. I don't remember.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Q. That 800 block or so?

A. Something, yeah.

Q. Was this an apartment as well?

A. Sorry?

Q. Was this an apartment as well?

A. Yes.

Q. And how many bedrooms were in this apartment?

A. Two.

Q. And do you remember how long you stayed at the Dublin-Granville location?

A. I was there till 2013.

Q. All right. So quite sometime at that location?

A. Yes.

Q. When you'd lived there was it just you and your daughters?

A. Yes, me and my daughters.

Q. Did you ever have anybody there, living there with you?

A. No. I don't -- no, no. Sefe would come sometimes, you know, spend the night. We was dating, yeah.

Q. No other persons there, though, besides you, your daughters and Sefe to visit?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



A. Yeah, just me and my children lived there, but Sefe would visit quite often. We was dating.

Q. Let's talk a little bit about that, if I can ask you. How did you come to know Sefe Asfadai Almedom? How long have you known him?

A. We worked at a place together, so that is how I met him. We had a lunch break. We didn't work in the same area, but we had a lunch break, and on the lunch break he was talking to me on the lunch break and I guess he told me he liked me and all of this other stuff, so --

Q. About what year was that?

A. 2009.

Q. So 2009, the two of you meet for the first time?

A. Yes.

Q. You hadn't known each other prior to work?

A. No. I met him at the workplace.

Q. Where were you working?

A. We were working at -- hmm, I think it was Toys R Us warehouse or something like that.

Q. Sort of a warehouse situation?

A. Yeah, like --

Q. And you said you started dating him?

A. No, not then.

Q. No, okay.
A. We just met at this workplace.
Q. How long did you know him before you started to become involved with him romantically?
A. I think I worked at this place September or October last and -- sometime in September, October. It was a seasonal job, so the seasonal job ended; and when that was over with, one of the ladies that I worked with gave him my number and he called me and we talked on the phone and that is when we began to, you know, hang out and things like that, yeah.
Q. Now at that time did you have feelings for Sefe Asfadai Almedom?
A. No, I didn't know him just then.
Q. Okay. How long did it take you for you to get to know him?
A. Not too long because we hung out quite often. We hung out quite often. It didn't take long.
Q. How frequently would you see each other?
A. Probably like, maybe like two or three times a week or maybe even more, I don't know.
Q. Would he come over to your residence?
A. No. I was going over to his house.
Q. And at that time do you remember where he lived when you first met?

A. Yes, on Beachworth.

Q. On Beachworth?

A. Uh-huh.

Q. And at some point then describe your relationship and how it progressed together.

A. Around the time I met him in December -- I ended up, when the seasonal job ended, I ended up having a hard time and I couldn't pay my rent, so I ended up moving out of my apartment to my daughter's aunt's house. And from there, I would go and visit and hang out with him at his house. And let me see. Yeah.

Q. Still on Beachworth?

A. Yeah, at Beachworth. I would go visit him at Beachworth. And we would hang out, drink, do, you know, have sex, whatever.

And one day I was going to go and check into a shelter. And when I was going to go, he told me I didn't have to go when he figured out my situation. And I would spend the night there, just me, you know, I would just -- I would spend the night -- I would go to my kids' aunt's house, do whatever I do, and whenever they go to sleep, I would go to be with him, and then go back to my kids in the morning.

Q. This went on for sometime --

A. Uh-huh.
Q. -- before you moved into the 3399 Beachworth Drive residence?
A. Uh-huh.
Q. And you said you recall moving in then probably late December, sometime early 2009?
A. It was December, yes.
Q. Okay. Or early 2010?
A. Let me see. It was 2009.
Q. The end of 2009?
A. Uh-huh, like the end of December.
Q. Okay. And then you said you moved out of that residence when?
A. 2011.
Q. Okay. So instead of six months, it was more like 18 months; is that right?
A. Well, I could be wrong because we were in the shelter, so --
Q. Some of that time?
A. Yeah, yeah. I don't remember the dates for that shelter, but I know we was there for like maybe 30 days I want to say.
Q. Living in a shelter before moving into the --
A. Yeah, like maybe anywhere from 30 days to

two months, somewhere in there, yeah.

Q. Now when you moved to Beachworth, did you move into Beachworth with Mr. Almedom and your daughters?

A. I did. My brother was with me as well. My brother, he was with me, but he did not live with me. But my brother, he was incarcerated and he needed an address, so he used my address to stay at my apartment. And when I lost my apartment, he was with me, but he didn't stay long.

But, yeah, my brother and my daughters, we would go over there and spend the night. And finally I was going to check into the shelter so that I can get my own thing, because they help you with that. And he actually insisted, he said, "You guys don't have to do that."

And he would actually -- when he would go to work he would give me a key and say, "You guys can come here, you can cook, you can do whatever." So he was generous to us, yeah.

Q. And so at some point you and the girls then did move into Beachworth?

A. Yes.

Q. Did your brother ever live at Beachworth?

A. Yeah, he was there for a short time, but I

don't remember the amount of time. But he was there and then he ended up moving to Springfield.

Q. Any other persons live at Beachworth then?

A. No.

Q. The whole time that you were there with your daughters?

A. No, no.

Q. What were the sleeping arrangements at Beachworth?

A. He had a two-bedroom, which was across from the room we had. But my kids would go into the smaller room, which was his children's room. And I would -- you know, the rooms were across from each other.

Q. Now, Mr. Almedom had his own children separate -- your children are not in any way related to him by blood, right?

A. No.

Q. And it became known to you that he had his own two children; is that right?

A. Yeah, I knew that before he met my children. I actually met his kids first.

Q. But did his children live with him full-time?

A. No. They would come on some weekends.

Q. And would your daughters sleep in the same bedroom on Beachworth that his kids would stay in when they came to visit occasionally?

A. Yeah.

Q. All right. At Beachworth, where were you working then, or were you working when you moved into Beachworth?

A. Several jobs. I actually had two -- it is very rare that I ever have one job. I usually have two. I worked at -- what is the name of the place? I can't even remember. But I was a CNA when I was with him.

Q. What is a CNA?

A. Nurse assistant, working in the nursing home. So --

Q. So you worked in a nursing home. And what else -- what else did you do when you were at Beachworth?

A. That was it, nursing home work.

Q. More than one nursing home or employer?

A. Yeah. One of them I think it was called -- shoot, I can't even remember the name of it.

Q. All right. What sort of, I guess, shifts or times were you absent or gone from the home?

A. One job was second shift, which is 3:00 to

11:00, and the next one was 11:00 until 7:00. But there is a lot of time that I worked 16-hour shifts. I would do 16 hours every day. Like it is very rare that I had a check with 30 hours. I would have like 58 and 68 hours for two weeks. Or not for two weeks. I am actually wrong. I would have like 60 hours or more a week. I lived at work pretty much.

Q. And when you were working, where would the kids be?

A. School, and then after school, they would go home after school.

Q. So can you just give us maybe an example of what your daily day would be like then with you working and the kids living there and you having to get them to school and stuff, just give us an example?

A. Yeah. So if I worked third shift, sometimes when I got off work, which was 7:00 a.m., by the time I got home, my children would already be at school.

Now, I did have a babysitter that I paid to keep an eye on my kids during 3:00 to 11:00 shifts for when they got out of school. I would cook before they went to school, and when they came home, there was food already there. All they had to do was do their homework, and the lady who I paid to babysit them, who was his neighbor, she would make sure they did their

homework and that they ate and got to bed on time. And he would get off work before me, so once he --

Q. When you say, "he" --

A. Sefe. Once Sefe got off work, the lady that was baby-sitting my children, she would go home, and shortly after I would follow up and be on my way. I would get off at 11:00, but sometimes I got off at 7:00 in the morning, so --

Q. All right. That was sort of a typical school day?

A. Yes.

Q. What about in the summer months?

A. In the summer months, pretty much it was the same thing, except my kids were not in school.

Q. All right. Was either Sefe or a neighbor or babysitter available for them?

A. Yeah, yeah, pretty much.

Q. Are there times that you would be at work that Sefe would be alone with the children?

A. Yes, sometimes.

Q. How often would that occur?

A. Quite often. I worked a lot. I always stayed at work. I pretty much lived at work. Sometimes his kids was there, sometimes they weren't. Most of the times they weren't. But a lot of times,

you know, I was always at work. I worked so much I didn't qualify for food stamps. I didn't qualify for not even medical from the government. I had my own insurance because I worked so much. I didn't qualify for any government benefits.

Q. And you were paying your bills by working so much?

A. Yes, I mean, I wasn't just --

Q. Were you supporting these three girls?

A. Yeah. I had child support as well, but I worked pretty much a lot.

Q. Okay. You said you were at Beachworth until maybe 2011 or sometime. Do you remember being the summer that you had moved, sometime in the summer months?

A. When did I move? Let me see. I think it may have been July or August. I think I moved into my apartment on Dublin-Granville Road in August, but I am not sure.

Q. All right. I won't hold you to that. But in 2011, all right?

A. Yeah, when I moved into my apartment.

Q. And you stayed there for --

A. Until 2013.

Q. Okay. And when in 2013 did you move, if you

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



know?

A. I moved, I want to say, like, I don't know if I -- I couldn't pay my rent because I ended up losing my job.

Q. This is when you lived at Dublin-Granville?

A. Yes.

Q. All right. I am going to back up a minute. Sorry to interrupt.

A. Yes.

Q. What necessitated or why did you move out of Mr. Almedom's residence on Beachworth and then get your own place on Dublin-Granville?

A. It was a toxic relationship. Every time I would try to break up with him, he would always come back with something, whether it was money or something that I needed. He would always come with something.

But the relationship was very toxic. And what I mean by "toxic" is a lot of arguing, a lot of the blame game, a lot of, oh, nobody is going to marry you; you've got three kids with three different men; stuff like that. There was a lot of unhealthy stuff going on.

