IN THE COURT OF COMMON PLEAS OF FRANKLIN COUNTY, OHIO

CRIMINAL DIVISION

- - -

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff, | : | |
| vs. | : | Case No. 13CR-1858 |
| Sefe A. Almedom, | : | Volume 3 |
| Defendant. | : | Pages 390 - 620 |

- - -

TRANSCRIPT OF PROCEEDINGS

Before Hon. David C. Young, Judge, and a jury, duly impaneled and sworn, on Thursday July 20, 2017.

- - -

APPEARANCES:

Michael T. Hughes, Assistant Prosecuting Attorney,
On behalf of the State of Ohio, Plaintiff.

Frederick D. Benton,
On behalf of Sefe A. Almedom, Defendant.

*LINDA S. SHUPE, RPR, RMR*
*Assistant Official Court Reporter*
*(614) 525-4434*

Case: 2:22-cv-02229-MHW-MRM Doc #: 9-3 Filed: 09/15/22 Page: 2 of 231 PAGEID #: 890

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



**INDEX TO THE WITNESSES**

CALLED BY THE STATE: PAGE

**PERRION THOMPSON**

Direct Examination by Mr. Hughes 407
Cross-Examination by Mr. Benton 455
Redirect Examination by Mr. Hughes 487

**TIONA ARNOLD**

Direct Examination by Mr. Hughes 496
Cross-Examination by Mr. Benton 548
Redirect Examination by Mr. Hughes 572

- - -

Thursday Morning Session,
July 20, 2017,
9:15 a.m.

- - -

Thereupon, the further trial of this cause was resumed pursuant to adjournment.

- - -

Thereupon, the following proceedings were held in open court before the jurors resumed their places in the jury box:

THE COURT: Everyone can have a seat. Back on the record, 13CR-1858, State of Ohio versus Sefe Almedom. Counsel, enter your appearances.

MR. HUGHES: Michael Hughes, State of Ohio.

MR. BENTON: Your Honor, Frederick Benton here on behalf of Mr. Almedom.

THE COURT: I received a defendant's motion for a new trial. It was, I think, filed at 7:46 p.m. last evening. Is there anything further on behalf of the defense?

MR. BENTON: Your Honor, the motion was to memorialize the oral arguments that were previously presented to the Court prior to the Court's ruling. And the Court may recall, I indicated that I intended to file that motion, further documentation of our

arguments in support of the motion. I know the Court has ruled. I ask the Court to reconsider its ruling based upon the additional citations provided in our motion.

THE COURT: Okay. And then the prosecution I just have given a copy to. I will reserve additional ruling on this motion.

I received supplemental jury instructions by the State of Ohio. Has the defense received those? I received your jury instructions on behalf of the defense and also a supplement with respect to spoliation and the second thing.

MR. BENTON: Your Honor, I received the jury instructions from the State this morning. I have not had a chance to take a look at it.

THE COURT: All right. We will deal with that later. Anything further we need to put on the record prior to bringing in the jury?

MR. HUGHES: Judge, as the Court addressed yesterday, I have Detective Phillips here and I am prepared to recall him and reopen his direct to go into this situation, and Fred's free to cross him all he wants I would assume at that point.

The issue I want to bring up with the Court is it is my understanding in speaking with the

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



detective that the property was destroyed because he had authorized its release to be returned back to Ms. Henderson, since she submitted the property. He had authorized it to be released to her because the case was over and because of the --

THE COURT: How are we going to get into that?

MR. HUGHES: I know. That's the whole -- how do we get into that without misleading the jury? I don't know. But his testimony would be that he would not have released the property and it would not have been destroyed but for the defendant's conviction and imprisonment. I don't know how to address that either, but that is what he would say.

MR. BENTON: Your Honor, first of all, it is my understanding that the Court would allow him to be recalled upon cross-examination, not as to direct examination. But inevitably I am sure we are going to cross this road during the course of any examination.

Again, we didn't create this problem. But by the same token, particularly in light of the Court's ruling concerning a mistrial, I don't know how, unless the State is prepared to just stipulate that the items were destroyed, I don't know how we address this issue; because at first my initial

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



thought was to not call the detective to the stand -- to recall the detective to the stand. But as I was thinking about it and preparing the proposed instructions for spoliation, I would note that I can get into that without there being a record for the jury's consideration that such items were, in fact, destroyed.

So I am in a conundrum here because certainly I don't want to make references to the fact that there is a prior conviction or even a prior trial. So I am -- my thought would be, if the Court were to allow this, because the detective did testify to this during trial outside of the presence of the jury, is to just simply, particularly in light of Mr. Hughes' later comments, to simply submit Defendant's Exhibit B, which is documentation of the destruction into evidence as an item of consideration for the jury's deliberation, but without any --

THE COURT: I am more inclined -- Mr. Benton, you bring up a good point. I am more inclined to say that, in fact, or do a stipulation -- I don't know whether the State will agree with it or not -- that, in fact, because he had cross-examined him, did you not get the panties from the little girls, that in fact, the Columbus police department did obtain three

sets of panties, did not test those panties, and subsequently destroyed the evidence.

MR. BENTON: Yes.

THE COURT: I mean, that is -- and admit Defendant's Exhibit B. I mean, that way we are not dealing with prior convictions that were overturned on appeal, and you can argue however you want to argue that. I think that is the cleanest way to do it without getting into why the detective destroyed the evidence and those kinds of things.

MR. HUGHES: Well, the State would not be willing to just stipulate to a record without authenticating them and having the officer explain the dates or the timelines or what happened. I can understand a limited instruction or instructing the witness that he can't comment on the destruction. I mean, he could say at the time he followed the protocol, the normal protocol of the department at that time.

THE COURT: I mean, this is your violation. You know, I am trying to protect this gentleman's --

MR. HUGHES: If Fred wants to introduce this evidence, he is going to have to get a deal.

THE COURT: Well, if you guys want to put together a stipulation that this was destroyed in

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



respect to Columbus police protocol at the time, that is for you two to work out. But I am not going to allow the detective to get up here and say I destroyed these because, you know, there was a conviction of the defendant.

MR. HUGHES: That is why I brought this up. I don't want that to happen either, Judge, and I was just trying to figure out a way that --

THE COURT: Columbus police, in fact, destroyed this during the pendancy of the appeal?

MR. HUGHES: That is correct, yes.

THE COURT: If you guys can come up, if you want to say they -- you can craft something, but I am more inclined to just do -- if you want to craft something that it was destroyed with respect to the Columbus police protocol, then you can come up with that. But Mr. Benton shouldn't have to allow you to get in, well, I did all of this once the guy was convicted and got life without parole.

MR. HUGHES: I don't want to get that in, Judge. I don't want to get that in. I am not trying to get it in. I just wanted to advise the Court of how we would address this issue without that information coming out. Because, again, the protocol is that the case was terminated. The judge -- or the

officer, based on the judgment of the Court, released the property back to Ms. Henderson. When she did not collect it, it was subsequently destroyed. He would not have released it if he didn't believe this case was over.

MR. BENTON: Judge, I want to be clear. The case was not terminated. There was a motion for a new trial that was pending, I believe prior to destruction of the evidence. There was then a subsequent notice of appeal. So it is not accurate to say that this case had been terminated. There was still ongoing litigation associated with the conviction.

THE COURT: And I am not going to deal with the case being terminated. You know, if it was destroyed pursuant to Columbus police protocol at the time, I mean, we can do something like that, and then everyone can argue and we don't need to recall the detective if you don't want to recall him on cross. I have not seen Defendant's Exhibit B, so --

MR. HUGHES: All right. I won't stipulate to the admission of the property slips or the information absent the detective's testimony about what any of this --

THE COURT: Okay. You don't have to stipulate.

MR. HUGHES: Well, we could do a stipulation as you suggested, Your Honor, like a single paragraph indicating the timeline, the property was destroyed pursuant to police protocol at the time.

THE COURT: We can do something like that, and I am still going to probably, I will admit the documents if I ever get a chance to see them. I have never seen them.

MR. HUGHES: Well, Judge, I don't know if they are admissible if they can't be authenticated by a witness.

MR. BENTON: Then, Your Honor, declare a mistrial. The State can't have it both ways. Or in the alternative, I would ask the Court to take judicial notice of those documents in light of the detective's testimony outside of the presence of the jury, at which time it was submitted and admitted for the purpose of the defendant's motion for a mistrial. It was already a matter of record for the Court because the Court did admit it as an evidentiary item pursuant to those arguments.

MR. HUGHES: I don't believe it was ever labeled or -- I provided it to the Court and to the defense attorney as soon as it was given to me, but --

THE COURT: I am not saying you did it

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



intentionally, and I ruled that you didn't do it intentionally.

MR. BENTON: Well, Your Honor, and if the record is ambiguous on this point, then let me make it clear now. The defendant has moved for the admission of Defendant's Exhibit B, which are the records documenting the destruction of the three undergarments that was testified to and identified by Detective Phillips.

So if it has not been done before, I would ask the Court to rule now that they have been admitted for purposes of the defendant's argument and motion for a mistrial.

MR. HUGHES: At what point did Detective Phillips testify about this defendant's exhibit?

MR. BENTON: I handed it to him. I said: Here is a copy of Defendant's Exhibit B.

THE COURT: You didn't get to Defendant's Exhibit B until after he was finished testifying, but you did inquire, why did you not get any of the underwear.

MR. BENTON: That is correct. That is correct.

THE COURT: And you asked the detective and he goes: I didn't think it was necessary in this

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



case.

MR. BENTON: I stand corrected. But let me rephrase it this way then. I would still move for the admission of that exhibit based upon the State's representation to the Court and the disclosure to counsel that these are the documentations of the evidence having been destroyed. I don't see why there is such an opposition to that when it is the State's own records.

MR. HUGHES: The opposition is there is no explanation. If the jury just gets this, it is not explained, there is nothing about this, they are not going to understand what all of these numbers mean. It is misleading.

THE COURT: Do you want me to declare a mistrial and we can deal with this again next week or the week after?

MR. HUGHES: It is up to you, Judge. Whatever decision you decide, the State respects that decision. I am simply indicating that --

THE COURT: That is why I am proposing that you do a stipulation as to what this document represents. That, in fact, three pair of underwear were received from Perrion Thompson on April 2nd, 2013 at 9:00 a.m., 9:02 a.m; that, in fact, on January 3rd,

2015, they were destroyed. I mean, I don't understand why we can't do something like that.

MR. HUGHES: Again, I don't -- just for the record, I don't think that is correct. I think they were destroyed on --

THE COURT: Okay, they were destroyed, updated July 31st, 2015 at 12:40.

MR. HUGHES: I think it is 7-13-15, if you look at page 4.

THE COURT: I mean, we can go through here. I mean, I don't see what the problem is. Why can't we do a stipulation as to what happened, what these documents represent and what happened? I mean, that seems the easiest way to deal with it.

MR. HUGHES: Judge, I don't object to that. I will sit down with the detective whenever I have an opportunity to do that at lunch and type something up that I believe is fairly representative.

THE COURT: I don't want to mislead the jury, but I, you know --

MR. HUGHES: I would need to sit with the detective.

THE COURT: Okay. We will deal with that on our next break.

MR. HUGHES: I have no objection to typing

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



up a stipulation, Judge. I want to make sure the information is accurate.

THE COURT: I have no problem doing that. Anything further?

MR. BENTON: Your Honor, yes. I would ask leave of the Court to recall Ms. Henderson to the stand. When I reviewed my notes, I realized there were just three questions that I failed to ask her that I think are important to this case. It is not going to be a long inquiry. It is yes or no questions.

And I did disclose to Mr. Hughes this morning my desire to have that witness recalled. I know he opposes it, but I am asking the Court for that leave.

THE COURT: And you oppose that?

MR. HUGHES: Just in general. If I recall, we were to the point where at recross on a limited subject of their grades improving. We had got it down to that narrow after about three hours on the stand. So I would object to reopening the cross after that complete lengthy --

THE COURT: I mean, the mother, Ms. Henderson, I am not going to allow her to be recalled. She did not see, hear or have any evidentiary value

other than they were her kids, so --

MR. BENTON: This was directly related to the testimony that she provided that, to be quite honest with you, Your Honor, I got distracted when I had to go into replaying her recordings, which caught me off guard that she would deny even that that was her voice. So --

THE COURT: I understand. I mean, this is a case whether they believe the little girls or they don't. That is what this case is about. So we are not going to recall any witnesses in there. And if you want to propose what the three questions you want to or proffer the three questions that you wanted to ask her, feel free to make a record.

MR. BENTON: Your Honor, my three questions were simply whether or not with regard to the bottles found in the cabinet at Mr. Almedom's house and photographed at the time of the search, whether or not the circumstances in which her children have observed her and Mr. Almedom actually engaged in sexual activity, and her computer activities, watching pornography on her computer.

THE COURT: Okay. Anything further?

MR. HUGHES: No, sir.

THE COURT: All right.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



- - -

Thereupon, at 9:30 a.m., the jury resumed their seats in the jury box.

- - -

THE COURT: Everyone can have a seat. Hope everyone had a good evening last night. It's interesting, when I have jury trials, for some reason I always note where certain jurors sit. Some people sit in the exact same seat every single time; and other jurors, I don't know where everyone is, they always keep switching. I don't know if it is a territorial imperative or whatever.

Are there any further witnesses on behalf of the State of Ohio?

MR. HUGHES: There are, Judge. The State calls Perrion Thompson to the stand. She is just down the hall, Your Honor. It will be just one second for her to walk down.

THE COURT: Okay. Come up here. Will you raise your right hand?

(Witness sworn.)

Have a seat and pull yourself up close to the microphone.

MR. BENTON: Your Honor, may we approach?

THE COURT: Excuse me?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



MR. BENTON: May we approach?

THE COURT: Okay.

\- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

MR. BENTON: I would object to calling this witness to testify as well as Tiona Arnold, who I know the State will also attempt to call to testify. This jury has already heard their statements by virtue of the videotape recordings that were played earlier in the week. This is basically allowing the State to recall this witness, as her testimony has already been elicited. And so for those reasons I indicated -- it basically gives them two bites at the apple, so I ask that these witnesses not be permitted to testify.

MR. HUGHES: Their testimony is as equally a part of the evidence as the medical records.

THE COURT: Overruled.

\- - -

THE COURT: You may inquire.

MR. HUGHES: Thank you, Judge.

\- - -

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



PERRION THOMPSON

Called as a witness by the State of Ohio, being first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HUGHES:

Q. Good morning.

A. Good morning.

Q. My name is Michael Hughes. I am an Assistant Prosecutor. I will be asking you some questions this morning. Okay?

A. Okay.

Q. All right? I am going to ask you if you can please kind of keep your voice up since the lady in front of you is typing down everything you say.

A. All right.

Q. All right? And you have to remember to say your answers instead of nod your head so she can type down what you say.

A. Okay.

Q. Okay?

A. All right.

Q. Could you speak up a little bit here for the ladies and gentlemen of the jury so they can hear you over here?

A. Okay. Good?

Case: 2:22-cv-02229-MHW-MRM Doc #: 9-3 Filed: 09/15/22 Page: 19 of 231 PAGEID #: 907

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858





MR. HUGHES: Everyone hear?

Q. Are you normally kind of soft-spoken?

A. Yeah.

Q. Not very loud?

A. No.

Q. Okay. First, could you let everybody know what your first and last name, can you spell those for the person typing?

A. First name is P-E-R-R-I-O-N; last name is Thompson, T-H-O-M-P-S-O-N.

Q. All right. Now, Ms. Thompson, I am not supposed to ask a lady, but how old are you?

A. Sixteen.

Q. So 16 years old. When were you born?

A. 2000, September 14th.

Q. Of what year?

A. 2000.

Q. 2000. All right. And where did you grow up?

A. Springfield, Ohio, and then -- that is where I was born. And then I moved to Columbus and then now I am in New York.

Q. And now you are in New York?

A. Yes.

Q. New York City area?

A. Yeah.
Q. How old were you when you moved from Springfield to Columbus?
A. Around eight? Eight years old.
Q. About eight years old?
A. Yeah.
Q. And do you have any sisters or brothers?
A. I have two sisters and a brother on my dad's side from my dad.
Q. What about your sisters, what are their names?
A. Tiona and Kanijah.
Q. And are they older, younger? What are the differences there?
A. Tiona is the second oldest and Kanijah is the youngest.
Q. When you moved to Columbus, who did you move here with?
A. My mom and two sisters.
Q. So it was just you, your two sisters and your mother, the four of you?
A. Yes.
Q. And what grade were you in in school when you moved here?
A. Fifth grade going into sixth grade.

Q. Fifth going to sixth. When you got to Columbus and lived here, do you remember where you started going to sixth grade?

A. CHATA, I'm not sure, I forgot the abbreviations, but CHATA is for short.

Q. And what kind of school was that?

A. It was a charter school.

Q. All right. And when you went to this charter school, how would you get to school every day?

A. Most days I would take the school bus, but a few days my mother would drive me.

Q. All right. When you first moved here to Columbus with your two sisters and your mother, do you remember where you were living?

A. Dublin-Granville Road, I remember that.

Q. Do you remember living on Dublin-Granville Road?

A. Yes.

Q. And do you remember what side of town? Do you remember where that is?

A. No.

Q. You don't? But did you have to take the bus to get to school from there?

A. Yes, I took a school bus.

Q. Did you always take the school bus to get to

school when you lived in Columbus?

A. Pretty much, most days. There was more days on the school bus than being droven to school.

Q. And if you were driven to school, who would drive you to school?

A. My mom would most days.

Q. All right. So you said you remember living in a place on Dublin-Granville Road?

A. Yes.

Q. Do you remember other places you would have lived when you were in Columbus?

A. Beachworth.

Q. Beachworth?

A. Yes.

Q. When you lived in Beachworth, who lived with you at the place on Beachworth?

A. It was me, my mother and two sisters and Sefe.

Q. All right. So the same four of you, but also including Sefe?

A. Yes.

Q. And any other places that you lived when you were in Columbus before you moved away?

A. Lakeside?

Q. Lakeside is the name of it?

A. Yes.
Q. All right. And who lived at Lakeside?
A. Same. Me, my mother, two sisters and Sefe.
Q. So you remember those three places specifically that you lived at?
A. Yes.
Q. Okay. What do you remember about the place on Beachworth? What kind of a place was that? Was it a house or an apartment or what?
A. It was an apartment complex.
Q. And what do you remember about the inside? How was it laid out?
A. Okay. So it was the front door -- from the front door that led into the living room, and to the right of the front door there was a closet and then stairs that you could go up. Once you are at the top of the stairs there was a bathroom in front of the staircase, and then to the left of the bathroom was the first bedroom. To the left of that room was a closet, and then to the left again was the second bedroom. And then from the living room, that led into like a mini hallway. And to the right of the opening for the hallway was a door to the basement. And to the left of the opening was a second bathroom, and that led into a dining room, the kitchen area, and

then a back door.

Q. All right. And that is the description of Beachworth?

A. Yes.

Q. How many bedrooms were there?

A. Two.

Q. Okay. Where did you and your sisters stay when you lived at Beachworth?

A. We slept in the first bedroom to the left of the bathroom upstairs.

Q. All right. And did you each have your own bed there?

A. No. There was two beds, so one of us would sleep -- one would sleep in one bed and two would sleep in another.

Q. How did you like that, having to share a room with your two sisters?

A. It was pretty cool, but the youngest one sleeps a lot, so it is annoying sometimes, but it was okay.

Q. Now what about the other bedroom, who slept there?

A. My mom and Sefe.

Q. That would be their room?

A. Yes.

Q. Okay. And do you remember what grade you were in when you lived at the Beachworth apartment?

A. Fifth grade.

Q. Fifth grade? All right. Do you remember how long you lived there?

A. For -- I'm not sure of the exact number of years, but it was for a couple, a while.

Q. Okay. So a while?

A. Yes.

Q. You said a while. Are there some places that you lived for very short periods of time?

A. Dublin. We didn't live there long because from Dublin was when we moved into Lakeside.

Q. And then you went to Lakeside?

A. Yes.

Q. Are there any other times that you lived somewhere that wasn't one of these three places?

A. A shelter. I am not -- I don't know the name, but we went into a shelter twice.

Q. Okay. Going back to Beachworth --

A. Uh-huh.

Q. -- what do you remember mostly about Beachworth?

A. Mostly I remember that is where everything began.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Q. When you say, "everything began" --
A. Yes.
Q. -- did something start happening to you at Beachworth that hadn't happened to you before in your life?
A. Yes.
Q. Okay. Can you describe the circumstances here for these folks about the first thing that you remember happening to you there?
A. The first thing I remember happening is there was a night that me and my two sisters were all in the living room while Sefe was sleeping on the couch. And we were all just watching a movie, and he had fallen asleep throughout the movie.
And then he eventually had woken up and my sisters were asleep. And he had called me over to lay on the couch with him. And then he said that he was going to do something and I would probably bleed, but don't worry, it's okay. And then he entered his penis into my vagina, and that was what I remember happening.
Q. All right. Do you remember if there was any blood or anything that first time?
A. Yes. Because I went to the bathroom and I tried to pee, and it was like it hurted a little; and

when I wiped, there was blood on the tissue.

Q. Okay. And had anything like that ever happened before?

A. No.

Q. And how old were you when that happened?

A. Nine.

Q. How did you react? What did you do?

A. I was -- I know my body shook a lot and I didn't really understand what was going on. But I knew it wasn't right and I was crying once I went to the restroom because I was scared. I didn't know what had happened.

Q. Do you know how long you were in the bathroom that first time?

A. No.

Q. Did you come out of the bathroom at some point that night?

A. Yeah, to go back and lay with my sisters.

Q. You went back to sleep?

A. Yeah.

Q. Did Sefe say anything to you afterwards?

A. No.

Q. Was there some period of time -- how much time had gone by then before something happened again?

A. Maybe like four days and something had

happened again.

Q. Okay. What about that next time, what do you remember? This is still at home?

A. Yes. The next time it was the same event, but we were on the couch and my sisters were in the room upstairs asleep, and he had came up to wake me up and --

Q. Were you asleep upstairs with your sisters?

A. Yes.

Q. So you were asleep in that bedroom that you shared with your sisters?

A. Yes.

Q. And you said somebody woke you up?

A. Yeah.

Q. Who woke you up?

A. Sefe. And he said to come down and watch TV. And then he laid me on the couch and he started to undress me and told me to take off my shirt. And then he, once I laid down, he came and he said, "It's okay. Just relax." And then he inserted his penis again into my vagina.