Q. So did you want to extricate or remove yourself from that situation?

A. I did, and I would try to -- every time I

would break up, he would come back, so -- he'd be outside knocking on my door.

Q. Did you continue to date then after you moved from Beachworth out of his house?

A. Yeah. I would break up with him; but like most naive women -- I might have even been insecure -- they go right back. So that is what I was doing, yeah.

Q. All right. And you did that for how long, would you describe that relationship with him?

A. It seemed like it was three years, almost four years or something.

Q. Okay. And then you indicated that you moved out of Dublin-Granville because you were going to lose that housing because you had lost a job?

A. Yeah. I moved before the -- I moved before -- it is like a move out on or before. And I didn't want no eviction on my record, so I moved out before the date into his apartment --

Q. You had a deadline?

A. -- not with the intention of staying, but with an intention of finding a new place, which I was there for three months. And during that time I was seeking another job because I usually have two, but somehow it didn't add up that way. I ended up finding

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



two jobs after I moved out of there.
Q. So you moved in with Sefe. Would that be on Lakeside?
A. Yes.
Q. And you moved in with him then maybe January of 2013 and stayed there for a few months?
A. Yeah.
Q. Okay. What necessitated that move, or why did you move from the residence at Lakeside?
A. Okay. My second daughter, Tiona, what I seen -- when your kids are asleep, me, I go around and look and see what they are doing, you know, cover them up, put the cover on them.
I just was walking by. And when I walked by, I seen something, like my daughter, Tiona, she jumped. And I am like, "Why did you jump and what are you doing?" She looked scared.
Q. What do you mean, "jumped?"
A. She was -- well, I didn't know, but she was humping on my --
MR. BENTON: Objection.
A. -- younger daughter, Kanijah.
THE COURT: Approach.
- - -
Thereupon, the following discussion was held

at the bench with the Court and counsel outside the hearing of the jury:

THE COURT: She is testifying that she witnessed this?

MR. HUGHES: Yes, yes. The one daughter, like, trying to hump the other girl.

THE COURT: Oh. Hump the other girl?

MR. HUGHES: Yes.

MR. BENTON: And obviously they are going to try to make an argument that somehow this has some relevancy to this case or that the activities were caused by my client. And there is no evidence, there is no foundation for that, and it is just speculation on her part.

THE COURT: I am going to allow her. I thought she was going to say she saw your client.

MR. HUGHES: No, she is talking about her daughter doing something to her other daughter.

THE COURT: Keep it very short.

MR. HUGHES: Yeah, sure.

- - -

THE COURT: Overruled.

Q. (By Mr. Hughes) You indicated that you saw your daughter jump?

A. Yeah. She was on top of her sister. Tiona

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



was on top of Kanijah, sexual activity. Their clothes was up. That is not normal child behavior. No, it is not.

Q. Had you ever seen that before that one time?

A. No, no.

Q. So this is the first time you saw this --

A. Yes.

Q. -- behavior with your daughters?

A. Yes.

Q. As a mother, what did you do or how did you respond?

A. The first thing in my mind is I am going to whip her ass. That was the first thing in my mind, because that is not okay.

So I said, "Where did you" -- I said, "What are you doing?"

And she looked scared. And I kept asking her, I said, "What was you doing?"

And she just -- she was scared like any normal kid when they doing something out of line and they know they have a parent that would discipline them. She knows I would discipline her. So she said that --

MR. BENTON: Objection as to what she said.

THE COURT: Sustained. You can't say what

your daughter told you.

THE WITNESS: Oh, okay. Well, anyways, I don't know how to answer it. I am confused now.

Q. (By Mr. Hughes) Did your daughter tell you something in response to you asking her about why she was humping her sister?

A. Yeah, she said, "Sefe told me to do it."

MR. BENTON: Objection, move to strike.

THE COURT: Sustained.

MR. HUGHES: May we approach, Your Honor?

THE COURT: You may.

\- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

MR. HUGHES: It is the defendant's statement, so it is not hearsay. Even though it is contained, it is a second party, it's still the defendant's statement.

So if the defendant says, "I am going to kill Fred," and the second person says, "Well, Michael Hughes" --

THE COURT: It is totally hearsay if it comes from the person. Now, she can say what the defendant told her.

MR. HUGHES: Okay, I will bring it up with Tiona. That is fine, Judge.

But then I should just let the Court know I intend to -- that witness will testify that Sefe told her.

THE COURT: That's fine. It's a statement against interest.

MR. HUGHES: I understand, Judge. That's fine. I will withdraw that question.

MR. BENTON: Your Honor, previously the Court had previously made a ruling that such line of questioning was not permissible and the State persisted in that line, which then elicited this statement from this witness.

I, again, because of that, renew my motion for a mistrial.

THE COURT: Overruled.

\- - -

THE COURT: You can't say anything that your daughter told you, but what you did as a result of her telling you something.

Q. Ms. Henderson, does that make sense, what the Judge's instruction was?

A. (The witness nodded her head.)

Q. With that in mind, did you have an

opportunity to speak with your daughter about what you saw?

A. Yes, I did.

Q. And did you tell her how you felt about it?

A. I didn't tell her how I felt about it.

Q. Did she tell you how she felt about it?

A. Well, she didn't -- I can't say what she told me. I'm confused.

Q. That's fine. Just listen to my questions, please, and we can work through this. If I ask a question you don't understand, let me know and I will repeat myself or I will ask it a different way. Okay?

Did you have an opportunity to speak with Tiona about what you observed her doing?

A. Yeah.

Q. Okay. And what about your other daughter?

A. The oldest one, Perrion, she was asleep.

Q. She was asleep while this was happening?

A. Yes.

Q. What about Kanijah?

A. Kanijah was awake.

Q. Okay. After you spoke with Tiona about what you observed, what actions as a mother did you take? What things did you do or put into motion?

A. Well, my natural instinct was to whip her

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



because that is out of line. But something in me just -- for some reason I just said, "Where did you learn that?" Instead of hitting her, I said, "Where did you learn that?"

Because she was scared, she didn't say anything, she didn't respond. I said, "Where did you learn that?" And she looked at me like --

Q. Now without saying who said where did you learn that, did she tell you where she learned that?

A. Yeah, but she looked at me like she saw a ghost, like she was scared. She didn't even want to respond. And I had to get aggressive with her. I said, "Where did you learn this?" I was very aggressive. And then she spoke up and she said where she learned it.

Q. Okay. Was that normal for you to have to be, quote, aggressive with her to get information?

A. No, no, no, no, no.

Q. How would you characterize your relationship with Tiona?

A. Tiona is my hyper child. She is very hyper. But I don't have to be aggressive with them unless it is something about school and I keep getting phone calls. Tiona is the silly one. She is the class clown. That is about the only time I have to get

aggressive with her. Other than that, I don't really have to get aggressive with them.

Q. So this was a not typical situation?

A. Not that, no.

Q. After you talked to her and she told you where she had learned that behavior, what did you then do as a mother?

A. Well, she told me that my oldest daughter --

MR. BENTON: Objection as to what she said, Your Honor.

THE COURT: Again, you can't say --

THE WITNESS: Oh, okay. Well, I found out that my oldest daughter --

MR. BENTON: Objection, Your Honor.

THE COURT: Sustained.

THE WITNESS: Okay.

Q. So after you talked with Tiona about what you had observed, did she disclose to you any new information that you didn't know as a mother?

A. Yeah. I learned a lot of things that I didn't know.

Q. And all of these things that you learned, were they any cause for concern?

A. Yes, it was a cause for concern. My first --

Q. And had you heard any of this information ever -- had you heard any of this information the entire time that you had been seeing Sefe Almedom?

A. No.

Q. Had any of your daughters ever relayed any of this information that they told you that day before?

A. No.

Q. After they told you what they told you, how did you respond?

A. I got my kids out of that situation.

Q. How quickly?

A. Very quickly. The next day.

Q. What did you do the very next day?

A. I waited until he left. And when he left, I checked into a hotel with my kids, and from there I made my police report and took my kids to Children's Hospital.

Q. All right. And up until that day --

A. Because I -- sorry.

Q. Up until that day in 2013, would you say that you had seen Sefe Asfadai Almedom on almost a daily basis for four years or more?

A. No. I seen him in court more.

Q. No. When you were living together.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



A. Before that happened?

Q. Yes. How often would you --

A. Pretty much almost every day.

Q. All right. So when you were living at Dublin-Granville Road and you were still dating, you would see him frequently, several times a week?

A. Yes.

Q. And when you moved to Lakeside for those several months, you would see him pretty much every day?

A. (The witness nodded her head.)

Q. And when you lived at Beachworth, you would see him pretty much every day?

A. Yeah. We shared cars and things like that. We bought cars together, so, yeah.

Q. For all of those years?

A. Yes.

Q. And then on one day you moved out. And did you ever see him after that?

A. When my kids -- when I found out what was going on?

Q. Yes.

A. No. In court. I mean --

Q. That is it?

A. -- why would I want to be around somebody

that did that?

MR. BENTON: Objection.

THE COURT: Sustained. Move to strike the last response.

Q. So you had a break with him essentially, you separated yourself and the children from Mr. Almedom?

A. Uh-huh.

Q. Did you have reason to contact him?

A. I had plenty of reasons to, but I didn't.

Q. Did you ever see him again, I guess, in person, one-on-one?

A. No.

Q. Have you ever had a conversation with him since that day that you moved your children out in 2013?

A. I can't remember. Honestly, I think I might have cussed him out on the phone or something. I don't know. I can't remember.