Q. Okay. Now at that time did you say anything to him about what he was doing?

A. I tried moving and saying, "I'm going back upstairs with my sisters," and saying, "I'm going to

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



sleep, leave me alone." But he would just keep telling me to come and pull me on the couch and say, "lay down," aggressively, so --

Q. Do you remember how you were laying down, what part of your body was on the couch?

A. My whole body was on the couch. My head was at the top and then just straight like -- yes.

Q. Did you have any bottoms on?

A. I had on my night pants and then a regular shirt like this to sleep in.

Q. Were those removed or did they come off?

A. He pulled, yeah, he pulled off my pants. And then from my pants he pulled off my shirt and then my panties.

Q. What about his clothes, what was he wearing or what did he do that time?

A. That time he didn't have on a shirt. He just had on regular shorts that a basketball player would wear or regular shorts that boys wear.

Q. Okay. And did he keep those on the whole time?

A. No, he took them off and then pulled his underwears down a little to about his knees and then --

Q. Then what did he do with his body or how did

his body, where did it go?
A. He would come and then lay on top of me and then pull -- push my legs up more towards my shoulders and then go in between my legs.
Q. With his whole body?
A. Yes. And then --
Q. All right. How long would that go on for on this couch?
A. For a while, because I would always try to move and it kept going on and on back and forth fighting. So I would say probably about maybe 15, 20 minutes.
Q. Okay. And what made it all stop, or how did that one particular time that you are talking about that you remember now where he had your legs were up kind of towards your shoulders, what or how did it stop?
A. He would move back from me and then I would see him grab his penis and then he would just walk away, go to the bathroom. And I would run to go upstairs before he came back.
Q. And so when you ran upstairs, would you go back to bed in the room with your sisters?
A. I would sit -- I would sit on the bed with my sisters and then I would -- sometimes I cried and

then I would lay down and just fall back asleep.

Q. Okay. How often would something like this happen when you were living on Beachworth?

A. This happened every -- in a week it would happen three times.

Q. On average?

A. Yes.

Q. And now did you ever keep track or a diary or write this all down?

A. No.

Q. Okay. Did you write down the exact times that these things happened?

A. No, but it always happened during the night or any day that my mother had to work.

Q. You talked about two specific nights that you remembered, the first time and this other time. You said also it happened when your mom was gone or at work?

A. Every time she was always gone or at work.

Q. Do you remember any of those instances just at Beachworth when your mom would be out of the home or out of the apartment?

A. Yes. There was another time in the basement where he was cleaning out the basement and he had called me down while my sisters were outside playing

with one of the neighbors, and said if I could help him with moving a cooler and some other things that were down in the basement.

And when I went, I was moving the stuff and taking it upstairs. And when I came back down, he grabbed me and took me to the farther corner of the basement and he told me to undress and then he bent me over and inserted his penis into my vagina.

Q. All right. First off, you said that he told you to undress?

A. Yes.

Q. Did you undress?

A. No, I didn't. I hesitated and I tried to just walk away and go back outside. And he said -- he pulled me and said to come. He said, "Just relax," as he always said to me, "Just relax. It is okay."

And then he told me to undress, and I took my shirt off because I was starting to get scared, because there was a look that, like, he gave me. It was an aggressive look.

Q. What do you mean, an aggressive look?

A. Like it was an intense look. It made me feel scared.

Q. Had he given you that look before in other instances?

A. Yes, the first time that was a look that I got from him.

Q. Why were you scared? What made you scared?

A. I was -- I was very little then, so he is way bigger than me, and it intimidated me, and his voice was very aggressive. So I took my shirt off. And then once I did that, he started to undo my pants and then bent me over and undressed himself to his knees.

Q. And then did sexual intercourse happen in that basement between the two of you?

A. Yes.

Q. How did that stop or that end that time?

A. Again, he just moved away from me and held his penis and then pulled up his pants and I dressed myself and left.

Q. Okay. What other instances -- when was your mom usually gone, just talking about Beachworth?

A. Usually she would leave in the late evenings and come back early in the morning because she did CNA work, so there were 16-hour shifts that they had them do, so it was always long periods of time.

Q. All right. Would you be then home alone with your two sisters and Sefe?

A. Yes.

Q. And that is the only people in the house?
A. Yes.
Q. When you were getting up in the morning, was your mom there to help you get ready for school sometimes?
A. Yes.
Q. Was sometimes she still at work?
A. Yes, or she would be coming home.
Q. Okay. Can you talk a little bit about what you did, what your role was there in the family with your mom gone?
A. When she was gone, I would help my sisters. Like once food was done, I would help them to make their plate, and then I would help the youngest one to get into the shower, because she was still young, so I would put the soap in there for her.
Q. About how old -- you are talking about Kanijah?
A. Yes.
Q. How old was she then when you were like nine or ten?
A. She was probably around four or five.
Q. So you helped her out?
A. Yes.
Q. Did you do the sort of things maybe that

your mom would help her do or help you do when you were younger?

A. Yes.

Q. What about, you described, you called Sefe Almedom, "Sefe." What would he do around the house when you lived there?

A. He would clean or he would just simply lay on the couch or watch TV and drink his beers.

Q. Okay. Did he participate in meals and food and eating and that sort of thing?

A. Yes.

Q. All right. Would he sometimes help you guys with school work or other things that needed to be done?

A. No.

Q. Still talking about the time at Beachworth, any other instances in your mind that you remember from that time at Beachworth when you were nine or ten years old or so?

A. No.

Q. Those three are the ones that stick out in your brain?

A. Yes.

Q. Do you know or recall if it happened more, but you don't -- do you remember other instances, but

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



not with particularity?

MR. BENTON: Objection as to leading.

THE COURT: She can answer. Overruled.

A. Can you repeat it, please?

Q. Sure. Asking it in a different or more simpler way, did what you described happen, happen other times, but you don't remember it as well as those ones that you just talked about?

A. Yes.

MR. BENTON: Objection.

THE COURT: Overruled.

Q. I'm sorry, your answer, ma'am?

A. Yes.

Q. Do you remember moving at some point to Dublin-Granville Road?

A. Yes.

Q. All right. You talked about -- I'm going to take one step back. You talked about instances of sexual intercourse. I want to ask you about any other instances that may or may not have involved intercourse, but also could have involved Mr. Sefe touching you.

A. Okay.

Q. Are there any specific instances you recall about him touching you that were not necessarily his

penis entering into you?
A. Yes. There was one time, this is now in Dublin-Granville Road, that he called me, he told me to come, he pulled me from the kitchen and sat me on his lap and said that he was going to show me videos. And the videos was on a sexual web site, porn, and he was saying --
Q. This was on a computer or what kind -- what was this on that you were looking at?
A. A computer like the one you have, like a Dell window.
Q. All right. So it had kind of a flat screen on it?
A. Yes.
Q. And where was this computer screen?
A. In Dublin there was a staircase that was in the middle of the dining room and the living room. And right under it was where the computer was and there was a space that was open.
Q. All right. And who would be able to use this computer?
A. There was two different desktops, one for my mom and one for me and my sisters to use.
Q. So if you got on the computer, you would have to click a certain thing to be able to get in it

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



for you?

A. Yes.

Q. And then could you not see or get into your mom's stuff on that same computer?

A. Yes, because there was certain passwords that she had set.

Q. So were you able -- did you know the password for her?

A. No.

Q. All right. So is this the computer you are talking about that Sefe asked you to come over and sit down?

A. Yes.

Q. And where were you when he asked you to come and sit down in front of the computer?

A. This time I was in the living room watching Disney Channel.

Q. Now you say, "this time." Does that mean it happened more than once?

A. Yes.

Q. Describe the time that you are talking about specifically.

A. He said -- he called me my name, Perrion, Perri, and he said to come. And then I just looked back and then I turned around back to the TV, and he

grabbed me to come -- he took my hand to come over and sat me on his lap and said, "I'm going to show you some videos."

And then he went to the web site. The web site was already up. And he went to the web site and started to scroll and then clicked on a video and made me watch it. And I tried to leave because I didn't know what it was and just trying to get away from it. And he just sat me back down with his hands and then he said, "Relax," and kissed me on my cheek; and then after the videos, I just went back to sit and watch TV.

Q. Did his hands touch any other part of your body?

A. They just sat on my thighs.

Q. On your thighs?

A. Yes.

Q. Was your butt pressed up against his lap?

A. Yes.

Q. And you said that he kissed you?

A. On my cheek.

Q. All right. How did you get up or away from that situation that time?

A. The video was over, and then I got up, and this time he didn't hold me back down, so I went and

sat back on the couch.

Q. All right. Do you know where your sisters or anybody else was that time?

A. My younger sister was in her room and my older sister was in my mother's room.

Q. And you said that something like that happened more than one time?

A. Yes.

Q. Could you tell these ladies and gentlemen here other instances that you remember at Dublin-Granville that are similar?

A. Another instance I remember is there was a day that I was in the kitchen and I was going to get something to drink, and he followed me into the kitchen. And while I was in the kitchen, he came behind me. As I bent over to get the juice out, he stopped me and then began to pull down my pants and then that is when again he inserted his penis into my vagina.

Q. And that happened at which location?

A. Dublin-Granville Road.

Q. And do you know how old or what grade you would have been in when that happened?

A. Then I was now in sixth grade and I was ten.

Q. So this is like maybe a half a year, almost

a year after all of this stuff had been started?

A. Yes.

Q. How did that make you feel when this happened? What would you do afterwards?

A. Me, I was always confused by what was going on and tried to, like, find a way to speak, but I didn't exactly know how to come out about it and speak on it, because it made me feel embarrassed because I know it was wrong, and I just didn't know how to help myself, so --

Q. All right. And this is what you were thinking to yourself when you were nine or ten or eleven years old?

A. Yes.

Q. And how old are you now?

A. Sixteen.

Q. And have you talked to other people about all of this since?

A. Yes.

MR. BENTON: Objection, relevance.

THE COURT: Overruled.

Q. I'm sorry. Have you talked to other people about this since?

A. Yes.

Q. Would that include counselors?

A. Yes.

MR. BENTON: Objection, Your Honor. Move to strike. May we approach?

THE COURT: Yes, approach.

- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

THE COURT: Basis?

MR. BENTON: The State has never disclosed to me any records of counseling. And if you are going to go into that, I am entitled to have that information, to know what was said to the counselor, how the counselor assessed it, and to test whether or not what she said to this counselor is consistent with what she is testifying to now, from what she said during the course of the interview.

MR. HUGHES: I don't disagree, Judge. I am not offering that. It's to explain that she can more easily talk about it now. Fred is going to bring up: Why didn't you ever talk about this with anybody?

Now that she has seen a counselor, I believe she can say --

THE COURT: Why don't we just stop it at the talking with the counselor?

MR. HUGHES: That's fine.

MR. BENTON: Well, Your Honor, I mean --

MR. HUGHES: My question was, is it easier for you to talk about this now than it was when this was happening? That is my next question. But I am not going into any counselor or anything. I don't have that information either, Judge.

MR. BENTON: I would move to strike and again renew my motion for mistrial.

THE COURT: Denied.

MR. BENTON: As to both?

THE COURT: Yes.

\- - -

THE COURT: You may inquire.

MR. HUGHES: Thank you, Judge.

Q. (By Mr. Hughes) Where we left off, you didn't talk about this when it was going on with anybody?

A. No.

Q. Are you much more able or easier to talk about it now?

A. Yes.

Q. You were mentioning Dublin-Granville. Do you recall what grade you were, what age you were when you lived in Dublin-Granville?

A. Sixth grade, and I was ten.

Q. Sixth grade, I'm sorry, speak up.

A. Sixth grade and I was 10 years old.

Q. You were ten?

A. Yes.

Q. And were you going to the same school about then?

A. No. I was in CHATA.

Q. CHATA?

A. Yes. Before fifth grade I spent in KIPP Academy and then I changed from KIPP to CHATA once I moved to Dublin.

Q. And when you are in Dublin do you remember how many grades you were in when you lived on Dublin-Granville?

A. I was in sixth grade. I spent sixth grade in Dublin.

Q. All right. What sorts of things did you do in school? What were you involved with when you were in sixth grade?

A. I did Step at a church that I went to with my second older sister, grandmother. And in school I would just do my regular classes.

Q. All right. Did you have a favorite class?

A. My favorite class was ELA because --

Q. What is that?

A. English Arts.

Q. I want to ask you about other specific instances between you and Mr. Almedom. Do you remember any other instances at Dublin-Granville?

A. No.

Q. Can you describe for the ladies and gentlemen here the layout of Dublin-Granville? Remember how you described how the apartment was sort of set up, Beachworth with the downstairs and the bedrooms are upstairs? Can you also now explain how you remember Dublin-Granville kind of laid out or what that apartment was like?

A. Okay. Dublin-Granville Road, you come in through the front door, and to the right behind the door was a glass mirror to see out to the front of the house. And then to the left of the door was the opening to the kitchen. And then when you go around, there is another opening which led into the dining room. And then from the dining room was the stairs, and on the right of the stairs was the living room and then the back door. And up the stairs to the right at the top of the stairs was my mother's bedroom. And to the left was an opening for a washer and dryer, and in front of that was my sister and I's bedroom. And in

the back of the hallway was the bathroom.
Q. All right. And how many people lived there?
A. Me and my two sisters with my mother.
Q. Okay. Now, when you were living on Dublin-Granville, did Sefe have his own place?
A. Yes.
Q. And do you remember the name of the road or street it was on?
A. He then lived in Lakeside.
Q. All right. When you were living at Dublin-Granville, would you sometimes also go and visit Mr. Sefe Almedom at Lakeside?
A. Yes.
Q. So there is a time when you were living there and you would visit him at Lakeside. Is there a time then separately that you moved from Dublin-Granville and moved in with him at Lakeside?
A. That was once my mother had got evicted from Dublin.
Q. I want to talk about that time period before your whole family, you and your mother and sisters moved to Lakeside all together. So the time that you lived at Dublin-Granville, but then sometimes you would visit Sefe Almedom at Lakeside.
A. Yes.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Q. Does that make sense to you, the time period I am talking about?

A. Yes.

Q. Would you have been between 10 or 12 years old at that time?

A. Yes.

Q. Okay. You talked about instances of vaginal intercourse. Did anything ever happen involving his penis and your mouth?

A. Yes.

Q. All right. Can you describe that for the ladies and gentlemen here, what you recall about those instances?

A. This started once he moved into Lakeside. There was nights that my mother would go over and we would stay the night there because her job was closer to his house. And once she would leave for work, we would still be there, and he would call me to sit on the couch with him. Me and my sisters would all be there. And then once they would fall asleep, he would pull me over on the side of the couch that he would lay on and have me under the covers with him.

And then once he was ready, he would tell me, "Oh, this is what you have to do," and he would show me a video and then pull -- undress himself from

the waist down and push my head towards his penis and show me the video again and then motion my head how to move.

Q. Did you say anything to him about that?

A. I would always try to move myself up and just go away, but my head was always pushed back down.

Q. All right. Do you know what hand or how he was pushing your head down?

A. His right hand.

Q. Okay. How did that make you feel when this was happening to you?

A. It made me feel that I was losing breath, I couldn't breathe properly, so I was scared. I thought I was going to pass out or something.

Q. Okay. What happened then as this was going on? You said it was hard to breathe?

A. Yes. I would always push back up and sounds would come out, like from not being able to breathe, like -- I don't know how to explain the sounds, but I would always try to make sounds to move and I would start breathing hard.

Q. Would he let you move?

A. No.

Q. Did it hurt?

A. Yes.

Q. How long did that go for?

A. That all happened for the whole time that once we moved into Lakeside. So that was about -- I am not sure of the exact time.

Q. All right. You remember that one particular time. Did what you described or something similar happen more than once that you just described?

A. Yes.

Q. Do you know how many times or how often that would happen?

A. It happened often. I don't know an exact number.

Q. Okay. And when you say, "often," would it be at the same time of the day when it happened or did it happen different times?

A. It would happen different times, but more than once in a week.

Q. More than once in a week, but different times of the day?

A. Yes.

Q. Was your mom gone from the home on some of those times that it happened?

A. Yes, she was always never home.

Q. How would it stop? What would make him stop moving your head with his hands?

A. He would always move away from me and then hold his penis and go to the bathroom and then come back.

Q. All right. You said that his penis was inside of your mouth?

A. Yes.

Q. Did you ever taste anything or was anything different about that?

A. There was one time towards the middle of when he started with entering his penis into my vagina and I tasted like a weird salty taste that I never did taste before.

Q. Did you say something to him about it or ask him about it?

A. I spit it out and it came on him, but --

Q. You spit it out?

A. Yes.

Q. Where did you spit it out onto?

A. It landed on, by his thigh area and around his penis.

Q. What did he do once you spit it on him?

A. He moved from me.

Q. Did he continue moving your head after that happened?

A. No.

Q. Did he stop then once you spit?
A. Yes.
Q. Did he get up then?
A. Yes. He went into the restroom.
Q. Okay. When -- do you know, did you want to move from Dublin-Granville into Lakeside with Mr. Sefe Almedom?
A. No.
Q. Why not?
A. Because I already knew what was going on, and being in the same space to me meant that I would never have a break. I would be hurt more.
Q. Did you, before you moved or before your mom moved you, did you tell that to her or explain it to her?
A. No, but I asked her if there was anywhere else we could go.
Q. Did you ever tell your mom why you didn't want to move there?
A. No.
Q. When you ended up moving to Lakeside with your mother, do you remember what happened there when you, as a family, everybody moved out of Dublin-Granville and you all together moved into Lakeside?

A. Yes. Me and my sisters shared the room that was upstairs, because it was a one-bedroom apartment. And my mother would sleep with us sometimes, but most days she slept in the living room. And --

Q. What is in the living room, can you describe? Do you remember how the living room was set up or laid out?

A. Okay. It was the front door. From the front door there was the opening into the living room, and to the left was a closet at the bottom of the stairs as well. And up the staircase to the right there was the first and only bedroom, and then to the left was that bedroom, was a bathroom, and from the bathroom was a closet.

Q. In the living room what kind of furniture was downstairs, when you walk in the door?

A. There was a brown couch and the armrest part of it was leather, and the seats were a soft brown.

Q. All right. Were there blankets or pillows or anything there?

A. There would be an orange blanket there that had flower decorations on it, and there was an ottoman and a table.

Q. Okay. Do you remember there being a kitchen table there or a place to sit?

A. Yeah, behind the living room area there was also a second bathroom. And then it was the kitchen that had, I am not sure what they call it, but it is like a table that is built into the wall, and it had chairs on both sides.

Q. Okay. At Lakeside, do you remember what grade you were in or about how old you would have been then?

A. I was still in sixth grade.

Q. And when you were there, were you still under 13 years old?

A. Yes.

Q. At Lakeside, do you remember, was there any specific instances of Mr. Almedom's penis and your body?

A. Yes.

Q. Can you tell the jurors what you remember specifically about any instances that happened to you when you all moved together, just to Lakeside?

A. One instance that sticks out in my head the most is a night that me and my sisters, we were all in the living room because there was an extra mattress that we would put in the living room because the TV was down there with cable. And he called me to go upstairs. He woke me up out of my sleep and took my

hand and told me to come upstairs with him. And this time I was actually on my period.

And he said to lay on the bed and undress my pants and said -- I tried to push away because I am on -- I was on my period. And he is like, "It's okay." And he still went and lifted my legs up and pushed, kept them open and came in between my legs and inserted his penis into my vagina and kept going.

Q. All right. And that sticks out in your head, you said?

A. Yes.

Q. Any another instances where his penis and your mouth or any other body parts, just at Lakeside, that stick out in your head?

A. Yes. There was another time I was in the kitchen and he came in the kitchen, and the 'frig was in the back corner of the kitchen. And so he opened the refrigerator door and the freezer door while I was getting out of the refrigerator to kind of like block my sisters from, if they walked in the house, from seeing what was going on.

And he bent me over and pulled my pants down and from behind me he inserted his penis into my vagina and then kept going back and forth.

Q. How did that stop or end?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



A. He pulled away from me and held himself, his penis, and went and walked away to the bathroom.

Q. Remember earlier you talked about one time you spit some stuff onto his thigh?

A. Yes.

Q. Did you ever see any of that other, that same sort of stuff other places?

A. Yes. It would always be in his hands most times or on whatever was under him.

Q. Okay. So you had seen that same stuff other times as well?

A. Yes.

Q. When you were at Lakeside, did you keep track of how many times this intercourse would occur between the two of you?

A. I didn't keep track of an exact number, but it was very often.

Q. Okay. When you were at Lakeside did you tell your mom you wanted to leave there, you didn't want to live there?

A. No.

Q. And that is after you had already moved?

A. Yes.

Q. And why not? Why didn't you tell her that you wanted out of there?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



A. Because I was always told by Sefe if I was to speak on anything that was occurring, that ACS, a children's services company, would take me and my sisters away from my mother, because they would consider her keeping us in bad conditions.

I was told that my uncle, whose name is Jabar, that I am close with, that he would be hurt if I ever told him.

There was a time that I went to visit my dad and I was talking to my mom, and he asked to have the phone. And I guess I walked away. And he said to me, "If you speak to anybody there, I will harm your sisters and mother and you will come back to nobody."

Q. How did that make you feel, hearing him tell you those things?

A. It scared me and made me feel that I had to protect my family by not speaking to anyone.

Q. Is that why you didn't tell anybody?

A. Yes. And I was also told that if I did, I would be sent back to his home country, Eritrea -- I am not sure if I am pronouncing it right -- but he would send me back to there, with him.

Q. Okay. Did you want to do that or see that happen to you?

A. No.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Q. Did you want to see your sisters or family hurt?

A. No.

Q. Were you worried or concerned that if you told, that you would become homeless?

A. Yes, very much.

MR. BENTON: Objection as to leading.

THE COURT: Rephrase the question.

Q. (By Mr. Hughes) What were you worried about if you told what Sefe was doing? What were you worried about that could happen to where you live?