Q. Okay. But you never met in person?

A. No.

Q. You never had physical contact with him in any way since then?

A. That would look so bad. No.

Q. Do you have an axe to grind against Mr. Almedom?

A. No, I don't have anything against him up until the point before I learned what happened. Yes, I have a problem now.

Q. All right. You described your relationship sometimes as you wouldn't get along well together. Is there anything that precipitated you moving out other than what your daughters had told you?

A. Like I said before, that relationship was toxic, but not to a point that I would have my kids be embarrassed to have strangers looking at them, doctors examining between their legs.

MR. BENTON: Objection, Your Honor.

THE COURT: Sustained.

Q. Did you want your daughters to have to go to Children's Hospital?

A. No.

MR. BENTON: Objection as to relevancy.

THE COURT: Counsel, approach.

- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

THE COURT: Where are you going with this?

MR. HUGHES: Well, Mr. Benton has alluded that somehow there is an axe to grind with this

particular witness, at least in his prior arguments to the Court and in his opening statement about bad blood between them and that. So I am addressing her motivations. It goes to her lack of motive to do this. That is my point.

THE COURT: Okay. I mean, I think she already said they had a bad relationship, toxic relationship. But, I mean, you can try and do it. I just anticipate her blurting out a bunch of potentially damaging situations, and I don't see how it benefits.

MR. HUGHES: Well, since we are here, my next line of questioning, Your Honor, involves the use of alcohol between the two of them, including her, but also including the defendant, which is a completely relevant portion.

The daughters will testify that Mr. Almedom was seen drinking all the time throughout the day. They will describe the bottles, they will describe him drinking. And that is a relevant and germane issue, and I am going to bring that up next with her, so we may as well address that while I am here now.

MR. BENTON: I would object. First of all, that is not relevant and it's a matter of speculation as to whether or not alcohol was a contributing

factor. In fact, based upon the transcript from the prior trial, there was no testimony at the time that any of these alleged incidents took place that he was intoxicated.

MR. HUGHES: Then why did you file motions to dismiss the inclusion of references to alcohol in your pretrial motions if this relevant or not relevant?

THE COURT: Was it brought up in the last trial?

MR. BENTON: It was brought up in the last trial. That was my intention, to avoid that same --

MR. HUGHES: Because it's an issue. I mean, the girls are going to talk about it.

THE COURT: Keep it minimal. I mean, whether she goes on a date without drinking is irrelevant as to whether his client --

MR. HUGHES: But if his client, Your Honor, is consistently intoxicated around the house, that corroborates the children's --

THE COURT: Okay. But, you know, if you can put time in the house --

MR. HUGHES: Okay. I'll just stick with that.

THE COURT: I mean, if they go out on a date

and go drinking --

MR. HUGHES: No. I will just keep it to the house or residences, inside residences.

MR. BENTON: But getting back, it goes to other acts evidence. And also she said that she was not there the majority of time. How does she know what he was doing at the time the children --

MR. HUGHES: She can only testify about what she saw.

THE COURT: Yes.

\- - -

THE COURT: You may inquire.

MR. HUGHES: Thank you, Your Honor.

Q. (By Mr. Hughes) Ms. Henderson, when you were talking about your relationship with Mr. Almedom over the years, do you drink alcohol?

A. I sure do.

Q. Okay. Do you know Mr. Sefe Asfadai Almedom to drink alcohol?

A. Yes.

MR. BENTON: Objection as to relevancy.

THE COURT: Overruled.

Q. Do you have personal experience in observing him drinking alcohol at home or at the residence --

A. Yes.

Q. -- when you lived there?
MR. BENTON: Same objection.
THE COURT: Overruled.
A. Yes.
Q. What about at Beachworth when you first moved in with him, would you see him drink any?
A. Yeah, we would drink together, hanging out.
MR. BENTON: Again, objection.
Q. Now I am talking about at the home. Would your daughters be present?
A. Yeah.
Q. All right. What sort of drinks would the two of you drink?
MR. BENTON: Objection.
THE COURT: Overruled.
A. Alcohol, liquor.
THE COURT: I will note your continuing objection, too.
A. The names, the brands?
Q. Well, what type of drink would you two be drinking?
A. Oh, vodka, gin.
Q. What about Mr. Almedom?
A. The same, vodka, gin.
Q. All right. What about when you moved to

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Dublin-Granville, did he ever come and visit you when you resided at Dublin-Granville with your daughters?

A. Yeah.

Q. Where he spent the night?

A. Yeah, spend the night. He was my boyfriend at the time, yeah.

Q. Did you ever leave your daughters with Mr. Almedom to watch them while you would go to work or do other things?

A. Yeah, but he was not necessarily -- he didn't necessarily watch them, you know. We spent a lot of time together. So he would be there. I wouldn't make him leave. I thought my kids was safe, so, you know, there was no issue that I thought of.

Q. It would have been normal for you to leave your children alone with Mr. Almedom?

A. Yeah.

Q. Is that true when you were at Beachworth, you would leave and the daughters would be there with him?

A. Yeah.

Q. What about at Lakeside?

A. The same.

Q. You would go to work or be absent from the home and the girls would be there alone with him?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



A. Yeah. How it originally started is his children would be there and my children were there, too. So they were -- he has daughters, I have daughters, so that is how it started.

But there was times when they were not there most of the time. But that is how it originally started. His children would be there, my children were there, so --

Q. All right. And at Lakeside did you observe Mr. Almedom drinking while at that residence?

A. Every residence.

Q. And how often?

MR. BENTON: Objection. I didn't hear the response.

THE WITNESS: Sorry. I said every residence.

THE COURT: Okay, overruled.

Q. And how often?

A. Pretty much every day.

Q. How much?

A. He would overindulge in alcohol.

Q. What do you mean by "overindulge?"

A. He would drink like a fifth.

MR. BENTON: Objection to the characterization, Your Honor.

THE COURT: I will sustain that.

A. The whole bottle sometimes, seriously. And I would try to ask him --

MR. BENTON: Objection.

THE COURT: Hold on. He has to ask a question.

Q. Not as to overindulge, but did you ever see any liquor bottles at the residence?

A. Yes.

Q. Would those be bottles that you drank yourself?

A. We would drink together, but I knew my limit. He did not know his limit.

MR. BENTON: Objection.

THE COURT: Move on.

Q. All right. You indicated that you had moved out after your daughters revealed something to you in 2013, and you indicated that you took them to Children's Hospital?

A. Yes.

Q. Did you cooperate with the medical personnel there?

A. Yeah, I did.

Q. Did you answer the questions as best you could?

A. Yeah.

Q. You also, I think, testified earlier that you went and you filed a police report of some kind?

A. I did. I first checked into the hotel and then I called the police from there. Then after that, I went to Children's Hospital.

Q. All right.

A. Yeah.

Q. In your entire relationship with Mr. Almedom, had you ever moved out so abruptly like this before?

A. No.

Q. So even those other instances where you moved, they were sort of planned things based on your job or your circumstances?

A. Uh-huh.

Q. Was this at one of those times?

A. Yes. Well, the last time?

Q. The last time.

A. The last time was not planned, no.

MR. HUGHES: All right. I have no other questions at this time. It is my understanding Mr. Benton may. Thank you very much.

THE COURT: Any cross-examination?

MR. BENTON: Yes, Your Honor.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



- - -

CROSS-EXAMINATION

BY MR. BENTON:

Q. Ms. Henderson, good afternoon.
A. Good afternoon.
Q. You would consider yourself to be a good mother, good parent, correct?
A. Yes.
Q. And you are close to your daughters?
A. Yes.
Q. And you have always enjoyed a good relationship with them?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. So despite the fact that you worked all of these hours, you're not leaving your children abandoned; is that a fair statement?
A. I'm not leaving them abandoned at all.
Q. You would continue to provide for them?
A. Continuously.
Q. Continue to monitor their well-being?
A. When I was not providing, yes.
Q. Continue to communicate with your children?
A. Yes.

Q. And you have always encouraged your children to communicate with you; am I correct?

A. Uh-huh, yes.

Q. Is that a yes or no?

A. Yes.

Q. You have to speak up for the court reporter. Okay? And you know of no reason or no circumstance why your children would not share information with you; is that a fair assessment?

A. I do know of a reason.

Q. Okay. But you -- prior to this disclosure that you described to the jury --

A. Uh-huh.

Q. -- you had no reason to believe that your daughters would not share information with you; is that a fair statement?

A. Prior to --

Q. Prior to this disclosure that you talked about a few moments ago.

A. What do you mean? Prior to me learning the information of what took place?

Q. Yes. Prior to that date, you had no reason to believe that your daughters would not communicate with you about anything; is that correct?

A. I had no reason.

Q. In fact, you would have expected your daughters to talk with you about anything; is that a fair statement?

A. Can you say that again?

Q. In fact, you would have expected your daughters to come to you and talk to you about anything?

A. Yeah, I would.

Q. And you, in fact, that is what you encouraged?

A. Yeah.

Q. Correct?

A. That is what a parent should do.

Q. You had an open and honest relationship with your daughters?

A. Yes.

Q. You also talked to your daughters about the issues of sexual abuse. Am I correct?

A. When?

Q. At any time.

A. No. Before?

Q. Before, before.

A. Before I knew what took place?

Q. Before you got information that you said you got.

A. Yeah, my kids are aware of that. They are females. They should be aware. We would get sex offender notifications in the mail.

Q. Well, it goes beyond that. Your children were aware of Tiona's aunt, for example, having been molested?

A. I don't know why would they know that.

Q. Well, do you remember telling that, saying that in your interview at Children's Hospital?

A. That Tiona's aunt was molested?

Q. Yes.

A. No, I have no idea about that. I don't understand how it would, her being molested.

Q. My question was, do you remember saying that?

A. No, not at all. Sorry.

Q. Do you remember saying that you grew up in a foster home where there was molestation?

A. Not true. I was never molested. Sorry.

Q. Do you remember saying that the children in the foster home, not yourself, were molested?

A. What children?

Q. In the foster home that you were in.

A. No. I don't even know what you are talking about. Sorry.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Q. So you're saying you never talked to your daughter about those things, you don't recall making any statements about your daughter -- about talking to your daughters about these things?