A. I was worried that me and my sisters, we would be harmed because we wouldn't have no type of support or any type of help.

Q. At some point did you tell about what had been going on?

A. Yes. I spoke to my sister, Tiona, and she had seen some of the events happen, so she --

MR. BENTON: Objection.

THE COURT: I am going to sustain that. You can ask another question.

Q. Was Tiona ever around when some of those things you described happening to you happened to you?

A. Yes, she was around one night.

Q. Was she close enough to see what would have

happened?

A. Yes.

MR. BENTON: Objection, calls for speculation.

THE COURT: It calls for speculation. Sustained.

Q. Could you see her from where you were when this was happening?

A. Yes.

Q. Nothing between you blocking her view?

A. No.

Q. All right. And you indicated that you talked to your sister about what had been going on?

A. Yes.

Q. After you talked to your sister, what happened?

A. A couple, I believe it was like a month or -- a few days after, there was a night that my mother came into the room and she caught my second older sister and the younger sister humping each other.

MR. BENTON: Objection as to her mother's observations.

THE COURT: Approach.

\- - -

Thereupon, the following discussion was held

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



at the bench with the Court and counsel outside the hearing of the jury:

THE COURT: I mean, she is just recounting what her mother said.

MR. HUGHES: Right. I don't know what she -- I mean, she is a kid and I don't --

THE COURT: I am going to sustain the objection and move to strike. I mean, if she observed anything.

MR. HUGHES: Yes. I mean, I couldn't predict her answer, Judge. I didn't do that on purpose.

THE COURT: Okay. Do you want to put anything on the record?

MR. BENTON: No. You hit the nail on the head, Judge.

- - -

THE COURT: I will sustain the objection and move to strike. Just testify as to what you observed.

Q. (By Mr. Hughes) So you can continue on. You had a conversation with your sister and then you said something happened with your mom?

A. Yes.

Q. And then did you end up talking to your mom about what happened?

A. Yes, because the next day, once I had woken up, she said, "Tiona told me what's been going on."

MR. BENTON: Objection.

THE COURT: Just don't say what your sister said or your mother said.

Q. What did you tell your mom after she talked to you?

A. At first I denied everything. I told her no, because I still had the fear of my family being hurt for me speaking and telling someone about it. And then she just kept repeating the question, and I eventually told her yes, it is true, what happened.

Q. All right. Did your mother threaten you in any way?

A. No.

Q. Did she tell you you had to tell or there would be some consequence?

A. No.

Q. So you had an opportunity -- did you then discuss or talk to your mom about what had been going on with Sefe Almedom all those years?

A. I spoke to her about some events, but I didn't give exact details right away.

Q. Okay. Not as much detail as here, for example?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



A. Yes.

Q. What did she do in response to -- after you told her, did she take you anywhere or do anything?

A. She told us to continue -- we went to school.

MR. BENTON: Objection as to what Mom said.

THE COURT: Overruled. It is not for the truth of the matter asserted.

Q. (By Mr. Hughes) You can continue. So you went to school?

A. We went to school, and after school we were picked up and taken to a hospital where they did an exam of things to check us out.

Q. All right. Was it your idea to go to the hospital?

A. No.

Q. All right. When you went to the hospital, did you talk to people about what had been going on?

A. The second day after they told us to come back, I spoke to people about more details.

Q. So you went to the hospital and then you went back to speak to somebody the second day?

A. Yes.

Q. And that second day, were you interviewed in a small room by a lady?

A. Yes.

Q. All right. Do you remember much about that interview that happened in 2013?

A. I only remember her showing me a picture to show her certain body parts that connected and touched each other.

Q. Have you ever seen a video of that interview with that lady that you just described?

A. No.

Q. Do you remember meeting with a doctor or a nurse after meeting with that lady and talking to her?

A. Yes.

Q. And did you have an examination done?

A. Yes.

Q. Okay. Did you want to go through that exam? How did it make you feel?

A. It made me feel uncomfortable being that there was -- my vagina had to be part of the examination. It scared me and it made me go back to the thoughts that I would have about when the activity with Sefe would occur. So it made me remember those memories I didn't want to remember, so it made me scared again.

Q. You said that there were things that you didn't want to remember about Sefe when you were

living with him or he was around?

A. Yes.

Q. Are there any good memories or things that he did when he was not engaged in the stuff you just described?

A. There would just be times that he was fun and we would all as a whole watch TV or soccer; but that's about it.

Q. All right. Around the house, had you ever seen your own mother drinking alcohol?

A. No.

Q. Have you seen Sefe Almedom drinking?

MR. BENTON: Objection as to relevance.

THE COURT: Overruled.

Q. You can answer that.

A. Yes.

Q. Okay. And how much?

MR. BENTON: Objection.

THE COURT: Overruled.

THE WITNESS: Continue?

THE COURT: You can answer.

A. Oh, okay. Yes. Yes, sir.

Q. And the question was how much?

A. Oh. It would be most at night or -- throughout the day it would be drinks of beer, and at

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



night it would be actual vodka is what the bottle would say.

Q. How do you know what it was at night that he was drinking?

A. Because the bottle would always be on the table and he would pour from the bottle into a separate glass.

Q. All right. Would this happen or occur when he would ask you to come downstairs from your bedroom?

A. Yes, most nights.

Q. And would he be drinking in other instances where you described the sexual intercourse that occurred between you?

A. Yes.

Q. Would he be drinking before those instances?

A. Can you repeat?

Q. Sure. Had you been seeing him drinking before those instances you described of him forcing your head down on him, for example?

A. No.

Q. What about the other instances where he would engage in intercourse with you?

A. Yes.

Q. Okay. Did you ever talk to him about that?

A. No. But I will always -- I would only say

like, "no," and "leave me alone," but it was never an actual conversation about it.

Q. All right. Did he, in fact, leave you alone over those years?

A. No.

Q. Do you see the person that you described, referred to as Sefe, do you see him sitting here?

A. Yes.

Q. And can you point to him for the ladies and gentlemen of the jury?

A. (The witness pointed to the defendant.)

Q. And what is he wearing?

A. A blue --

MR. BENTON: We will stipulate, Your Honor.

A. A blue shirt.

MR. HUGHES: Okay. Your Honor, the defense stipulates the identification of the defendant.

THE COURT: Okay. It shall be so stipulated.

Q. Before moving out, you said your mother picked you guys up from school after you told what happened?

A. Yes.

Q. And you went to the emergency room in the hospital. Did you ever go back to Lakeside?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



A. No.

Q. Did you see Mr. Sefe Almedom almost every single day up until that point when you moved out?

A. Yes.

Q. Did you ever have any contact with him ever again, you know, phone calls or see him to talk to him, to have a conversation since you went to the hospital to talk about what happened --

A. No.

Q. -- in 2013?

A. No.

MR. HUGHES: I have no further questions, Your Honor. Thank you.

THE COURT: Cross-examination?

MR. BENTON: Yes.

\- - -

CROSS-EXAMINATION

BY MR. BENTON:

Q. Good morning.

A. Good morning.

Q. Let's talk about a few things here. You gave an account of three different locations where you stayed with your mother, your sisters, and also with Sefe?

A. Yes.

Q. Okay. And I believe they were in order of the Beachworth --
A. Yes.
Q. -- that was the first place?
A. Yes.
Q. Then Dublin-Granville Road?
A. Yes.
Q. And then Lakeside?
A. Yes.
Q. Now, before moving in with Mr. Almedom on the Beachworth Drive address, you and your family lived on Burstock Court; is that correct?
A. I don't remember.
Q. I can't hear you.
A. I don't remember.
Q. Okay. But you lived some other places; is that a fair statement?
A. Yes.
Q. And then you were, your family was evicted from that location sometime in maybe November or December of 2009. Sound about right?
A. Yes.
Q. And at that time then you all moved in with Ebony Arnold?
A. Yes.

Q. And again, do you recall Ms. Arnold living at an address on Yates Drive?

A. Yes.

Q. And then sometime after your move to that particular location, Ms. Arnold also had to leave because her house had been foreclosed upon. Does that sound about right?

A. Yes.

Q. And so your family didn't have a place to stay?

A. Correct.

Q. And that is when you moved into the Beachworth Drive address. Is that a fair statement?

A. Yes.

Q. Now, while there, you, your uncle, Jabar Swift, came to live with you, correct?

A. Yes.

Q. And that would have been sometime in January of 2010?

A. I don't remember the time.

Q. Was it shortly after you all moved into the Beachworth address?

A. I don't remember.

Q. Okay. Do you recall him staying there after having been released from prison?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



A. Yes.

Q. And he stayed there for about two to three months?

A. Yes.

Q. And while he was staying there and because Ebony and her children were being evicted, they came to stay at the Beachworth address as well. Is that a fair statement?

A. Yes.

Q. So in this household you have you, your sisters, your mother, Sefe, your uncle, Jabar, and Ms. Arnold, correct?

A. Yes.

Q. And Ms. Arnold had two children?

A. Yes.

Q. And Ms. Arnold stayed at that location for about a good month, if not more, correct?

A. I don't know how long she stayed. I don't remember.

Q. It was more than just a couple of days, correct?

A. Yeah.

Q. More than just a couple of weeks, correct?

A. Yes.

Q. Okay. Now, then sometime in February or

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



March of 2010, your uncle leaves that address on Beachworth, and Ebony and her children leave that address on Beachworth?

A. Yes.

Q. You all then move -- you, your mother and your sisters move from the Beachworth address into a family shelter?

A. Yes.

Q. And that happened because there was a lot of arguing going on between you and your mother -- I mean, between your mother and Sefe, correct?

A. Yes.

Q. And oftentimes they did not get along; is that correct?

A. Yes.

Q. And you were aware of that because you would see the arguments?

A. Yes.

Q. You would hear the arguments?

A. Most of the times.

Q. And that would not make you feel good, did it?

A. No.

Q. Now, you moved into the family shelter located on Fifth Avenue, correct?

A. I don't know the address.
Q. Okay. Do you recall that in part of that program you had people who worked there?
A. Yes.
Q. There were counselors there?
A. I don't know.
Q. You don't remember?
A. Yeah, I don't.
Q. Okay. There was certainly a number of people there who were working in that particular location?
A. Yes.
Q. And you all were involved in a program where after you stay for a period of 90 days, they would then help you all find a house, correct?
A. Yes.
Q. And you all stayed there for that 90-day period?
A. Yes.
Q. And, in fact, when the 90-day period had expired, you all had not yet found a house, so they then moved you into a hotel. Is that correct?
A. Yes.
Q. And you stayed in a hotel for a couple of months after that?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



A. Yes.

Q. And certainly while you were at the family shelter, Sefe was never there, correct?

A. Yes.

Q. In fact, you moved from the family shelter to a hotel on Brice Road. Does that sound familiar?

A. Yes.

Q. And then from there, sometime in 2011, you all move to this apartment on Dublin-Granville Road?

A. Yes.

Q. And you stayed there up until the time that you were again evicted. Is that a fair statement?

A. Yes.

Q. And while at the Dublin-Granville Road apartment, you stayed there with your mother and your two sisters?

A. Yes.

Q. Now while all of this is going on, you are still in school, correct?

A. Yes.

Q. Still participating in your activities at church?

A. No.

Q. You were not?

A. Yeah.

Q. You still had contact with other family members?

A. Yes.

Q. You are still visiting your dad in Cincinnati?

A. Yes.

Q. And you had a very close relationship with your father; is that a fair statement?

A. Yes.

Q. And there were times when your father would come down from Cincinnati to Columbus and visit you. Is that a fair statement?

A. He didn't come to visit. He would come to pick me up.

Q. He would come to pick you up, and then he would take you back to Cincinnati?

A. Yes.

Q. And when he would come to pick you up, you're just with your dad?

A. No, his fiancee.

Q. Oh, his fiancee. Your father and his fiancee would come to Columbus, excuse me, to pick you up?

A. Yes.

Q. And that was true when you stayed at

anyplace. Is that a fair statements?

A. Yes.

Q. So whether you were at Beachworth, Dublin-Granville, Lakeside, the shelter, your dad would always come and pick you up?

A. Not at -- during the time I was in the shelter, he didn't come to pick me up; but afterwards he started again.

Q. Well, actually, when you were at the shelter you are not allowed -- you have to be there every day in order to qualify for the program, correct?

A. Yes.

Q. But even while you were in the shelter, you were still able to talk with your dad?

A. Yes.

Q. And did you have a close relationship with his fiancee as well?

A. No.

Q. Did you want to live with your dad? Wasn't there a discussion about you living with your dad at one time?

A. Yes. I spoke to him, but I didn't keep speaking about it.

Q. Okay. And did you ever have discussions with your mother about living with your dad?

A. Once.
Q. Did she approve?
A. No.
Q. And you also had a circumstance in which your dad was supposed to come and get you and he did not?
A. Yes.
Q. And that made you upset?
A. Yes.
Q. In fact, you were crying, correct?
A. Yes.
Q. And Sefe gave you $20 or so because you were upset about the visit, correct?
A. No. His friend did.
Q. Okay, his friend did. Do you remember during your interview at Children's Hospital saying that Sefe had given you the money?
A. No.
Q. You don't remember that? So if that is on the recorded interview, you are not going to dispute that, are you?
A. No.
Q. Okay. And Sefe also drove you to Cincinnati to see your dad?
A. Yes.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Q. Dropped you off, correct?
A. Yes.
Q. Came back to Columbus and then later drove back to Cincinnati to pick you up, correct?
A. Yes.
Q. And those are times at which not only was he there, but also your mother, your sisters as well, correct?
A. Yes.
Q. When you all lived at the Dublin-Granville property, Mr. Almedom got his apartment at Lakeside?
A. Yes.
Q. And you all would come over and visit while he was at Lakeside?
A. Yes.
Q. Ultimately your family moved in with him at the Lakeside address?
A. Yes.
Q. And that was after you all were evicted from the Dublin-Granville Road property?
A. Yes.
Q. And when you moved in, do you remember that there was a guy there by the name of Jim or Jimmy who also lived there?
A. Yes.

Q. And he stayed there up until the time about which you all then began to move in. Is that a fair statement?

A. When we moved in, he still was there, too.

Q. He was still there, right, right, right. How long did he continue to stay there while you all -- after you all had moved in?

A. I don't know an exact time, but he was there for a while.

Q. He was there for a while?

A. Yes.

Q. And also while at this Lakeside property, Sefe's mother came from California to stay for a few weeks?

A. Yes.

Q. About three weeks?

A. I don't know how long.

Q. It was a long visit, though?

A. Yes.

Q. And while she was there, she would cook for you all and help keep the apartment clean and things of that nature, correct?

A. Yes.

Q. Do things with you all?

A. Yeah.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Q. And you liked her, right?

A. It was okay.

Q. Okay. Now you have had, while growing up, you had a good relationship with your mother?

A. Yes.

Q. Felt that you could tell her anything that you wanted to, correct?

A. Yes.

Q. Your mother always encouraged you or you always were encouraged to talk to your mother, correct?

A. Yes.

Q. You also had a good relationship -- was Ebony related to you?

A. No.

Q. Or she was Tiona's aunt?

A. Yes.

Q. But you kind of considered Ebony as your aunt as well, correct?

A. Yes.

Q. And you had a good relationship with Ebony?

A. Not a good relationship, but it wasn't a bad relationship either.

Q. And you had a good relationship with her children?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



A. Yes.
Q. In fact, you had a good relationship with Sefe's children?
A. Yes.
Q. You had friends while you were at school?
A. Yes.
Q. You had teachers, of course, that you communicated with at school?
A. I didn't ever really speak to my teachers, no.
Q. You played sports at one time?
A. I don't remember.
Q. You don't remember. And then you were engaged in activities at your church?
A. Yes.
Q. And you talked about the dance team?
A. Yes.
Q. And there were other youth activities that you also were involved in?
A. Just at church, the dance and step.
Q. Okay, the dance and the step. And so I would imagine that there was somebody in charge of -- were those two separate teams?
A. Yes.
Q. And did you have then two separate

supervisors or individuals who were responsible for those teams?

A. Yes.

Q. And so you had a good relationship with them as well?

A. Yes.

Q. And how many people were on the dance team, or step team?

A. The step team there was, I don't know an exact number, but maybe around 15, 20.

Q. Okay. And how many people were on the, is it the praise team?

A. Yes.

Q. How many people were on the praise team?

A. Maybe 20 to 25. That was a bigger team.

Q. Were some people who were on the praise team also on the step team?

A. Yes.

Q. And you got to know them very well?

A. Yeah.

Q. During this time would I be correct in assuming at some point in time you met the pastor of the church?

A. Yes.

Q. Had a chance to talk to the pastor?

A. Yeah.
Q. And you liked the pastor, correct?
A. Yeah.
Q. And then there were members of the church that you also were familiar with?
A. Yes.
Q. You got to know?
A. Yes.
Q. Growing up, your mother would talk to you and your sisters about the past experiences within the family as to other individuals who had been molested, correct?
A. No.
Q. You don't remember that?
A. No.
Q. Did your mother ever have a conversation with you about stranger danger?
A. Yes.
Q. Okay. And she would tell you what to do in those circumstances?
A. Yes.
Q. And she told you about Tiona's aunt being molested?
A. Yes.
Q. And about her, your mother's experience

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



while growing up in a foster home?

A. Yes.

Q. And children in that foster home being molested?

A. No.

Q. You don't recall that?

A. No.

Q. But there was discussions?

A. About Tiona's family members that had.

Q. And child molestation?

A. Yes.

Q. And what you were to do in those circumstances; is that correct?

A. Yes.

Q. You talked about these computers, and I want to make sure I have got this correct. At the Beachworth apartment, was there a computer there?

A. I don't remember.

Q. You don't remember. At the Dublin-Granville Road apartment, was there a computer there?

A. Yes.

Q. And what kind of computer was it?

A. I don't know the exact brand name, but it was like a desktop computer, like the --

Q. So you had a monitor like this?

A. With the keyboard and the mouse.
Q. And a keyboard and a mouse?
A. Yes.
Q. And was there a separate unit where you could --
A. For, yeah, a USB.
Q. A drive and that sort of thing?
A. Yes.
Q. And that was at the Dublin-Granville house, right?
A. Yes.
Q. So prior to that time there was no computer at the Beachworth property, right?
A. I don't know.
(Juror coughing.)
MR. BENTON: Do you need some water?
THE COURT: Want a bottle of water or something?
A JUROR: I have one. Sorry.
THE COURT: Do you want to take a break? Do you need a break?
Q. (By Mr. Benton) At the Lakeside apartment, was there a computer there?
A. I don't know.
Q. As to each of these locations, Beachworth,

Dublin-Granville and Lakeside, was there one computer or more than one computer?

A. Dublin, there was one computer.

Q. Just one computer. And you don't recall if there were no computers at any of the other locations, correct?

A. Yeah, I don't remember.

Q. And the computer had a password on it for your mother, correct?

A. And a separate one for my sisters and I.

Q. And a separate one for your sister?

A. And myself.

Q. And yourself. So if I were at this computer and I were to turn it on, I would need a password, whether it be to get into your mother's account, your sisters' account or your account; is that correct?

A. No. Me and my sisters shared the same account. Our names was all on the same one. It was just one for my mom and then one for me and my sisters.

Q. Okay. But as to either account, you would need a password to be able to sign in on it; is that correct?

A. Yes.

Q. Have you ever had an occasion in which you

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



observed your mother watching pornography on a computer?

A. No.

Q. You don't recall that?

A. No.

Q. Was there ever an occasion in which you and your sisters walked in on your mother having sex with someone else?

A. I don't remember.

Q. Pardon me?

A. I don't remember.

Q. You don't remember that? You were asked questions about whether or not you ever observed your mother drink alcohol. Do you remember that question?

A. No.

Q. And you said you have never seen your mother drink alcohol?

A. Yes.

Q. Yes, that is correct?

A. Yeah.

Q. Okay. I am going to show you what has been previously marked for identification purposes as State's Exhibit 6, with the Court's permission, No. 6. Do you see these bottles here?

A. Yes.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Q. Is that on your screen in front of you?
A. Oh, yeah.
Q. Okay. Do you see the other one there?
A. Yes.
Q. Those are bottles of cologne, are they not?
A. Oils. They are oils.
Q. Oils?
A. Yes.
Q. That you would take and you would rub on your skin?
A. Not me personally.
Q. No, not you personally, but I am saying that is what it would be like?
A. Yes.
Q. These are bottles very similar to this, correct?
A. Yes.
Q. And it has a little roller at the top, right?
A. Yes.
Q. Okay? You were asked questions about what Sefe did around the house, and I think the question got to the point as to whether or not he ever helped with homework. You said no, right?
A. Yes.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Q. But do you recall when you were having some difficulty with math, Sefe would help you with math?
A. No.
Q. You don't recall that?
A. No.
Q. Okay. Do you know that he was good at math, right?
A. No.
Q. Did you ever have problems with math?
A. Yes.
Q. Now, you talked a lot about these instances that you described. For the benefit of the jury, I would imagine if I were to ask you as to any one of these instances, could you tell me what day of the week it happened?
A. No.
Q. If I were to ask you as to any of these incidents, could you give me a time to which it happened?
A. During the nighttime.
Q. That is the best you can do, right?
A. Not -- maybe around 10:00, late hours.
Q. 10:00 or late hours. If I were to ask you to give me an exact date as to any one of these instances, I'm assuming you would not be able to do

that. Is that a fair statement?

A. The month, not the -- I can give a month, but not a day number.

Q. And so if I were to ask you, can you give me the date, time and year for each one of these instances, that is not something you can do, is it?

A. No.

Q. I can't hear you.

A. No.

Q. Now, as to these accusations, you talked to your mother about it?

A. About --

Q. About these accusations you are making.

A. No.

Q. You talked to your mother at some point in time, correct?

A. Oh, yes, at some point after.

Q. And you talked to your sisters about it?

A. After my second older sister --

Q. Tiona?

A. Yes.

Q. And you talked to people at the Child Advocacy Center?

A. Yes.

Q. Is there any point in time in which your

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



mother said anything to you that would lead you to believe that you need to testify in this case in a certain manner?

A. No.

Q. When you met -- okay, this is 2017. When you met four years ago with the Child Advocacy Center, you were in a room alone with a lady. Do you remember that?