A. What things? Her aunt and me and children in a foster home being molested?

Q. Not you being molested, but her aunt being molested and the children in the foster home that you were in having been molested.

A. No.

Q. Would it assist you to listen to your interview as to what you said?

A. Sorry?

Q. Were you aware that your interview was recorded with Children's Services?

A. Yes, I sure was, yes.

Q. And so if you have the benefit of listening to that interview, would that give you a clear indication as to what you said on that date?

A. It would.

MR. BENTON: Your Honor, with the Court's permission, I would like to play Ms. Henderson's interview from that particular date.

MR. HUGHES: Judge, I have no objection outside of the jury's presence.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



MR. BENTON: Outside the presence of the jury, yes. I'm sorry, that was my intention.

THE COURT: Ladies and gentlemen -- duration? Five minutes, ten minutes?

MR. BENTON: This was an hour-long interview, but I only intend on playing the first maybe five minutes.

THE COURT: All right. Let's take about a ten-minute recess. Hold on. Do not discuss the case among yourselves. Do not permit anyone to discuss it with you or in your presence. It is your duty not to form or express an opinion in the case until it is finally submitted to you.

\- - -

Thereupon, the jurors exited the courtroom and the following proceedings were held in open court, in the presence of the defendant:

THE COURT: Everyone can have a seat.

MR. HUGHES: For the record, what is this interview?

MR. BENTON: This is the interview at Nationwide Children's, the CAC.

MR. HUGHES: Do you know who conducted this interview?

MR. BENTON: That I don't remember.

MR. HUGHES: Was this interview provided to you by the State in discovery?

MR. BENTON: Yes.

MR. HUGHES: Off the record.

(Discussion held off the record.)

MR. HUGHES: I think we have the same interview, Judge. He said it was an hour long interview with Children's Services.

THE COURT: Can you get it up quicker than he can?

MR. HUGHES: No, he has it, Your Honor. He characterized it as an hour long interview with Children's Services, and I believe it is a 15-minute long statement with Detective Phillips, not --

MR. BENTON: I am going to begin at 2:41.

MR. HUGHES: And it's with Detective Phillips, not Children's Services, right?

MR. BENTON: Yeah, yeah, yeah.

MR. HUGHES: Judge, we are talking about the same interview with Detective Phillips. It is not Children's Services.

MR. BENTON: But it was at CAC. That is the way I understand it.

MR. HUGHES: All right. I have this interview, I have heard it. That's fine.

MR. BENTON: Okay.

\- - -

Thereupon, the audio-recorded interview of Ms. Henderson by Detective Phillips was played for the Court, out of the presence of the jury, as follows:

DETECTIVE PHILLIPS: -- capable of doing that, particularly Perrion?

MS. THOMPSON: My kids are very --

(Tape paused.)

MR. BENTON: First of all, I am at 2:42, 2:43 of an interview with Ms. Henderson and Detective Phillips which I believe through discovery identifies that this interview took place at the CAC on a date that her children were examined.

Q. (By Mr. Benton) Ms. Henderson, the voice that you heard -- you heard two voices, one being a male voice and another being a female voice. That female voice would be yours?

A. I need to keep hearing it. I am not going to say that until I hear more of it.

Q. Let me back it up a little bit, because I want to make sure I get to the appropriate point.

A. I'm not going to agree to that.

\- - -

Thereupon, the audio-recorded interview

resumed, as follows:

DETECTIVE PHILLIPS: -- what happened and are able to articulate it, and both of your daughters appear very capable of doing that --

MS. THOMPSON: Uh-huh.

DETECTIVE PHILLIPS: -- particularly Perrion?

MS. THOMPSON: Well, my kids are very familiar with child molestation, not that this is something, but --

(Tape paused.)

Q. (By Mr. Benton) Having heard just that portion, does that sound like your voice?

A. I am not going to agree to that until I hear more of it. Sorry.

\- - -

Thereupon, the audio-recorded interview resumed, as follows:

MS. THOMPSON: Tiona, her aunt grew up being molested because her grandmother was a drug addict. And the family and the surrounding people that we know repeatedly talked to them about those things.

And then I grew up in a foster home, in assistance, but my foster mom, her two daughters was molested, and they are grown women. So we talk about

these things, stranger danger and, you know. I mean -- but I mean, it can happen.

DETECTIVE PHILLIPS: Sure it can.

(Tape paused.)

- - -

Q. (By Mr. Benton) Do you need to hear more?

A. No, no, that is me. Yeah, that is me.

Q. And now having heard that, does that refresh your recollection?

A. Yes, it does. Yeah, there was no children in my foster home being molested, but my foster mom's biological daughters, who were grown and didn't live there, they were molested, yeah.

Q. All right.

A. But my children are not aware of what happened to them; but because of that, I know to warn my children of them type of things.

Q. But at the time that you were interviewed when you gave that statement, you were talking about your having talked to your daughters about those things?

A. About the dangers, the dangers, the dangers. Not about people physically being raped, because I don't know what actually happened. The dangers of rape, stranger danger, whatever, you call it.

Q. Do you remember -- okay.

We will deal with that with the jury.

THE COURT: Go get the jury.

THE BAILIFF: All rise.

\- - -

Thereupon, the jury resumed their seats in the jury box.

\- - -

THE COURT: Everyone can have a seat. You may inquire.

MR. BENTON: Thank you.

Q. (By Mr. Benton) Ms. Henderson, you had the benefit of listening to the recording during the recent break; is that correct?

A. Uh-huh, yes.

Q. And after having heard that recording, does that now refresh your recollection as to the interview that you had with Detective Phillips at CAC?

A. Yes.

Q. And in that interview, you said that your children are very familiar with child molestation; am I correct?

A. No, you are not. They are familiar with the dangers of molestation.

Q. And in that interview you said that the

family and the people surrounding her repeatedly talk to them about these things?

A. I talk to them about that.

Q. About the issues with respect to molestation?

A. The dangers of being taken advantage of, yes.

Q. Are you denying the fact that you made a statement that your children are very familiar with child molestation?

A. No, I am not denying it. It is the way you are wording it.

Q. No. I'm saying are those your words that you told Detective Phillips?

A. They are my words, yes.

Q. Now, you also said to this jury that you were involved in a very toxic relationship with Mr. Almedom?

A. Yes.

Q. And you said that you argued a lot?

A. Yeah.

Q. And would it be fair to say that those arguments would oftentimes take place in the presence of your children?

A. They would take place anywhere. Not around

my children and not around them, anywhere.

Q. So it did include at least times when your children were present?

A. Yes, yes, yes.

Q. And part of the arguments relating to your relationship with Mr. Almedom was because you cheated on him. Is that a fair statement?

A. No, that's a lie. Sorry. I did not cheat on him, yeah. Thanks, uh-huh.

Q. Do you remember that same interview that you had with Detective Phillips when you told the detective you cheated on him and that was the source of the conflict between you and Mr. Almedom?

A. No, I don't. You can get the recording out. That is a lie. I never cheated on him.

MR. BENTON: Your Honor, again with the Court's permission --

THE COURT: You may.

MR. BENTON: This would be at approximately 3:27 of that same interview.

\- - -

Thereupon, the audio-recorded interview was played as follows:

DETECTIVE PHILLIPS: So that had you guys been having problems or anything, or --

MS. THOMPSON: Oh, yeah, typical relationship problems, arguing. You know, I cheated on him in 2012 in the spring or -- the spring or summer. Summer. The pool was open where I lived at.

And I cheated on him and he found out and, you know, I told him, yeah, I admitted to it. And ever since then it is like, "Are you going to forgive me?" I am like, "If you can't forgive me, I can just move on."

(Tape paused.)

- - -

A. I don't remember that.

Q. Was that your voice?

A. I don't know. I am not going to say that was my voice. I don't remember that. I don't remember cheating on him. I really don't.

Q. My question is this. Was that your voice?

A. I am not going to say that is my voice because I don't remember cheating on him. Sorry, I am just not.

Q. But you would admit that that voice you heard is part of the same interview that you admitted to earlier?

A. I don't know about that either.

MR. BENTON: Your Honor, with the Court's

permission I would like to go back to the earlier portion and play it.

THE COURT: All right.

THE WITNESS: I really don't remember that.

MR. BENTON: Going back now to 2:40 of this interview.

\- - -

Thereupon, the audio-recorded interview was played as follows:

DETECTIVE PHILLIPS: -- what happened and are able to articulate it, and both of your daughters appear very capable of doing that --

MS. THOMPSON: Uh-huh.

DETECTIVE PHILLIPS: -- particularly Perrion?

MS. THOMPSON: Well, my kids are very familiar with child molestation, not that this is something, but --

\- - -

(Tape paused.)

Q. (By Mr. Benton) Having heard just that portion, does that sound like your voice?

A. I'm not going to agree until I hear more of it. Sorry.

\- - -

Thereupon, the audio-recorded interview resumed, as follows:

MS. THOMPSON: Tiona, her aunt grew up getting molested because Tiona's grandma was a drug addict. And the family and the surrounding people that we know repeatedly talked to them about these things.

And then I grew up in a foster home, in assistance, but my foster mom, her two daughters was molested, and they are grown women. So we talk about these things, stranger danger and, you know. I mean -- but I mean, it can happen.

DETECTIVE PHILLIPS: Sure, it can.

- - -

(Tape paused.)