A. Yes.

Q. And you were asked questions about what happened.

A. Yes.

Q. And you responded to those questions, didn't leave anything out?

A. Correct.

Q. Correct?

A. Yes.

Q. You did not -- you were not restricted from what you could say; am I correct?

A. Yes.

Q. And, in fact, there were several times in which you were asked, "Is there anything else that you need to tell me?" Do you remember that?

A. No.

Q. Okay. Did you feel at any point in time in

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



that interview that you could not say what you wanted to say?

A. No.

Q. Did you feel at any time during that interview that you were limited as to what you could say?

A. No.

Q. Did you at any time during that interview feel that you were not being given enough time to say what you wanted to say?

A. No.

Q. And, in fact, if there was something during the course of that interview that you wanted to go back to or add to or correct, you had that opportunity?

A. Can you rephrase?

Q. Okay. If at any time during that interview there was something that you wanted to add to what you had already said, you had that opportunity to do so, correct?

A. I don't remember.

Q. You don't remember? If there was something there that was incorrect, you had an opportunity to correct it?

A. No.

Q. You did not?
A. There was nothing to correct.
Q. I can't hear you.
A. There was nothing to correct.
Q. I understand that is what you are saying, but my question is, if you needed to correct something, you could have had that opportunity, right?
A. I don't know.
Q. In other words, you were free --
MR. HUGHES: Objection, asked and answered.
THE COURT: He can finish the question.
MR. BENTON: Thank you.
Q. You were free to say anything that you wanted during the time of that interview?
A. Yes.
Q. And you were not being rushed?
A. No.
Q. Okay. Do you remember about when it was that you had expressed your desire to live with your father in Cincinnati?
A. I was 11? I was still --
Q. About 11?
A. Yeah, I had just turned 11.
Q. Okay. And you had always wanted to live with your dad. Is that a fair statement?

A. No.
Q. Now, do you remember being made aware of plans for your mother and Sefe to move to either California or Miami or Hawaii or some other place outside of Ohio?
A. Yes.
Q. And that was not something you wanted to do, was it?
A. No.
Q. And, in fact, you expressed your objections to your mother about such a move. Is that correct?
A. I don't remember.
Q. You don't remember. Do you ever recall going to a father-daughter dance?
A. Yes.
Q. With Sefe, Tiona, and his daughter at the Woodcrest Elementary?
A. Yes.
Q. And that was both in 2011 and 2012, correct?
A. I don't know the years.
Q. Pardon me?
A. I don't remember the year.
Q. But it was at the Woodcrest Elementary School, correct?
A. I don't remember the name of the school

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



either.

Q. You do remember going to the father-daughter dance on at least two occasions, correct?

A. Yes.

Q. Do you ever remember going out to eat with Sefe at the Hometown Buffet or Golden Corral or whatever?

A. I don't remember.

Q. You don't remember. Do you ever remember while out at Lakeside, or Lakeview, excuse me, you, Sefe, your mother and the girls taking walks out there?

A. Yes.

Q. That happened rather frequently, correct?

A. Not frequently, but it happened.

Q. Okay. You remember Sefe taking you all to the 4th of July celebration in Ashville, Ohio in 2012?

A. No, I don't remember.

Q. Do you remember going to Ashville, Ohio?

A. No.

Q. Do you remember going outside of Columbus to go to a fireworks display?

A. No.

Q. You don't remember that? Do you remember Sefe taking you all to Red White & Boom in 2013?

A. No.
Q. Okay. You've never been to Red White & Boom?
A. I have, but I don't remember who I went with.
Q. Pardon me?
A. I have been, but I don't remember who I went with.
Q. When you went or who you went with?
A. Yeah.
Q. Do you remember when Sefe hosted a birthday party for your 12th birthday for you and also Leelee?
A. Yes.
Q. And you remember Sefe going with you and Tiona and your mother to a baptismal service for either Ebony's children or perhaps maybe you all? Do you remember that?
A. Yes.
Q. When Father's Day would come around, you told that man, "Happy Father's Day," wouldn't you?
A. Yes.
Q. Give him a Father's Day card?
A. I don't remember.
Q. Give him a Father's Day gift?
A. I don't remember.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Q. Even though your mother worked all of these hours, you still communicated with her even when she was at work, correct?
A. Not all the time.
Q. But sometimes?
A. Yeah.
Q. In fact, you had a cell phone that you could use to contact your mother. Am I correct?
A. I didn't have it -- I got it once I was in Dublin-Granville. I had a phone then.
Q. So you had it when you were at the Dublin-Granville address?
A. Yes.
Q. You did not have one at Beachworth?
A. No.
Q. Did you have it when you were at Lakeside?
A. Yes.
Q. Or Lakeview or whatever it is?
A. Yes.
Q. So you, when your mother was at work, you still had telephone access to her?
A. Yes.
Q. And when mom was at work, she would periodically call in, whether you were at Dublin, Lakeside or Beachworth, your mother would call in to

check to see how you all were doing?

A. Yes.

Q. And when you were staying at the, I believe it was the Beachworth address, you had a babysitter, right?

A. Yes.

Q. And she would watch you while your mother was at work?

A. Yes.

Q. Stay with you until your mother came home from work?

A. Or until Sefe got home.

Q. So sometimes he would stay there until your mother got home from work, and sometimes she would stay there until Sefe came home, correct?

A. Yes.

Q. Did you have a good relationship with the babysitter?

A. Not really, but it was good enough.

Q. Pardon me?

A. It wasn't excellent, but it was a mutual relationship.

Q. A mutual relationship. Certainly one that would have allowed you to feel comfortable talking to her?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



A. No.

Q. Okay. When you said earlier -- here it is. You said earlier that despite the hours that your mother worked, she -- excuse me -- she always managed to take you and your sisters to school, correct?

A. No. Sometimes, most days we took the school bus, but there were some days that we were driven to school, but we took the school bus more days than we were driven to school.

Q. So you got to school more often by bus than you did by your mother taking you?

A. Yes.

Q. So your mother did not take you to school every day?

A. Yes.

Q. On the average of a week, during the course of a week, how often would your mother drive you to school?

A. It would be maybe once every two to three weeks.

Q. Once every two to three weeks, okay. Are you suggesting to this jury that your mother worked so much that you never saw her?

A. No.

Q. Are you suggesting to this jury that your

mother worked so much that you never had a chance to talk to her?

A. No.

Q. Are you suggesting to this jury that your mother worked so much that you never had an opportunity to spend quality time with her?

A. No.

Q. With respect to this computer again, you said there was a log-in for yourself and a log-in for your mother, right?

A. Yes.

Q. You could not log into your mother's computer, correct?

A. No.

Q. She was the only one who had that password, correct?

A. I don't know.

MR. BENTON: I have nothing further, Your Honor. Thank you.

THE COURT: Any redirect?

- - -

REDIRECT EXAMINATION

BY MR. HUGHES:

Q. Hi, Perrion. A couple of questions.

Do you remember Mr. Benton talking to you

about your mom talking to you about stranger danger?

A. Yes.

Q. Was Sefe a stranger to you?

A. No.

Q. Did you want to move anywhere with your mom and your sisters that would involve Sefe moving along with you, like to California or Hawaii or Florida?

A. No.

Q. You didn't tell your mother for a long time about any of this stuff that had been going on with Sefe. And why not?

A. Because I was always hit with threats of if I spoke, I would be taken from my mom, or --

Q. Why didn't you tell the pastor at church?

A. Because I didn't feel comfortable with him. It was just me meeting him one day and speaking about an award they were giving at the church.

Q. Did you have the same concerns if you were to tell a teacher about what had been happening?

A. Yes.

MR. HUGHES: No other questions. Thank you.

THE COURT: All right. You can step down. Thank you.

(Witness excused.)

Ladies and gentlemen, we are going to take

our morning break at this time. Be back at 11:20.

Do not discuss the case among yourselves. Do not permit anyone to discuss it with you or in your presence. It is your duty not to form or express an opinion in the case until it is finally submitted to you.

THE BAILIFF: All rise.

- - -

Thereupon, at 11:05 a.m., a recess was taken until 11:22 a.m.

- -

THE COURT: Back on the record, 13CR-1858. Anything we need to put on the record prior to bringing the jury in?

MR. HUGHES: No, Your Honor.

MR. BENTON: No, Your Honor.

THE COURT: All right. Go get the jury.

MR. HUGHES: Over the break I will work on that stipulation and have something for the Court and Mr. Benton when we come back.

THE COURT: Okay.

THE BAILIFF: All rise.

- - -

Thereupon, the jury resumed their seats in the jury box.

Case: 2:22-cv-02229-MHW-MRM Doc #: 9-3 Filed: 09/15/22 Page: 101 of 231 PAGEID #: 989

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



\- - -

THE COURT: Everyone can have a seat. What we are going to do, ladies and gentlemen, don't get too comfortable. We are going to take our lunch break, and if you guys can come back at 12:45, and then we will try and get started shortly thereafter. All right?

Do not discuss the case among yourselves. Do not permit anyone to discuss it with you or in your presence. It is your duty not to form or express an opinion in the case until it is finally submitted to you. Go have an enjoyable lunch.

\- - -

Thereupon, at 11:25, a lunch recess was taken until 12:45 p.m.

\- - -

Thursday Afternoon Session,
July 20, 2017,
1:00 o'clock, p.m.

- - -

Thereupon, the further trial of this cause was resumed following the lunch recess.

- - -

Thereupon, the following proceedings were held in open court before the jurors resumed their places in the jury box:

THE COURT: Everyone can have a seat. Back on the record, 13CR-1858. Mr. Benton, have you taken a look at that?

MR. BENTON: I have, Your Honor, and I am prepared to discuss that when the Court is ready.

THE COURT: All right. I have been presented with a State's Proposed Stipulation, and essentially it says: "If recalled to the witness stand, Detective David Phillips would testify as follows: After testifying in this case, he reviewed property records held by Columbus police department. He discovered that on April 2nd, 2013, he did obtain three pairs of underwear from" --

MR. HUGHES: So that is the issue, Your Honor. I think we would agree that it should read,

"three pairs of underwear from Shatyra Henderson as part of the investigation." I made that change.

THE COURT: On the sheet it was, "Perrion Thompson."

MR. HUGHES: And again, the detective is here, Judge, and he would say -- and we confirmed this in my office. He received them from Ms. Henderson. And that is why I don't want to just admit all of the property sheets without him explaining them. But they are from Ms. Henderson, not Perrion Thompson.

MR. BENTON: That is the caption of the investigation, not that they were restricted to --

THE COURT: What's that?

MR. BENTON: That is the caption of the investigation, not that the underwear was not exclusively related to Perrion Thompson.

THE COURT: It says, "Owner, Perrion Thompson." Or if you want, do you want to stipulate that he got them from Ms. Henderson, however you pronounce her name?

MR. BENTON: Yes.

MR. HUGHES: That would be No. 2, yes, Judge. I have put in No. 2, "Shatyra Henderson," S-H-A-T-Y-R-A.

THE COURT: And then are you okay with that?

MR. BENTON: Your Honor, I am okay with that addition. But where I have a concern, or there is a disagreement, I believe that there should also, these documents should -- the property slip marked as Defendant's Exhibit B, which was --

THE COURT: What's that?

MR. BENTON: The property slips that were marked as Defendant's Exhibit B that were presented on the arguments concerning the mistrial should also be referenced within this stipulation and submitted to the jury for purposes of their deliberation.

THE COURT: It has the property number, but you want your Exhibit B in?

MR. BENTON: Yes, sir.

THE COURT: I will think about that, whether we admit that in addition to this.

MR. BENTON: Okay. And, Your Honor, I don't think the record is clear that whether or not you have ruled on the admissibility of Defendant's Exhibit B for purposes of our motion for a mistrial.

THE COURT: I have not admitted B. I will do that as part of your case in chief.

MR. BENTON: No, no, no. I am saying as part of -- in support of our motion for a mistrial, we have presented Defendant's Exhibit B and ask the Court

to admit that for purposes of our argument in that.

THE COURT: I will admit it for purposes of the argument, Defendant's Exhibit B. And I will overrule the motion for -- do you want to make a record?

MR. HUGHES: No, Judge, just that it relates only to that motion.

THE COURT: Correct. It has not been admitted into the jury.

MR. BENTON: And that is subject to further discussion, correct?

THE COURT: Right. Anything else we want to put on the record?

MR. HUGHES: No, sir.

THE COURT: Anything on behalf of the defense?

MR. BENTON: No, Your Honor.

THE COURT: Go get the jury.

MR. HUGHES: Your Honor, with the understanding regarding that language and that stipulation, am I free to let the detective go then, since there are no more factual clarifications?

THE COURT: You don't want to further call him?

MR. BENTON: Well, it depends upon how the

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Court rules on Defendant's Exhibit B. I think that needs to be made a part of the record for purposes of the trial proceeding.

THE COURT: Okay. We will have him on call. He can take off today. I mean, we are going to go through all of your witnesses. Have him on call to come in if they need it.

MR. HUGHES: All right. Thank you, Your Honor, I'll do that.

\- - -

Thereupon, the following proceedings were held in the courtroom in the presence and hearing of the Jury:

THE BAILIFF: All rise.

\- - -

Thereupon, the jury resumed their seats in the jury box.

\- - -

THE COURT: Everyone can have a seat.

Any further witnesses on behalf of the State of Ohio?

MR. HUGHES: Yes, Your Honor. The State will call Tiona Arnold to the stand.

THE COURT: Raise your right hand.

(Witness sworn.)

Have a seat and pull yourself up close to the microphone. You may inquire.

MR. HUGHES: Thank you, Your Honor.

\- - -

TIONA ARNOLD

Called as a witness by the State of Ohio, being first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HUGHES:

Q. Good afternoon.

A. Afternoon.

Q. Can you tell the ladies and gentlemen here your name, and can you spell it for the lady sitting in front of you that is typing everything out?

A. Oh. My name is Tiona Arnold, T-I-O-N-A, A-R-N-O-L-D.

Q. Tiona, how old are you?

A. Thirteen.

Q. Thirteen today, or now?

A. Uh-uh.

Q. When is your birthday?

A. February 5th, 2004.

Q. February 5 of 2004? Okay. Is there a grade that you are in right now?

A. Yes.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Q. What grade?
A. Eighth.
Q. Eighth grade. And where are you attending school?
A. Unity Prep.
Q. Unity Prep?
A. Charter school.
Q. It's a charter school? Where is that located?
A. Brooklyn, New York.
Q. And how long have you been going to that school?
A. Since sixth grade.
Q. Do you like it?
A. Yeah.
Q. How would you describe how you're doing in school?
A. Good.
Q. Okay. Is there a point in time when you weren't doing well in school?
A. Uh-huh.
Q. All right. Do you remember before you moved to New York going to school here in Columbus?
A. Yeah.
Q. All right. Can you tell the folks here what

school you remember going to when you were living here?

A. I remember going to -- I don't remember. I can't remember the name of it.

Q. Pardon?

A. I can't remember the name of it.

Q. Can't remember the name of the school? Well, how old were you when you were going to school here?

A. Like, I have been going to school here since I was one, but before I moved the last year I was here, I was like nine.

Q. You were what?

A. Before I moved the last year that I went to school here, I was nine.

Q. All right. And what were your favorite school subjects when you were here in Columbus, living here?

A. History, math, ELA, that's it.

Q. Can you speak up a little bit? I couldn't hear everything you said. History and math and what?

A. And ELA.

Q. And what?

A. ELA.

THE COURT: Can everyone hear?

Q. Just try to remember to speak up because it is hard to hear you. I am out on the other side of the room here. I want to make sure everybody, including myself, can hear what you are saying. Okay?

A. Okay.

Q. What?

A. Okay.

Q. Thank you. If at any point I ask a question and you don't understand, just let me know and I will ask it again. Okay?

A. Okay.

Q. Can you hear me all right?

A. Yeah.

Q. Great. Do you have any brothers or sisters?

A. Yeah. I have two sisters and I have another brother.

Q. Okay. Tell me about your sisters.

A. Well, they are pretty cool.

Q. What are their names?

A. Perrion and Kanijah.

Q. And are they older or younger or what?

A. Perri is older than me. Kanijah is younger than me.

Q. Does that make you then the middle sister?

A. Yeah.

Q. How do you like being the middle sister?
A. Um, it's cool.
Q. All right. Are there good things about being the middle sister?
A. Yeah.
Q. Like what?
A. Like, I get, like, I get a lot of stuff from my big sister and sometimes I can give stuff to my little sister.
Q. You mean stuff they used to have, like clothes or something?
A. Yeah, or like if my big sister gives me money for, like, me helping her clean, I can share with my little sister to buy something.
Q. You share with your sisters?
A. Yeah, but not all the time.
Q. What about -- you said you had a brother, too?
A. Yes, on my dad's side.
Q. That's on your dad's side?
A. Yes.
Q. Do you see your brother very often?
A. No. He lives here, in Ohio.
Q. Did your brother ever live with you and your mom and your two sisters?

A. No.

Q. When you were younger, before you moved out of Columbus, do you remember the very last place you were living here in Columbus?

A. Yeah.

Q. What do you remember about it?

A. The pond, the little lake.

Q. There was a pond or a lake there?

A. Yeah.

Q. Okay. Was this an apartment or a house that you lived in?

A. It was an apartment.

Q. Do you remember what the inside of this apartment looked like?

A. Yeah.

Q. Can you tell the ladies and gentlemen here, if you had to describe it for them, when you walked in the door, where was everything?

A. There was a living room and then there was a kitchen behind it.

Q. All right. And that is on the first floor?

A. (The witness nodded her head.)

Q. Were there other floors?

A. Yeah. And if you go upstairs, there is like a bathroom and then there is a big room over there.

Q. All right. Would you sleep at that place?

A. Uh-huh.

Q. Where would you sleep when you were living there?

A. We would sleep in the room, me and my sisters, the room upstairs.

Q. Did your mom sleep somewhere there?

A. Uh-huh.

Q. Where did she sleep?

A. Sometimes, like, she slept in the room with us, or she slept downstairs; and sometimes we slept downstairs and then they would sleep upstairs.

Q. Now when you lived at this house or this apartment, who else lived there besides you and your two sisters and your mother?

A. Him. (The witness pointed.)

Q. All right. So you pointed in one direction somewhere in the court and said, "him."

A. (The witness nodded her head.)

Q. Do you know the name of the person that also lived there with you?

A. (The witness nodded her head.)

Q. And you have to just say. The lady in front of you is typing. Can you say "yes" or "no," or if you know?

A. Yeah.
Q. Okay. Can you say his name?
A. Uh-huh.
Q. Okay. And what is the name of that other person that lived there with you?
A. (No response.)
THE COURT: Can you identify what he is wearing?
MR. BENTON: Your Honor, we stipulate as to identification.
THE COURT: Okay.
Q. (By Mr. Hughes) All right. Tiona, you don't have to think about that right now. Okay? Is that all right? Okay.
You were talking a little bit about that place where you were last living here in Columbus. Is that where you were living before you moved to New York?
A. Yeah.
THE COURT: There's tissues over to the left in front of you if you want any tissues.
THE WITNESS: Thank you.
Q. Okay. Did something -- or what, if anything, happened just before you and your family and your mom moved out to a hotel?

A. Would you repeat that?
Q. Uh-huh. Did you move from this place that had a lake to a hotel?
A. Yeah.
Q. All right. Did you know that you were going to be moving out ahead of time to a hotel?
A. No.
Q. Was that a surprise to you?
A. Uh-huh. Well, we talked about it with my mom and then I didn't really, you know, before that.
Q. So after you talked about it with your mom, is that when you moved into the hotel?
A. Yeah.
Q. So you hadn't planned on moving out?
A. (The witness shook her head.)
Q. Okay. Were you happy to have gone to a hotel from that place near the lake?
A. Yeah.
Q. And why?
A. Because it was just us.
Q. When you say, "just us," who?
A. My sisters and my mom and me.
Q. Okay. And was one person missing from that?
A. Uh-huh.
Q. And were you happy or sad that that person

was not with you?

A. Happy.

Q. Okay. I want to kind of talk about some of the things. Do you remember at some point you said you did talk to your mom about what had been happening?

A. Uh-huh.

Q. What made you decide or why did you start to talk to her about it?

A. Because it was like me and my sister and then like she asked -- well, we started -- she was asking us questions and then I was like talking to her about it. And, well, she took me outside for a walk and we started talking about it.

Q. Do you remember going outside for a walk with your mom?

A. Yeah.

Q. And at that point you felt like you could talk about it with her?

A. Not really, but I did.

Q. Okay. Well, why didn't you -- why were you still apprehensive and not really feel like you could talk to your mom?

MR. BENTON: Objection as to the form of the question.

THE COURT: What is that?

MR. BENTON: Objection as to the characterization.

THE COURT: What was the question?

(Question read.)

THE COURT: Overruled.

Q. You can answer that question. The Judge said you can answer that question.

A. Because, like, I wasn't -- well, yeah, I was kind of scared.

Q. What made you scared to talk about it?

A. Because I didn't want them to get hurt or something.

Q. You didn't want who to get hurt?

A. My sisters and my mom and uncle, dad.

Q. Why would you think that your sisters or your mom or your uncle or your dad would be hurt?

A. Because that is what he said; or like he would say, like, that if we told, like, we would get taken away. That is what he said to my big sister.

Q. And did you think you would be taken away if you told?

A. Yeah.

Q. And when you say, "taken away," what did you think in your head would happen to you if you told

somebody what had been going on?
A. I just thought we would get, like, split up.
Q. I'm sorry?
A. Like when I said taken away, I thought we would get, like, split up or something.
Q. Split up? When you say, "split up," does that mean you would be taken away from your sisters?
A. Yeah.
Q. You would be taken away from your mother?
A. Uh-huh.
Q. Who are the most important people in your life?
A. My mom and my sisters.
Q. Any other reasons you didn't tell your mom before that day she took you on this walk?
A. Yeah, I was just scared. I didn't want them to get hurt or anything.
Q. Okay. Did you tell your mom that when you did tell her about what had happened?
A. Yeah.
Q. Did your mom take you to the hospital?
A. Uh-huh.
Q. Did your mom take you to the hospital to talk to some people about all of the things that had been going on?