Q. Do you need to hear more?

A. That's me. No, I needed --

Q. Okay. Was that you?

A. That was me. I don't remember cheating on him and I don't even remember saying that, so --

Q. You do admit that both of those statements were made within the context of the same interview?

A. I am not going to agree to that. Sorry. I am just not. The first part, yeah. The next part, I don't remember that.

Q. No problem. So there never were any discussions between you and Mr. Almedom about you being unfaithful to him?

A. I don't remember that; but he would always accuse me of stuff anyways.

Q. He would accuse you of that, right?

A. I don't know about that. He would always accuse me of stuff.

Q. Let's go back over this timeline and make sure we have a clear understanding of what we are dealing with here. You did at one point in time live at 1735 Burstock Court, Apartment D, correct?

A. Yes.

Q. And you were evicted from that apartment sometime in November of 2009?

A. I moved out before the eviction, yes.

Q. But the eviction had been filed?

A. Yeah.

Q. And again, that was in about November 25th, 2009?

A. December, I believe.

Q. And at that -- I'm sorry, were you finished?

A. I believe it was December.

Q. And at that time you then, you and your three children moved in with Ebony Arnold?

A. Yes.

Q. Is that a yes?

A. Yes.

Q. And Ebony is Tiona's aunt?

A. Yes.

Q. And you all moved in at a location at 1473 Yates Drive; is that correct?

A. Yes.

Q. Now, so it was around that time that you first met Mr. Almedom when you were working at the Toys R Us warehouse?

A. Yes.

Q. And then you lost your job about a week before Christmas. Is that a fair statement?

A. I did not lose my job. It was a seasonal job. The seasonal job ended.

Q. So you were not fired?

A. No. It was a seasonal job.

Q. You began dating Mr. Almedom then sometime around Christmas, maybe after Christmas, but before New Years. Is that a fair statement?

A. We began, yeah, yeah; but not in Christmas. It was when the seasonal job ended and he contacted me when I no longer worked there. He paid a co-worker for my number and we began to have conversation.

Q. I didn't ask you about that.
A. We didn't start dating in December.
Q. It was either late 2009 or early 2010; is that a fair statement?
A. Earlier. We began building a relationship.
Q. Okay. And at that time when you began dating him, you were still staying with Ebony?
A. Yes.
Q. And Ebony then was forced out of her home, is that correct, and she had to move?
A. No, she was not forced out of her home. Around the time when I was living with him, she was going to be losing her home, but it was not around the time when I moved in with him. Those dates do not match up.
Q. You and your children moved in with Mr. Almedom on the Beachworth Drive address around the first of 2010. Is that a fair statement?
A. No, it was around December.
Q. Around December?
A. We started spending the night and we would spend the night there, but we officially moved in, like in December.
Q. December of 2009?
A. '10.

Q. 2010?

A. Yes. Well, December of 2009 is when we would go over there and spend the night sometimes because his children would be there. And he invited us over to meet his kids. January of 2010 is when we officially moved there.

Q. That was my question.

A. Okay.

Q. Between December of 2009 and January of 2010, you and your children moved into his residence at Beachworth?

A. Yes.

Q. Is that a yes?

A. Yes.

Q. Now, did your brother -- Jabar Swift is your brother, correct?

A. Yes.

Q. Did your brother move in with you and your children at the Beachworth Avenue -- Beachworth Drive house at the same time, or did he come later?

A. He would be with us. He was there with us.

Q. And he stayed at that residence for about two, three, maybe four months, correct?

A. Yes.

Q. And that was right after he was released

from prison?

A. Yeah, from jail. He was not in prison.

Q. Okay. And then after the time or somewhere during that time period Ebony came to live at that Beachworth apartment with her children?

A. Actually, Ebony came there and spent the night with her children because her children's school was closer and she didn't have a car. I would provide her kids transportation to school. But she came to spend the night there and be with her children. She did not need to live there. She was there for like a week or so.

Q. We are now into January 2010. You're evicted from your apartment, Ebony is foreclosed on her residence, so neither one of you have a place to stay, right?

A. Ebony did not lose her home. Ebony still had her home. She lost her home a whole year later.

Q. But she comes over to stay at the Beachworth Avenue place -- Beachworth Drive place because she doesn't have anyplace to stay, correct?

A. Wrong. She was there for a week. She stayed with Jasmine Brown.

Q. Isn't it a fact that she stayed at the Beachworth apartment for approximately one month?

A. Wrong.
Q. Her and her children?
A. Wrong.
Q. But you will admit it was at least a week?
A. Yeah, she stayed with Jasmine Brown.
Q. And you didn't write down on a calendar anything when she came and when she left, right?
A. No.
Q. And you're going back seven years ago and trying to remember the time frame when she stayed at that apartment. Is that a fair statement?
A. Actually, I am not. I know she didn't want to be there in the first place.
Q. I didn't ask you that. My question is, how long was she there?
A. She was there about a week. It seemed like it was a week, I don't know.
Q. It seemed like it was a week?
A. It did seem like it was a week.
Q. And then sometime in February or maybe March of 2010, your brother leaves, Ebony leaves, and it is just you, your children and Mr. Almedom at the Beachworth apartment, correct?
A. Yeah.
Q. Correct?

A. Uh-huh, yes.
Q. Is that a yes?
A. Yes.
Q. And you said in response to a question presented to you by Mr. Hughes that the last time you left, you left abruptly because of these accusations, that was the first time you had ever done that. Do you remember saying that?
A. Sorry? The last time --
Q. You said -- you were asked by Mr. Hughes, had you ever moved out of Mr. Almedom's place in an abrupt fashion such as you did the last time that you were there. Do you remember that question?
A. Yes, I do.
Q. And you said that was the first time that ever happened?
A. The last time, I left fast.
Q. Right. Now, but sometime in the end of 2011, 2012, because you were having conflicts again or because there was conflicts between you and Mr. Almedom, you left his residence and moved into a family shelter on Fifth Avenue; is that correct?
A. Yes.
Q. Then it was towards the end of 2011, maybe the beginning of 2012 that you were finally able to

get in your own place at 877 Dublin-Granville Road?

A. You are wrong. It was August 2011.

Q. It was August of 2011?

A. Yes.

Q. Okay. And at times Mr. Almedom would come over there and stay with you, because you all still were in a relationship, correct? Is that a yes or no?

A. Yes.

Q. Then in February or March sometime around 2012 -- or excuse me. In 2012 sometime around February or March, Mr. Almedom secures a place at 4519 Lakeside Street. Sound about right?

A. I don't remember the dates for his lease signing or his moving in. Sorry. I just remember when I was there. Can't help you.

Q. Okay. You are aware that he did secure an apartment on Lakeside Street, correct?

A. Yeah. We were dating.

Q. And that was sometime in the early part of 2012; sound about right?

A. I don't remember. I just remember when I was there.

Q. Okay. Do you remember the first time you ever saw the apartment?

A. I don't remember that. I just remember when

I needed to be there. I don't know what you are trying to get at.

Q. I am just asking a question. Now, while you were at -- excuse me. While he was at that particular location, sometime in June or July of 2012, there was a guy by the name of Jim who came to stay at that residence. Do you remember him?

A. I don't remember the dates, but I remember Jimmy, uh-huh.

Q. And you remember Jimmy staying at that residence on Lakeside, correct?

A. Yeah, I remember that.

Q. Okay. But you just don't know how long he stayed there, correct?

A. I don't remember the dates, but I remember Jimmy, yes.

Q. Do you recall whether or not his stay was for a significant amount of time?

A. I don't remember that either. Sorry.

Q. So you don't know whether it was for six months or a year?

A. I know it wasn't a year. It was for a short time, but it wasn't a year. And I don't even think it was six months either.

Q. But again --

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



A. And I can't really tell you if it was three months, four months, but I know it wasn't six months and I know it wasn't a year. It was like it was a short time.

Q. But again, you don't know?

A. I do know. I know it wasn't six months. I know it wasn't a year, and I don't know the dates. I am not going to let you confuse me.

Q. Now, at this same Lakeside address in January of 1213, Sefe's mother came from California to visit, correct?

A. Yeah, yes.

Q. And she was there for about three weeks?

A. She was there, but I don't remember.

Q. Correct?

A. Yeah, she was there. I don't know how long, though.

Q. She came all of the way from California and she was there for --

A. She was there for a while.

Q. Yeah, a while, a good period of time.

A. Yes.

Q. Cooked dinner?

A. Yes, we both cooked.

Q. And she is there with -- let me rephrase

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



that. So when you would come over there with the children, she would be there, correct?

A. Yes.

Q. Now with respect to your apartment at 877 Dublin-Granville Road, at some point in time you were evicted from that apartment. Is that a fair statement?

A. Again, I moved out before the eviction.

Q. So the eviction was filed, but you moved out before they forced you?

A. Yes.

Q. And that was on January 11, 2013?

A. Let me see. Hold on. No. I was in that apartment through 2013. Dublin-Granville Road?

Q. Yes, yes. That is what I said.

A. I was in that apartment until 2013.

Q. My question is, were you in that apartment? Did you move out of that apartment as of January 11, 2013?

A. Oh, okay. It was in January. The day I can't tell you, but it was January.

Q. Fair enough, fair enough. And when you moved into that apartment, into the Lakeside apartment, Jim was still there?

A. When we came there, Jimmy was not there.

Jimmy had been gone already.

Q. Well --

A. He would be there when we would come over and spend the night, visit; but Jimmy was gone when we needed to be there. And matter of fact, it was around the time when his mother came to visit, Jimmy was not there when his mother was there.

Q. But when you were making preparations to move into this particular residence, you told Jimmy he had to go, right?

A. No, I did not tell Jimmy he had to go. We both told Jimmy he had to go, because he wasn't helping him. There was times I helped him and paid his rent, and he did the same for me. But we both was trying to get him to go.