A. Yeah. But it wasn't the same day that I told her.

Q. So you remember she took you to the hospital one day, maybe to the emergency room?

A. Uh-huh.

Q. And then you had to go back to a different hospital at a different place the very next day?

A. Yeah.

Q. And that very next day did you talk to a woman in a room about everything that had been going on?

A. Uh-huh.

MR. BENTON: Your Honor, may we approach?

THE COURT: You may.

- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

MR. BENTON: If I'm understanding the testimony correctly, she said she was taken to the hospital twice, once to the emergency room and then the second day. I have no documentations of an emergency room visit.

THE COURT: That is what the other girl testified.

MR. HUGHES: Yeah. Me neither. I mean, they are not evidence. They didn't see them because there was no acute trauma. They told them to go to the --

MR. BENTON: But there's still some documentation of them having appeared there.

MR. HUGHES: There might be, but, I mean, I'm not offering it. She just said she went to visit the emergency room and her mom took her to Children's Hospital the next day. There is no evidence -- I'm not introducing any evidence of anything that happened there.

MR. BENTON: This is the first it is being disclosed to me that they went to the emergency room.

MR. HUGHES: That's not true, Judge.

MR. BENTON: I missed it with the first witness, but there is nothing in discovery about them going to the emergency room. And if you say it is not true, show me where it is or show the Court where it is.

MR. HUGHES: Ms. Lampkins testified about that.

THE COURT: What hospital did they go to?

MR. HUGHES: I don't even know, Judge. The discovery indicates they had an emergency room visit

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



and they were referred to Children's Hospital.

MR. BENTON: It does not.

MR. HUGHES: He could ask Ms. Lampkins on the stand. He could have asked Gail Hornor, who is the treating medical nurse.

THE COURT: Did you get anything that they went to the emergency room?

MR. BENTON: No.

MR. HUGHES: I don't believe that. I believe it is contained in the Children's Hospital --

MR. BENTON: Well, show me.

MR. HUGHES: I'm not offering it as any evidence in this case. Judge, maybe she went to a school dance. I don't have to bring in the principal for her to say, "I went to a dance." There is no evidence of that. Where is the school records?

MR. BENTON: In relationship to this case and in relationship to this investigation.

MR. HUGHES: It is not relevant. It is just a procedural thing. Her mom took her to the hospital. She testified that she took her to the emergency room and that she took her back to Children's the following day. You could have asked Ms. Henderson all about that.

MR. BENTON: The only reference I had to any

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



medical visit was with respect to when they went to CAC. Now, if it is not relevant, then why is the question being asked?

THE COURT: Well, let's get through this witness and I will note, you know, if we have to recall people and find out what hospital, you can get a subpoena to get whatever records. And if they have to sign HIPAA releases, they have everyone here in order to get that; or if they maybe just turned them away at the hospital.

MR. HUGHES: Again, I don't know either.

THE COURT: You need to find out what hospital it was, emergency room. That's the first I heard of it was by the other witness.

Right now, I'm not going to rule. We are going to go through this witness and we will see if we can -- we will take a break and try and figure out what is going on.

And you are entitled to discovery. If they went to the hospital for treatment for sexual abuse, that is what this whole case is about.

MR. BENTON: Yes. And again, I would renew my motion for a mistrial.

THE COURT: Okay, you may.

- - -

Q. (By Mr. Hughes) Ms. Arnold, you said that you went to Children's Hospital. Do you remember talking to a lady in a room?

A. I don't really remember talking to a lady in a room, but I do remember going to the hospital.

Q. Do you know if, when you went to the hospital, if any of that was video-recorded?

A. No.

Q. Have you ever seen a video of yourself talking to somebody at the hospital?

A. Huh-uh.

Q. You have to say "yes" or "no."

A. No.

Q. Okay. When you went to the hospital to talk to the people there, what were you there to talk to them about?

A. What had happened.

Q. What had happened?

A. Yes.

Q. What had happened involving what?

A. Like when we were at the house.

Q. Can we talk a little bit about the house?

A. Uh-huh.

Q. Can we talk first about Lakeside, which is

the last place that you lived, where you described there was a little lake there?

MR. BENTON: Objection, leading.

A. Yeah.

THE COURT: Overruled.

Q. You just described an apartment and the layout of the inside of the apartment?

A. Yeah.

Q. And that is the apartment I am going to talk about.

A. Okay.

Q. First I am going to show you this one. It has got State's Exhibit 15 on the bottom corner of it. Do you see that?

A. Uh-huh.

Q. And do you recognize what that is a picture of?

A. Yeah.

Q. And what is it a picture of?

A. That is the front door of the house.

MR. HUGHES: All right. Permission to publish, Your Honor?

THE COURT: You may.

Q. And you said this is the front door to get into the house?

A. Yeah.
Q. And when you say, "house," you are talking about the apartment; is that right?
A. Yeah.
Q. And that is the address listed there, 4519?
A. I don't remember the address, but I remember the door.
Q. But you remember that door?
A. Yeah.
Q. Do you know how long you lived there?
A. No, not exactly; but, like, it could have been for about like close to a year or over it.
Q. Do you know the exact dates?
A. No.
Q. Okay. Do you remember being in school when you lived there?
A. Yeah, I think that is the house where I went to -- I can't remember the school name. I think so. I think I did go to school in the house, yeah, I did.
Q. So you were going to school when you were living at that house?
A. Yeah.
Q. Is there a time that you weren't living at this house here, but you would come here and stayed or spent the night or be here sometimes even though you

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



were not actually, like, living there all the time?

A. We would be there sometimes. I can't remember if we spent the night or not.

Q. But is there a time that you actually lived somewhere else, but you would come to this place and sleep or spend the night sometimes?

MR. BENTON: Objection, asked and answered.

THE COURT: Overruled. You can answer.

A. I don't think so. I can't remember. I don't think we did.

Q. All right. You said when you walked into this apartment, you described the kitchen as being in the very back?

A. Yeah.

Q. Okay. I want to show you State's Exhibit 14. Okay? Do you recognize this?

A. Uh-huh.

Q. And where do you recognize it from?

A. That is the living room.

MR. HUGHES: Okay. Permission to publish, Your Honor?

THE COURT: You may.

Q. This is the living room at that same place?

A. Yeah.

Q. Can you see it on the screen right in front

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



of you?

A. Yeah.

Q. All right. Can I ask you, what, if you look at that screen, what do you remember about what is depicted there?

A. The pictures of everything.

Q. Of everything?

A. Yeah.

Q. Can you talk a little bit about the next photograph, if I can approach and show you another photo?

A. Yeah.

Q. I'm going to show you State's Exhibit 13. Do you know what that is a photo of?

A. Yeah.

MR. HUGHES: Okay. Permission to publish?

THE COURT: You may.

Q. What are we looking at here, Tiona?

A. The couch.

Q. The couch? Would you ever sleep on this couch?

A. Yeah.

Q. Who else would sleep on that couch?

A. Sometimes my sisters, we slept together.

Q. All three of you?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



A. Yeah.

Q. All right. Did anything happen on this couch?

A. Yeah.

Q. That you remember?

A. Yeah.

Q. Yeah? Can you tell the ladies and gentlemen here what you remember happening on that brown couch in that living room?

A. (The witness cried.)

THE COURT: Do you want a bottle of water or anything?

Q. Let's stop and think about one particular instance, okay?

A. Uh-huh.

Q. Let's say on this couch, did something happen on this couch to your body more than once?

A. Yeah.

Q. Okay. More than twice?

A. Yeah.

Q. More than three times?

A. Yeah.

Q. More than four times?

A. Yeah.

Q. More than ten times?

A. Yeah.
Q. How often?
MR. BENTON: Objection, Your Honor. May I approach?
THE COURT: You may.

- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

THE COURT: She is a child witness. I will give you some leverage to lead a little bit. If she needs a break to get composed, that's fine. Otherwise, I am not going to let you lead her throughout all of the incidents.

MR. HUGHES: Okay. Well, my response is I am trying to establish numerosity and specific instances, so I am asking her if she remembers.

THE COURT: The objection was leading.

MR. BENTON: Well, not only that, and I made the suggestion as to her and I probably also should have made it with respect to Perrion. The indictment in this case as to this particular young lady alleges seven counts. He is referencing ten or more incidents. My client is only charged with seven counts. So he is restricted to only what it is he has

been indicted for.

MR. HUGHES: That is just not true, first off.

THE COURT: Well, just because the State of Ohio hasn't indicted, you know, for 75 counts, she can testify as to what is going on.

MR. HUGHES: I am trying to narrow it down, Your Honor, trying to build a rapport with her so I can talk about specific instances.

THE COURT: I understand that. But if she is not going to answer the questions, I can't --

MR. HUGHES: I understand.

THE COURT: You know, I am very familiar with the indictment and the dates and I have been paying close attention to that, for your sake. You can lead her a little bit, but not too much.

\- - -

THE COURT: You may inquire.

Q. (By Mr. Hughes) All right. Ms. Arnold, I have some more questions as to that. All right?

A. Yeah.

Q. Okay? We last left off talking about the living room and the brown couch at Lakeside. Do you remember that?

A. Yeah.

Q. Okay. I would like to ask you about some very specific things that would have happened on that particular couch. Okay?

A. Okay.

Q. Besides sleeping with your sisters on that couch, did you ever find yourself alone on that couch with anybody else?

A. Yeah.

Q. And who was that person?

A. Him (witness pointing).

MR. HUGHES: Your Honor, let the record reflect the identification of the defendant. She pointed and said, "him."

THE COURT: The record shall so reflect.

Q. Can you talk about a time with him on the couch?

A. Yes.

Q. Okay.

A. First we would just be, like, watching a TV show or a movie -- not really movies, but like TV shows or something like that.

Q. Okay. Would this be at day or night?

A. Nighttime.

Q. And would your mom be there?

A. No, she had to work.

Q. And where would your sisters be?

A. Sometimes they will be on the couch, too, or they will be somewhere else, like upstairs, like asleep or something.

Q. All right. Is there a time you remember when your sisters were not in the room or on the couch or nearby?

A. Uh-huh.

Q. And can you tell the ladies and gentlemen about those times?

A. Yeah. Well, we would just be like watching TV. And we had, like, well, he had like some cover or something, or I would be under it. At first I would just be watching a show with him and then he would be like on this side of the couch and I would be like over there, like watching TV, because the TV was, like, in front of it. And then I would watch the TV and we'd be watching the show.

Q. And how long did you watch a show together for?

A. Like a few shows would pass sometimes.

Q. Okay. So that would be a while?

A. Yeah.

Q. When you were on the couch, were you eating anything?

A. No. Sometimes we would eat, but not all the time.

Q. All right. Would you, like, drink something when you are sitting on the couch, watching TV?

A. Huh-uh.

Q. What about him?

A. Yeah.

Q. When you say, "yeah," what do you mean?

A. Yeah, he did drink.

Q. What?

A. The bottles. It is alcohol. I don't know what it is called.

Q. Okay.

MR. BENTON: Objection, Your Honor.

THE COURT: You stated an objection?

MR. BENTON: Yes, Your Honor.

THE COURT: Overruled.

Q. Then what would happen after, when you are on the couch?

A. And then that is when he would start to touch me and stuff.

Q. You said he would start doing what and stuff?

A. To touch me and stuff.

Q. Can I ask you a few questions about

Case: 2:22-cv-02229-MHW-MRM Doc #: 9-3 Filed: 09/15/22 Page: 134 of 231 PAGEID #: 1022

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



touching?

A. Yeah.

Q. All right. What part of your body was touched?

A. Like private areas.

Q. Okay. When you say, "private areas," would you be comfortable pointing to them here for the people in court?

A. Yeah.

Q. Okay. Can you point to the areas?

A. It would be like over here and stuff (witness indicating).

MR. HUGHES: Your Honor, let the record reflect she was motioning her hands in the chest area and the area to below her waist.

THE COURT: The record shall so reflect.

Q. What part of his body would touch these areas that you indicated?

A. His hands.

Q. One hand or both hands?

A. It would sometimes be one or it would be two.

Q. Did he say anything to you while this touching was happening?

A. No. Or sometimes he would and sometimes he

would just say, the super stuff, like he would say he was going to hurt us if we told.

Q. Okay. Did you say anything to him when this was going on?

A. I didn't want him to do it.

Q. You didn't want him to do it?

A. Yeah.

Q. Did you say that to him?

A. Yeah. I would say, "stop" or "no, I didn't want it."

Q. And did he stop when you said, "stop?"

A. No.

Q. Did he stop touching you when you said, "no?"

A. No.

Q. Do you know how many times something like that happened at Lakeside?

A. No. I didn't count, but it was a lot.

Q. You didn't count?

A. No.

Q. Why didn't you count?

A. Because I didn't want to.

Q. Why didn't you want to?

A. Because I didn't. I just wanted to forget it.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Q. Okay. Could you forget it?

A. No.

Q. How often did think about it?

A. A lot.

Q. Did you think about it while you were in school?

A. Yeah, but sometimes I didn't.

Q. Would you try to do things so you wouldn't think about it?

A. Yeah, like me and my sisters, we would go to the park or something, or we would go to our grandmother's house that we had cousins to play with.

Q. All right. When you did those things, were you anywhere near him?

A. Huh-uh, but I was just, like, with all of my family.

Q. I want to ask you also about another time, still talking about the same place, the same place with the brown couch. You said sometimes your sisters were in the room or nearby?

A. Yeah, my big sister.

Q. Well, describe or tell what you remember about your sister being nearby when this was happening?

A. Well, like he would tell her to watch,

because there was a show that he used to watch all the time. And sometimes we would, like, he will be watching it, we will all be watching the show together or something. And then, like, well, he would do -- well, he wouldn't like call her over or something. He would just like grab her. But, like, it wasn't like -- I don't know how to explain it. And then, like, he would just -- and I would just be watching the show.

Q. Did you know what was going on with your sister?

A. Yeah.

Q. You did? How did you know what was happening with your sister and him?

A. Because, like, she wouldn't be like, crying; but, like, I could hear crying and sometimes she would be making sounds.

Q. Were they normal sounds?

A. No.

Q. You just talked about his hands touching you. Did his hands touch you any other places that you had lived or stayed at?

A. No. In the other places it was just my big sister.

Q. So for you at Lakeside is where you remember

him touching you?
A. Yeah.
Q. Did he ever touch other parts of your body? You indicated near the top part. Do you remember doing this, indicating your chest?
A. Yes.
Q. And you moved your hands down towards your middle part. Do you remember doing that?
A. Yes.
Q. Do you remember a time when his hands touched your middle part?
A. Yeah.
Q. Then when you say, "middle part," do you know of any other words you call that?
A. Yeah, yeah.
Q. Can you say that? You are allowed to say those words in court. You are allowed to say whatever words you want to use in court.
A. Well, like "vagina" or something.
Q. Pardon?
A. Like "vagina."
Q. Can you talk about his hands in that area of your body?
A. Uh-huh.
Q. Would you, please?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



A. First he would be like touching my chest or something and he was like kissing something.

THE COURT: Do you want to take a break?

(The witness shook her head.)

Q. Tiona, I am going to ask not about the kissing or the touching the chest part. Let's talk about his hands in the area you said about where your vagina is?

A. Okay.

Q. What words would you use to describe what it felt like?

A. It hurt.

Q. It hurt?

A. Yeah.

Q. Had you felt that kind of hurt before?

A. No.

Q. Did you know what to do?

A. No.

Q. How bad did it hurt?

A. A lot.

Q. Can I show you a different picture? Is that all right?

A. Yeah.

Q. I am going to ask you about this picture. It is called State's Exhibit No. 8. It has a sticker

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



on it. Okay? And do you recognize what that is a photo of?

A. Yeah.

Q. What is it?

A. That is the bedroom.

Q. The bedroom?

A. Uh-huh.

Q. Whose bedroom?

A. That's, well, not normally for a specific person, because we all slept in there, but not at the same time. Sometimes, like, we rotated.

Q. All right. I didn't hear everything you said, I know.

A. What I'm saying, it wasn't for, like, (inaudible) bedroom before they moved in and sometimes we slept up there and then sometimes like we slept downstairs.

Q. So sometimes you would sleep in this bed?

A. Yeah.

Q. And then sometimes you would sleep downstairs on the couch part?

A. Uh-huh.

MR. HUGHES: Permission to publish this, Your Honor?

THE COURT: You may.

Q. Do you recognize anything in that picture?
A. Yeah.
Q. What?
A. Everything.
Q. Everything? Did anything happen on that bed?
A. No, it never happened in the bed.
Q. What about that blanket?
A. Uh-huh.
Q. Was that blanket always on that bed?
A. No.
Q. Where would that blanket sometimes also be?
A. The living room.
Q. Where?
A. The living room.
Q. On that big brown couch?
A. Yes.
Q. And would anybody be under the blanket?
A. Yeah.
Q. Who?
A. Sometimes him and my sisters or him and me.
Q. Did you see times when him and your sister were under the blanket and you were in the same room?
A. Yes.
Q. Were there times you and him were under the

blanket and your sister was also somewhere else around in the room?

A. Yes.

Q. Can you talk about, tell us about you under the blanket?

A. Well, when we were under the blanket, we wasn't on the couch. We were, like, on the floor by the couch.

Q. So you were in the room where the brown couch is?

A. Yeah.

Q. And was the blanket there with you?

A. Yeah.

Q. And what happened?

A. He just, like, sometimes he would -- sometimes he would use his hands or his private parts.

Q. Okay. And where would his hands go?

A. Sometimes on my chest; sometimes inside my vagina.

Q. And how did that feel when that happened?

A. It didn't feel good.

Q. You said sometimes it was not his hands?

A. Yes.

Q. What other part would it be of his?

A. It would be his private parts.

Q. His private parts?
A. Yeah.
Q. Would they go inside of your private parts?
A. Yeah.
Q. And when you say your "private parts," do you mean your vagina that you described earlier?
A. Yeah.
Q. How did that make your body feel?
A. It hurt.
Q. Did you tell him that?
A. Yeah.
Q. Did you tell him to stop?
A. Yeah.
Q. Did he ever stop?
A. No.
Q. Do you know how many times what you just described happened at that house?
A. A lot.
Q. Did you keep track?
A. No. I didn't want to count.
Q. I'd like to ask you a couple more questions about private parts. Is that all right?
A. Yes.
Q. You said his private part went into yours. Did you ever see his private part?

A. Yeah.
Q. All right. Do you remember where you saw it first?
A. Living room, in the living room.
Q. In where?
A. The living room.
Q. Okay. What was happening when you saw his private part?
A. He told, like, he was like -- he had, I don't know what it is called, but it was like an oil. He was putting it on his private part.
Q. He was putting some -- I'm sorry, I didn't hear you.
A. He was putting some type of an oil on it.
Q. Okay. What was he doing with this oil that he had?
A. He was putting it on his private part.
Q. On his private part?
A. Yes.
Q. Did you see him doing this?
A. Yeah.
Q. Okay. And after he did that, what happened next?
A. Then he did it.
Q. Then he did it to who?

Case: 2:22-cv-02229-MHW-MRM Doc #: 9-3 Filed: 09/15/22 Page: 145 of 231 PAGEID #: 1033

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858





A. Me.
Q. And what did he do to you?
A. Then he like put (pause) he put his private parts in mine.
Q. All right. Would you have to move around or anything? How was your body?
A. No. I didn't have to move.
Q. Where were you?
A. Sometimes on the floor or sometimes on the couch.
Q. Okay. Do you remember a time on the floor?
A. Yeah.
Q. How was your body, like what part was touching the ground?
A. My butt.
Q. Your butt?
A. My back.
Q. You were laying on your back?
A. Yeah.
Q. And then where was his body?
A. He was on top of mine.
Q. What about your legs or your feet, do you remember where they were?
A. Yeah, they were facing towards the staircase to go up the steps.

Q. All right. So sort of pointed out with your feet facing straight towards the stairs?
A. Yes.
Q. And then when he got on top of you, what happened with your legs or your feet?
A. They opened.
Q. Do you know how long it went on for?
A. (No response.)
Q. Do you know what made it stop that particular time?
A. No.
Q. Any time that it would stop, do you know why it would stop?
A. No.
Q. Remember we were talking about his hands?
A. Okay.
Q. Can we talk about your hands?
A. Yeah.
Q. Did your hands touch Sefe Almedom?
A. Yeah.
Q. Did you want to touch him?
A. No.
Q. How did you end up touching him then if you didn't want to?
A. Because he would sometimes take my arm and

then move it forward.

Q. He would take your arm and move it?

A. Yeah.

Q. Did you tell him you wanted to do that?

A. No.

Q. What did you tell him?

A. I didn't want to do it.

Q. Do you think he was listening to you?

A. Yeah. I believe he heard me.

Q. How do you know he could hear you when you were saying these things to him?

A. Because I said it loud. I know he could hear me. He was right next to me.

Q. Why did you say it so loud?

A. Because I wanted him to know, like, I didn't want to do that.

Q. Okay. Do you know how many times that happened?

A. That didn't happen a lot.

Q. Okay. Did anything ever happen involving his private part and your mouth?

A. Yeah, twice.

Q. Two times you remember? Now, did you write down when that happened?

A. No. I just remember it was twice.

Q. Do you remember, were you in school or was it summertime when that happened?

A. Well, I was in school, but I think we were on a break.

Q. Okay. And do you remember where you were living? Let's just talk about one time. You said there were two times?

A. Yeah, it happened in the living room.

Q. In the living room?

A. Yeah, at Lakeside.

Q. Of which place?

A. Lakeside.

Q. One time or both times there?

A. Both times.

Q. Was anybody home when that happened?

A. I don't think so. I think they might have went to the store, but I can't remember.

Q. Okay. So it was just you and him at the apartment?

A. Yeah.

Q. How did that start?

A. I don't know.

Q. What -- can you talk about just what parts you do remember about that first time with the mouth?

A. Yeah.

Q. Okay. And what about that first time?
A. The first time it happened, like, it was nasty.
Q. Okay. Now you said the first time. Had you ever seen that before?
A. (The witness shook her head.)
Q. Had you ever seen other people doing that before?
A. No.
Q. And what was nasty about it?
A. It didn't feel good; like, it felt like I was going to throw up.
Q. Did you say that to him?
A. I couldn't.
Q. Why not?
A. Because I couldn't talk. It was in my mouth.
Q. Can I ask you about the second time?
A. Yeah, it was just like the first time.
Q. Was it in the same room?
A. Yeah.
Q. Was it like a short time after the first time, or a long time after the first time?
A. It was like -- the first time it wasn't that long, but I think the second time, yeah, it was

longer.