Q. Now, during your relationship with Mr. Almedom, there would be times there when you would have discussions about future plans, correct?

A. Yeah.

Q. Things that you and he would do together, correct?

A. Uh-huh.

Q. Yes or no?

A. Yes, correct.

Q. And one of those plans included possibly

moving to California or New York, right?
A. No. New York, that's a lie. It was Cali, Miami or Hawaii, uh-huh.
Q. Okay. When you say, "Cali," you are saying California?
A. Yes, California, Miami or New York. I mean, sorry. California, Miami or Hawaii. We never discussed New York.
Q. All very beautiful places.
A. Yeah.
Q. And when you would have these discussions with Mr. Almedom, there were times in which you would share those discussions with your children. Is that a fair statement?
A. I don't know. I know we were talking about it, but I don't know if we included the kids in that because we were just talking about it.
Q. Were there ever any objections from your children about wanting to move out of Ohio?
A. No.
Q. To either California, Miami or Hawaii?
A. No, no.
Q. There was never any objection?
A. No. They are kids.
Q. Tiona enjoyed a close relationship with her

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



father?

A. She did.

Q. And he stayed in Cincinnati?

A. No. That is wrong, too.

Q. Okay. Where did he stay?

A. He lives in Columbus.

Q. He lives in Columbus?

A. Back and forth between Columbus and Springfield.

Q. Columbus and Springfield, okay. All right. I'm sorry, it is Perrion's father that lives in Cincinnati?

A. Yes, and they don't have a close relationship.

Q. Tiona would spend time with her father?

A. Yes.

Q. She would communicate with her father?

A. Yes. Both of them, actually, Perrion and Tiona.

Q. Let's just focus on Tiona now.

A. Right.

Q. She would communicate with her father and her father would communicate with her?

A. Yes.

Q. And if Tiona ever had any problems, she had

the opportunity to sometimes come to you or go to her father, correct?

A. Yes.

Q. Perrion's dad lived in Cincinnati?

A. Yes.

Q. And you said her relationship with her father was not as close as Tiona's was with her dad?

A. Yeah. He lives out of town.

Q. But even though he lived out of town, would he stay in contact with her, communicate with her by phone?

A. Yeah, but not as much as Tiona's dad.

Q. And Perrion would likewise communicate with him?

A. Yes.

Q. And there were times when Perrion would go to Cincinnati to visit?

A. The time I was dating him, she only went once, so, yeah.

Q. I will come back to that. There were times in which dad would come down to Columbus to visit her?

A. Dad, who? Who?

Q. Or come up to visit her. Perrion's dad.

A. Not true.

Q. He never came up from Cincinnati to visit

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858





her?

A. Not true. Sorry.

Q. Was there ever an occasion in which he was scheduled to come from Cincinnati to Columbus to visit his daughter?

A. Yeah, but, see, he is a workaholic. There is times he would cancel. But he has never came to pick her up while I was dating him. We actually went and took her to him while I was dating him.

Q. You are jumping ahead. I will get to that in a second. But there was at least one occasion in which dad was scheduled to come and see Perrion and he did not?

A. It happened many a times. He is a workaholic.

Q. Do you remember on at least one of those occasions your daughter becoming upset and Mr. Almedom giving her money to try to console her for her dad missing a visit?

A. Yeah, but he didn't give her money. Somebody else gave her money, named Isaac.

Q. Okay, all right. And you said there was a time in which Mr. Almedom, along with yourself, along with your other daughters, drove Perrion to Cincinnati to visit her dad, right?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



A. Yes.

Q. Drove all of the way out there, came back to Columbus, then drove all of the way back there to pick her up, correct?

A. Uh-huh, uh-huh. I remember that very well; but I have some information that goes with that.

Q. Now, Sefe would -- do you recall the time when Sefe took Tiona and Perrion to the father-daughter dance along with his daughters?

A. Yes.

Q. At Woodcrest Elementary?

A. Uh-huh, it happened twice, yeah.

Q. And that was sometime between 2011, 2012, fair enough?

A. Yeah, maybe, '13, too, I don't know.

Q. And he would also, along with himself, take the girls to Hometown Buffet?

A. You are talking about out to eat?

Q. Yeah.

A. After the father-daughter dance? I am confused.

Q. No, no, no. I am saying -- I am not associating it with the father-daughter dance. I am saying there were occasions at which Sefe, your daughters and yourself would go out to Hometown Buffet

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



to eat.

A. Not true. We went to Cracker Barrel once.

Q. Oh, you went to Cracker Barrel?

A. And I paid for it, yeah.

Q. Okay. So it was not Hometown Buffet, but Cracker Barrel?

A. Yeah, we went to Cracker Barrel or Golden Corral, one of those.

Q. I am not focused on the location.

A. I am just saying --

Q. And there were also times when you all stayed at Lakeview (sic) that you, Mr. Almedom and the girls would go out for a walk. It was a beautiful place, right?

A. Every now and then, not too often.

Q. And then he took the girls in 2012 to the July 4th fireworks in Ashville, Ohio. Do you remember that?

A. I don't remember it. I think they went with the lady who was baby-sitting them named Susan. I don't remember that. Sorry.

Q. But you are not saying it didn't happen, you just don't remember?

A. I don't remember him going. I remember the lady who I paid to do daycare for my kids doing it,

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Susan.

Q. You do remember your children going to the 4th of July fireworks in Ashville, Ohio sometime in 2012?

A. I don't know if it is Ashville. I don't know where it is; but I know the lady who took care of them while I was working took them. I don't know where it is.

Q. And that was outside of Columbus; is that a fair statement?

A. I don't know that. Sorry.

Q. Do you remember Sefe taking the children down to Red White & Boom in 2013?

A. Excuse me. Ashville, I think I do remember that.

Q. Okay, all right. Do you remember him also taking the girls to Red White & Boom here in Columbus in 2013?

A. Yeah, I think we all went, yeah.

Q. Do you remember when Sefe hosted a birthday party for Perrion when she turned 12 and at the same time also Lee-Lee, which was Isaac's daughter, they had a party together?

A. Yeah, but he did not host it. Isaac's wife, Amy, had a party for Lee-Lee, and Perrion joined the

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



party. He had nothing to do with it.

Q. Sefe had nothing to do with that?

A. It was the other family's party, not his. Sorry.

Q. And do you remember Sefe attending the baptismal service for, I believe it was Ebony's children, and probably would be your children?

A. Yes.

Q. During your relationship with Sefe, your children would oftentimes share with him Father's Day greetings. Is that a fair statement?

A. Yeah, I think so.

Q. You talked about this babysitter. Do you remember her name?

A. Susan.

Q. Do you remember her last name?

A. No, sorry, just Susan.

Q. Did she live next door?

A. Across the street.

Q. Where you all lived on Lakeside, Lakeview?

A. Beachworth.

Q. Oh, on Beachworth?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. Do you remember in one of your interviews with the detective, sharing with the detective that you thought that she might be a relevant witness to talk to?

A. I do believe -- oh, I don't know if I said that. I may have, because when I'm at work, she is there and she was there.

Q. And you suggested to the detective --

A. And then she would leave when he would come, she would leave and go home.

Q. And you suggested to the detective that he should talk to her, correct?

A. Yeah, she might have known something, I don't know.

Q. You also suggested to the detective, did you not, that on one occasion you found some of the girls' underwear that had some stains or discolorations that raised some concerns for you. Do you remember telling the detective that?

A. Yeah. Actually, no, you are wrong. What had happened is once the situation was brought to light, I went and looked in their underwear and I never really thought anything of it, but when that situation came to light, I started to mention that, yes.

Q. And you offered to the detective to give him that underwear?

A. And I did, yes.

Q. And how many pairs of underwear did you give him? Well, actually --

A. I don't remember that. Sorry. I just grabbed -- I just grabbed up whatever didn't look right and I gave it to them.

Q. And that would include underwear for both Perrion and Tiona, correct?

A. Yes, uh-huh. I believe so. I don't know.

Q. With respect to the babysitter, while you were on Beachworth, did she watch those children every time that you were there during the whole period of time that you stayed there?

A. No, not the whole time, because there was times that I didn't work; but when I was working, she did watch them for me and I paid her.

Q. So the entire time that you were at Beachworth, the entire time that you were at Beachworth, other than when you were at work, Susan would watch your children. Is that a fair statement?

A. She was watching them while I was working, yes.

Q. And again, even though you worked these long

hours, you still checked up on your children?

A. Yeah, I will call, check up, she would let me know what they are doing, how things are going, yes.

Q. You would still talk to your children?

A. Not every day. I mean, I just had no reason to think that my children wasn't safe. And if my children ever needed to call me, they could call.

Q. That wasn't my question. You would talk to your children about anything?

A. While I am at work?

Q. At any point in time.

A. Yeah, on my lunch break or whatever.

Q. You'd talk to them at work, talk to them when you get off work, right?

A. Well, no, hold on. There is sometimes I got to work at 11:00 p.m. They would be asleep. So that is not true. There is sometimes I got off at 7:00 a.m., they are at school. That is not true, so --

Q. You would never go 24 hours without talking to your children?

A. No. Why would I do that?

Q. You would never go 24 hours without seeing your children?

A. Why would I do that?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Q. Your answer is no to both questions, correct?

A. The answer is no. I would see my kids. When I am going to work, they are coming in. I still would see them no matter how hard I was working.

Q. You had a home computer, correct?

A. Yes, I did.

Q. A laptop, in fact?

A. I don't know. I owned a computer. I don't know about a laptop.

Q. And was that computer ever at any of the locations that you testified to, that being Beachworth, Dublin-Granville Road or Lakeside?

A. It was at my apartment on Dublin-Granville Road.

Q. Your computer -- I am kind of asking the same question but in the negative. So you did not have a computer at the Beachworth Drive address?