Q. I'm sorry, the second time was?

A. It was longer.

Q. Longer? Meaning it lasted longer?

A. Yeah.

Q. What about the time in between the two, was it like the next day, the next week, the next --

A. No, it could have been like the next month or something.

Q. But it wasn't like two nights in a row, it was about a month later?

A. Yeah.

Q. And you said both of those times were at Lakeside?

A. Yeah.

Q. In that same room with the brown couch?

A. Yes.

Q. (By Mr. Benton) Your Honor, I am going to object to the former question, because I don't believe she established a time frame.

THE COURT: I can't hear you.

MR. BENTON: I'm sorry. I said I am going to object to the former question, because I don't believe she established a time frame as was stated by the prosecutor in his questions.

THE COURT: Overruled.

Q. Whenever you lived at Lakeside, did your mom live there with you the whole time?

A. Yeah.

Q. Whenever you lived at Dublin-Granville Road, was your mom always living there at the same time?

A. Yeah.

Q. And even before that, in another residence, did you always live with your mother?

A. Yeah.

Q. Okay. Tiona, I am going to show you State's Exhibit No. 11 and ask you if you recognize what is on picture 11? What is that?

A. Just steps.

Q. You said steps?

A. Yes.

Q. And can you help me just by speaking up a little bit?

A. Yeah.

Q. Thanks. Are these the steps you said that your feet were pointed towards when you described the incident recently?

A. Yeah.

Q. And where do these steps go?

A. To the bathroom and the bedroom.

Q. So they go upstairs to the bathroom and the bedroom?

A. Yeah.

Q. State's Exhibit No. 9, I am showing you this picture. What is that?

A. The bathroom.

Q. Is that the bathroom at the top of the steps you just described?

A. Yeah.

Q. Anything ever happen in the bathroom?

A. No. He would just tell me to go shower.

Q. Okay. Now State's Exhibit No. 7, do you recognize where this is from?

A. Yeah, that is from the bedroom.

Q. Is this the same bedroom upstairs at Lakeside?

A. Yeah.

Q. Next to the bathroom you just described?

A. Yeah.

Q. And do you recognize anything depicted in State's Exhibit 7?

A. Yeah, everything.

Q. Everything?

A. Yeah.

MR. HUGHES: Permission to publish, Your

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Honor?

THE COURT: You may.

Q. This should be on that little picture in front of you. Did you just have a chance to look at it when I showed it to you?

A. Yeah.

Q. And do you remember what is in that picture?

A. Yeah.

Q. Do you remember what is in that picture without even seeing the picture?

A. Yeah.

Q. What?

A. The dresser, the book, the water bottle, the knives.

Q. And what do you remember about those knives?

A. Couldn't tell what the knives (inaudible). He was going to use the knives.

Q. What was he going to use the knives for?

A. To hurt people.

Q. How do you know that?

A. Because he said it.

Q. He said what?

A. That if we told, he would hurt people.

Q. Tiona, I have a few more questions. Is that going to be all right?

A. Yeah.

Q. We talked about a lot of different body parts. Is there a part of your body that his penis went inside that we have not talked about yet?

A. Yeah, but -- he tried to, but it didn't work.

Q. All right. Can you describe what was happening?

A. With my butt.

Q. All right. When you say your "butt," do you mean the part where poop comes out?

A. Yeah.

Q. Do you remember where that happened?

A. The living room.

Q. Do you know who was home, if anybody?

A. No. I think it was me, him, and my little sister, but I think my little sister was upstairs asleep.

Q. That is Kanijah?

A. Yes.

Q. So was it daytime or nighttime?

A. That was around daytime.

Q. And were you eating anything that day when it happened?

A. No.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Q. Were you drinking anything when this was happening?

A. No, we were watching a show.

Q. You were watching a show?

A. Yes.

Q. Was he drinking anything when this was happening?

A. Yeah. He was always drinking.

MR. BENTON: Objection.

Q. What was he drinking?

A. You know, the clear bottle, the alcohol, different things.

MR. BENTON: Same objection, Your Honor.

THE COURT: Overruled.

Q. Can you describe that bottle that you say you saw?

A. Yeah. It was like clear. I think it was a white sticker and a white cap.

Q. Okay. What happened then in the living room this time?

A. Well, my sister was upstairs asleep and I was upstairs -- well, I wasn't upstairs asleep with her; but she was upstairs, she had walked upstairs to go to sleep, and we were watching Two and a Half Men, I think, watching that show.

And while we were watching it, he was drinking his bottle and I was on the other side of the couch. He was over there in his cover and stuff. And then he came over to me and, I mean, he tried to do it, but it didn't work.

Q. All right. What didn't work?

A. When he tried to put his private parts in my butt.

Q. Now, had that ever happened before?

A. No.

Q. Can you describe, did you see his private part?

A. No.

Q. What did you feel?

A. Felt him trying to put it in my butt, but it didn't work, and that hurt.

Q. You say it hurt?

A. Yeah.

Q. Did it hurt a lot?

A. Yeah.

Q. Could you see if it was in your butt or not?

A. No.

Q. What did you do because it hurt so much?

A. Like, I put my back, like, side down.

Q. You put what down?

A. My back.
Q. Okay. And what did that do or make him do?
A. Nothing. He just got frustrated.
Q. Well, what did he do that he was so frustrated?
A. He just stopped and went back to watching his show.
Q. Right back to the couch?
A. Yeah.
Q. What did you do?
A. Went back upstairs and I shut the door and I laid with my little sister.
Q. Did you tell your little sister what happened?
A. No. She was too young. She wouldn't understand.
Q. Did you ever -- when you lived at Dublin-Granville Road and when you also were at Lakeside, were you in school?
A. Yeah.
Q. Did you see your teachers at school?
A. Yeah.
Q. Did you do any kind of, like, extra school stuff?
A. No.

Q. Did you do any kind of stuff at church?

A. No. Yeah, when my -- well, before he started babysitting us or whatever, when I used to go to my grandmother's house, me and my big sister, we danced at the church.

Q. As part of the church dance group?

A. Yeah.

Q. Did you ever tell anybody at church about what was going on at home?

A. No. I didn't want to be thinking about that.

Q. What about at school?

A. No.

Q. So, is there a reason you didn't tell people until the day you told your mom?

A. Usually when we were out, I wasn't really -- I didn't want to think about it, so I would just be focused on what was going on. And I never really got asked about it, or like the topic was never brought up.

Q. Once you did tell and then go to Children's Hospital, did you feel any different inside?

A. Yeah. I was kind of -- I was like more scared because I felt like -- I didn't know, I just got scared. But then I was kind of happy because my

mom said now we can -- now like everything will be fine and he will never touch us again, and I was happy.

Q. Is that the last time you saw him is when your mom took you away to live in that hotel right after this all happened?

A. Yeah, and until we went to court.

MR. HUGHES: Okay. I don't have any other questions, Tiona, right now. This gentleman, Mr. Benton, might have some questions for you. Okay?

THE COURT: Any cross-examination?

MR. BENTON: Yes, Your Honor.

- - -

CROSS-EXAMINATION

BY MR. BENTON:

Q. Tiona, good afternoon.

A. Good afternoon.

Q. I need to talk to you. And do you need a break or are you okay to go forward?

A. I am okay.

Q. Okay. And if I have any question that you don't understand, let me know.

A. Okay.

Q. I want to be sure we have good communication here. Is that all right?

A. Yeah.
Q. Now, you are 13 now?
A. Yeah.
Q. Okay. And I would imagine that if I were to ask you as to the accusations that you have made, a date, a time, where this happened, you would not be able to tell me, would you?
A. No.
Q. And so you have had an opportunity, though, to talk about this matter with your mother, correct?
A. Yeah.
Q. Your sister?
A. Uh-huh.
Q. Perrion?
A. Yeah.
Q. And other people, correct?
A. Yeah, the hospital.
Q. Now, you have had conversations with your mother before all of this was disclosed. You had conversations with your mother before, she talked to you all about child molestation, correct?
A. Can you repeat that?
Q. Okay. Your mother talked to you and your sisters about stranger danger, right?
A. Yeah.

Case: 2:22-cv-02229-MHW-MRM Doc #: 9-3 Filed: 09/15/22 Page: 161 of 231 PAGEID #: 1049

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



Q. And she talked to you about experiences that your aunt had when your aunt was molested, she told you about that?

A. No.

Q. You don't remember that?

A. No.

Q. Okay. Do you remember your mother talking to you about her experience growing up in a foster home?

A. Yeah.

Q. And did she -- and do you remember her talking to you about children being molested in a foster home -- in that foster home?

A. She didn't, no.

Q. Pardon?

A. No.

Q. You don't remember that?

A. Nope.

Q. But she certainly talked to you about what to do if you were confronted with someone who was trying to molest you; is that correct?

A. Yeah.

Q. And that would have included talking to somebody -- first of all, she encouraged you to talk to somebody, correct?

A. She didn't really encourage us because, like, it never happened before. She just, like, talked to us about, like, those type of situations.
Q. And you were told that if they were to happen, talk to her or talk to a family member or talk to a friend, right?
A. Yeah.
Q. Okay. Now, you had lived at a number of locations between 2010 and 2013, correct?
A. Yeah.
Q. And you all stayed at one point in time back in November of about 2009, you had a place on Burstock Court. Does that sound familiar?
A. No.
Q. Do you remember before moving in with Sefe your mother being evicted from an apartment?
A. Um, yeah. No, I don't remember that.
Q. You don't remember that?
A. No.
Q. Do you remember moving from an apartment into a house with your Aunt Ebony?
A. No.
Q. Did you ever move into a house with your Aunt Ebony?
A. Uh-huh, yeah.

Q. Ebony Arnold is your aunt, correct?
A. Yes.
Q. And you all did stay there after having moved out of your own apartment before that time; is that correct?
A. I don't remember.
Q. Okay. So you don't remember the circumstances that led you to live with your aunt?
A. No.
Q. Okay. And when you lived with your aunt, that would have been sometime around December 2009? Does that sound about right?
A. I don't remember.
Q. Okay. Do you remember in December?
A. No.
Q. Do you remember whether or not it was in 2009?
A. No.
Q. Or early 2010?
A. No.
Q. You don't remember?
A. No.
Q. Do you remember at some point in time moving out of your Aunt Ebony's house?
A. Yeah.

Q. And then you moved in with your mother and your sisters at a place on Beachworth with Mr. Almedom, correct?

A. Yeah.

Q. And at that time or shortly thereafter, your Uncle Jabar came to stay with you all?

A. No.

Q. After he got out of prison?

A. I don't remember that.

Q. You don't remember that? Okay. And do you remember while at the Beachworth address, your Aunt Ebony coming to live there, along with her two children?

A. I don't remember that.

Q. You don't remember that either? Okay. Do you remember at some point in time your family moving from Beachworth into the family shelter?

A. No.

Q. You don't remember that?

A. Huh-uh.

Q. Do you remember living in the shelter?

A. Yeah.

Q. How many times did you stay in the shelter?

A. I don't remember.

Q. Do you remember staying in the shelter for

as long as at least three months?

A. No.

Q. Do you remember your mother getting her own place and moving into an apartment on Dublin-Granville Road?

A. Yeah, I remember living there.

Q. Okay. Then do you remember your mother having to move because she was being evicted from that Dublin-Granville Road address?

A. No.

Q. You don't remember that?

A. No.

Q. Do you remember your mother moving in with Mr. Almedom on Lakeside?

A. Yeah.

Q. With you and your sisters?

A. Yeah.

Q. Do you remember while at Lakeside you had -- there was a gentleman who lived there also by the name of Jim?

A. Yeah. I don't remember his name, but I remember him.

Q. And he was there at Lakeside for quite sometime, correct?

A. Yeah.

Q. And do you remember at some point in time, perhaps maybe in January of 2013, Mr. Almedom's mother coming from California to stay at that Lakeside address?

A. I don't remember the dates, but I remember her coming.

Q. And she came and she stayed for several weeks. Am I correct?

A. I don't remember several weeks, but I remember her staying.

Q. And do you remember that took place sometime in January, 2013?

A. No.

Q. Do you remember what month it occurred in?

A. No.

Q. Do you remember what year it occurred in?

A. No.

Q. So you are not saying she didn't, she wasn't there in January 2013, you just don't remember?

A. Yeah, she was there, but I just -- I wasn't paying attention to the dates. I don't remember.

Q. While she was there, she cooked?

A. Yeah.

Q. And cleaned around the house?

A. Yeah.

Q. And did a whole lot of other things around the house, correct?

A. Yes.

Q. You all spent time together?

A. Uh-huh.

Q. Tiona, was there ever a time when you walked into a room and found your mother engaged in sex with Mr. Almedom?

A. No.

Q. That never happened?

A. No.

Q. Was there ever a time when you walked into a room and your mother was engaged in sex with another person?

A. No.

Q. You don't remember that?

A. No.

Q. Your father lives here in Columbus?

A. I think, yeah, Springfield.

Q. He lives in Springfield now?

A. Yeah.

Q. When you were here in Columbus, staying at the different addresses that we talked about, your father lived in the city?

A. Yeah, he lived in Columbus.

Q. And you have a close relationship with your father, correct?

A. Yeah.

Q. You oftentimes spoke with your father, correct?

A. Yeah.

Q. And was there a point in time when you even wanted to stay with your father?

A. Yeah, I used to go to his house every weekend and I had, like, I had a god-sister, too, and a god-brother, and it was fun at my dad's house.

Q. Okay. And this would have been back in 2009, 2010, 2011, 2012, 2013, correct?

A. I don't remember the dates.

Q. Well, it would have been during the time that you were living on Dublin-Granville Road?

A. Yeah.

Q. Beachworth?

A. Yes.

Q. Lakeside?

A. Yeah.

Q. And in the shelter?

A. No.

Q. No?

A. No. I didn't go to his house when we

went -- I didn't go to his house when I went there.
Q. I'm sorry, you didn't go to where?
A. To his house. When we left Lakeside, we went to a hotel.
Q. But during the time before you went to the hotel, while you were living at Lakeside, you would still see your dad?
A. You said -- can you repeat that?
Q. During the time that you would be staying at Lakeside, you would still have contact with your dad?
A. Yeah.
Q. You still would see your dad?
A. Yeah.
Q. In fact, and you felt comfortable talking to your father, correct?
A. Yeah.
Q. And, in fact, there was a time when you complained to your father that Mr. Almedom had yelled at you. Do you remember that?
A. Yeah.
Q. And you told your father that?
A. Yeah, I told him I didn't like him.
Q. You told him you didn't like him?
A. Yeah.
Q. And that was when you were staying where?

A. Lakeside.
Q. On Lakeside. So you talked to your father about problems you were having with Mr. Almedom?
A. Yeah.
Q. And are you aware as to whether or not your father ever had a discussion with Mr. Almedom about your complaint?
A. Yep.
Q. In fact, he hit him; am I correct?
A. Yeah.
Q. Now, there was a time when -- strike that. You were aware that your mother and Mr. Almedom had problems, correct?
A. Um, what do you mean, problems, like --
Q. They argued a lot?
A. Yeah.
Q. Argued a lot in your presence?
A. Not really in my presence, but they did argue.
Q. You could hear the arguments?
A. Yeah.
Q. Okay. And there was a discussion at one point in time about all of you moving to California or New York or Hawaii or Miami, somewhere outside of Ohio. Do you remember that?

A. No, I don't remember that.

Q. You don't remember it? You don't recall any conversations about moving out of Ohio?

A. No.

Q. During this time period that you knew Mr. Almedom, do you remember sometime in 2011 and 2012 going to a father-daughter dance at Woodcrest Elementary along with his daughter?

A. Yeah, I remember that.

Q. Okay. And you went and had fun, right?

A. Yeah.

Q. Do you remember going out to eat with Mr. Almedom at places like Hometown Buffet or Cracker Barrel or some of the other restaurants in the area?

A. No.

Q. You don't remember doing that?

A. No.

Q. Do you remember while at Lakeview (sic) -- Lakeview, you said they had this lake and that's why you remembered it, right?

A. Yeah.

Q. A very pretty lake, right?

A. Yeah.

Q. And sometimes you all, including you and Mr. Almedom and your sisters, would take walks out

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



there by the lake. Is that correct?

A. Yeah, that is correct.

Q. And do you remember going to a 4th of July fireworks in Ashville, Ohio sometime in 2012 with Mr. Almedom?

A. Um, no. I don't remember that.

Q. You don't remember that?

A. No.

Q. Do you remember going to Red White & Boom sometime in 2013 with Mr. Almedom?

A. I remember Red White & Boom, but I just don't remember going with him or going at all.

Q. Do you remember going out of town at all for any fireworks display?

A. No.

Q. Do you remember when Perrion was turning 12 and Sefe held a party for her and also for Leelee? Do you remember that?

A. Yeah, but I don't think that was at Lakeside, and I don't think it was when she turned 12, but I remember a party.

Q. But you attended that party, correct?

A. Yeah.

Q. And do you remember when Sefe would go to church with you and the rest of the family for a

baptism?
A. No.
Q. You don't remember that?
A. No.
Q. Now you were active in the church; am I correct?
A. Yeah, but that was my church. That was the church I went to with my grandmother.
Q. And about how old were you when you were going to that church?
A. I was like -- I was, like, young, like --
Q. Young?
A. Yeah, I was like younger, but I just don't remember the age.
Q. And your grandmother, is this your mother's mother or your father's mother?
A. My dad's mom.
Q. And you said earlier that oftentimes you would spend time with your grandmother and your cousins and you would have good times with them?
A. Yes.
Q. And you loved your grandmother, right?
A. Uh-huh.
Q. You loved your cousins, correct?
A. Yeah.

Q. You loved your mother, correct?
A. Yeah.
Q. And you felt comfortable with your family members such that you felt safe with them?
A. Yeah.
Q. You certainly felt safe with them when you were alone with them; am I correct?
A. Yeah.
Q. And you can tell them whatever it is that you wanted to tell them; am I correct?
A. Yeah, but not about that.
Q. Okay. Do you remember there being a babysitter who would watch over you and your sisters?
A. Miss Susan?
Q. Yes.
A. Yeah.
Q. Where were you staying at the time Miss Susan was watching you?
A. That was the house -- I don't remember, but it was the house, I think that was Beachworth.
Q. And she was your babysitter for the entire time that you were at Beachworth; is that correct?
A. Not the entire time, but most of the time.
Q. Most of the time?
A. Yes.

Q. And she would be there during the evenings; am I correct?

A. Yeah.

Q. You said that after your mother and your sisters left Lakewood (sic), you all went to a shelter, a hotel, correct?

A. Yeah.

Q. And you said then on that same day you went to the emergency room?

A. No. I said it wasn't the same day.

Q. It was the next day you went to the emergency room?

A. I don't remember if it was the next day, but it was close to that time period.

Q. So do you remember what emergency room you went to?

A. Children's Hospital. I don't remember, but I think it was Children's Hospital.

Q. Now when you went to the emergency room, then there was another occasion when you went to Children's Hospital for that interview; is that correct?

A. I don't remember.

Q. Or was that the same day?

A. I don't remember.

Q. You don't remember?
A. No.
Q. Do you remember them being on two separate occasions?
A. I believe so. I think it was.
Q. And I know you said that you have not reviewed the video-recording of your interview, but you do remember that interview, correct?
A. Yeah.
Q. And you had an opportunity to tell the lady that you were speaking with any and everything that you wanted to, correct?
A. Yeah.
Q. You were not restricted in any way from saying what you felt to be important?
A. Uh-huh.
Q. Correct?
A. Yeah.
Q. There were no time limits in terms of what you could say; am I right?
A. Yeah.
Q. You had as much time as you needed?
A. Yeah.
Q. And if you needed to correct anything, you had that opportunity as well; is that correct?

A. Can you rephrase that question?
Q. If you had said something and then you later thought that maybe I had that wrong, let me go back and correct something, you had that opportunity to do that, right?
A. No.
Q. You didn't have any opportunity to change what you had to say?
A. No. I just spoke to her.
Q. Now, I am going to show you what has been previously marked for identification purposes as State's Exhibit 7. Do you see that?
A. Yeah.
Q. Okay. Those are the two knives. Isn't it a fact that these knives were placed there by your mother?
A. No.
Q. They were her knives?
A. No. They were in the kitchen.
Q. Huh?
A. They were in the kitchen at first.
Q. You have seen your mother with these knives before?
A. Cooking.
Q. And your mother took those knives in that

bedroom?
A. No.
Q. Not that you know of?
A. No, she didn't put them there.
Q. All right. Tiona, during this whole time period during which your mother had dated or was dating Mr. Almedom, as you described, there were a number of different things that you all would do together, correct?
A. Not really.
Q. Well --
A. You mean all of us together?
Q. Well, all of you all together, or that you would do with Mr. Almedom, correct?
A. Incorrect.
Q. Huh?
A. That is wrong.
Q. That is wrong?
A. Yeah.
Q. Well, I am talking about, for example, the father-daughter dance, church, going out to dinner?
A. That was like four things. That didn't happen a lot.
Q. Okay, all right. And when Father's Day came around, you would tell him happy Father's Day?

A. Yeah.
Q. Give him a Father's Day card?
A. Nope.
Q. Father's Day gift?
A. Nope. He got like these instant, these little things you rub on your arm. My mom bought it and we gave it to him.
Q. You would give him these things that he would roll on his arms?
A. Yes.
Q. And that would be for Father's Day, right?
A. Yeah.
Q. Would they look something like this?
A. Yeah.
Q. Little ball on the top?
A. Uh-huh.
Q. That you roll over your arms?
A. Yes, that is what I was talking about.
Q. Okay. Tiona, when you were testifying, you were obviously moved, very emotional, just in the thought of recounting these experiences, correct?
A. Yeah.
Q. Would it be fair to say that you were as emotional on the days when these things would happen?
A. Yeah.