A. At Beachworth, we had -- I had a computer at Dublin-Granville Road, and at Beachworth I might have had a tablet, either there or Lakeside, but I know I had a tablet, at Lakeside I had a tablet and I had a computer at Dublin-Granville Road. Beachworth I don't remember what I had. I don't know.

Q. So you had a computer at Dublin-Granville

Road, a tablet at Lakeside?

A. Yes.

Q. And you don't know what if anything you had at Beachworth, correct?

A. Yeah, I don't think I had anything then.

Q. And Mr. Almedom did not own a computer, correct?

A. Not one that was able to be used, no.

Q. On your computer or your tablet, you have to have a password to log on. Is that a fair statement?

A. There was not always a password on there. I put a password on there when I learned that my kids was using it for long periods of time. Then I had set passwords on there.

Q. And did you do that on the computer, the tablet, or both?

A. I know I did it on the computer with the tablet. That was for the kids. It was not really mine. It was for the kids and for me to look for a job.

Q. So there was no -- let me ask you this. Did you ever own the tablet and a computer at the same time?

A. No, no, no.

Q. You had the computer first?

A. Yes.

Q. And then the tablet?

A. The tablet was last. When I had the tablet, I no longer had the computer.

Q. Was there a period of time in which you did not have either a tablet or a computer?

A. Yes, there was. I didn't have them both at the same time and there was a period of time when I didn't have it, yes.

Q. So you had the computer first?

A. Yes.

Q. When was the last time that you had the computer?

A. I do not remember the date. Sorry. I had it, but I don't remember the date.

Q. Do you remember where you were?

A. Where did I work?

Q. No. Do you remember where you were living at the time?

A. I just told you, Dublin-Granville Road. For the computer?

Q. Okay. So after you moved from the Dublin-Granville Road apartment, you no longer had the computer?

A. No, I didn't -- I don't remember all of that

information. Sorry.

Q. When you acquired the tablet, where were you?

A. I was at, I believe Lakeside. Yeah, Lakeside.

Q. Did you move into Lakeside with the tablet or did you acquire the tablet after you moved into Lakeside?

A. I had bought it when I was living there, yeah.

Q. So when you first moved in, you did not have the tablet?

A. No, I bought it with my income tax return.

Q. How long were you at --

A. I bought it with my own money.

Q. Okay. How long were you at Lakeside before you purchased the tablet?

A. I don't remember that. Sorry.

Q. Did you purchase it with your income tax refund?

A. Yeah, uh-huh, yes.

Q. Do you recall if you got your refund in April, or was it sooner or earlier, later?

A. I think I got it in February or March. I don't know. I can't -- I don't know, sometime around

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



there.
Q. And you had a password on the computer. Did anyone else have access to that password?
A. My kids. Well, there was, you know, on the computer have like a guest and a normal. There was two separate sides. There was one side for the kids and one side for me, so I don't know how to verbalize that, but they had something for theirself and it was set to a code, and I had my thing. So I don't know if that helps you out.
Q. So there were -- as to the computer, there was the capability to have two different sets of log-ins?
A. Yes.
Q. And one was for you and one was for the kids?
A. Yes.
Q. And both were password protected?
A. The children's weren't, but it was set to not allow them to certain things and it was also set to cut off at a certain time because they would be on the computer.
Q. So you had parental controls when your children log in, so they could not visit certain sites, inappropriate sites?

A. Yes, yes, yes.

Q. And also limited time that they were able to be on the computer?

A. Yes.

Q. Now with respect to your password, you were the only one who had that password; is that a correct statement?

A. I believe he had it as well. He knew it.

Q. But you are not sure on that?

A. Sefe. No, it is not -- no, I'm not sure. He was my boyfriend. He had the password. It is no confusion there.

Q. With respect to the tablet, were there any password protections on that?

A. I already told you no, it was for the children.

Q. Were there any similar parental controls on the tablet?

A. No.

Q. So the children could get on the tablet, have access to any site on the Internet?

A. Yes.

Q. Why would you put parental controls on a computer, but not put parental controls on a tablet?

A. First of all, when I was in my own

apartment, there was times that I went to work and they were not with an adult. So my children would be on the computer more than they should be instead of in bed on a school night. That's why.

Secondly, the tablet, there was an adult there who could monitor what they were doing. That is why.

Q. Were you staying where your children would be staying at home -- where were you living at the time that your children would be alone while you were working?

A. Where was I living? Dublin-Granville Road. There was sometimes I went to work and they were home alone. They were fed, they were cleaned, they were safe. They were good.

Q. And I would imagine that your oldest daughter probably had a cell phone or something to be able to reach you?

A. Yes, always.

Q. And what period of time are we talking about?

A. The dates?

Q. Yes.

A. Do you want to know if it was during the time I am with him? What do you want to know?

Q. You said you lived on Dublin-Granville Road, correct?

A. Yes, uh-huh.

Q. Did the children stay there by themselves all the time when you were at work?

A. No, they did not.

Q. Did the children stay by themselves at that address a majority of the time?

A. No, there was no majority of times. Sometimes when I didn't have anybody to sit with them, I would still go to work. It was not all the time. It was sometimes.

Q. You stayed at that apartment for how long?

A. 2011 to 2013.

Q. For that two-year period, on a monthly average, how often would those children stay at that apartment by themselves?

A. Whenever I had to work, if I didn't have anybody for them, which was not too often because Sefe would always help me.

Q. My question is, during that time period, how long on a monthly average, how many times would those children be there by themselves?

A. Not too often, but I really don't know. It wasn't too often.

Q. Would you say two or three times a month?

A. Maybe five, maybe six, but I really don't know. I never kept count.

Q. Perrion's birthdate is September 4th, 2000, is that correct?

A. Uh-huh.

Q. Is that a yes or no?

A. Yes.

Q. Tiona's birthdate is February 5th, 2004; is that correct?

A. Yes.

Q. And between 2010 and 2013, would it be fair to say that your daughters were in school?

A. They were school-age children, yes, yes.

Q. And they went to school every day?

A. Yeah, they went to school every day.

Q. They participated in activities at school?

A. Yeah, if I was off work and I could get them there, yeah.

Q. What kinds of activities would Perrion participate in?

A. I can't really remember that stuff. She did do volleyball that I know. She tried out for, I want to say cheerleading, but I can't really remember, but I know she played volleyball.

Q. What types of activities would Tiona participate in?

A. I don't think that was available for Tiona just then. Nothing was available for her then, yeah.

Q. Your children --

A. Oh, sorry. Tiona played tennis.

Q. And your children maintain good grades?

A. No. They were really struggling actually in school, yeah. They were struggling, yeah.

Q. Their grades remained consistent?

A. Consistent, what do you mean? Good or bad? Because they were not good grades; they were bad.

Q. Well, whether they were good or bad, they remained consistent, correct?

A. I don't remember. I know they were struggling in school.

Q. Your children had friends?

A. They had friends, sure.

Q. They had friends at school?

A. They had friends at school, they had, yeah, they had friends.

Q. Had friends from the neighborhood?

A. From what I understand. There was not too many kids on Beachworth. There was more kids at Dublin-Granville Road that they had friends, that they

made friends with.

Q. Okay. They associated with family members?

A. Yeah, uh-huh.

Q. And I would assume then that you had Easter, Thanksgiving, Christmas, summer events, barbeques, 4th of July, Memorial Day, Labor Day, they would come, birthday parties, they would engage with other family members?

A. It just depends, because I was always one to most of the time work on the holidays. So some holidays I worked, some holidays I did not work. It just really depended. I don't know.

Q. But your children had a normal life?

A. From what I thought they did, they had a normal life. I mean, for a struggling single parent, yes, normal life, parents always at work, yes.

Q. And your children also attended church?

A. Yeah.

Q. And they participated in activities at church?

A. Yeah, they did.

Q. Praise team being one of them?

A. Yeah, they did. They was praise dancers and they were in the choir and all kind of little kids' activities at the church.

Q. So they did praise dancers, the choir, and other youth activities that went along?

A. Yes.

Q. And they had friends at the church as well?

A. Yeah.

Q. And were there other family members who also attended church with them?

A. Yes, Tiona's aunt, that was her family's church.

Q. And Perrion actually went to church?

A. Yes, all of us.

Q. All of you, right. These children knew the pastor?

A. Yeah, they know him. I don't know if they knew him by name, but they knew him, yes.

Q. They have had the opportunity to meet the pastor before?

A. Yes.

Q. Had an opportunity to meet some of the church officials, deacons -- deacons, I don't know whatever they got at the church, but make sense?

A. Yeah, uh-huh.

Q. And did they attend Sunday school?

A. Sometimes. It was early, so if we made it.

Q. And they would go to church on an average

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



every Sunday?

A. No, not every Sunday.

Q. Most Sundays?

A. Yes, most Sundays.

Q. Would they participate in weekday activities at the church?

A. No. They would go to practice for dance and stuff, which was the praise dance for church, but I mean, that was here and there.

Q. As a responsible mother, you would take your children to make sure they had received appropriate medical care?

A. What do you mean, a well check-up?

Q. Yeah, I mean, every year when students go back to school, they have got to get shots, right?

A. Right, right, right.

Q. You take them to get their shots?

A. Yeah.

Q. You take them to get their teeth checked?

A. Yep.

Q. You take them to get their eyes checked?

A. Uh-huh.

Q. Is that a yes?

A. Yes. Well, not really the eye doctor, but, yeah.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Q. You take them to get physical exams when required?

A. Yes. They don't check your vagina. Sorry.

Q. My question is you take them to get checked up, right?

A. Yes.

Q. And you would have occasions in dealing with your children to assist them in getting dressed sometimes?

A. Sorry?

Q. Would you have occasion to assist your children to get dressed?

A. They didn't need my assistance. They are big. They are independent.

Q. You would have occasions to certainly buy clothes for your children?

A. Yeah.

Q. Go shopping with them?

A. Yeah.

Q. Help them try on outfits?

A. They don't need my assistance. Kids from single parents are very independent. Sorry. They don't need assistance for that.