Q. And you would be in such an emotional state even when your mother would come home from work?
A. No. Sometimes I think -- I would be asleep. She didn't come home until late.
Q. Well, but you would then talk to your mother the next day, right?
A. Yeah.
Q. You would still be in an emotional state?
A. No. I would forget about it.
Q. You had forgotten about it?
A. Not forgotten. I just didn't want to entertain it or give it any attention anymore.
Q. So you, the next day, would be your normal, happy-go-lucky self?
A. Yeah. Not all the time, though.
Q. Would you have any feelings or expressions of sadness when you would see your mother the next day?
A. No. I would just be like relaxed, because --
Q. Pardon me?
A. I would just be like more calm and relaxed.
Q. More calm and relaxed?
A. Yeah.
Q. So each time these incidents occurred as you

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



described to this jury, the next time you would see your mother, you would just be calm and relaxed?

A. Not all the time, but, yeah.

Q. Not all the time, okay. Sometimes you would see your mother on the same day these incidents happened?

A. No. It would be like the next day.

Q. It would always be the next day?

A. Uh-huh.

Q. Your mother would call in while she is at work to check on you sometimes?

A. Yeah.

Q. Okay.

A. But that would be like before that happened.

Q. Okay. But there was nothing that prevented you from talking to your mother, right?

A. Are we talking about in general or about the situation?

Q. Yeah, either way. You talked to your mother, right?

A. Yes, I talked to her.

Q. And in talking with your mother, you never said to your mother that anything happened, correct?

A. Huh-uh, no.

Q. You never said to your mother about being in

any sort of pain, correct?
A. No. Yeah, sometimes I would feel sick or if my head was hurting, a little nauseous.
Q. And that was from what had happened as you described, correct?
A. Yeah, but not every time. Sometimes I would just feel sick.
Q. But you told your mother that, though, right?
A. About that is what happened?
Q. No. About the fact you were nauseous or that you were in pain.
A. Yeah. Not pain. I just told her I felt nauseous.
Q. But you never told her why?
A. No.
Q. So as to four years from the time frame at which you say that these -- no. After seven years from the time frame in which you say these things happened, you're very emotional, you are very tearful, but you were not very emotional and very tearful when it happened, correct?
A. I was.
Q. You were?
A. I was.

Q. Okay. But not the next day?

A. No. Not all the time.

Q. Pardon me?

A. Not all the time. Sometimes I would be a little sad, but like -- it wasn't like -- I wasn't like depressed or anything. I was just kind of more relaxed. I didn't really want to play as much.

Q. And you had no outer signs of any physical difficulty that came to the attention of your mother that you are aware of; am I correct?

A. No.

Q. Pardon me?

A. No, you are correct.

MR. BENTON: I have nothing further. Thank you.

THE COURT: Any redirect?

- - -

REDIRECT EXAMINATION

BY MR. HUGHES:

Q. Tiona, your mom talked to you about, I guess, what people call stranger danger. Do you remember that?

A. Yeah.

Q. Did your mom talk to you about what to do if somebody threatened to kill you?

A. Yeah.
Q. And threatened to kill her?
A. Yeah. Well, not threatened to kill her, because we never really thought that would happen, so she just talked about the stranger danger stuff.
Q. What about when you went to this dance with him, meaning Sefe, at school?
A. Yeah.
Q. Did he touch you at the dance?
A. No. I didn't dance with him.
Q. Did he put his penis in you at the dance?
A. No. I stayed with the girls.
Q. When you would go to church, did you ever go to church and Sefe Almedom would be at the same church?
A. No. We went to one of his churches, like one time, and there were a lot of people there. We didn't -- it wasn't really like a church. I think it was like a get-together or something.
Q. Did he ever touch you there?
A. No. We went one time.
Q. Did he ever touch you at Perrion's party?
A. No.
Q. Did he ever touch you anywhere outside of the place where you were living?

Case: 2:22-cv-02229-MHW-MRM Doc #: 9-3 Filed: 09/15/22 Page: 185 of 231 PAGEID #: 1073

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858





A. No.

Q. Did he ever touch you outside of the living room at Lakeside?

A. No.

Q. He always touched you in private?

A. Yeah.

Q. Anyone else ever there other than your sisters on a couple of times in the same room nearby and everything you described happening?

A. Can you repeat that?

Q. Sure. You said sometimes your sister would be in the same room?

A. Yes.

Q. And Sefe would be doing stuff to you?

A. Uh-huh.

Q. Anybody else ever around or that you ever saw when this stuff was happening to you?

A. Yeah. It was -- remember that, the guy that lived -- I don't remember his name. Joe, I think? He (inaudible) at the front of the TV and the couch was behind him. But, like, when he was there, he didn't do like extreme stuff. That is when he just used his hands.

Q. And when you talked about "him," who do you mean?

A. Who, Joe?
Q. Yeah.
A. Yeah, Joe was watching the show, too.
Q. Where was Joe?
A. He was like -- there is like a table, so like he was in front of the table watching Two and a Half Men.
Q. And what residence or what house or place was that at?
A. Lakeside.
Q. And when -- do you remember him -- did he live there?
A. Yeah.
Q. For how long?
A. Not that long, but he did stay there.
Q. And when did he leave?
A. I'm not sure. I don't think he left before us, but I think -- I don't remember.
Q. Okay. And did you ever talk to your mom about Jim, about anything?
A. No.
Q. Did you ever mention Jim before about anything? Did Jim ever put his penis inside of you?
A. No. He was nice. He took us to a store one night and we got candy.

Q. Did Jim ever take your head and force it on his penis?

A. No.

Q. Did Jim ever put his penis in your butt?

A. No.

MR. HUGHES: No other questions. Thank you.

THE COURT: Any other questions as a result of those questions?

MR. BENTON: No, Your Honor.

THE COURT: All right. You can step down. You can take your water with you. Just leave all of that there. Don't worry about it.

(Witness excused.)

Ladies and gentlemen, we are going to take our afternoon break here. Do not discuss this case among yourselves. Do not permit anyone to discuss it with you or in your presence. And it is your duty not to form or express an opinion in this case until it is finally submitted to you. So we will take about a 15-minute break.

THE BAILIFF: All rise.

- - -

Thereupon, at 2:38 p.m., the jurors exited the courtroom and the following proceedings were held in open court, in the presence of the defendant:

THE COURT: You guys can have a seat. The issue that I have outstanding is whether there is another emergency room visit. I can't imagine that there would be two separate visits. I can't imagine a kid would go to Children's Hospital and be turned away and told to come back another day. But if there is, you know, we should probably get it to Mr. Benton.

MR. HUGHES: Judge, I can address that. So first off, in discovery, Mr. Benton has had throughout the pendency of this case, including as the appellate attorney and now the trial attorney, he has copies --

MR. BENTON: Well, I didn't have discovery during the appeal. I did not get it until after the appeal, after the conviction was overturned, so -- that discovery was not provided until after the conviction was overturned.

MR. HUGHES: The computer does indicate through the electronic filing system, he did receive discovery on 6-27, 2016, well over a year ago. Those records include Children's Hospital records of the visit which was recorded.

In those summaries, Your Honor, referring to page 2 of 8, it says specifically: "Family was redirected here from emergency department visit on 3-13 due to sexual abuse allegations. See report for

further details."

The forensic interviewer will testify that they were not treated or seen at the emergency department. And references to the emergency department visit are actually numerous. I located at least two and I think three in just sitting here while the last witness was testifying to address this issue, and I have copies.

I believe Mr. Benton either entirely didn't look at the records or missed them or intentionally misrepresented that statement to the Court about first being aware of an emergency room visit, because they are clearly typed and are contained in these medical records, which he has had for over a year.

MR. BENTON: And I am just asking counsel at what page are you referring to? I never made any intentional misrepresentation to the Court.

THE COURT: I don't believe you would do so, Mr. Benton, so don't --

MR. HUGHES: This is the specific one I just quoted. I was looking for the Bates stamp; but, of course, Your Honor, it is hundreds of pages. As the witness is testifying, I am trying to do three different things.

But that is the portion I just quoted on the

record, and I was able to locate another portion here as I was going through it that referenced an emergency department visit and then referral to Children's Hospital.

MR. BENTON: Your Honor, first of all, the discovery that I have has Bates stamps as to all of the documentation that has been provided. I don't see this within the discovery that has been provided as referenced by counsel. This does not have a Bates stamp. I am also looking at something here that says, has a date of March 7th, 2013, within which is referenced a report from March 3rd of 2013. And again, it says, "ED report," I will admit that, but there is no ED report, at least that I see with this one page that has been handed to me that's incorporated with that, and I don't see this documentation at all in the discovery.

Now if it is an oversight on my part, I will admit it. But I still challenge the State to show me where the discovery that has been Bates stamped and provided to counsel through electronic discovery, where is this document.

THE COURT: You guys can work that out, not me. You guys can take a look at what was exchanged and what wasn't exchanged, when it was.

Who is your next witness?

MR. HUGHES: Kerri Wilkinson, Your Honor. she is the one that conducted the interview of Tiona, and that will be my last witness.

THE COURT: Okay, all right. And you are going to object to her -- do you want to voir dire her outside the presence of the jury?

MR. BENTON: Your Honor, I wouldn't need to voir dire her, but I will object to her being called to testify.

THE COURT: As being cumulative to the testimony of the witness?

MR. BENTON: That is exactly right, Your Honor.

THE COURT: All right. Overruled.

\- - -

Thereupon, at 2:45 p.m., a recess was taken until 3:00 o'clock, p.m.

\- - -

Thereupon, the following proceedings were held in open court before the jurors resumed their places in the jury box:

THE COURT: Everyone can have a seat. Did you find it?

MR. HUGHES: I did, Judge. Mr. Benton

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



represented to the Court that he had never, quote, "heard or knew that the children went to the emergency department," it was the first he heard about it, et cetera; even though Ms. Henderson testified she first took them to be treated and they were referred to Children's Hospital.

And that is further reflected on Bates stamped pages 43, 50 and 76 in the discovery and medical records provided last year. Forty-three, 50, and 76 contained information about that emergency department visit and then referral to Children's for the subject of the evidence that the State has presented.

MR. BENTON: Your Honor, I will restate again so the record is clear what I said. In the discovery I received, there was no reports with respect to any emergency room visit. And the records that were provided fail to give at least sufficient detail that I think that would have established that that was what was being referenced within this report.

The report says specifically, "Other supplemental history. Family was redirected here from their ED visit on March 3rd, 2013 due to sexual abuse allegations. See ED report for further detail." That is in all capital letters.

That ED report was not included within the discovery. There is nothing in the discovery telling me even what ED stands for. So again, I stand upon the representation that I made in good faith to the Court that I did not have any information regarding any emergency room visit by these children.

The other thing that I will point out is that even if that is what ED stands for -- and no one has testified to that effect. But even if that is what ED stands for, there is certainly no way that I could have access to those records without gaining a HIPAA release from the mother as it relates to her children, which would have been -- was not going to happen; certainly not any cooperation on her part that she is going to disclose her children's medical records to counsel for Mr. Almedom. So I stand upon my representation.

THE COURT: I never thought you misrepresented anything, Mr. Benton.

Anything else we have to put on the record prior to bringing the jury in?

MR. HUGHES: No, sir.

MR. BENTON: Your Honor, again, I think as I mentioned before, we would object to not only this witness being called to testify for the reasons that

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



we stated earlier, but I anticipate there will be a request to play a recorded interview of Tiona Arnold, and we would object to that in light of the fact Ms. Arnold has testified. And again, there are portions in the video where there are statements that are objectionable, particularly as it relates to third-party statements concerning her youngest sister.

THE COURT: And that was at 6:02?

MR. BENTON: Yes. Specifically, as it relates to this interview beginning at 12 minutes and 5 seconds, Tiona makes a statement, "because she told me." And then as a follow-up to that statement, at 16 minutes and 2 seconds, the interviewer in recounting what Tiona says, makes a statement: "So you also say Kanijah told you that he touched her, isn't that what you said?"

And the response was: "She told us sometimes.

Okay. She told who?

Me and Perri.

Okay. What would she tell you and Perrion?"

And then she would recount what the youngest child said.

And then there's also statements at 23 minutes and 29 seconds, "Perrion said that it started

to her at Beachworth."

And then at 25 minutes and 18 seconds, the interviewer is summarizing statements of Tiona and says, "I know he touched all three of you."

And then at 44 minutes and 20 seconds, said that "she" -- referencing to Perrion -- "kept telling him to stop, but he told her to shut up."

And then at 52 minutes and 36 seconds, Tiona says: "Perrion also witnessed this."

And then at 1 hour and 56 seconds, Perrion makes a statement -- I mean, Tiona makes a statement: "Perrion told Mom." And I have outlined these objections and they have been provided to Mr. Hughes.

THE COURT: Have they been redacted? How long is this tape?

MR. HUGHES: The tape is one hour and five minutes, Your Honor. But if the Court wanted to, we can address each one of those individually, because as you heard, Perrion and Tiona were sometimes in the same room when this was going on.

THE COURT: But she can't -- I mean, I am letting this come in as medical records, but that is saying that all of the, you know, this person told me this. Or is this interview not to treat Perrion, but to treat Tiona? That is how they come in through the

medical records. You know, all of the hearsay and the persons saying, "I know he touched all three," that clearly is other acts evidence.

MR. HUGHES: All right. I am going to --

THE COURT: You know, if we can redact whatever the portions are that relate to her telling whoever it is --

MR. HUGHES: Judge, I'd like -- no problem doing that, but I think what should happen is that the State should play those and not just base them on his summary of those few seconds and then the Court says, well, exclude it.

I think the Court should listen to each one of these portions to make a determination of whether or not there is a reason to redact it.

THE COURT: You know, guys, this is the third, fourth day of trial. This has been going on for four years and you have been involved for two years. Why are we dealing with this issue right now?

MR. BENTON: Judge, I gave this information --

THE COURT: I am not saying -- if we want to deal with it, I mean, we can play it.

MR. HUGHES: I mean, just because Fred sends me an e-mail saying I am going to object to the video

doesn't mean I am going to just fold up camp and --

THE COURT: No, no, no. I am letting you play the video, but I can't allow hearsay of this girl telling this person that this person told me this.

MR. HUGHES: I guess I don't agree with every single one of Mr. Benton's. I would like to play them.

THE COURT: All right. I don't know if you can redact it very quickly or --

MR. HUGHES: I have those portions keyed up. If Mr. Benton wants to bring the time frames to the Court's attention, I can zoom right there and the Court can make a determination.

THE COURT: All right then, let's do it.

MR. BENTON: I don't want him to suggest that I am misrepresenting this again. But again, I am recording as I am listening to this interview, and it begins at 12 minutes and 5 seconds.

THE COURT: Okay. Go to 12 minutes and 5 seconds.

\- - -

Thereupon, the forensic interview of Tiona Arnold was played as follows:

FORENSIC INTERVIEWER: "Touching us, meaning you and Kanijah?" Tell me all about that time when

you say he took you to the bathroom, put duct tape over your mouth and was touching you and Kanijah.

TIONA ARNOLD: Yeah, because she said he don't want nobody to hear us when we scream."

- - -

(Video paused.)

MR. HUGHES: All right. Judge, I believe -- are you objecting to this statement, Mr. Benton?

MR. BENTON: Yes.

MR. HUGHES: All right. If the Court listens, she is recounting being in the bathroom with Kanijah when this is happening, Judge. So she is saying Kanijah says, "Don't touch me, don't put duct tape on me," but this is happening in front of her. She is an eyewitness to this.

THE COURT: Yeah, but it is --

MR. HUGHES: It is not hearsay. If she is being sexually abused in front of Kanijah, and Kanijah says stop, that is not hearsay because it is happening, it is a present sense impression. They are in the room together. Tiona is testifying about what occurred.

THE COURT: This is relating to touching Kanijah.

MR. HUGHES: And her in the bathroom.

THE COURT: She can say, "I was in the bathroom," but when she says Kanijah tells someone to stop touching me, how is that relevant to whether he touched Tiona?

MR. HUGHES: Because it is a defendant's statement.

THE COURT: No, it is Kanijah's statement.

MR. HUGHES: Correct, of --

THE COURT: And I am not going to allow Kanijah to come in and testify as to her own abuse without a charge pending.

MR. HUGHES: Will the Court listen to this -- a portion and not just the three seconds or whatever? I would ask the Court to look at it and listen to it in context.

THE COURT: The context is I am not going to allow any statements that Kanijah made come in.

MR. HUGHES: All right. Will the Court then instruct the State as to what the statement is to be excluded, because Tiona --

THE COURT: Whatever that portion that Kanijah told Sefe to not --

- - -

Thereupon, the video was played as follows:

TIONA ARNOLD: He took us to the bathroom

with him and then he put duct tape over our mouth and he was touching us."

(Video paused.)

MR. HUGHES: So this is Tiona saying in the bathroom that the defendant was touching Kanijah. This is her own personal observation.

THE COURT: Okay.

(Video resumed.)

FORENSIC INTERVIEWER: Touching us, meaning you and Kanijah? Tell me all about that time when you say he took you to the bathroom and put duct tape over your mouth and was touching you and Kanijah.

TIONA ARNOLD: Because she said he don't want nobody to hear her us when we scream."

\- - -

MR. HUGHES: I believe she said he said he didn't want anybody to hear her scream.

THE COURT: I don't know what --

\- - -

(Video resumed.)

FORENSIC INTERVIEWER: He said that? Okay. Tell me all about him touching you and Kanijah.

TIONA ARNOLD: He was touching us where he not supposed to.

FORENSIC INTERVIEWER: Okay. And this

happened when you were in the bathroom with him and Kanijah, tell me about where he was touching you.

TIONA ARNOLD: Down there.

FORENSIC INTERVIEWER: What do you call that part?

TIONA ARNOLD: My pee-pee.

FORENSIC INTERVIEWER: You call it a pee-pee? Okay. Tell me about how he was touching your pee-pee that time in the bathroom.

TIONA ARNOLD: With his hand.

FORENSIC INTERVIEWER: With his hand? Tell me how his hand was touching your pee-pee.

TIONA ARNOLD: Like this.

FORENSIC INTERVIEWER: What do you call that?

TIONA ARNOLD: I don't know."

\- - -

(Video paused.)

MR. HUGHES: Are we past the part you seek to exclude, Fred?

MR. BENTON: All of this is a discussion about activities in the bathroom that involved her and Kanijah.

THE COURT: Right. But, I mean, she is allowed to testify to what he was doing, whether

Kanijah was present or not.

MR. BENTON: Well, one thing, Kanijah being present, yes. But first of all, Tiona clearly has already testified. So now the question becomes in respect to this interview, you have as to this account an intertwining of what has supposedly happened to her as well as her sister. And the questions that are being presented to her are being presented in the collective sense and she is responding in like manner.

So I don't see how you are able to sever that out, or how the State severs it out. My suggestion to the Court is that the State not play this beginning part of this interview or that it be redacted or otherwise put on mute.

What is going to happen, if you redact it, the State moves to have this admitted into evidence, I will certainly not agree to it being admitted with these references being included.

THE COURT: Is it easy to redact?

MR. HUGHES: If I have a certain time frame, Your Honor.

THE COURT: Really the references to Kanijah or any statements. I mean, can't you just mute over those seven seconds or five seconds? I mean, we can do that tonight, but I am wondering how do we --

MR. BENTON: At this time it appears to be anywhere between about 12:04 to where it is currently stopped, 13:01.

THE COURT: She can testify as to he put duct tape over her and he was fondling her.

MR. BENTON: But she didn't testify to that.

THE COURT: I understand. But this is for medical purposes.

MR. BENTON: Well, but here is the problem.

THE COURT: We are not limiting everything to her testimony.

MR. BENTON: No, no, no. I understand that. But my concern is, is that she is saying what happened to us. And the "us" that has been referred to is Kanijah.

MR. HUGHES: She is a witness. I mean, she testified --

THE COURT: We are not dealing with Kanijah. She can witness five homicides, but we are not dealing with those five homicides. We are dealing with her abuse, alleged abuse by the defendant. Is there any way we can get Kanijah's name taken out? I don't know how easy it is. I don't know why I am dealing with this on the fourth day of trial, minutes before the next witness is going to testify.

MR. HUGHES: I mean, my understanding was it was the Court's ruling that these would be admissible. And Fred sent me an e-mail saying, "I am going to object to all of this stuff being played, period." I mean, I am on notice he is going to object to it because he sent me an e-mail. But that is what he has done, I expect.

THE COURT: I am admitting it to the extent that it doesn't violate -- you know, I didn't know what was on there. This is the first time I have heard it. I don't know what hearsay she is saying and what the person is saying. And if she is verifying that all three girls were to deal with, I am not letting that in.

MR. HUGHES: Okay. I guess --

THE COURT: There is no hearsay exception.

MR. HUGHES: My point is then, Your Honor, that the State would need some direction and the Court will have to watch this entire video and then let the State know what its ruling is as to what portions of time would not be admissible for the jury; and then I.T. people could cut the sound out for those brief periods or portions. I think that is the only way to do it, because in the prior trial --

THE COURT: This probably wasn't even

objected to in the prior trial.

MR. BENTON: Actually, it was, and the objection was sustained as it related to statements made by Kanijah.

THE COURT: And that was upheld on appeal, but I don't know if you addressed that on appeal.

MR. HUGHES: Well, this video was admitted in its entirety and not as a basis of any reversal. So it is the State's position that the entire video comes in.

THE COURT: I am not going to allow it to the extent that she talks about Kanijah. I don't know where it is. You and Mr. Benton can take whatever time you need. Should we send the jury home today and deal with this issue?

MR. HUGHES: I guess Fred and I are not going to agree --

THE COURT: Well, you are going to know some little parts. It doesn't take very long.

MR. HUGHES: So every time the name, "Kanijah" is mentioned, I can just redact the word, "Kanijah."

THE COURT: Okay. You know, something like that.

MR. HUGHES: If that will cure it.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



THE COURT: Any hearsay that Kanijah says, my sister said this, or the other person said this. Mr. Benton gave you five things. You guys can work on those five things. The question is whether we can get it done today, or do I send the jury home?

MR. HUGHES: But again, Your Honor, I think there is a context to it. If, for example, Tiona says," Kanijah said, 'Ow, stop punching me,' while he was raping us in the bathroom," I would say that that is a statement by Kanijah that is admissible in this interview because she personally heard it.

THE COURT: Correct. I would agree to something like that; but that is not what this is.

MR. HUGHES: That is where Fred and I, we simply don't agree.