Q. And it is your testimony to the jury that -- let me rephrase that. You realize these are

accusations that date from September 4th, 2010 through March 1st of 2013? Does that sound about right?

A. What accusations?

Q. The accusations your children have made.

A. I don't know what the dates are, but it sounds right.

Q. And from September 4th, 2000 -- well, let me rephrase that. At no time prior to the date where you said this disclosure was made to you, at no time have your children ever said anything to you that caused you to react in the way that you did that night; am I correct?

A. I thought I can't say what my children told me, so --

Q. I didn't ask you what you --

A. But, no, they didn't.

Q. And at no time prior to that moment did you make any observations that would cause you to have a suspicion or concern about your children's well-being?

A. No, I didn't.

MR. BENTON: Ma'am, thank you very much for your answers.

Thank you, Your Honor.

THE COURT: Any redirect?

MR. HUGHES: Yes, a few questions.

\- - -

REDIRECT EXAMINATION

BY MR. HUGHES:

Q. Ms. Henderson, did Sefe provide for the children?

A. He did, yeah. He, you know, he wasn't a slouch, but, yeah, he did sometimes.

Q. Would that include buying groceries?

A. Yes, he did.

Q. And he would prepare meals and food to feed your family?

A. Yes.

Q. And put a roof over your head?

A. He did.

Q. The girls after they would go to church and interact with the pastor, where did they go home and sleep at night?

A. From what I understood, they slept in their room, down in their room.

Q. In the same house where Sefe lived?

A. Yeah.

Q. When they would come home from school after talking to teachers all day and school counselors, where would they come home to sleep?

A. I don't understand. Sorry.

Q. Would they come home and sleep with you and Sefe in the residence where you lived?

A. Oh, no. They sleep in their room that they were supposed to sleep in, yes.

Q. All right. And you talked a little bit about the girls' grades were not very good?

A. No, they wasn't.

Q. After you moved out abruptly in March of 2013, where did you move to?

A. In March 2013 when I moved out, I checked into a hotel, and that is where I made my report and where I took my kids to the hospital after the report was made.

Q. Did you subsequently move out of state?

A. No, I didn't. I stayed.

Q. For how long?

A. I stayed for quite a while. The thing is the hotel that I went into was $600 or $650 a month, and that ended up getting shut down, and I couldn't afford to keep staying in that hotel, so I went to another hotel which cost more. And I think I was there for about a month.

After that I stayed with a family member and I tried to find an apartment. I couldn't. I had trouble finding an apartment. Eventually I left, but

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



I think I might have left in September or October of 2013 or '14. I don't really remember. I don't remember.

Q. Months later?

A. Yes, months later. I didn't leave right away.

Q. Did you enroll the girls in a new school when you moved?

A. In New York?

Q. Yes.

A. I did.

Q. And compared to how they were doing in January, February and March of 2013 right before all of this stuff happened, how are they doing now?

A. Honor roll.

MR. BENTON: Objection as to relevancy.

A. Honor roll. They were on the honor roll the whole time.

THE COURT: You can approach.

\- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

MR. BENTON: Objection as to relevancy, how are they doing post --

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



MR. HUGHES: I mean, he opened the door. That is my only question, the difference.

THE COURT: If that is your only question, I will allow it.

MR. HUGHES: That's it.

THE COURT: And the girls won't be able to testify today.

MR. HUGHES: I don't think we will be able to get to them today. We could start if the Court wants to.

THE COURT: I don't want to break up the testimony.

MR. BENTON: Do I have a follow-up then to that line of questioning?

THE COURT: Yes, very short.

MR. BENTON: Yes, sir.

\- - -

THE COURT: You can continue.

MR. HUGHES: Thank you, Your Honor.

Q. (By Mr. Hughes) Ms. Henderson, my question is, just comparing the girls in school now academically as to how they were doing when they were living at the same residence as Sefe Almedom --

A. They are doing better.

Q. Okay. In school?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



A. They are doing better in school. They are doing better socially. My oldest daughter, she was having -- they are doing better.

MR. BENTON: Objection, Your Honor.

THE COURT: Overruled.

THE WITNESS: They are doing better.

MR. HUGHES: Okay, thank you.

THE COURT: Any questions as a result of those questions?

MR. BENTON: Yes, Your Honor.

- - -

RECROSS-EXAMINATION

BY MR. BENTON:

Q. Ms. Henderson, you talked about, when you previously testified, about the children were not doing well in school. Do you remember that question?

A. Uh-huh.

Q. Is that a yes or no?

A. I remember it, yes.

Q. I'd just ask you to speak up.

A. Okay.

Q. Now, this talk about Perrion. Perrion was eight or nine. How was she doing in school?

A. You said when she was eight or nine?

Q. Eight or nine, yes.

A. I don't remember that, but I don't think she was struggling like she was at the time, no. She wasn't struggling like that.

Q. She was struggling, but to a different level?

A. She was not -- no, I never said she was not struggling how she was when I was with him. I never said she was struggling.

Q. Okay. And with respect to Tiona, how was she doing in school, let's say, when she was about six or seven?

A. As far as I know, her grades was good. She was, like, in kindergarten or first grade, easy work.

Q. Now that you are in New York, your children are staying at a consistent place?

A. At a consistent address?

Q. At a consistent address.

A. Yes, uh-huh.

Q. When you were in Ohio, they were moving around between shelters and being evicted, correct?

A. You are wrong. We were at the shelter for 30 days. And after the 30 days we were there for, like, two days.

Q. So while in Ohio, there were at least two occasions they stayed at a shelter?

A. Yes.

Q. Two occasions at which they were evicted from an apartment?

A. Yes.

Q. And other occasions when they had to stay in a hotel, correct?

A. When I moved out from Sefe, I stayed at a hotel, and that was only once in my whole life that I ever had to stay in a hotel.

Q. And there were times also where they had to live, they lived with other family members such as Ms. Arnold, Ebony Arnold, correct?

A. That is when I moved from Springfield to Ohio, yes.

MR. BENTON: Nothing further. Thank you.

THE COURT: All right. You can step down.

THE WITNESS: Okay. I am done? Thank you.

(Witness excused.)

THE COURT: Counsel, do you want to approach?

\- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

THE COURT: Who do you have tomorrow?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



MR. HUGHES: Perrion and Tiona, and then the last person that did the other interview and another detective.

THE COURT: Okay. So we have a full -- we can start with the little girls and go from there.

MR. HUGHES: They are supposed to fly back at some point, so I would prefer to do them first since they have flights.

THE COURT: Okay, we will break for the day.

\- - -

THE COURT: Courtney had cranked up the white noise, if you didn't notice it that one time.

We are going to take a break for the day. We are going to start, if you guys can be here 8:30, quarter to 9:00, I'm going to try and start at 9:00 o'clock.

But do not discuss the case among yourselves. Do not permit anyone to discuss it with you or in your presence. It is your duty not to form or express an opinion in the case until it is finally submitted to you.

Go have a good evening.

THE BAILIFF: All rise.

\- - -

Thereupon, the jurors exited the courtroom

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



and the following proceedings were held in open court, in the presence of the defendant:

THE COURT: Everyone can have a seat. Could you, Mr. Hughes, e-mail Cathy the jury instructions that you guys used in the last case?

MR. HUGHES: Yes, sir, I can. I will go ahead and e-mail the Court those jury instructions.

THE COURT: Did Cathy do the verdict forms?

MR. HUGHES: The Court should have verdict forms already.

THE COURT: Would the Court also have the jury --

MR. HUGHES: You should have that as well, yes. And, Judge, if I e-mail, I would just include Fred on a copy of any proposed instructions if there are any differences from the last time. I think since the last trial, there is a case called *Eskridge*, which may apply in this instance. And I would highlight that in my proposed instructions which would be an addition to the original instructions. And I think that is just recent case law.

MR. BENTON: That says what?

MR. HUGHES: Eskridge.

MR. BENTON: That says what?

MR. HUGHES: Since this trial.

MR. BENTON: What does Eskridge say?

MR. HUGHES: Eskridge says that in cases where a person has a parental role of authority, that that can fulfill the force element. You don't have to show that a person was, I guess, otherwise coerced. The fact that you feed, shelter and roof a child and that they can use that housing and everything a parent provides, even though they are not a parent, if they have that position of authority, that that can suffice for the force element.

That instruction has been utilized in the Timothy Harrow case, and it has come back affirmed by the Court of Appeals in the Tenth District, and I will include that language in the proposed instructions.

THE COURT: If it applies. We will take a look at it.

MR. BENTON: Your Honor, also, I have provided both to the Court and counsel defendant's proposed instructions. I don't know if you had a chance to look at that.

THE COURT: I have not gotten anything.

MR. BENTON: I e-mailed it to your bailiff.

THE COURT: Okay. She hasn't printed it out.

MR. BENTON: And the other thing is I do

anticipate in light of recent developments requesting an instruction on spoliation, and I will craft that language this evening.

THE COURT: Okay.

MR. HUGHES: Thank you, Judge.

THE COURT: Just think about how you want to recall the detective.

MR. BENTON: I don't intend to do so, Judge.

MR. HUGHES: I will recall the detective. I will place him back on direct examination and I would --

THE COURT: What I want to do is just reopen it for cross.

MR. HUGHES: I will make him available for that, Judge.

\- - -

Thereupon, at 4:17 p.m., Wednesday, July 19, 2017, the further trial of this cause was adjourned until 9:00 o'clock, a.m., Thursday, July 20, 2017.

\- - -