THE COURT: Why don't we get -- are you guys going to be able to listen to this in 15 minutes? We have got an hour interview and probably --

MR. BENTON: Well, Your Honor, I have already given the marked locations in the interview where my concerns are.

THE COURT: All right. What are the five marked locations?

MR. HUGHES: That is what I suggested, that we go to those specific locations.

THE COURT: Okay, this is one. I am going to exclude any reference to Kanijah at 12:05. What is the next one?

MR. BENTON: And again, that runs from about 12:05 to about 13:01 in that one.

THE COURT: No, no, it is way back there. It's 12:05 to 12:07.

MR. BENTON: No. But even then, she is still talking about --

THE COURT: She can talk to that. I am letting that in, because she is talking about her being assaulted.

MR. BENTON: No, she was talking about -- she makes the reference to "us" and the continuing conversation about --

THE COURT: Okay. Then if we delete "Kanijah," then I don't think it will be -- she is talking about him assaulting her right there.

MR. BENTON: She is talking about him assaulting both of them at that juncture. That is my point.

THE COURT: I understand your point, but she is talking about her own abuse right there. I will allow that in. I have to allow that in. So whatever the reference to Kanijah at 12:05.

MR. HUGHES: Let me play it quickly here.

- - -

Thereupon, the video was played as follows:

FORENSIC INTERVIEWER: Touching you and Kanijah? Tell me all about that time when you say he took you to the bathroom and put duct tape over your" --

MR. HUGHES: So that would be 12:03 to 12:07 when she talks about Kanijah. I can redact that and exclude it.

THE COURT: Okay.

MR. HUGHES: What is the next portion, Mr. Benton?

MR. BENTON: Well, continue to play this.

- - -

Thereupon, the video was played as follows:

FORENSIC INTERVIEWER: -- "over your mouth and was touching you and Kanijah.

TIONA ARNOLD: Yeah, because he said he didn't want nobody to hear us when we scream."

- - -

MR. HUGHES: So the nurse says, "What about touching you and Kanijah?" And then Tiona says, "He doesn't want to hear us."

THE COURT: We can do 2:19. I mean, "hear

us," that is fine.

- - -

Thereupon, the video was played as follows:

FORENSIC INTERVIEWER: He said that? Tell me all about him touching you and Kanijah.

TIONA ARNOLD: He touched us where he not supposed to.

FORENSIC INTERVIEWER: And this time when you were in the bathroom with him and Kanijah, tell me about where he was touching you.

TIONA ARNOLD: Down there.

FORENSIC INTERVIEWER: What do you call that part?

TIONA ARNOLD: My pee-pee.

FORENSIC INTERVIEWER: You call it pee-pee? Okay. Tell me about how he was touching your pee-pee that time in the bathroom.

TIONA ARNOLD: With his hand.

FORENSIC INTERVIEWER: With his hand? Tell me how his hand was touching your pee-pee.

TIONA ARNOLD: Like this.

FORENSIC INTERVIEWER: What do you call that?

TIONA ARNOLD: I don't know.

FORENSIC INTERVIEWER: Okay. Was his hand

moving, staying still, or something else?

TIONA ARNOLD: Uh-huh.

FORENSIC INTERVIEWER: Which one?

TIONA ARNOLD: Moving.

FORENSIC INTERVIEWER: Moving, okay. What did it feel like when he was touching your pee-pee that time in the bathroom?

(No response.)

What's that mean?

I don't know.

Don't know? Okay. That's okay if you don't know. Tell me about where your clothes were that time in the bathroom when he was touching your pee-pee.

TIONA ARNOLD: They were up.

FORENSIC INTERVIEWER: They were up? Okay. Tell me about how he was touching your pee-pee if your clothes were up.

TIONA ARNOLD: He was touching us by the zipper part.

FORENSIC INTERVIEWER: Okay.

- - -

(Video paused.)

THE COURT: What is the next thing? I have from 12:03 to 12:45. And then --

MR. BENTON: Then the next part begins about

16:02.

MR. HUGHES: Why is it 12:45, Judge? I thought it was 12:03 to 12:07.

THE COURT: Because the interviewer, you know, says: "Tell me about him touching you and Kanijah," or whatever.

MR. HUGHES: But that also addresses the portion where Tiona says: He didn't want to hear us scream, so he put duct tape over our mouth.

THE COURT: If you can get it that he put the duct tape over our mouth, that is fine; but not mentioning Kanijah. And "us," I don't care about.

MR. HUGHES: What is the next one, Fred?

MR. BENTON: 16:02.

MR. HUGHES: All right. I will start here at 15:50.

\- - -

Thereupon, the video was played as follows:

TIONA ARNOLD: He would always say we don't know God or anything, but he doesn't know God.

FORENSIC INTERVIEWER: Tell me about what he said about you not knowing God.

TIONA ARNOLD: Every time, like, every time if, like, him and my mom got in an argument, like yelling back and forth or something, because, like, he

wanted to watch the news 'cause she wanted to watch football or something but she didn't want to, like because she -- like he would have the TV up loud on purpose, picking, and my mom would be looking for jobs on the computer because she don't have a job, and he would have the computer -- the TV up loud on purpose, and she would always ask him to, like, turn it down, but he would say no and just turn it up more each time.

So then my mom said, "Why do you keep picking on me? I have no problem with you, but you just keep picking," or something.

And then he was like," You don't know God," or something. But he kept saying it to us.

And then my mom said: "Don't bring my kids into this."

FORENSIC INTERVIEWER: Okay. "Tiona, when you said he -- the time in the bathroom when he put the duct tape on your -- over your mouth, how old were you when that happened?

TIONA ARNOLD: Nine.

FORENSIC INTERVIEWER: Nine?

\- - -

(Video was paused.)

MR. HUGHES: All right. For the record, I

think Mr. Benton may have been off a minute. So we are going to go back to 14:50 instead of 15:50 and see if he wants to exclude at 15:02.

- - -

Thereupon, the videotape was played as follows:

FORENSIC INTERVIEWER: So let me make sure I understand, "the same thing." He unzipped it, her zipper part, and touched her pee-pee?

TIONA ARNOLD: On top of her panties.

FORENSIC INTERVIEWER: On top of her panties? Okay. So you call them panties, not underwear? Okay. Were there any other times that you saw him touch Kanijah's?

TIONA ARNOLD: (Shakes head.)

FORENSIC INTERVIEWER: Okay. You also say Kanijah told you that he touched her; is that what you said?

TIONA ARNOLD: No. She told me -- that time I saw her, but she told me some time. She told us sometimes.

FORENSIC INTERVIEWER: Okay. She told who?

TIONA ARNOLD: Me and Perri.

FORENSIC INTERVIEWER: Okay. What was she telling you and Perrion?

TIONA ARNOLD: She would say, "Mr. Seff touched me."

FORENSIC INTERVIEWER: Did she say where he was touching her, or she would just say he touched her?

TIONA ARNOLD: She would just say, "He touched me."

FORENSIC INTERVIEWER: Okay. Did she tell you that one time or more than one time?

TIONA ARNOLD: More than one time.

FORENSIC INTERVIEWER: Okay. Is there anything else she would say about him?

TIONA ARNOLD: No.

FORENSIC INTERVIEWER: No? Okay.

TIONA ARNOLD: He would always say we don't know God or anything, but he doesn't know God.

\- - -

(Video paused.)

MR. HUGHES: Judge, I had about 15:17 through 15:55. Does that sound right?

THE COURT: Yeah.

MR. HUGHES: Okay. I can exclude that.

MR. BENTON: Well, there was one spot at 15:11 and then 15:17 and 15:55.

MR. HUGHES: What's 15:11?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



- - -

Thereupon, the video was played as follows:

FORENSIC INTERVIEWER: So let me be sure I understand, "the same thing." He unzipped it, her zipper part, and touched her pee-pee?

TIONA ARNOLD: On top of her panties.

FORENSIC INTERVIEWER: On top of her panties? Okay. So you call them panties, not underwear? Okay.

Were there any other times you saw him touch Kanijah's --

(Video paused.)

- - -

MR. HUGHES: Judge, it's not Kanijah. The interviewer asked her if there were other times --

THE COURT: She saw her touch --

MR. HUGHES: She saw it.

THE COURT: Okay, but she is not part of this case. If you want to indict Count 16, then that may come in later.

MR. BENTON: And actually, I would suggest to the Court from 14:48 through 15:11.

THE COURT: You can't tell that she is talking about Kanijah on that, so I will do 15:09.

MR. HUGHES: All right. What is the next

one?

MR. BENTON: 16:39 --

THE COURT: 16:39? Didn't we just go all of the way through that up to 17?

MR. BENTON: I don't recall, Your Honor, to be quite honest with you.

- - -

Thereupon, the video was played as follows:

TIONA ARNOLD: Each time. So then my mom said: "Why do you keep picking on me? I have no problem with you, but you just keep picking," or something.

And he was like, "You don't know God," or something, but he kept saying it to us."

(Video paused.)

- - -

MR. BENTON: I stand corrected, Your Honor. Yes, we did go through that.

The next one would be at 23:29.

MR. HUGHES: All right.

- - -

Thereupon, the video was played, as follows:

TIONA ARNOLD: But he started touching me at the beginning over at his friend's house, Mr. Isaac.

FORENSIC INTERVIEWER: Okay. I just got

confused, Tiona. I thought you said he didn't touch you when you lived on Beachworth.

TIONA ARNOLD: No, not Beachworth. He touched my sister. On Dublin-Granville, on -- over at his friend's house, Mr. Isaac, when he went to a business trip to a different culture, he asked Mr. Seff, 'cause that's his best friend, he said they're like brothers.

And he asked him to watch his house for him. And so we had all stayed over there. And so when my mom had to go to work, he babysitted us, and that's when he started touching us.

Then on Dublin-Granville Road, he started touching me a whole bunch. We started living there for like a medium-long time at Dublin -- on Dublin-Granville Road.

FORENSIC INTERVIEWER: Okay. So he touched you -- I'm talking just about you, because I know he touched all three of you, so it gets confusing. At Mr. Isaac's house he touched you and he touched you when you lived on Dublin-Granville Road?

TIONA ARNOLD: Yeah, when we started to live there for a medium-long time.

FORENSIC INTERVIEWER: A what? When you started to live there for what?

TIONA ARNOLD: A medium-long time.

FORENSIC INTERVIEWER: A medium-long time?

TIONA ARNOLD: Short and long.

FORENSIC INTERVIEWER: Did it happen to you anywhere else?"

\- - -

MR. HUGHES: Your Honor, I stopped at 24 minutes and 44 seconds.

MR. BENTON: Your Honor, my time is a little bit off. I think the time -- it just depends on what device you are playing it from. But I thought it was at -- my next point was at 23:29. I believe it may have occurred about a minute before that, so if we could go there.

MR. HUGHES: All right. I will try 22:22 is where we will start.

\- - -

Thereupon, the video was played as follows:

FORENSIC INTERVIEWER: So that is where it would start?

TIONA ARNOLD: She -- Perrion says that it started to her at Beachworth, but he only started --

\- - -

MR. BENTON: Stop at 22:31.

THE COURT: I am going to allow that.

MR. HUGHES: What is the next number, Fred?

MR. BENTON: Actually, just let it play. I think it picks up at about 24:24.

\- - -

Thereupon, the video was played as follows:

TIONA ARNOLD: -- "he had asked his friend to -- his friend had asked him to watch his house, because he would go into a different culture. And then when he was there, my mom had to go to work 'cause we were all staying there to watch the house for him and my mom had to go to work. That was before she knew he touched her. She had to go to work, and then that's when he started to touch me at the beginning.

But we -- but we didn't -- then we were still out living -- we were still living at Dublin-Granville Road. That's when he only touched Perri. But he touched her at East Dublin-Granville Road -- I mean, at Beachworth.

Then when we got to get -- when we was living in Beachworth for like a medium-long time, that's when he started touching me, at Beachworth. But he started touching me at the beginning over at his friend's house, Mr. Isaac.

FORENSIC INTERVIEWER: Okay. I just got --

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



- - -

(Video paused.)

MR. HUGHES: What was the next?

MR. BENTON: It is coming right up.

- - -

FORENSIC INTERVIEWER: I thought you said he didn't touch you when you lived on Beachworth?

TIONA ARNOLD: No, not Beachworth. He touched my sister. On Dublin-Granville, on -- over at his friend's house, Mr. Isaac, when he went to a business trip to a different culture, he asked Mr. Seff, 'cause that's his best friend, he said they're like brothers.

And he asked him to watch his house for him. And so we had all stayed over there. And so when my mom had to go to work, he babysitted us, and then that's when he started touching us. Then on Dublin-Granville Road he started touching me a whole bunch. We started living there for like a medium-long time over on Dublin-Granville Road.

FORENSIC INTERVIEWER: Okay. So he touched you -- I'm talking just about you, because I know he touched all three of you, so it gets confusing. At Mr. Isaac's house --

- - -

MR. BENTON: At 24:21.

THE COURT: I am going to let that come in.

MR. BENTON: I didn't hear you.

THE COURT: I am going to let that come in, even though she says, "he touched all three of you," you know, if we have "Kanijah" not in there, that is fine.

MR. BENTON: But who is the three then?

THE COURT: What?

MR. BENTON: With saying all three, you are putting in a third accuser that's not part of the indictment.

THE COURT: It could mean the mother.

MR. BENTON: Your Honor, the mother is not a subject of the indictment. There's only two people that are the subject of this indictment, not three people.

THE COURT: Mr. Benton, I can let this whole tape come in, but I am trying to give -- you can't just slice the one word out. I mean, if you want to do one word -- and this should have been dealt with --

MR. BENTON: Judge, I tried to deal with it.

THE COURT: -- nine months ago, six months ago. You know, if you wanted to get the whole thing transcribed and we can just, you know, white it out or

Case: 2:22-cv-02229-MHW-MRM Doc #: 9-3 Filed: 09/15/22 Page: 222 of 231 PAGEID #: 1110

0A894 - C24 Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



you can delete any reference to Kanijah in this, I don't know if you can do a global search on that.

MR. HUGHES: I cannot, no. I have to manually go through it and watch it and then have somebody --

THE COURT: I am going to allow the "all three." That is not --

MR. HUGHES: What is the next time? And I will also note, Judge, when he filed his motion to suppress, he has all of the specificity which he did not put in his motions that he filed with this Court. That would have been helpful.

THE COURT: I mean, we are not playing the blame game. We are dealing with what we have to deal with now.

MR. HUGHES: What is the next time, Fred?

MR. BENTON: 44:20.

MR. HUGHES: Should I do 43:20, since --

MR. BENTON: That will work.

MR. HUGHES: All right. I will do 43:16.

\- - -

Thereupon, the video was played as follows:

TIONA ARNOLD: -- saying, "I don't care."

FORENSIC INTERVIEWER: Okay. Where was it hurting?

TIONA ARNOLD: In my pee-pee.

FORENSIC INTERVIEWER: Where at?

TIONA ARNOLD: In my pee-pee.

FORENSIC INTERVIEWER: In your pee-pee or on your pee-pee?

TIONA ARNOLD: In it.

FORENSIC INTERVIEWER: In it? So when his pee-pee touched your pee-pee, was it on the inside of your pee-pee, on the outside, both? Tell me about where it touched.

TIONA ARNOLD: The inside.

FORENSIC INTERVIEWER: Did someone ever see his pee-pee touching your pee-pee?

TIONA ARNOLD: Perri.

FORENSIC INTERVIEWER: Perri? Tell me about that and tell me about Perri seeing it.

TIONA ARNOLD: She kept telling him to stop, but he just told her to shut up.

\- - -

THE COURT: Are you wanting to exclude that statement?

MR. BENTON: Yes, sir.

THE COURT: I'm going to allow that one.

MR. HUGHES: Next time?

MR. BENTON: 52:36.

MR. HUGHES: Should we do 42? Oh, wait. 51:36, sorry.

\- - -

Thereupon, the video was played as follows:

FORENSIC INTERVIEWER: Did you see it touch her pee-pee one day or more than one day, his pee-pee touch her pee-pee?

TIONA ARNOLD: More than one day.

FORENSIC INTERVIEWER: Did you ever see his pee-pee touch someone else's pee-pee?

TIONA ARNOLD: No.

\- - -

MR. HUGHES: 47? Yeah, it cuts off at 47 minutes. For some reason, Judge, when you hit 47 minutes, it won't let me jump past 47.

\- - -

(Video resumed.)

FORENSIC INTERVIEWER: How many? How did it -- did you see it touch her pee-pee one day or did his pee-pee touch her pee-pee?

TIONA ARNOLD: More than one day.

FORENSIC INTERVIEWER: Did you ever see his pee-pee touch someone else's pee-pee?

TIONA ARNOLD: (Inaudible.)

FORENSIC INTERVIEWER: Did his pee-pee touch

somewhere else on your body? Tell me about that.

- - -

MR. BENTON: What I can say from the record is that my notation at 52:36 -- excuse me. At 52:36 is the statement that says, "Perrion also witnessed this." And at one hour and 56 seconds, it says, "Perrion told mom." Those would be the two remaining.

THE COURT: Perrion --

MR. BENTON: "Perrion told mom."

MR. HUGHES: I can see that one, Judge, yes, at one hour, 56, the witness says, "Perrion told mom." I mean, that is clearly, you know, something Perrion said. I don't disagree with that one.

THE COURT: So we just have those two?

MR. HUGHES: 12:03 to 12:07, 15:09 to 15:55, and then one hour and -- around one hour and 56 seconds, specifically, "Perrion told mom." I can have that removed.

MR. BENTON: And 52:36 she said, "Perrion also witnessed this." That is the concern that I have.

THE COURT: Is that it?

MR. HUGHES: I think that is it.

THE COURT: All right. Anything else we have to put on the record?

MR. HUGHES: I don't know, it doesn't want to play it. It is weird. I don't know why it freezes. Did you have that issue?

MR. BENTON: Yes, yes.

THE COURT: Can I bring in the jury, or --

MR. HUGHES: I guess, so --

THE COURT: We are going to have to manually do this and then have your I.T. people tonight or tomorrow, if you are going to admit this disk --

MR. HUGHES: We will have to make it permanent.

THE COURT: You will have to cut the noise out or cut the audio out, and if it is only for those small little bits --

MR. HUGHES: I am just concerned now, Judge, when I try to play this, it's --

THE COURT: That means we can save 15, 20 minutes?

MR. HUGHES: It's like not playing. I don't know why it's not. I mean, the Court can see there, it just gives me a pause. It doesn't give me --

MR. BENTON: We aren't planning to play it now. You have to take it to your I.T. people, right?

MR. HUGHES: I think the Judge indicated I

can unplug the volume at those times and play it and then when it goes to the jury --

THE COURT: I don't know that you have time to play it today.

MR. HUGHES: Well, my concern is as I just tried to play it there, Judge, it froze up on me. That causes me concern. It doesn't look like it is scratched.

MR. BENTON: That is the same problem again.

MR. HUGHES: Well, jumping to the -- I wonder if I open it in Media Player if it will work differently.

MR. BENTON: Your times might be off.

MR. HUGHES: I want to jump to this portion at the end, Your Honor, to make sure it plays. For some reason it just froze up on us here. All right, here it is freezing at 46 minutes and 54 seconds. And let me see, 47:14, and now it is not working.

Well, Judge, I don't know, this is a technical difficulty here. I have no idea why this stops playing. I don't know what the deal is here. This is new to me. I mean, I have got notes all of the way through one hour and 4 minutes and 20 seconds.

(Discussion held off the record.)

MR. BENTON: That portion of the video which

the Court said it would allow that says, "I know he touched all three of you," I do want the Court to know I do object to that, and I believe I also have to object at trial as a result of the motion in limine to preserve that issue. So --

THE COURT: All right.

MR. BENTON: Your Honor, I did file a proposed jury instruction, set of instructions that I filed with the Court which I do intend to file, but I want to let the Court and counsel know I am going to change that only from the standpoint that to the extent that I list the full names of the girls, I am going to just reference their initials, because it will be a public filing.

MR. HUGHES: That probably should be accurately reflected in the State's copy as well, since they were minors. I believe it may include their names and not their initials.

THE COURT: It does. It is all over.

MR. HUGHES: I can make those changes and submit them to the Court as well.

THE COURT: I had the final deal, unless there is some --

MR. HUGHES: So, Judge, I will defer to the Court. Ms. Wilkinson is here. We could begin her

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



testimony and play about half of the video and then she can return first thing in the morning.

THE COURT: I don't want to split it up.

MR. HUGHES: Whatever the Court would like, I understand.

THE COURT: If she is going to testify five minutes and then play the video.

MR. HUGHES: Correct. And then also, Your Honor, and also then if I get like an original copy from her own medical file.

THE COURT: Just have her bring it in case.

MR. HUGHES: Well, if I can get that tonight, I can do those redactions this evening that the Court ordered and then they will be done and ready to go in the morning.

THE COURT: Perfect. Let's get the jury in here and let them go home.

MR. HUGHES: Can we explain there is a technical issue?

THE COURT: I will.

THE BAILIFF: All rise.

\- - -

Thereupon, the jury resumed their seats in the jury box.

\- - -

THE COURT: Everyone can have a seat. Unfortunately, as with a lot of my cases, we have this relatively brand new courthouse, we have all of these electronics here, I have a computer on my desk, and the defense counsel has an iPad, the prosecutor has another laptop and we brought up another laptop. And we are having technical difficulties to play the -- in the old days we would just put the old cassette in a boom box and play it. But unfortunately, we have to get that technical thing fixed.

So I am going to let you go for the evening. Do not discuss this case among yourselves. Do not permit anyone to discuss it with you or in your presence. It is your duty not to form or express an opinion in the case until it is finally submitted to you.

We will start -- I don't have any other cases set for tomorrow, so I am going to try and start exactly at 9:00 o'clock. So if you can get here, you know, 8:30, 8:45 beforehand and we will be good to go. All right? Have a good evening.

THE BAILIFF: All rise.

- - -

THE COURT: We'll start at 9:00.

MR. HUGHES: Thank you, Judge.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:33 PM-13CR001858



\- - -

Thereupon, at 4:05 p.m., Thursday, July 20, 2017, the further trial of this cause was adjourned until 9:00 o'clock a.m., Friday, July 21, 2017.

\- - -