Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



IN THE COURT OF COMMON PLEAS OF FRANKLIN COUNTY, OHIO

CRIMINAL DIVISION

- - -

State of Ohio, :

Plaintiff, :

vs. : Case No. 13CR-1858

Sefe A. Almedom, : Volume 4

Defendant. : Pages 621 - 893

- - -

TRANSCRIPT OF PROCEEDINGS

Before Hon. David C. Young, Judge, and a jury, duly impaneled and sworn, on Friday July 21, 2017, Monday, July 24, 2017 and Wednesday, August 23, 2017.

- - -

APPEARANCES:

Michael T. Hughes, Assistant Prosecuting Attorney,
On behalf of the State of Ohio, Plaintiff.

Frederick D. Benton,
On behalf of Sefe A. Almedom, Defendant.

*LINDA S. SHUPE, RPR, RMR*
*Assistant Official Court Reporter*
*(614) 525-4434*

Case: 2:22-cv-02229-MHW-MRM Doc #: 9-4 Filed: 09/15/22 Page: 2 of 274 PAGEID #: 1121

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858

0A894 - C80



INDEX TO THE WITNESSES


CALLED BY THE STATE: PAGE

**KERRI WILKINSON**

Direct Examination by Mr. Hughes 632
Cross-Examination by Mr. Benton 713
Redirect Examination by Mr. Hughes 723
Recross-Examination by Mr. Benton 724

\- - -

CALLED BY THE COURT:

**DAVID PHILLIPS**

Examination by the Court 758
Examination by Mr. Hughes 760
Examination by Mr. Benton 762
Examination by the Court 762


\- - -

0A894 - C81
Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



# INDEX TO THE EXHIBITS


| STATE'S EXHIBITS | | IDENTIFIED | ADMITTED |
|---|---|---|---|
| 4 - 15 | Photos | | 744 |
| 16 | Forensic interview of Tiona Arnold | | 744 |
| 17 | Forensic interview of Perrion Thompson | | 744 |

- - -

| DEFENDANT'S EXHIBITS | | IDENTIFIED | ADMITTED |
|---|---|---|---|
| B | Property inventory report | 758 | 763 |

- - -

| JOINT EXHIBITS | | IDENTIFIED | ADMITTED |
|---|---|---|---|
| 1 | Tiona Arnold forensic interview (unredacted) | 852 | |


- - -

CLOSING STATEMENTS

By Mr. Hughes . . . . . . . . . . . . . . . . . . 765
By Mr. Benton . . . . . . . . . . . . . . . . . . 788
By Mr. Hughes . . . . . . . . . . . . . . . . . . 820

\- - -

JURY CHARGE 832
VERDICT 858
SENTENCING 869

\- - -

Friday Morning Session,
July 21, 2017.

- - -

Thereupon, the further trial of this cause was resumed pursuant to adjournment.

- - -

Thereupon, the following proceedings were held in open court before the jurors resumed their places in the jury box:

THE COURT: Everyone can have a seat. Back on the record, 13CR-9558, State of Ohio versus Sefe Almedom.

Counsel, do we need to put anything on the record? Do you have all of the audiovisual things working?

MR. HUGHES: Yes and no. Your Honor, I have the changes made by our office and I wanted to make sure they were correct before we played them in front of the jury, and Fred and I discovered they were off. That is being fixed now, but we have written down the times on which we do agree, and I can do exactly what I did yesterday by just hitting the mute button for those portions of time, and my technology person will provide a finished copy; and then Fred and I will review that prior to any submission to the jury to

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



make sure it is accurate.

THE COURT: Okay.

MR. HUGHES: But we have gone through the timeline both here this morning playing the version I will play in court and we have matched up the times, and I think we agree on all but one, if I am not -- is that correct, Fred?

MR. BENTON: Well, somewhat. There is an additional -- if the Court would remember, yesterday we had difficulty getting to a certain portion of the recording to be able to address. There is a video portion at 43:40, I believe it is -- or 49, excuse me, where Tiona says that she -- that Tiona describes an incident in which she was being vaginally penetrated. And in her statement she says that she, referencing Perrion, kept telling him to stop, but he told her to shut up.

Because that is a third-party statement, I would move to strike that or move that that not be played. I also --

THE COURT: So, let me get that. So Tiona was being vaginally penetrated and Perrion observed that and told him to stop and then --

MR. BENTON: Yes, yes, that would be my objection. And I would ask the Court to revisit that

portion of the video where the examiner says, "I know he touched all three of you." Assuming -- obviously, we are not anticipating a conviction; but if there is a conviction, I think this case could come back again on that issue.

This jury has heard that there are three daughters. This jury has heard the allegations with respect to two of the daughters. I think there is an inherent suspicion about the third daughter. To allow this statement to come in, to say, "I know he touched all three of you," for a child who is not the subject of this indictment, who has not testified, who is not -- for whom my client has not had a right of confrontation, I think it is highly prejudicial to his rights to a fair trial.

At the time that it is played, I do intend to raise an objection, but I will also notify the Court that I am renewing my motion for mistrial. So obviously, I will not say that in front of the jury, but I want to be able to alert the Court that when I say, "objection" and I renew my motion, that is exactly what it is I am referring to.

THE COURT: Okay. I do not believe that the examiner indicated that she knew anything about Kanijah or whatever her name is, so I am going to let

that come in.

MR. BENTON: Well, Your Honor, if the Court will allow me, during the course of the interview, the portions that we redacted relate to those conversations concerning Kanijah. And so what the examiner says at that portion in the video, 24:21, she is summarizing what Tiona has said to her, and she says exactly, "I know he touched all three of you." So --

THE COURT: But she did not indicate that he touched them sexually.

MR. BENTON: Your Honor --

THE COURT: I mean, the entire -- Mr. Benton, I appreciate everything, and I will give you whatever opportunity. But the issue in this case is whether they believe the two girls.

MR. BENTON: But why put out there an accusation of touching a third girl, which basically is --

THE COURT: It says, "touching." I mean, it is not sexually molesting.

MR. BENTON: But in the context of this interview and in the context of this case it can have no other meaning.

THE COURT: I think it is such -- if you

want to do it, I mean, we can take it out. If that is what you want, I will take it out.

MR. BENTON: Thank you, Your Honor.

THE COURT: I mean, it is so immaterial on an hour interview. One statement by somebody is not in any way going to affect whether they believe the two girls. But if you want to take that one statement out, that is fine, I will grant you that.

MR. HUGHES: Thank you, Judge.

THE COURT: But I think it's immaterial to the case.

MR. HUGHES: I want to note for the record those times that I will intend to redact for future purpose. Mr. Benton suggested that at the end of the case I submit the original along with the version that we have cut the time out, if it is needed. So I will be excising the audio portion from 11 minutes and 25 seconds through 12 minutes; excising audio from 15 minutes and 30 seconds to 16 minutes; excising audio at 20 minutes and 22 seconds through 20 minutes and 26 seconds; excising the audio at 24 minutes and 20 seconds through 24 minutes and 22 seconds, which is what Mr. Benton -- that is the statement that the Court just addressed.

Then excising the time at 45 minutes and 14

seconds through 45 minutes and 29 seconds; and excising the time at 59 minutes and 58 seconds through one hour and 15 seconds.

THE COURT: Do you agree with that?

MR. BENTON: Yes, Your Honor.

THE COURT: All right. Anything else we need to put on the record prior to bringing in the jury?

MR. HUGHES: Let me make sure my witness isn't in the bathroom or something.

THE COURT: I have given you a draft of the jury instructions.

MR. HUGHES: Can she just be here, Judge?

THE COURT: Yes, that's fine.

Go get the jury.

MR. HUGHES: Judge, can we also, when I go to play -- I'm not sure when is appropriate, Your Honor, but the jury should know that the Court has authorized the video to be redacted, so there is nothing like, like we didn't -- you know what I mean? So the jury understands that the Court has authorized --

THE COURT: They don't need to address that issue.

MR. HUGHES: Okay.

THE BAILIFF: All rise.

- - -

Thereupon, at 9:25 a.m., the jury resumed their seats in the jury box.

- - -

THE COURT: Everyone can have a seat. There's a nasty storm brewing. Were you guys watching that?

We have got all of the technical difficulties worked out, so you can call your next witness.

MR. HUGHES: I will, Your Honor. The State calls Kerri Wilkinson to the stand.

THE COURT: Raise your right hand.

(Witness sworn.)

Have a seat. Pull yourself up close to the microphone.

You may inquire.

MR. HUGHES: Thank you, Your Honor.

- - -

KERRI WILKINSON

Called as a witness by the State of Ohio, being first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HUGHES:

Q. Good morning.

A. Good morning.

Q. Can you tell the ladies and gentlemen here your name, and can you spell that for the record, please?

A. Yes. My name is Kerri Wilkinson. K-E-R-R-I, W-I-L-K-I-N-S-O-N.

Q. All right. Ms. Wilkinson, where are you employed?

A. I am employed at Nationwide Children's Hospital.

Q. All right. And how long have you worked there?

A. It will be 15 years next month.

Q. Could you tell us a little bit about your educational background and training prior to starting at Children's?

A. Sure. I have my Bachelor in Science from The Ohio State University. Then I went on to get my Master's in social work from Case Western Reserve

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



University.

Q. Do you have any licensure in the State of Ohio?

A. Yes. I have been a licensed social worker in the State of Ohio since 1997.

Q. All right. When you started at Children's Hospital, what did you do there about 15 years ago when you first started?

A. So I have had the same position the whole time I have been employed at Nationwide Children's Hospital. My title there is a forensic interviewer.

Q. And throughout your entire term of service at Children's Hospital, that role has never changed?

A. Correct. I have been in the same position the whole time.

Q. Can you talk to the Court a little bit about, I guess, what sort of training do you go through and do you go through continuing training regarding interviewing children?

A. Yes. So I attended forensic interview training. It is a week-long training in Cincinnati, Ohio through the Childhood Trust. And then to maintain my licensure in the State of Ohio as a social worker, I need to have continuing education hours. So I have to have 30 hours every two years to maintain my

licensure.

Q. You have continued to do that updated training throughout your career?

A. Yes.

Q. How or why is interviewing children different than dealing with adults?

A. Well, I mean, children are different than adults, just how they process information; developmentally they are in different places in their lives. So a three-year-old, talking to a three-year-old would be very different than talking to an adult. You have to be aware of children developmentally when you are asking them questions.

Q. Is that part of your own assessment that you do before you go to see a patient, is to know their age and some information about them to be able to know how to approach that patient?

A. Yes. It is important to know the age of the child, if the child has any developmental delays or speech delays prior to talking to them. It is important to gain that information prior to talking to them.

Q. Generally speaking, in your role have you seen these same children before, or when the children present to you, are you typically seeing them for the

first time?

A. Yes. I only see when the children present to the hospital, at the center I work. I have never met them before, so I will just meet them that one time and then I won't see them again after the interview.

Q. So in your role there is no sort of follow-up or you don't have clients that once you see or assess, come back to you for follow-up visits or anything like that in your position at Children's?

A. No. I don't see the children for any kind of follow-up visits.

Q. Can you explain the role of a forensic interviewer? What is your purpose, and why do you talk to these children?

A. The role of a forensic interviewer is to gather as much information as we can from the child regarding the allegation of physical abuse, sexual abuse, so that that child doesn't have to then be re-interviewed by several different people, to prevent causing more trauma to that child. If they have to repeat their story over and over again, we know that can be traumatic for children, so the forensic interviewer, we are trained to ask the children questions in a certain way that is developmentally

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



appropriate, that is open-ended. We don't want to lead the children in any way. And we are there to try to gather, like I said, as much information as we can, find out if there is anything that has happened to their bodies so that their medical provider then knows what kind of testing to do and any kind of follow-up that may be needed to be done for them medically.

Q. You had indicated or discussed the purpose of minimizing trauma. Based on your experience and training, how does trauma manifest itself in children that you interview?

A. So, how trauma is manifested in children is different. Every child is different. So how one child may respond to trauma may be extremely different than how another child may respond to trauma. One child may talk about trauma in a tearful manner, be very upset about it, have difficulty relating the information. Another child may relay their history of abuse in more of a matter of fact way because they have just processed how they are dealing with that trauma in a different way.

Q. So there is no any one single indicator regarding -- symptomatic of trauma?

A. No. Every child handles it differently.

Q. When you obtain information or a history

from that child patient, what is your purpose in obtaining that information?
A. So the purpose is for medical diagnosis and then treatment, if there is any kind of follow-up treatment that we recommend for that child. So --
Q. I am going to interrupt you there. Would follow-up treatment include a physical exam?
A. Yes.
Q. Would follow-up treatment include a mental health component?
A. Yes.
Q. Does the team have a mental health component there at Children's Hospital?
A. Yes, we do.
Q. Is a mental health -- is there a person assigned a mental health role to observe while you are conducting your assessment?
A. They observe a portion of that interview, yes.
Q. So in addition to a physical exam and mental health concern, any other treating or medical persons involved?
A. Not for the appointment that day, no.
Q. And when you conduct your assessment of these children, is it recorded?

A. Yes, it is.

Q. And do you ultimately make a summary or notes based on your interview?

A. Yes, I take notes as I am interviewing the child.

Q. And do you reduce those notes to a typewritten format of some kind?

A. Yes, we have to enter that after that into a typed report that becomes a part of the child's medical record.

Q. And that would contain a MRN number?

A. Yes.

Q. What do you do with those handwritten notes that you end up later just typing in the medical record?

A. We have to shred our notes once we are done, so after we are done taking our report, we then shred those notes that we take.

Q. But what you have noted is now then contained in the medical records of that child?

A. Yes, it is.

Q. And would that video interview also be part of that child's medical record?

A. The video interview?

Q. Yes, uh-huh.

A. Yes.
Q. All right. Did you have an opportunity to interview a Tiona Arnold?
A. Yes, I did.
Q. And what do you recall -- have you had an opportunity to then prior to today's testimony to review that child's medical records?
A. I did review her medical record and the DVD interview, yes.
Q. All right. Do you recall the date that you conducted the interview of Tiona Arnold?
A. March 6th, 2013.
Q. All right. Do you recall in your review of the medical records if the child had been to Children's Hospital to be interviewed before?
A. I don't recall her having to be interviewed before I interviewed her, no.
Q. All right. Do you know from looking at the medical records if her mother attempted to take her to the emergency room prior to your scheduled interview?
MR. BENTON: Objection, calls for hearsay.
THE COURT: Okay. Overruled. If you can answer.
THE WITNESS: Repeat the question. Sorry.
Q. In your review of the medical records,

contained in the records are you aware if the mother took Tiona Arnold to the emergency room prior to your interview?

A. Yes. Ms. Arnold did take Tiona to the emergency room, I believe once she found out the information, yes.

Q. Are you familiar with Children's Hospital's policies regarding acute reporting trauma and non-acute trauma?

A. Yes.

Q. And can you explain the difference for the jury here?

MR. BENTON: I am going to object, Your Honor.

THE COURT: Overruled.

MR. BENTON: Your Honor, may I approach?

THE COURT: Yes.

\- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

MR. BENTON: Maybe I misunderstood the question, but there is no foundation laid that she has reviewed any records from the emergency room, so I don't know how she can give testimony about the

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858





emergency room.

THE COURT: The question was does she know the procedures at the hospital. If she knows the procedures, she can say the procedures at the hospital for acute or non-acute. That was the question. Overruled.

MR. BENTON: Okay, okay.

MR. HUGHES: Thank you.

\- - -

THE COURT: You can answer the question, if you remember it.

A. So, the question was acute versus non-acute situations when a child presents to our emergency department. So an acute situation would be a situation in which an alleged abuse situation, if that child would have been abused within 72 hours. For teenagers I believe they extend it to 96 hours.

So if the child didn't have any kind of contact with the alleged perpetrator outside of that window of the 72 or 96 hours, then they are redirected to the Child Assessment Center, which is the area of the hospital where I work.

If the alleged abuse situation would have taken place within the 72-hour time frame or 96-hour time frame, then the child is kept at the emergency

room and they do the interview over there and they do a rape evidence collection kit if it is after hours. If it is during the day and where the center I work is open, then they would try to redirect the children over there in those acute situations, so the 72-hour, 96-hour time frame. I hope that is making sense.

Q. And in your interview of Ms. Arnold was this an acute or non-acute situation?

A. This was a non-acute situation.

Q. Okay. And you had said again, I'm sorry, what was the date of your interview?

A. March 6th, 2013.

MR. HUGHES: Your Honor, at this point in time I would like to play that interview.

THE COURT: I will note your objection.

MR. BENTON: Thank you, Your Honor.

THE COURT: You may.

MR. HUGHES: And, Judge, I will adjust the sound as the Court directed at the appropriate times.

THE COURT: Okay.

\- - -

Thereupon, State's Exhibit No. 16, the forensic interview of Tiona Arnold, was played for the jury as follows:

FORENSIC INTERVIEWER: So, Tiona, like I

said, my name is Kerri, and what I do here is just talk to kids like you, and then when we're all done talking, there's a nurse here, it's a girl nurse. She's going to do a checkup on your body just to make sure everything is okay. And you can have your mom with you for the checkup part if that's what you would like. You're not in any trouble, Tiona, for being here today. No trouble. This is a safe place where kids like yourself can come and talk. Okay?

And while we're talking, Tiona, if there's any questions I ask you and you don't know the answer to the questions, just tell me you don't know. Okay? So if I ask you what is the name of my dog, what would you say?

TIONA ARNOLD: I don't know.

FORENSIC INTERVIEWER: Okay. You don't know the name of my dog, so that's what I want you to say in here. Okay? I don't want you to guess or make up any answers. I also want you to tell me if I get something wrong in here. So if I were to say to you, "Tiona, you have a hat on today, don't you," what would you say to me?

TIONA ARNOLD: No.

FORENSIC INTERVIEWER: Okay. So if at any point while we're talking I get something wrong that

you're trying to tell me, let me know, because I want to get everything right.

If there's a question I ask you and you don't really understand my question, let me know, Tiona, and I'll ask it a different way for you, because I want you to understand my questions.

So, tell me about yourself, Tiona. How old you are, where you go to school, what you like to do for fun.

TIONA ARNOLD: I'm nine. I go to Columbus Humanities Arts and Technology Academy. And I like to sing. I like to play on the DS. I like to play with my sisters. I like to color.

FORENSIC INTERVIEWER: Uh-huh.

TIONA ARNOLD: Sometimes if it's not too cold, we get to play in the snow. And that's it.

FORENSIC INTERVIEWER: That's it? What grade are you in?

TIONA ARNOLD: Third grade.

FORENSIC INTERVIEWER: Third grade, okay. Did you have school today?

TIONA ARNOLD: No, because it was too much snow.

FORENSIC INTERVIEWER: Okay. Do you like having snow days or do you like --

TIONA ARNOLD: No, I like going to school.

FORENSIC INTERVIEWER: You like going to school? Tell me what you like about school.

TIONA ARNOLD: Well, I get to play with all my friends and I get to learn different things.

FORENSIC INTERVIEWER: Is there something you don't like about school, or --

TIONA ARNOLD: No.

FORENSIC INTERVIEWER: -- any subjects you don't like, anything like that? No?

TIONA ARNOLD: No.

FORENSIC INTERVIEWER: Okay. And you said you sing or like to sing. Tell me about that.

TIONA ARNOLD: Well, we have music, art, gym, and computer lab and music. I always do good in music and I do good at everything.

FORENSIC INTERVIEWER: Okay. Great. Is there certain kinds of music that you like to sing, or --

TIONA ARNOLD: Church music.

FORENSIC INTERVIEWER: Church music?

TIONA ARNOLD: Because me and my sister, we used to do praise dancers at our church.

FORENSIC INTERVIEWER: Oh, okay. What kind of dancers?

TIONA ARNOLD: Praise dancers.

FORENSIC INTERVIEWER: Prez dancers?

TIONA ARNOLD: Praise.

FORENSIC INTERVIEWER: Oh, praise dancers. I'm sorry. I didn't understand. So tell me about being a praise dancer.

TIONA ARNOLD: Well, you get to go, like we went to different states and we go to different churches and dance to different songs, and we also step, like to the church music too --

(Door opens.)

UNIDENTIFIED PERSON: Oops, excuse me. I'm sorry.

FORENSIC INTERVIEWER: It's okay.

(Door closes.)

TIONA ARNOLD: And we step, we praise dance. That's it.

FORENSIC INTERVIEWER: Okay. When was the last time you did praise dancing?

TIONA ARNOLD: Well, they had -- for the winter, like, we don't do it in the winter 'cause it's too cold. Mostly like the summer and the spring, but we don't do it in the winter 'cause it's too cold.

FORENSIC INTERVIEWER: Okay. Did you have school yesterday?

TIONA ARNOLD: Uh-huh.

FORENSIC INTERVIEWER: Yeah? Okay. So tell me about your day yesterday, everything that happened yesterday at school from the beginning until the end.

TIONA ARNOLD: Well at the beginning we do morning work, then we take a bathroom break. And then we do math and then we do reading where we read out loud to each other, the whole class. And then we -- for kids who went up in both of their grades, we get candy bars. And then I got a Snicker.

FORENSIC INTERVIEWER: Oh, okay. So what did you -- I didn't understand what you said. How did you get the candy bar?

TIONA ARNOLD: You have to go up in both of your grades, reading and math, for the tests you take.

FORENSIC INTERVIEWER: Oh, for the test you take. So because of your grades you got the candy bar?

TIONA ARNOLD: Huh-uh. If we go up, because she says that means we paid attention good.

FORENSIC INTERVIEWER: Oh, okay. All right.

TIONA ARNOLD: After she passed out the candy bars we go to lunch. She let me eat it after lunch.

(Door opens.)

UNIDENTIFIED PERSON: Excuse me.

FORENSIC INTERVIEWER: That's okay.

UNIDENTIFIED PERSON: Sorry.

FORENSIC INTERVIEWER: Okay. That's okay.

(Door closes.)

FORENSIC INTERVIEWER: Who was that?

TIONA ARNOLD: My little sister.

FORENSIC INTERVIEWER: Oh, your little sister. Okay.

Q. And after that we -- after we go to lunch, we go to do science, and then we go to -- like just certain days that we have specials, like paragon -- not paragon, like gym, art, music, and art we have certain days, but yesterday we had art -- yeah, yesterday was art. We have art. And then after we came back from art, we went to -- we went to -- back to the class, we finished our science, and then we had recess and then we had paragon.

FORENSIC INTERVIEWER: Oh, okay. What's paragon?

TIONA ARNOLD: We like -- we talk about different states and we do and like -- on paragon night it's -- we have it every year, once every month. I mean, we have it once every month and we dance and stuff and talk about the cultures that we learned

about.

FORENSIC INTERVIEWER: Oh, okay. Interesting. Thank you for telling me about your day yesterday.

So I just met your -- that's your little sister? Well, I didn't meet her, but she ran in here. What's her name?

TIONA ARNOLD: Kanijah.

FORENSIC INTERVIEWER: Okay. And how old is Kanijah?

TIONA ARNOLD: Five.

FORENSIC INTERVIEWER: And then you talked about your sister, Perrion. How old is Perrion?

TIONA ARNOLD: Twelve.

FORENSIC INTERVIEWER: Twelve. Do you have any other sisters?

TIONA ARNOLD: My stepsister.

FORENSIC INTERVIEWER: Okay. Who is your stepsister?

TIONA ARNOLD: Dalaina.

FORENSIC INTERVIEWER: Dalaina? How do you spell that?

TIONA ARNOLD: D-A-L-A-I-N-A.

FORENSIC INTERVIEWER: How old is Dalaina?

TIONA ARNOLD: Seven.

FORENSIC INTERVIEWER: And who does she live with?

TIONA ARNOLD: My dad. And 'cause when I was -- when they got married, I was the flower girl.

FORENSIC INTERVIEWER: Oh, okay. When your dad got married to --

TIONA ARNOLD: To Miss Alexis. That's my step-mom.

FORENSIC INTERVIEWER: Miss Alexis?

TIONA ARNOLD: Uh-huh.

FORENSIC INTERVIEWER: Okay. So Dalaina is Alexis' daughter?

TIONA ARNOLD: Uh-huh.

FORENSIC INTERVIEWER: You guys have the same dad, or no?

TIONA ARNOLD: No.

FORENSIC INTERVIEWER: No. Okay. And you were the flower girl?

TIONA ARNOLD: Uh-huh. And I have a stepbrother, Cory, he's six.

FORENSIC INTERVIEWER: Okay.

TIONA ARNOLD: I mean five. And I have my old brother, Jaja, he's nine -- no, not nine, he's almost two years older than me. He's eleven.

FORENSIC INTERVIEWER: Jaja? Is that his

real name, Jaja?
TIONA ARNOLD: Jalizianse.
FORENSIC INTERVIEWER: And he's two years older. So he's eleven. How do you spell his name?
TIONA ARNOLD: J-A-L-I-Z-I-A-N-S-E.
FORENSIC INTERVIEWER: So your stepbrother, Cory, who does he live with?
TIONA ARNOLD: My dad and Miss Alexis.
FORENSIC INTERVIEWER: Oh, okay.
TIONA ARNOLD: That's the youngest brother.
FORENSIC INTERVIEWER: Okay. And Jaja, who does he live with?
TIONA ARNOLD: His mom.
FORENSIC INTERVIEWER: His mom? Okay.
TIONA ARNOLD: But every time if I go to my dad's house for, like, my birthday, my brother, he always comes down there for my birthday.
FORENSIC INTERVIEWER: Oh, okay. What's your dad's name?
TIONA ARNOLD: Gary.
FORENSIC INTERVIEWER: Gary?
TIONA ARNOLD: We call him J. R. 'cause it's Gary Junior, but his real name is Gary. But that was my grandpa's name.
FORENSIC INTERVIEWER: Okay. And so you and

Jaja have the same dad?

TIONA ARNOLD: Uh-huh.

FORENSIC INTERVIEWER: Okay. And any brothers or sisters?

TIONA ARNOLD: The one who touched us, his kids are named Senhet and Selana. But that's not our sisters.

FORENSIC INTERVIEWER: How do you spell their names?

TIONA ARNOLD: S-E-N-H-E-T. And Selana is S-E-L-A-N-A.

FORENSIC INTERVIEWER: Okay. And how old are they?

TIONA ARNOLD: Senhet is ten and Salana is seven.

FORENSIC INTERVIEWER: Okay. You said that's the one who touched us?

TIONA ARNOLD: Yeah. That's his kids.

FORENSIC INTERVIEWER: Oh, his kids. Okay. What's his name?

TIONA ARNOLD: Sefe, Mr. Seff, S-E-F-E. He's African.

FORENSIC INTERVIEWER: S-E-F-E, and you call him, "Mr. Seff?"

TIONA ARNOLD: Uh-huh.

FORENSIC INTERVIEWER: Okay. And how do you know Mr. Seff?

TIONA ARNOLD: That's -- he used to be my mom's boyfriend before he touched us.

FORENSIC INTERVIEWER: Oh, okay. And who did he touch? You say he touched "us." Who's "us?"

TIONA ARNOLD: My sisters and me.

FORENSIC INTERVIEWER: Which sisters?

TIONA ARNOLD: Perrion and Kanijah.

\- - -

MR. BENTON: Your Honor, may we approach?

\- - -

FORENSIC INTERVIEWER: Okay. How do you know he touched Perrion?

TIONA ARNOLD: Because he always do it in front of us.

FORENSIC INTERVIEWER: Because what?

TIONA ARNOLD: He do it in front of us.

\- - -

MR. BENTON: Your Honor, may I approach?

THE COURT: You may.

\- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



MR. BENTON: I don't know what happened, but the video clearly played a portion in which she said, "He touched me, Perrion and Kanijah."

THE COURT: I understand that.

MR. HUGHES: That is not the agreed upon part where we stopped.

THE COURT: I agree.

MR. BENTON: I would object to that being made and I would move for a mistrial.

THE COURT: Okay. Overruled.

\- - -

(Video resumed.)

FORENSIC INTERVIEWER: Who's us?"

TIONA ARNOLD: Me and Kanijah.

FORENSIC INTERVIEWER: Okay.

(Video was muted.)

FORENSIC INTERVIEWER: Okay. Tell me all about that time when you say he took you to the bathroom and put duct tape over your mouth and was touching you and Kanijah.

\- - -

MR. BENTON: Objection, Your Honor.

\- - -

TIONA ARNOLD: Yeah, 'cause he said he didn't want nobody to hear us when we scream.

- - -

MR. BENTON: Objection, Your Honor.

- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

THE COURT: I thought this is where we were going to stop, at 12:02.

MR. HUGHES: 11:25 to 12. I resumed at 12:02. This is what happened when they were in the bathroom together. The next time we stop is at 15:30. This is what the two -- she witnessed happened with her sister in the bathroom, not what her sister said. And these are the times we have all agreed.

MR. BENTON: I did not agree to anything in this case indicating Kanijah.

THE COURT: All right. Continue.

MR. BENTON: Again I will make my objection and I renew my motion for a mistrial.

THE COURT: Okay. Overruled.

- - -

MR. HUGHES: Your Honor, I am just going to make a record that we stopped the audio and video at 11 minutes and 25 seconds, and I resumed it at 12 minutes and 2 seconds.

And I will next stop it at 15 minutes and 30 seconds.

THE COURT: Okay.

\- - -

Thereupon, the video resumed as follows:

FORENSIC INTERVIEWER: He said that? Okay. Tell me all about him touching you and Kanijah.

\- - -

MR. BENTON: Objection, Your Honor.

\- - -

TIONA ARNOLD: He was touching us where he not supposed to.

\- - -

THE COURT: What is your objection?

\- - -

FORENSIC INTERVIEWER: Okay. And this time when you were in the bathroom with him and Kanijah, tell me about where he was touching you.

TIONA ARNOLD: Down there (indicating).

FORENSIC INTERVIEWER: What do you call that part?

TIONA ARNOLD: My pee-pee.

FORENSIC INTERVIEWER: You call it a pee-pee? Okay. Tell me about how he was touching your pee-pee that time in the bathroom.

TIONA ARNOLD: With his hand.

FORENSIC INTERVIEWER: With his hand? Tell me how his hand was touching your pee-pee.

TIONA ARNOLD: Like this (indicating).

FORENSIC INTERVIEWER: Okay. What do you call that?

TIONA ARNOLD: I don't know.

FORENSIC INTERVIEWER: Okay. Was his hand moving, staying still, or something else?

TIONA ARNOLD: Uh-huh.

FORENSIC INTERVIEWER: Which one?

TIONA ARNOLD: Moving.

FORENSIC INTERVIEWER: Moving, okay. What did it feel like when he was touching your pee-pee that time in the bathroom?

(No response.)

What's that mean?

TIONA ARNOLD: I don't know.

FORENSIC INTERVIEWER: Don't know? Okay. That's okay if you don't know.

Tell me about where your clothes were that time in the bathroom when he was touching your pee-pee.

TIONA ARNOLD: They were up.

FORENSIC INTERVIEWER: They were up? Okay.

Tell me about how he was touching your pee-pee if your clothes were up.

TIONA ARNOLD: He was touching us by the zipper part.

FORENSIC INTERVIEWER: Okay. I'm not sure I understand, "by the zipper part."

TIONA ARNOLD: This part, the zipper.

FORENSIC INTERVIEWER: Was your zipper up or down or something else?

TIONA ARNOLD: Down.

FORENSIC INTERVIEWER: Your zipper was down? Tell me how your zipper got down.

TIONA ARNOLD: Because he said he wanted to touch us or something.

FORENSIC INTERVIEWER: He unzipped it?

TIONA ARNOLD: (Nods head.)

FORENSIC INTERVIEWER: So he unzipped your zipper and then what did he do?

TIONA ARNOLD: That's when he put the tape over our mouth.

FORENSIC INTERVIEWER: Okay. And then what?

TIONA ARNOLD: Then he does when he touched us.

FORENSIC INTERVIEWER: Okay. Did he touch the skin of your pee-pee or on top of your underwear,

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



or something else?

TIONA ARNOLD: Top of my underwear.

FORENSIC INTERVIEWER: On top of your underwear?

TIONA ARNOLD: (Nods head.)

FORENSIC INTERVIEWER: Okay. And that was the time in the bathroom? You said he also touched Kanijah?

TIONA ARNOLD: (Nods head.)

FORENSIC INTERVIEWER: Tell me all about him touching Kanijah when you were in the bathroom.

- - -

MR. BENTON: Judge --

THE COURT: Approach.

- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

MR. BENTON: I don't know how much further this can go, Your Honor.

THE COURT: Mr. Benton, you are in charge. You were to direct me to certain statements that are at issue. I have never reviewed this. And for you to allow this to go on is not my issue.

MR. BENTON: Judge, I did not allow this. I

did not play the video. I pointed out to the Court and made consistent objections that anything referencing Kanijah should not be played, and it is being played anyway.

THE COURT: You did not point out 14.53.

MR. BENTON: I did point these out, Your Honor.

MR. HUGHES: That is why I made a record of it before we began, Your Honor.

THE COURT: Okay.

\- - -

THE COURT: Can we take a five-minute recess? Hold on. Do not discuss the case among yourselves. Do not permit anyone to discuss it with you or in your presence. It is your duty not to form or express an opinion in the case until it is finally submitted to you.

THE BAILIFF: All rise.

\- - -

Thereupon, the jurors exited the courtroom and the following proceedings were held in open court, in the presence of the defendant:

THE COURT: Everyone can have a seat. Make your objections as to whatever, that you objected to the playing of the tape, that in the previous trial

Case: 2:22-cv-02229-MHW-MRM Doc #: 9-4 Filed: 09/15/22 Page: 41 of 274 PAGEID #: 1160

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858





the entire tape was played without redaction. There is no indication that -- I had no idea what is on this tape. I have not reviewed the tape. The tape has been presented in discovery to counsel by the State of Ohio in this matter.

I believe that any mention of Kanijah without any additional information is harmless error. The entire critical issue in this case is whether or not the jury believes Tiona and Perrion's testimony. And it was not raised on appeal in the previous matter as to the playing of the tape.

As far as redacting, I am doing what I can do to do this. I believe it is counsel's obligation to alert the Court of any issues in the matter. And we broke yesterday, had an opportunity to speak about this tape. We reviewed all of the issues as to where potentially Kanijah's allegation was mentioned. This was never brought up yesterday. It was not brought up in the previous, I don't know how many continuances, 10, 12 continuances over the past year.

So I think any mention, any indication that an eight- or nine-year-old girl speaking to a forensic investigator is any harmless error as to what it does. The issue in this case is 100 percent whether the jury is going to believe the testimony yesterday of Tiona

-- or the testimony the previous day of Tiona.

Mr. Benton, you can make whatever objection and/or motion for mistrial in this matter.

MR. BENTON: Your Honor, again, I would object as I have consistently objected to any references during this trial relating to the youngest child, that being Kanijah. I have been consistent with that.

The fact that this video may have been played in a prior trial is of no consequence in this case, because I was not counsel of record. In fact, this Court was not on the bench at the time. And the conviction was overturned due to the ineffective assistance of counsel.

And one of the issues that was, in fact, raised is that this jury -- and both in terms of our motion for a new trial, which was presented to this Court and denied, and in our appeal was references to the fact that there was a third child that the jury then had the opportunity to hear about who never testified, whose count was subsequently dismissed and impacting my client's right to due process, fair trial and his right of confrontation.

In this context, Your Honor, we went on record. First off, I provided the State of Ohio with

a list of those portions of the video that I was given the opportunity to review in the prosecutor's office. I was not given a copy of this video, and so it was not disclosed to me in discovery.

And it was with respect to the portions that I had made objections to, I provided that information well in advance to Mr. Hughes. We went on the record yesterday with -- well, first of all, I alerted the Court at the beginning of trial that there were provisions within the interview that would be subject to an objection.

We went on the record again yesterday as to this precise issue. I pointed out these specific provisions that related to my concern, and I made it clear that any references within the video concerning Kanijah I believe was objectionable and should not be played.

And I specifically pointed out at 14:48 through 15:11 where there was a discussion relative to Kanijah. That is what was played here in this court. Also I pointed out 15:11 through 15:55. That was also pointed out to the Court. And also as it relates to 24:21 where the interviewer says, "So he touched all three of you."

So somehow to suggest that this is my fault

because I am not engaged in due diligence in trying to bring this matter to the attention of the Court or to the State of Ohio is simply inaccurate. My client is entitled to a fair trial. This is a serious situation that involves a highly sensitive matter because of not only the nature of the allegation, but also the age of these girls and the fact that they are involving minors.

Now this jury has the ability to hear on repeated occasions that there is accusations as it relates to a third child. They know that a third child exists, because throughout this trial there was testimony that there was a younger sister who also resides in the house at the various locations that were made.

So now this jury has the opportunity to take into its consideration during its deliberation that there is a third allegation with respect to my client touching yet another child. That is unfair to my client and his right to due process and his right to the effective assistance of counsel. I again implore this Court to declare a mistrial and I would also implore this Court to not allow any other portions of this tape to be played that makes any reference as far as Kanijah is concerned.

If the Court is inclined to be consistent with its prior rulings, I would ask also that this Court instruct this jury to disregard any references that were made as relates to Kanijah, but I do not make that with the suggestion that it provides a license for any further references to this third child to be played to the jury.

THE COURT: Do you want me to give an instruction?

MR. BENTON: Yes, Your Honor. I don't think it cures it. I want to make the record clear; because if there is an appeal, I don't want the record to suggest that I believe that that cure is a problem. I think the problem is incurable. But at a minimum, I think the Court must make an instruction to the jury to disregard any references as far as Kanijah is concerned and certainly not to allow the State to play any other portions of this tape that references that child.

THE COURT: Thank you. Anything on behalf of the State of Ohio?

MR. HUGHES: Just, Judge, that -- I mean, Mr. Benton noted that the first case or trial was reversed in part due to ineffective assistance of counsel. And I wonder here why under the criminal

rule he waited until the witness took the stand to try to point out these very specific things when he has had the discovery since June of 2016. I don't know what to take away from that. He has had plenty of opportunities.

I will only state, Your Honor, that we spent all afternoon yesterday addressing these same issues. We came up with times. I asked the Court to direct me to those times specifically based on Mr. Benton's late objection. The Court gave us times.

Mr. Benton came in early this morning. We reviewed this video. We agreed on those times, and I placed those times on the record before we started this process. Thank you.

MR. BENTON: Your Honor, even this Court made the observation that you thought one of the portions of the video that was played by the State had been previously ruled by this Court not to be played. And again, for the State again to continuously make suggestions to impugn my representation, that I am somehow trying to engage in trickery, I did not have this video since the date that the State misspoke. I reviewed this video after we had a hearing just earlier this month. I have been consistent in my investigation and diligence with this case, and I have

been consistent and I have not waited until this witness has taken the stand to raise this issue. I raised it from the day that we began this trial.

THE COURT: These come in under medical records. These are medical records. I am doing what I can do to try to protect the defendant's right to a fair trial.

I will offer an instruction upon playing this matter that the jury is to disregard any reference to Kanijah in any way and a clarifying instruction.

Anything further we need to put on the record?

MR. HUGHES: No, Your Honor.

MR. BENTON: Your Honor, will the Court also instruct the State -- well, let me stop here. Your Honor, then I want the opportunity to further review this tape again to make sure there are not any other playings of recordings that mentions Kanijah in this matter. I thought we had it clear as to where we were, and obviously there has not been any agreement.

And I would also point out to the Court that what was presented today as having been a redacted copy was, in fact, not a redacted copy. In fact, the State has now directed technical personnel to further

correct the recording that did not include the redactions.

So again, this is not a situation where I am waiting until the last minute to try to engage in some sort of a shotgun approach. I want the opportunity to listen to the rest of this tape, to make sure I have no other issues with respect to this child's name being mentioned.

THE COURT: Has the prosecutor's office been open for the last year?

MR. HUGHES: I'm sorry, Judge?

THE COURT: Has the prosecutor's office been open for the last year?

MR. HUGHES: Yes, sir.

THE COURT: Every day?

MR. HUGHES: Yes, sir, except for Christmas and holidays.

THE COURT: Okay. The motion for mistrial is overruled. Go get the jury.

MR. BENTON: Your Honor, can I listen to the balance of the tape? I don't understand the Court's reference about the prosecutor's office being open every day.

THE COURT: You have had every day since when you filed for discovery, June of 2016, to go to

the prosecutor's office to listen to this tape.

MR. BENTON: Your Honor, this recording was brought here this morning.

MR. HUGHES: This is the same recording that has been --

THE COURT: This is the same tape we went over yesterday. And to the extent we hear Kanijah's name, I will give a curative instruction. I mean --

MR. HUGHES: I mean, judge, if his client wants to plead guilty to gross sexual imposition, because this witness is talking about being molested in the bathroom with their daughter -- I mean, that is the subject of a charge in the case, if they'd like to put that evidence on. Thank you.

THE COURT: It is a medical record. The whole thing could come in.

MR. BENTON: Will the Court provide a limited instruction before this tape resumes?

THE COURT: I will. What is the girl's name?

MR. HUGHES: Kanijah, K-A-N-I-J-A-H.

THE COURT: And what is the last name?

MR. BENTON: Arnold.

MR. HUGHES: I don't know her last name. I don't know, Judge. I will have to --

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



MR. BENTON: I believe it is Thompson in the indictment.

THE COURT: I am just going to pull up the indictment.

THE BAILIFF: All rise.

- - -

Thereupon, the jury resumed their seats in the jury box.

- - -

THE COURT: Everyone can have a seat. Ladies and gentlemen, I am going to specifically instruct you that you are instructed to disregard and they are not evidence and must be treated as if you never heard any statements with respect to Kanijah Thompson. Okay?

You may continue.

- - -

Thereupon, the playing of the forensic interview resumed as follows:

FORENSIC INTERVIEWER: So let me make sure I understand, "the same thing." He unzipped it, her zipper part, and touched her pee-pee?

TIONA ARNOLD: On top of her panties.

FORENSIC INTERVIEWER: On top of her panties? Okay. So you call them panties, not

underwear? Okay. Were there any other times you saw him touch Kanijah's?

TIONA ARNOLD: (Shook head.)

FORENSIC INTERVIEWER: No? Just that one time? Okay.

- - -

MR. BENTON: Same objection.

- - -

FORENSIC INTERVIEWER: You also say Kanijah told you that he touched her. Is that what you said?

- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

THE COURT: I will note your continuing objection for this.

MR. BENTON: All right. Excuse me. Objection and motion.

THE COURT: Correct. Overruled.

MR. HUGHES: And I will redact the audio to the previously agreed times noted on the record.

- - -

Playing of the forensic interview resumed as follows:

TIONA ARNOLD: She told us sometimes.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



(Video muted.)

FORENSIC INTERVIEWER: Tell me about what he said about you not knowing God.

TIONA ARNOLD: Every time, like, every time if, like, me and my mom got in a argument, like yelling back and forth or something, 'cause like he wanted to watch the news 'cause he wanted to watch football or something but she didn't want to, like, he would have the TV up loud on purpose pickin', and my mom would be looking for jobs on the computer 'cause she don't have a job, and he would have the TV up loud on purpose and she would always ask him to like turn it down, but he would say no and just turn it up more each time.

So then my mom said, "Why do you keep pickin' on me? I have no problem with you, but you just keep pickin'," or something."

But then he was like, "You don't know God," or something. But he kept saying it to us.

FORENSIC INTERVIEWER: Okay. Tiona, when you said he -- the time in the bathroom when he put the duct tape on your -- over your mouth, how old were you when that happened?

TIONA ARNOLD: Nine.

FORENSIC INTERVIEWER: Nine? Okay. Do you

remember what month that happened?

TIONA ARNOLD: No.

FORENSIC INTERVIEWER: No? Okay. And where did he get this duct tape?

TIONA ARNOLD: I don't know. It was gray.

FORENSIC INTERVIEWER: Okay. Do you know where he got it from, or --

TIONA ARNOLD: No. It was gray or silver.

FORENSIC INTERVIEWER: Gray or silver? Okay. Were there any other times that he touched you?

TIONA ARNOLD: Yeah, but not -- he didn't put duct tape on our mouth, though.

FORENSIC INTERVIEWER: Okay. So that was the only time he put duct tape on your mouth? Okay. Tell me about the other times that he would touch you.

TIONA ARNOLD: Just that -- he -- the other times he did it in front of Perri and Nie-Nie. Or if he touched Kanijah, he did it in front of me, our sister. And he told us, "Don't try to help her." And if he did it to Perri, he did it in front of me and Kanijah.

FORENSIC INTERVIEWER: Okay. I just got confused. So when he touched you, he did it in front of who?

TIONA ARNOLD: Perri and Kanijah.

FORENSIC INTERVIEWER: So Perri and Kanijah?

TIONA ARNOLD: And if he touched Nie-Nie, he did it in front of me and Perri. And he said if we try to help her, he would kill us. And every time, like -- if he touched Perri, he did it in front of me and Kanijah.

And some -- and one time, we were going downstairs to get something to eat and my mom was asleep, he was waving knives over her head, two knives doing like this or something.

And I told him, I said, "Why are you doing that?"

And he said, "Why are you being nosey?"

I said, "Because that's my mom, and you wavin' knives over her head."

And he said because he have a voodoo something, he have a voodoo doll of my mom. He said, "If she ever tries to hurt him, he'll kill her."

And he said -- 'cause my mom used to work at a hospital or something, and every time she went to work, 'cause she used to have her own red car, and every time that she went to work, he would always say she's going out to the strip club or something. Well, I never knew what that was till he told me.

FORENSIC INTERVIEWER: Tell me about what he

told you.

TIONA ARNOLD: He said she was a prostitute. Well, we -- well, one time we -- 'cause one time we picked her up from it, so we never believed him.

FORENSIC INTERVIEWER: What's a prostitute? Did he tell you what that meant?

TIONA ARNOLD: No. He just said she works that, but I don't know what it meant.

FORENSIC INTERVIEWER: Okay. I guess I'm confused, because I thought you said he touched Nie-Nie one time that you saw.

TIONA ARNOLD: Yeah, one time that I saw, but --

(Video muted.)

TIONA ARNOLD: -- in the bathroom and when he did it in front of us.

FORENSIC INTERVIEWER: Okay. And he said if you helped her, what would happen?

TIONA ARNOLD: He would kill us. And he said if we ever told our mom, she would kill us. But he said if we tried to help Kanijah, he would kill us; but then he said if we told our mom, she would kill us.

FORENSIC INTERVIEWER: So tell me about the second time you saw him touching Nie-Nie.

TIONA ARNOLD: That was when he did it in front of me and Perrion, and then he told us, "Don't try to help her or I'll kill you guys."

FORENSIC INTERVIEWER: But how was he touching her that time?

TIONA ARNOLD: We didn't see 'cause he -- 'cause they were under the cover.

FORENSIC INTERVIEWER: Oh, you didn't see it; they were under the covers?

TIONA ARNOLD: Yeah, he did that to all of us.

FORENSIC INTERVIEWER: When you say, "under the covers," tell me more about that.

TIONA ARNOLD: It was like -- it was a cover that he says was his favorite cover or something, he said it was like -- it's like an orange cover. He always sleep with that cover.

FORENSIC INTERVIEWER: Where were you guys when he would touch you under those covers?

TIONA ARNOLD: In the living room.

FORENSIC INTERVIEWER: Okay. Is there a certain place in the living room?

TIONA ARNOLD: On the couch.

FORENSIC INTERVIEWER: Okay. Did it always happen on the living room couch when he would touch

you guys? Except for there was a time in the bathroom. Were there any other rooms that it happened in when he touched you guys?

TIONA ARNOLD: No.

FORENSIC INTERVIEWER: No? Okay.

TIONA ARNOLD: Except for when we had our other house at Beachworth -- no, no, no, Dublin-Granville Road, I mean. Because we lived on the other side of town.

FORENSIC INTERVIEWER: So where were you living when this first started, the touching part started?

TIONA ARNOLD: Granville Road.

FORENSIC INTERVIEWER: So the touching started --

TIONA ARNOLD: 877 East Dublin-Granville Road. But we lived in Apartment E.

FORENSIC INTERVIEWER: So that's where it would start?

TIONA ARNOLD: She -- Perrion said that it started to her at Beachworth, but he only started it to me when he had asked his friend to -- his friend had asked him to watch his house because he would go into a different culture. And then when he was there, my mom had to go to work 'cause we were all staying

there to watch the house for him and my mom had to go to work. That was before she knew he touched her. She had to go to work, and then that's when he started to touch me at the beginning.

But we -- but we didn't -- then we were still out living -- we were still living at Dublin-Granville Road. That's when he only touched Perri. But he touched her at East Dublin-Granville Road -- I mean at Beachworth.

Then when we got to get -- when he was living on Beachworth for like a medium-long time, that's when he started touching me, at Beachworth. But he started touching me at the beginning over at his friend's house, Mr. Isaac.

FORENSIC INTERVIEWER: Okay. I just got a little confused, Tiona. I thought you said he didn't touch you when you lived on Beachworth.

TIONA ARNOLD: No, not Beachworth. He touched my sister. On Dublin-Granville, on -- over at his friend's house, Mr. Isaac, when he went on a business trip to a different culture, he asked Mr. Seff, 'cause that's his best friend, he said they're like brothers. And he asked him to watch his house for him, and so we had all stayed over there.

And so my mom had to go to work, he

babysitted us. And then that's when he started touching us. Then on Dublin-Granville Road he started touching me a whole bunch. We started living there for like a medium-long time at Dublin -- on Dublin-Granville Road.

FORENSIC INTERVIEWER: Okay. So --

(Video muted.)

FORENSIC INTERVIEWER: At Mr. Isaac's house he touched you and he touched you when you lived on Dublin-Granville Road?

TIONA ARNOLD: Yeah, when we started to live there for a medium-long time.

FORENSIC INTERVIEWER: A what? When you started to live there for what?

TIONA ARNOLD: A medium-long time.

FORENSIC INTERVIEWER: A medium-long time?

TIONA ARNOLD: Short and long.

FORENSIC INTERVIEWER: Did it happen to you anywhere else?

TIONA ARNOLD: Over at his house.

FORENSIC INTERVIEWER: Over at whose house?

TIONA ARNOLD: Mr. Seff's house, over on Lakeside.

FORENSIC INTERVIEWER: He lived on Lakeside?

TIONA ARNOLD: Yeah, where that little boy

drowned, 'cause he helped him in the pool -- in the pond.

FORENSIC INTERVIEWER: All right. So how old were you when he first started touching you, Tiona?

TIONA ARNOLD: Nine -- eight, 'cause my birthday just passed. It was February 5th.

FORENSIC INTERVIEWER: So the very first time he touched you was at Mr. Isaac's house or at Mr. Seff's house?

TIONA ARNOLD: Mr. Isaac's house.

FORENSIC INTERVIEWER: It just happened the one time at Mr. Isaac's --

TIONA ARNOLD: Uh-huh.

FORENSIC INTERVIEWER: -- or did he touch you more than one time there?

TIONA ARNOLD: Uh-huh, 'cause we only went over to his house for a couple of days, but he only touched me one day at his house.

FORENSIC INTERVIEWER: And that was the very first time?

TIONA ARNOLD: Yeah, 'cause the rest of the days my mom was home 'cause it was her -- 'cause she was off those days.

FORENSIC INTERVIEWER: So tell me everything

about the first time that Mr. Seff touched you at Mr. Isaac's house.

TIONA ARNOLD: Well, he was touching -- well, he kept blowing kisses at us, he kept blowing kisses at me like this (indicating) or doing that, and he kept on touching my boob.

FORENSIC INTERVIEWER: Okay. Where was he kissing you, where on your body?

TIONA ARNOLD: He didn't kiss me. He was blowing kisses at us.

FORENSIC INTERVIEWER: Oh, okay. Thank you for correcting me. Was there someone else there the first time at Mr. Isaac's when he was blowing kisses and touching your boobs?

TIONA ARNOLD: Me and my sisters.

FORENSIC INTERVIEWER: Which ones?

TIONA ARNOLD: Perrion and Kanijah.

FORENSIC INTERVIEWER: Did they see what he was doing to you?

TIONA ARNOLD: Yeah, because he always say that he was just -- 'cause he always do it in front of -- like if he touched me, he'll do it in front of Perri and Kanijah. And if he touch Kanijah, he'll do it in front of me and Perri. And if he touched Perri, he'll do it in front of me and Kanijah.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



FORENSIC INTERVIEWER: Okay. There were times, though, when it happened under the cover where you didn't see what was happening?

TIONA ARNOLD: Uh-huh.

FORENSIC INTERVIEWER: Is there something else that happened at Mr. Isaac's house? You said he was blowing kisses, touching your boobs. Is there anything else that happened at Mr. Isaac's house that first time?

TIONA ARNOLD: No.

FORENSIC INTERVIEWER: Tell me all about him touching your boobs.

TIONA ARNOLD: He would do this or something (indicating).

FORENSIC INTERVIEWER: Okay. What did that feel like?

TIONA ARNOLD: I don't know.

FORENSIC INTERVIEWER: Okay. And what room were you in at Mr. Isaac's house?

TIONA ARNOLD: The living room.

FORENSIC INTERVIEWER: And what were your sisters doing when he was touching you?

TIONA ARNOLD: They were in the living room too, but when he was touching me and Perri, he would tell Kanijah to get on the laptop.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



FORENSIC INTERVIEWER: At Mr. Isaac's house? So when he touched you and Perri, he told Kanijah to get on the laptop?

TIONA ARNOLD: Uh-huh. Because we have Netflix on the TV and it could go onto the laptop, and he was always telling me, "Let her watch, like, kid movies like Dora or Brats." Or sometimes she wanted to watch SpongeBob. And Perri said that one time he made her watch porn, but I don't know what that is.

FORENSIC INTERVIEWER: Did he do anything to Perri on the day at Mr. Isaac's house?

TIONA ARNOLD: He touched her more than me and Kanijah because he say -- 'cause he said I'm too fat.

FORENSIC INTERVIEWER: He touched her more at Mr. Isaac's house, or like the whole time he touched her more?

TIONA ARNOLD: The whole time.

FORENSIC INTERVIEWER: Okay. Did you see him touch her at Mr. Isaac's house?

TIONA ARNOLD: Uh-huh.

FORENSIC INTERVIEWER: Tell me what you saw that time at Mr. Isaac's house. What happened to Perrion?

TIONA ARNOLD: He touched her butt and her

boob, and blowing kisses at her, too.

FORENSIC INTERVIEWER: Did you see him do anything else to her at Mr. Isaac's? Okay.

Did he do anything to Kanijah that time at Mr. Isaac's?

TIONA ARNOLD: No.

FORENSIC INTERVIEWER: Tell me about him touching Perri's butt.

TIONA ARNOLD: He would always slap her butt or something.

FORENSIC INTERVIEWER: Okay. Tell me about him touching her boobs.

TIONA ARNOLD: He did the same thing to her that he did to me.

FORENSIC INTERVIEWER: Can you show me with your hand on top of your shirt?

TIONA ARNOLD: (Indicating.)

FORENSIC INTERVIEWER: Then you said it happened at his house on Lakeside, Mr. Seff's house on Lakeside?

TIONA ARNOLD: Uh-huh.

FORENSIC INTERVIEWER: How many times did it happen at Mr. Seff's house?

TIONA ARNOLD: A whole bunch.

FORENSIC INTERVIEWER: A whole bunch?

TIONA ARNOLD: Yeah.

FORENSIC INTERVIEWER: And tell me about where it would happen when -- at Mr. Seff's house.

TIONA ARNOLD: In the living room --

FORENSIC INTERVIEWER: Okay.

TIONA ARNOLD: -- on the couch.

FORENSIC INTERVIEWER: Okay. And where would it happen on Dublin-Granville?

TIONA ARNOLD: No, he didn't live there. We lived there. He lived at the Lakeside house.

FORENSIC INTERVIEWER: Oh. I thought you said it happened at the Dublin-Granville house, too.

TIONA ARNOLD: Yeah.

FORENSIC INTERVIEWER: Where did it happen there?

TIONA ARNOLD: On the living room couch.

FORENSIC INTERVIEWER: Was there a place that it happened at the most?

TIONA ARNOLD: On the couch in the living room.

FORENSIC INTERVIEWER: At Dublin-Granville or at his house?

TIONA ARNOLD: Every time when he touched us, if he wasn't at his house, it was over at the living room on the couch at somebody's house.

FORENSIC INTERVIEWER: Okay. Is there something else that he did to your body?

TIONA ARNOLD: No.

FORENSIC INTERVIEWER: You told me he touched your boobs.

TIONA ARNOLD: And he always said that he -- he always say, "Don't bite your nails 'cause you'll look nervous." But I never bite my nails. That's why they're always long, 'cause I never bite them. But my sister, Perri, she been biting her nails ever since she was a little kid. But he didn't know us when we was a little kid. She been biting her nails.

FORENSIC INTERVIEWER: So tell me about a time on the living room couch that he touched you, from the beginning to the end?

TIONA ARNOLD: He would touch our boob or something, and then he would always smack our butt or touch -- or one time that he kissed Perri, but -- 'cause she -- she -- 'cause he put his tongue in her mouth.

Q. How do you know he put his tongue in her mouth?

A. 'cause every time I would fake use the bathroom to see if he was gonna touch her, and then one time he had kissed her, and he did this, he put

Case: 2:22-cv-02229-MHW-MRM Doc #: 9-4 Filed: 09/15/22 Page: 67 of 274 PAGEID #: 1186

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858


his tongue out before her face got to him, 'cause he kept holding her back like this, forcing her.

FORENSIC INTERVIEWER: Forcing her to what?

TIONA ARNOLD: To kiss him.

FORENSIC INTERVIEWER: So one time you saw him kiss her, or did you see him kiss her more than once?

TIONA ARNOLD: Only one time.

FORENSIC INTERVIEWER: Okay. Did he ever kiss you?

TIONA ARNOLD: No. He tried to, but I said no.

FORENSIC INTERVIEWER: Tell me about him trying to kiss you.

TIONA ARNOLD: He was trying to kiss me like this, (indicating), and I said no.

FORENSIC INTERVIEWER: And then what happened?

TIONA ARNOLD: And then he said, "You do too much."

FORENSIC INTERVIEWER: You do too much? What does that mean?

TIONA ARNOLD: I don't know.

FORENSIC INTERVIEWER: What happened after he said, "You do too much"?

TIONA ARNOLD: He said get -- he said, "Get away from me," so I went to go sit on the couch with Perri and Kanijah.

FORENSIC INTERVIEWER: Okay.

TIONA ARNOLD: And then one time he put his pee-pee in me and Perri's mouth.

FORENSIC INTERVIEWER: Uh-huh. Tell me all about that time.

TIONA ARNOLD: And then I kept trying to tell him no, but he kept holding my head down.

FORENSIC INTERVIEWER: And is this something that happened on this -- at the very same time he was doing this to you and Perri, or was this two different days he was putting your --

TIONA ARNOLD: Two different times. Well, actually at the same day, but he does it for -- he did it for a whole bunch of days.

FORENSIC INTERVIEWER: Okay. Now I'm a little confused. So did he put his pee-pee in your mouth one day or more than one day?

TIONA ARNOLD: More than one day.

FORENSIC INTERVIEWER: More than one day he put his pee-pee in your mouth? Okay.

TIONA ARNOLD: Do you all have to draw blood? Do you all have to get shots?

FORENSIC INTERVIEWER: You know, I'm not sure. That's really up to the nurse if there's gonna be shots or not. I don't know.

TIONA ARNOLD: 'Cause I don't like shots 'cause they hurt.

FORENSIC INTERVIEWER: We'll have to ask the nurse. Okay?

Tell me about one of the times that he put his pee-pee in your mouth.

TIONA ARNOLD: We was on the couch.

FORENSIC INTERVIEWER: On the couch? Okay. So you were on the couch and then what happened?

TIONA ARNOLD: Then he told me to come over there.

FORENSIC INTERVIEWER: Okay. And then what happened?

TIONA ARNOLD: Then he put a cover over my hair, was holding my head down.

FORENSIC INTERVIEWER: He put a cover on your head and was holding your head down? And then what? Here's a Kleenex.

TIONA ARNOLD: (Crying.) Then he kept holding my head down.

FORENSIC INTERVIEWER: Uh-huh.

TIONA ARNOLD: Then he pulled down his.

FORENSIC INTERVIEWER: Uh-huh.

TIONA ARNOLD: And then he put pee-pee in my mouth.

FORENSIC INTERVIEWER: Was there something that ever came out of his pee-pee when it was in your mouth? Nothing came out?

TIONA ARNOLD: No.

FORENSIC INTERVIEWER: Did you ever see something come out of his pee-pee? And which houses did that happen at? Because I know you said it happened more than once, when he put his pee-pee in your mouth.

TIONA ARNOLD: On Lakeside.

FORENSIC INTERVIEWER: On Lakeside? Okay. That didn't happen when you lived at Dublin-Granville Road?

TIONA ARNOLD: It happened there, too.

FORENSIC INTERVIEWER: Okay. Did someone ever see him putting his pee-pee in your mouth?

TIONA ARNOLD: (Shaking head.)

FORENSIC INTERVIEWER: No one saw? How do you know that he put his pee-pee in Perri's mouth?

TIONA ARNOLD: Because I sawed it.

FORENSIC INTERVIEWER: You sawed it? Did you see him put his pee-pee in your mouth one day or

more than one day?

TIONA ARNOLD: More than one time.

FORENSIC INTERVIEWER: More than one time? Okay. Where did you see that happen at?

TIONA ARNOLD: On the couch in the living room.

FORENSIC INTERVIEWER: Okay. At Lakeside and Dublin-Granville, or just one of those you saw it happen to Perri?

TIONA ARNOLD: Both of them.

FORENSIC INTERVIEWER: So tell me about one of the times you saw him put his pee-pee in her mouth.

TIONA ARNOLD: On the couch.

FORENSIC INTERVIEWER: Okay. Tell me everything about one of the times you saw him put his pee-pee in Perri's mouth. They were on the couch --

TIONA ARNOLD: She kept trying to get away from him, but he just holded her down with his hands.

FORENSIC INTERVIEWER: Tell me about him holding her down with his hands.

TIONA ARNOLD: He was doing this to her head, and then -- and then he peed in her, and then pee got in her mouth.

FORENSIC INTERVIEWER: You said pee got in her mouth? Tell me about that. How do you know pee

got in her mouth?

TIONA ARNOLD: Because I sawed it.

FORENSIC INTERVIEWER: Tell me everything you saw about that.

TIONA ARNOLD: 'Cause when he was using that cover, and then he had -- I had saw it because she kept doing this and then pee came out.

FORENSIC INTERVIEWER: Where was the cover at?

TIONA ARNOLD: On the couch.

FORENSIC INTERVIEWER: The cover was on the couch?

TIONA ARNOLD: No, they were covered with it.

FORENSIC INTERVIEWER: I'm sorry?

TIONA ARNOLD: They were covered with it. All he did was cover his legs, but he didn't cover his pee-pee.

FORENSIC INTERVIEWER: So the cover was on his legs, and you saw his pee-pee when he was putting it in her mouth? And you said the pee got in her mouth. How do you know it got in her mouth?

TIONA ARNOLD: Because when she moved her head, it was still coming out.

FORENSIC INTERVIEWER: Coming out of where?

TIONA ARNOLD: His pee-pee.

FORENSIC INTERVIEWER: Okay. And tell me what the pee looked like that came out of his pee-pee when he was putting it in her mouth.

TIONA ARNOLD: I couldn't see 'cause it was dark 'cause he turned out our lights. It was nighttime. But there was still a little bit of light 'cause the kitchen light was on.

FORENSIC INTERVIEWER: So how do you know pee was coming out if you couldn't see?

TIONA ARNOLD: Well, the kitchen light was on.

FORENSIC INTERVIEWER: Okay.

TIONA ARNOLD: I could see a little bit, though, but not all the way, but -- cause he had put her head back and then that's when I sawed it.

FORENSIC INTERVIEWER: Okay. And what did it look like?

TIONA ARNOLD: I could see -- I only saw -- I only saw from the kitchen light was on, but I don't know what it looked like, because I was sitting on the other couch.

FORENSIC INTERVIEWER: Okay. Did he ever put his pee-pee in someone else's mouth or just your mouth and Perrion's?

TIONA ARNOLD: Me and Perri's, but he don't do that to Kanijah.

FORENSIC INTERVIEWER: Okay. And you said nothing came out of his pee-pee when he put it in your mouth, just when he did it to Perri?

TIONA ARNOLD: Uh-huh.

FORENSIC INTERVIEWER: Okay. Did his pee-pee touch somewhere else on your body? Tell me about that.

TIONA ARNOLD: My pee-pee and Perri's, too.

FORENSIC INTERVIEWER: Tell me everything about his pee-pee touching your pee-pee.

TIONA ARNOLD: He had hold us down --

FORENSIC INTERVIEWER: Uh-huh.

TIONA ARNOLD: -- then -- then he was touching us with his pee-pee.

FORENSIC INTERVIEWER: He was touching you what?

TIONA ARNOLD: With his pee-pee.

FORENSIC INTERVIEWER: How did his pee-pee touch your pee-pee?

TIONA ARNOLD: 'Cause he was on top of us.

FORENSIC INTERVIEWER: So then what happened after he got on top of you?

TIONA ARNOLD: Started to move.

FORENSIC INTERVIEWER: Who started moving?
TIONA ARNOLD: Mr. Seff.
FORENSIC INTERVIEWER: I'm sorry?
TIONA ARNOLD: Mr. Seff.
FORENSIC INTERVIEWER: So Mr. Seff started moving, and then what?
TIONA ARNOLD: Then he knew I kept trying to get up, but he kept holding me down.
FORENSIC INTERVIEWER: And then what?
TIONA ARNOLD: He was -- he was on top of me for a long time.
FORENSIC INTERVIEWER: Uh-huh. And then what?
TIONA ARNOLD: And then after a long time then he got off me. And then he told me -- then he told me, "Go take a bath."
FORENSIC INTERVIEWER: Uh-huh.
TIONA ARNOLD: And that's it.
FORENSIC INTERVIEWER: Uh-huh. Tell me about him holding you down.
TIONA ARNOLD: He was holding my legs down with his legs, and he was holding my -- my arms down with his hands.
FORENSIC INTERVIEWER: Tell me about that. Where did that happen?

TIONA ARNOLD: In the living room on the couch.

FORENSIC INTERVIEWER: Okay. At which places?

TIONA ARNOLD: At his house.

FORENSIC INTERVIEWER: Was that the only place it happened, at his house? Okay. He didn't touch your pee-pee with his pee-pee at Dublin-Granville?

TIONA ARNOLD: No.

FORENSIC INTERVIEWER: Okay. Did his pee-pee touch your pee-pee one day or more than one day?

TIONA ARNOLD: More than one day.

FORENSIC INTERVIEWER: Okay. And tell me about where your clothes were when his pee-pee touched yours?

TIONA ARNOLD: He pulled them down.

FORENSIC INTERVIEWER: Which clothes did he pull down?

TIONA ARNOLD: My pants.

FORENSIC INTERVIEWER: Your pants? Did he pull anything else down?

TIONA ARNOLD: No. My pants were down at my knees.

FORENSIC INTERVIEWER: Okay. And tell me about where his clothes were.

TIONA ARNOLD: He took all his clothes off except for his shirt.

FORENSIC INTERVIEWER: Okay. How did his pee-pee touch your pee-pee when he would touch it?

TIONA ARNOLD: (Indicating.)

FORENSIC INTERVIEWER: What did it feel like when his pee-pee was touching your pee-pee?

TIONA ARNOLD: I kept telling him that he was hurting me, but he kept saying, "I don't care."

FORENSIC INTERVIEWER: Okay. Where was it hurting?

TIONA ARNOLD: In my pee-pee.

FORENSIC INTERVIEWER: Where at?

TIONA ARNOLD: In my pee-pee.

FORENSIC INTERVIEWER: In your pee-pee or on your pee-pee?

TIONA ARNOLD: In it.

FORENSIC INTERVIEWER: In it? Okay. So when his pee-pee touched your pee-pee, was it on the inside of your pee-pee, on the outside? Both? Tell me about where it touched you.

TIONA ARNOLD: Inside.

FORENSIC INTERVIEWER: Did someone see his

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



pee-pee touching your pee-pee?

TIONA ARNOLD: Perri.

FORENSIC INTERVIEWER: Perri? Tell me about that. Tell me about Perri seeing it.

TIONA ARNOLD: She kept telling him to stop, but he kept telling her to shut up.

FORENSIC INTERVIEWER: You also said he touched -- he did this to Perri? How do you know he did this to Perri?

TIONA ARNOLD: Because he did it in front of me. Because he did it in front of me just like he did it -- just like he did it in front of her.

FORENSIC INTERVIEWER: Was there anything different about his pee-pee touching her pee-pee? Like you said he did the same thing to you. Was there anything different about him doing it to Perri? What was different about it?

TIONA ARNOLD: He just peed on her.

FORENSIC INTERVIEWER: Tell me about him peeing on her.

TIONA ARNOLD: He peed on her. One day he wasn't even going to clean it up. He just kept doing it.

FORENSIC INTERVIEWER: How do you know he kept peeing on her?

TIONA ARNOLD: Because I saw it -- because when she got up, her clothes was wet, and he had told her go take a bath.

FORENSIC INTERVIEWER: Did something ever come out of his pee-pee when it touched your pee-pee?

(Video muted.)

FORENSIC INTERVIEWER: Tell me about the white stuff that came out when his pee-pee touched yours. Where did the white stuff go?

TIONA ARNOLD: To my pee-pee.

FORENSIC INTERVIEWER: To where?

TIONA ARNOLD: To my pee-pee.

FORENSIC INTERVIEWER: The white stuff went to your pee-pee? And tell me how many times you saw his pee-pee touch her pee-pee.

TIONA ARNOLD: (Inaudible).

FORENSIC INTERVIEWER: How many? Did you see him touch her pee-pee one day or one time?

TIONA ARNOLD: More than one day.

FORENSIC INTERVIEWER: Did you ever see his pee-pee touch someone else's pee-pee? Did his pee-pee touch somewhere else on your body? Tell me about that.

TIONA ARNOLD: He put it in me and Perri's butt.

FORENSIC INTERVIEWER: He put it where?
TIONA ARNOLD: In my butt.
FORENSIC INTERVIEWER: In your butt or on you butt?
TIONA ARNOLD: In.
FORENSIC INTERVIEWER: In it? Did he put it in your butt one day or more than one day?
TIONA ARNOLD: More than one day.
FORENSIC INTERVIEWER: How about Perri's?
TIONA ARNOLD: More than one day.
FORENSIC INTERVIEWER: Where did that happen?
TIONA ARNOLD: When we was on the couch.
FORENSIC INTERVIEWER: At which place?
TIONA ARNOLD: Lakeside.
FORENSIC INTERVIEWER: Anywhere else? So tell me about one of the times that he put his pee-pee in your butt.
TIONA ARNOLD: At Lakeside.
FORENSIC INTERVIEWER: So you were at Lakeside. Tell me everything about him putting his pee-pee in your butt. Like one of the times that it happened, what you were doing, where it was, everything about it.
TIONA ARNOLD: We were on the couch, the

long couch, not the short one.

FORENSIC INTERVIEWER: So there's a long couch and a short one in his living room? Would all of the things happen on the long couch or --

TIONA ARNOLD: (Nods head.)

FORENSIC INTERVIEWER: Okay. So tell me about the time that he put his pee-pee in your butt.

TIONA ARNOLD: He had told me to turn over and he pulled up his clothes and then he pulled down my pants.

FORENSIC INTERVIEWER: He told you to turn over and he pulled down his pants?

TIONA ARNOLD: And he pulled down mine, too.

FORENSIC INTERVIEWER: Okay. And then what?

TIONA ARNOLD: Then he was (inaudible).

FORENSIC INTERVIEWER: Okay. And then what?

TIONA ARNOLD: And then he just stopped.

FORENSIC INTERVIEWER: What made that stop him putting his pee-pee in your butt?

TIONA ARNOLD: I kept moving and he told me to stay still, but he was hurting me, so I didn't.

FORENSIC INTERVIEWER: Tell me about it hurting you.

TIONA ARNOLD: It was hurting me.

FORENSIC INTERVIEWER: Where on your body

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



was it hurting you?

TIONA ARNOLD: Because he was (inaudible) and my stomach started hurting.

FORENSIC INTERVIEWER: What did it feel like to have his pee-pee in your butt?

TIONA ARNOLD: I don't know.

FORENSIC INTERVIEWER: Do I have that right? You said he put his pee-pee in your butt? And you don't know what it felt like? Did it hurt anywhere else beside your stomach when he put his pee-pee in your butt?

TIONA ARNOLD: No.

FORENSIC INTERVIEWER: No? Okay. Did he ever put anything on his pee-pee when he would do these things to you?

TIONA ARNOLD: No.

FORENSIC INTERVIEWER: Did he ever put anything on your body?

TIONA ARNOLD: No.

FORENSIC INTERVIEWER: You also said he put his pee-pee in Perri's butt. How do you know that?

TIONA ARNOLD: Because I saw it. And one time he put oil on his pee-pee.

FORENSIC INTERVIEWER: Tell me about him putting oil on his pee-pee one time.

TIONA ARNOLD: It was some type of oil.

FORENSIC INTERVIEWER: Which time was that?

TIONA ARNOLD: Over at his house, on the big couch.

FORENSIC INTERVIEWER: What happened -- what was going on right before he put the oil on his pee-pee?

TIONA ARNOLD: Well, he had (inaudible). After a long time then he went to go get some more oil.

FORENSIC INTERVIEWER: When he was on you, did he put his pee-pee in your butt or his pee-pee in your pee-pee, which --

TIONA ARNOLD: In my butt and inside my pee-pee.

FORENSIC INTERVIEWER: I can't hear you. I'm sorry.

TIONA ARNOLD: In my butt and inside my pee-pee.

FORENSIC INTERVIEWER: So he put oil on his pee-pee when he put it in your butt and in your pee-pee? That just happened one time, though?

TIONA ARNOLD: (Shaking head.)

FORENSIC INTERVIEWER: I guess I am confused. So he put oil on his pee-pee more than one

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



time? Because earlier you said one time, so I want to make sure I am getting it right. It was more than once? And then what happened after he put the oil on his pee-pee?

TIONA ARNOLD: He (inaudible) got on top of us (inaudible).

FORENSIC INTERVIEWER: Tell me about this oil he would use.

TIONA ARNOLD: (Inaudible) oil.

FORENSIC INTERVIEWER: Did anything ever come out of his pee-pee when he put it in your butt? Tell me about that.

TIONA ARNOLD: Some white stuff.

FORENSIC INTERVIEWER: Some what?

TIONA ARNOLD: Some pee or some white stuff.

FORENSIC INTERVIEWER: Pure white stuff?

TIONA ARNOLD: No. Pee or white stuff.

FORENSIC INTERVIEWER: I can't hear you. Oh, pee or white stuff. Okay. Where would that go?

TIONA ARNOLD: Into my butt.

FORENSIC INTERVIEWER: Into your butt? Did someone ever see him put his pee-pee in your butt?

TIONA ARNOLD: Perri.

FORENSIC INTERVIEWER: Okay. And you said you saw him do that to her, too. Did he do the same

thing to Perri, or was there something different when he put his pee-pee in her butt?

TIONA ARNOLD: He didn't use no oil.

FORENSIC INTERVIEWER: He didn't use no oil? So who would he use the oil with?

TIONA ARNOLD: Me.

FORENSIC INTERVIEWER: You? He didn't use oil when he did it to her, or he did?

TIONA ARNOLD: He didn't.

FORENSIC INTERVIEWER: Okay. Tell me about that, him not using oil with her.

TIONA ARNOLD: I don't know.

FORENSIC INTERVIEWER: Okay. Did his pee-pee touch somewhere else on your body? Tell me about that.

TIONA ARNOLD: On my -- in my pee-pee.

FORENSIC INTERVIEWER: So you told me his pee-pee touched your pee-pee and his pee-pee touched your butt and his pee-pee touched your mouth. Did his pee-pee touch somewhere else on your body?

TIONA ARNOLD: That's it.

FORENSIC INTERVIEWER: That's it? I know you said your mouth had to touch his pee-pee. Did his mouth touch somewhere on your body?

TIONA ARNOLD: No.

FORENSIC INTERVIEWER: Just when he tried to kiss you, you said? Did you ever see his mouth touch someone else's body?

TIONA ARNOLD: (Head shaking.)

FORENSIC INTERVIEWER: I know you talked about him touching your boobs, and that was on top of your shirt. Did he ever touch your boobs under your shirt?

TIONA ARNOLD: Yeah, when I had on a training bra.

FORENSIC INTERVIEWER: So tell me about that.

TIONA ARNOLD: Well, he was touching my boobs from my training bra.

FORENSIC INTERVIEWER: So was your -- tell me about where your training bra was when he touched your boobs.

TIONA ARNOLD: It was on.

FORENSIC INTERVIEWER: Okay. So how did he touch your boobs if your training bra was on? I'm sorry.

TIONA ARNOLD: He touched my boobs on top of my training bra.

FORENSIC INTERVIEWER: Oh, on top of your training bra? Did he ever touch the skin of your

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



boob?

TIONA ARNOLD: Uh-huh.

FORENSIC INTERVIEWER: Yes? Tell me how he did that.

TIONA ARNOLD: My skin.

FORENSIC INTERVIEWER: How did his hand get to the skin of your boob then?

TIONA ARNOLD: He would go like this.

FORENSIC INTERVIEWER: Anything else that he did to your body?

TIONA ARNOLD: (Head shaking.)

FORENSIC INTERVIEWER: You talked about him touching your butt. He would slap it, you said, and put his pee-pee in your butt. Did he do anything else to your butt?

TIONA ARNOLD: (Head shaking.)

FORENSIC INTERVIEWER: Did he ever make you touch him anywhere on his body? Tell me about that.

TIONA ARNOLD: He made me squeeze his pee-pee.

FORENSIC INTERVIEWER: Tell me about him making you squeeze his pee-pee.

TIONA ARNOLD: He would always take my hand.

FORENSIC INTERVIEWER: Did that happen one day or more than one day that he made you squeeze his

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



pee-pee?

TIONA ARNOLD: One day.

FORENSIC INTERVIEWER: I'm sorry?

TIONA ARNOLD: One day.

FORENSIC INTERVIEWER: So tell me about that one day from the beginning to the end that he made you squeeze his pee-pee.

TIONA ARNOLD: He told me to come over and that's when he didn't have no cover.

FORENSIC INTERVIEWER: So he told you to come over?

TIONA ARNOLD: And he grabbed my hand. He was making me touch him.

FORENSIC INTERVIEWER: Tell me about what his pee-pee felt like when he grabbed your hand and made you touch him.

TIONA ARNOLD: Squishy.

FORENSIC INTERVIEWER: Sorry?

TIONA ARNOLD: Squishy.

FORENSIC INTERVIEWER: Oh, squishy? Okay. Where did that happen at?

TIONA ARNOLD: On the couch.

FORENSIC INTERVIEWER: But which place?

TIONA ARNOLD: His house.

FORENSIC INTERVIEWER: Had someone else ever

touched his pee-pee?
TIONA ARNOLD: Perri.
FORENSIC INTERVIEWER: How do you know Perri did?
TIONA ARNOLD: She did it in front of me.
FORENSIC INTERVIEWER: Okay. Did someone ever see you touching his pee-pee? Who saw that?
TIONA ARNOLD: Perri.
FORENSIC INTERVIEWER: Did anything ever come out of his pee-pee when he made you squeeze it?
TIONA ARNOLD: No.
FORENSIC INTERVIEWER: Did he make you touch somewhere else on his body?
TIONA ARNOLD: No.
FORENSIC INTERVIEWER: Did he ever make you touch other people or other kids?
TIONA ARNOLD: No.
FORENSIC INTERVIEWER: Is there anything else, Tiona, that happened with Mr. Sefe? Because everything is important. Just because I didn't ask doesn't mean it is not important. Is there anything else or anything else you saw him do to your sisters?
TIONA ARNOLD: (Head shaking.)
FORENSIC INTERVIEWER: Nothing else? Has someone else ever touched your private parts or done

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



something to your body that wasn't okay with you?

TIONA ARNOLD: No.

FORENSIC INTERVIEWER: No one else? Has someone else ever made you touch their body, or their private parts? Has someone ever shown you a movie or a magazine with people without their clothes on?

TIONA ARNOLD: No, but Mr. Seff showed me pictures, a video of girls dancing gross.

FORENSIC INTERVIEWER: Tell me about how -- the girls that were dancing gross. What do you mean?

TIONA ARNOLD: They was shaking their butts at boys.

FORENSIC INTERVIEWER: Shaking their butts at boys? Did he show it to you and Perri? It was a movie? Okay. Did people have clothes on or they didn't have clothes on?

TIONA ARNOLD: They had small shorts on.

FORENSIC INTERVIEWER: They had what on?

TIONA ARNOLD: Small shorts.

FORENSIC INTERVIEWER: Small shorts? Did they have shirts on?

TIONA ARNOLD: Yeah, some did just have shirts because their stomach was showing.

FORENSIC INTERVIEWER: Did he show you anything else?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



TIONA ARNOLD: No.

FORENSIC INTERVIEWER: Did he say anything about the movie that he was showing you?

TIONA ARNOLD: No. He (inaudible) falling asleep.

(Video muted.)

FORENSIC INTERVIEWER: Has someone ever taken a picture of you without your clothes on?

TIONA ARNOLD: No.

FORENSIC INTERVIEWER: No? Or videos of you without your clothes on?

TIONA ARNOLD: No.

FORENSIC INTERVIEWER: Have you ever seen big people hit each other or push each other?

TIONA ARNOLD: No.

FORENSIC INTERVIEWER: Do you have any questions for me since I just asked you a whole bunch? No? Can I take a break, Tiona?

If you think of something else that you want to make sure that you tell me, let me know when I come back. I will be right back. I want to see if the nurse is ready. Okay? There is a trash can over there if you want to throw that away.

(Forensic interviewer left the room.)

FORENSIC INTERVIEWER: Okay. Did you think

of anything else, Tiona? No? Any questions for me since I just asked you a whole bunch? I can't remember if I asked you that.

And I know we talked for a long time. So thank you so much for talking to me today. I know it is not easy to talk about these things that have happened, so thank you for being so brave to talk to me.

And, Tiona, just remember if someone is ever doing something to your body or private parts, you go tell an adult right away. Even if the person tells you not to or threatens you, you always, always go tell. Okay?

Do you have people in your life you can go tell if someone is touching your body or hurting your body? Who can you tell?

TIONA ARNOLD: My mother.

FORENSIC INTERVIEWER: Who else can you tell?

TIONA ARNOLD: My dad or my mom.

FORENSIC INTERVIEWER: Always, always go tell a teacher at school, a nurse, a doctor, any grownup you can tell. Always find a grownup.

Thank you again for talking to me today. Do you want your mom in for your checkup?

TIONA ARNOLD: No.

FORENSIC INTERVIEWER: You don't want your mom? Okay. I will take you to the playroom. Okay? It is up to you.

(Video play concluded.)

\- - -

Q. (By Mr. Hughes) Ms. Wilkinson, is that an accurate copy of the interview that you conducted with Tiona Arnold, absent the purposeful deletions of some portions of sound?

A. Yes.

Q. Once you complete your interview process or assessment of the patient, what is the next step in a child -- in Ms. Arnold's visit here at Children's on this date?

A. So then after I interview Tiona, she had a medical exam done by a nurse practitioner, Gail Hornor.

Q. And then do you ever have any follow-up with Ms. Arnold in this case?

A. No.

Q. Had you seen her prior to this assessment interview that you conducted in 2013?

A. No.

Q. Have you seen her since?

A. No.

MR. HUGHES: All right. I have no other questions at this time, Your Honor. Thank you.

THE COURT: All right, ladies and gentlemen, let's take a five-minute recess right now. Do not discuss the case among yourselves. Do not permit anyone to discuss it with you or in your presence. It is your duty not to form or express an opinion in the case until it is finally submitted to you.

THE BAILIFF: All rise.

- - -

Thereupon, at 11:05 a.m., a recess was taken until 11:22 a.m.

- - -

THE BAILIFF: All rise.

- - -

Thereupon, the jury resumed their seats in the jury box.

- - -

THE COURT: Everyone can have a seat. Any cross-examination?

MR. BENTON: Thank you.

- - -

CROSS-EXAMINATION

BY MR. BENTON:

Q. Ms. Wilkinson, good morning.
A. Good morning.
Q. You are a licensed social worker, correct?
A. Yes.
Q. And as a licensed social worker, you are not in a position to render a medical opinion; is that a fair statement?
A. Fair, yes.
Q. You are not in a position to prescribe narcotics?
A. No.
Q. Nor are you in a position to render a diagnosis?
A. Correct.
Q. This was a forensic interview; is that correct?
A. Yes.
Q. And forensics by its nature relates to the use of scientific principles and practices as part of a criminal investigation. Would that be a fair statement?
A. If you are just talking about the word, "forensics"?
Q. Yes.
A. Yes.

Q. And within the course of your role as a forensic interviewer, what scientific principles and practices do you employ?

A. Well, my title is forensic interviewer, so the definition of a forensic interviewer is a neutral fact-finding person who collects information when there is an allegation of physical or sexual abuse.

Q. But my question was, what scientific principles and practices or techniques do you employ?

A. I don't know how to answer that other than the training I have been given to become a forensic interviewer.

Q. Would it be fair to say there is no scientific practices, techniques or procedures that are utilized?

A. Scientific?

Q. Yes, ma'am.

A. I don't believe so.

Q. Okay. This is, however, a part of a criminal investigation. Is that a fair statement?

A. Is the interview part of a criminal investigation?

Q. Yes.

A. I mean, I don't use it as of a criminal investigation. Whether law enforcement uses it as

part of an investigation, they would have to be asked that question. I don't use it. I don't do any criminal investigation after I interview that child, no.

Q. But the interview is conducted with the understanding that it is part of a criminal investigation. Is that a fair statement?

A. The detective may use it as part of their investigation. If that is what you are asking, then I would answer yes.

Q. You're aware that there was an ongoing criminal investigation associated with these accusations. Is that a fair statement?

A. Was I aware that there was a criminal investigation?

Q. Yes, ma'am.

A. Yes, I was aware there was a detective assigned to the case, yes.

Q. And you were aware that this -- you have done thousands of these interviews, would that be fair to say?

A. Yes.

Q. And when these interviews are done, they are done in most instances with the understanding that at some point in time they will be surrendered to the

police and perhaps may be used in a court of law. Is that a fair statement?

A. Most cases do not end up in a court situation. Most of the cases we see do not end up going to court.

Q. But, in the cases that you have had, you have had a number of these same types of interviews that are used as part of a criminal investigation that ultimately end up in court where you are called to defend. Is that a fair statement?

A. I have been involved in cases, yes, that do end up in court, yes, that is a fair statement.

Q. And you were not part of the medical evaluation, correct?

A. The medical -- like where the child goes to get the exam, is that what you are asking? I am not part of the examination part, no.

Q. And again, you are not there to try to gather information for purposes of developing a medical diagnosis; is that a fair statement?

A. Well, my purpose is to gather information. I don't make the diagnosis, but my purpose is to gather the information to then pass along to the medical provider, yes.

Q. You don't ask questions from your

perspective with the intent of you being able to assess a medical diagnosis?

A. Are my questions to assess for medical diagnosis?

Q. Yes, ma'am.

A. Well, my questions -- I am gathering information, yes, about that child's body to pass along to the medical provider, yes. I don't make the diagnosis. If that is what you are asking me, no, I do not make the diagnosis.

Q. Let me ask this question. Do you ask any particular questions for purposes of a medical diagnosis?

A. Well, yes, I am asking questions about things happening to that child's body, potentially happening to that child's body, yes, so that that doctor or medical provider could make a diagnosis. My job is to gather what has happened to that child's body for that medical provider, yes.

Q. Well, whatever assessment is made as to whether or not the questions are relevant to a diagnosis or not, that is a determination made by someone other than yourself?

MR. HUGHES: Objection, calls for her to speculate.

THE COURT: If she can answer it.

Q. Do you understand my question?

A. I was going to ask you to repeat it, please. Thank you.

Q. How the information is assessed that you provide as to whether or not it will assist in making a medical diagnosis, that is something that someone else determines; is that a fair statement?

A. All I can answer is I gather that information from that child. Anything and everything that that child provides me about what has happened to their body to assist the medical provider in making a diagnosis, yes.

Q. And then someone else makes that determination as to how well that that may or may not be for purposes of making a medical diagnosis? That is my question.

A. A medical provider uses that information that I gathered to assist in making their medical diagnosis, what type of STI testing they may need to do on that child based on what that child provided to me during the interview.

Q. And again, my point is, those are decisions made by individuals other than yourself?

A. The diagnosis is the decision made. The

questions that are asked are my questions.

Q. That is not my question. However the information that you gather is processed, those are decisions made by other individuals?

A. Yes. How the information I gather is processed is made by someone else, yes.

Q. And I think you said that you do not see children that you interview, there is no follow-up on your behalf?

A. Correct, there is no follow-up.

Q. Now, when you're conducting an interview, you are accepting what is being told you at face value; is that a fair statement?

A. I am accepting what the child tells me at face value, yes.

Q. You are not there to challenge the child.

A. Correct.

Q. You are not there to try to determine if statements made can be corroborated or not corroborated. You just accept what the child tells you. Fair enough?

A. Correct.

Q. You don't ask questions to -- for example, I noticed in the interview you didn't ask questions with respect to who might have been the other occupants at

these locations. That is not your job, is it?

A. Correct.

Q. You don't make an assessment as to whether or not the statements that are provided to you by a child may have been the subject of influence from any third-party or outside sources. That is not your responsibility, is it?

A. No.

Q. Again, any information that you take or that you gather, you gather that information, as I believe you testified, you then pass that information as is to third parties, correct?

A. The information that I gather is given to the medical provider.

Q. Well, it is also given to the police?

A. Well, the police in this case were there observing the interview, yes.

Q. And are you aware that a recording of the interview was ultimately surrendered to the police?

A. Yes, I am aware of that.

Q. And are you aware as to -- strike that. You did not engage in any further interview of the child?

A. No, I did not interview that child any other days other than that day.

Q. Okay. And you notice that when this

interview was first being played, the recording was first being played, the camera kind of moves around. Who directs the movement of that camera?

A. In this specific case, I can't recall who moved the camera. But since the child didn't sit in a smaller chair, I don't know if the nurse practitioner moved the camera or someone else in the multi-disciplinary team used the remote to move the camera.

Q. So it is not motion activated?

A. No, it is not. Someone had to physically move the camera.

Q. You talked about an awareness of the child having been to the emergency room?

A. Yes.

Q. And you were not present at the time that that child went to the emergency room. Is that a fair statement?

A. That is a fair statement.

Q. You have no idea in terms of what may have been communicated at the time within that emergency room; is that correct?

A. I do not.

Q. You were not provided any assessment, conclusions, or discharge summary relative to that

emergency room visit; is that a fair statement?
A. Yes. I do not have -- or I did not have a discharge summary of that visit.
Q. And so whatever was -- so you talked about assessments, meaning acute versus non-acute. You have no firsthand knowledge as to what conclusions were reached from that emergency room visit; is that a fair statement?
A. Well, what I can conclude is that --
Q. I am not asking you your conclusion. My question is do you have any firsthand experience as to what conclusions were reached by the emergency room personnel?
A. No, I do not.
MR. BENTON: I have nothing further. Thank you.
THE COURT: Any redirect?
MR. HUGHES: Yes.

\- - -

REDIRECT EXAMINATION

BY MR. HUGHES:
Q. Ms. Wilkinson, you had indicated that if a child was interviewed about their trauma at the emergency room, would they then be transferred or scheduled for an additional interview by you at the

advocacy center?

A. An additional interview?

Q. Yes.

A. No. So, I mean, they would be -- if it happened in the time frame, they would be interviewed over in the emergency room.

Q. And in this case, was Tiona's related trauma within the time frame that she would have been seen at the emergency room?

A. No.

Q. And you had discussed keeping records of your interviews, such as the video. Would that constitute a record in this case, a medical record?

A. We keep a copy of the interview for security purposes, yes.

Q. If the police request or subpoena or get a warrant for that information, are you obliged to turn it over?

A. Yes. It becomes chain of custody. The DVD becomes chain of custody for law enforcement.

Q. If asked, you or hospital personnel would make available any patient's medical records upon a lawful request?

A. Yes.

MR. HUGHES: No other questions. Thank you.

THE COURT: Any as a result of those?

- - -

RECROSS-EXAMINATION

BY MR. BENTON:

Q. Ms. Wilkinson, the notes that you took in that interview are not medical records; is that a fair statement?

A. My handwritten notes?

Q. Yes, ma'am.

A. Well, they become part of the medical record because I do a typed report which becomes part of Tiona's, her, you know, medical records within the hospital.

Q. Your actual notes are medical records?

A. My handwritten notes are shredded; but I use my handwritten notes to type a written report that becomes part of her medical history.

Q. The typewritten report is what you prepare from the handwritten notes?

A. Yes.

Q. They are one in the same?

A. Yes.

Q. Are they medical records? Do you prepare a medical record?

A. Yes, I have to prepare a medical record for

this child's chart.

Q. Were all of those notes incorporated into a larger file that constitutes a medical record?

A. I don't understand what you're asking.

Q. Well, here is my question. When I think of a medical record, I am thinking of a document that has a diagnosis, recommended treatment, description, or pharmacy prescription, some other notations, documentation from medical personnel.

A. My interview summary was part of her medical records from that day that she was seen at the Child Assessment Center. So it would be my report was in there, Gail Hornor's report, who is the medical provider, Anthony Cherry, who is our mental health advocate, those would all be part of her medical record from that day.

Q. It is the entire package that is considered a medical record; is that a fair statement?

A. Yes. All of those reports that were done by those individuals become part of her medical record.

MR. BENTON: Thank you. Nothing further.

THE COURT: All right. You can step down. Thank you.

(Witness excused.)

Counsel, do you want to approach?

- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

THE COURT: I assume that is your last witness?

MR. HUGHES: It is, Judge.

THE COURT: And then what we need to do, subject to the admission of all exhibits -- are you going to rest or are you going to read the stipulation or --

MR. HUGHES: I believe the Court would normally do that.

THE COURT: I have to do your B with that.

MR. HUGHES: I believe the Court would normally do that upon the admission of the evidence, so I would ask the Court to read that when the evidence is admitted.

THE COURT: Okay. Let's take a break now and go through all of your exhibits you want to admit.

MR. HUGHES: And I have received the redacted copy. So over the break, if I could watch that to make sure or do whatever he wants to do with it, but it should match up with what was played in court.

THE COURT: All right.

- - -

THE COURT: Ladies and gentlemen, we are going to take a lunch break now. If you can be back about 12:45, and you can go down to the Rib Festival, my favorite festival in Columbus.

So do not discuss this case. Do not discuss the case among yourselves. Do not permit anyone to discuss it with you or in your presence. It is your duty not to form or express an opinion in the case until it is finally submitted to you. Go have a good lunch.

THE BAILIFF: All rise.

- - -

Thereupon, the jurors exited the courtroom and the following proceedings were held in open court, in the presence of the defendant:

THE COURT: Did you print out the finalized version of this?

MR. HUGHES: I think I sent it to Ms. Culp. The only change was to insert Ms. Henderson's name where it said --

THE COURT: If you can print that out so I can read it --

MR. HUGHES: I can't print from here, Judge,

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



but I did e-mail that to, I think, Courtney with that change. I e-mailed it at 2:17 yesterday, the stipulation.

THE COURT: And on those verdict forms, they don't make sense to me. Even though Mr. Almedom was convicted of those, where the jury finds two things under the age of 13, I think there should be, as with the rape verdict forms, the way he is indicted on -- I will just take Count 9, that he did have sexual conduct -- contact with Tiona Arnold, having purposely compelled Tiona Arnold to submit by force or threat of force and/or being less than 13.

MR. HUGHES: Well, it has to say 10, Judge. Here is why it has to say 10. If you look at --

THE COURT: That is under the rape, under 12.

MR. HUGHES: Oh, you are talking about the GSI counts.

THE COURT: Yes, these are the GSI counts.

MR. HUGHES: I stand corrected. Yes, sir. My mistake.

THE COURT: So I don't think on those, the four GSI counts --

MR. HUGHES: Correct. It is only 13 for GSI.

THE COURT: Right. And then under -- I think we also need -- the jury needs to find force or threat of force.

MR. HUGHES: Yes, Judge. I will make those changes as to that.

I also noticed as to the GSI counts, the mens rea, purposely, not knowingly. It has both in there. And I am going to cite *State v. Dunlap, 129 Ohio St.3d 461*.

MR. BENTON: Judge, I have no objection. I will put in --

THE COURT: What is that?

MR. BENTON: I say I have no objection, because I agree with him on that. Knowingly is not an element. We should remove the knowingly definition in Counts 1, 2, and 9.

THE COURT: Is knowingly a part of this?

MR. HUGHES: Not on GSI. Only, Judge, as to Counts 1 and 2 --

THE COURT: Nine and 10?

MR. HUGHES: And 9 and 10. And then in 2, 9 and 10, knowingly is just in parentheses as just having been defined. So we just need to strike the word, "knowingly."

THE COURT: So are we taking out the

definition of "knowingly" entirely from this?

MR. HUGHES: Just as to Count 1. And then --

THE COURT: Purposely compel by force, purpose --

MR. HUGHES: I believe the rapes are purposely, which would mean knowingly is not included in the other counts.

THE COURT: So we are just deleting "knowingly," it is all "purposely"?

MR. HUGHES: Yes, sir.

MR. BENTON: Yes, yes.

THE COURT: Any other changes to the jury instructions?

MR. BENTON: Your Honor --

MR. HUGHES: Judge, in regards to the force as it relates to the GSI counts, I did ask a fellow prosecutor about that, and this prosecutor indicated that the additional finding of force or not force does not change the level of offense.

And so if the jury were to find no force is used, that actually would be not guilty. So there should not be a separate finding for force as to the GSIs. The verdict, if there was no force, it is an element, and they would just find not guilty. So I

would ask the Court to consider that or look into that based on that argument.

THE COURT: I am just looking at your indictment.

MR. HUGHES: Right. I am just saying the jury forms in the first case did not have that extra language in it.

THE COURT: I know it did not. I didn't understand why it didn't.

MR. HUGHES: I mean, that is the State's position as to why it should not be included. It was not included in the first instance.

THE COURT: I think that was error.

MR. BENTON: Your Honor, as to that issue, there is language within the indictment where the State expresses alternate means. I had also raised in our demand for a bill of particulars that the State clarify which means it is relying upon. And the State in its response continued with the same language included within the indictment. So I do think that the jury does need to make a specific finding as to whether or not it is by force or threat of force.

As it relates do the other portions of the jury instructions, in the beginning with page 1, the second paragraph, last sentence, at the conclusion of

the last sentence, because we are dealing with multiple counts as well as multiple accusers, I think that the concluding sentence should read, "puts in issue all essential elements of each offense," because there are multiple offenses here. And I would ask that that be carried forth throughout these instructions.

And as to the second paragraph, the last sentence, I think it should read, in summary, every essential element of that offense.

THE COURT: Where are you?

MR. BENTON: I am on the second paragraph, the next --

THE COURT: I have got it. "A plea of not guilty is a denial of the charge and puts in issue all of the essential elements of each of the offenses."

MR. BENTON: Right. And then the second, next paragraph, the second sentence: "Defendant must be acquitted of an offense unless the State produces evidence which convinces you beyond a reasonable doubt of every essential element of that offense."

Because, again, it is each offense that the jurors must make a consideration for, so it must be a consideration to --

THE COURT: I don't get, "The defendant must

be acquitted of an offense unless the State produces evidence which convinces you beyond a reasonable doubt of every essential element of the offense."

MR. BENTON: Well, if -- it is not the offense. There is several offenses. That's why I say --

THE COURT: Well, you're acquitted unless they prove the offense. There are 15 different offenses.

MR. BENTON: Right. Again, just a suggestion, Your Honor.

THE COURT: Okay. I will take whatever suggestions you guys want.

MR. BENTON: Your Honor, the second page, first paragraph which reads, "reasonable doubt," I would ask the Court to include as we suggested in our proposed instruction at the conclusion of that paragraph language that says: "If you find the State has proved each essential element of each offense, then your verdict must be guilty. If you find, however, that the State failed to prove any one or more of the essential elements of these offenses, then your verdict must be not guilty."

THE COURT: I would use 100 percent OJI on this. This is how it is defined in OJI.

MR. BENTON: On page 4 of the instructions, the first sentence says: The State need not prove motive." I would also ask to add that the defendant also need not prove motive.

I recognize the general statement, the defendant does not have a burden of proof. My concern is that the jurors may look to the defense to try to offer -- to seek an explanation as to why these accusations were made. So I would ask to add that the State nor the defense need to prove motive.

THE COURT: What is your position? I have never -- I have seen that requested, but --

MR. HUGHES: Me neither, Judge. I think I would stay away from that because it does put an onus for the jurors to think about what the defense has to do or not do, and the defense has to do nothing. So I have never seen that language. I would urge against including it.

MR. BENTON: What did you decide, Your Honor?

THE COURT: I'm going to keep, "the State need not prove motive," that's it. The defendant has no burden.

MR. BENTON: Your Honor, then with respect to the instructions proposed by the defense, again,

because there are multiple counts and multiple accusers, I do believe that the instructions that say that each juror must weigh and consider each count independent from the other should be included.

THE COURT: Where are you seeking that?

MR. BENTON: Well, it is not within your instructions, but it is within the defense proposed instructions that says that each -- and it is an OJI instruction that says that the jurors must independently weigh each count and be uninfluenced by their deliberation or verdict as to any other counts.

THE COURT: There is an OJI instruction on that?

MR. BENTON: Yes.

THE COURT: Let me grab OJI. What section would that be under?

MR. HUGHES: I have a copy of Fred's proposed instructions and it reads: "The charges set forth in each count of the indictment constitute a separate and distinct matter. You must consider each count and any evidence applicable to each count separately. And you must state your findings as to each count uninfluenced by your verdict as to any other count. Mr. Almedom may be found not guilty or guilty of any one or all of the offenses charged." I

do not disagree with that at all, Judge.

THE COURT: If you want to agree to that --

MR. HUGHES: Yes. I mean, it is an accurate statement of the law and we do have multiple counts, so --

THE COURT: Where do you want to put that?

MR. BENTON: Your Honor, I would put it under the same section that talks about the number of witnesses.

MR. HUGHES: Page 4 maybe, Judge?

THE COURT: What page is it on yours, your proposed instructions?

MR. BENTON: It is on page 8 of my proposed instructions, Your Honor.

THE COURT: Okay, I will grant that. I will put it on the bottom of page 4, top of page 5.

MR. BENTON: Okay.

THE COURT: Anything further?

MR. BENTON: Your Honor, the defense -- let me deal with the easy one first. I had also proposed an other acts instruction. I am going to withdraw that request, but I do request an instruction on spoliation. We have proposed some alternate language to be included, and that is one option would be that you have heard -- "You have heard evidence that

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



certain items of evidence in custody of the Columbus police were later destroyed prior to trial. You may, but are not required to infer that such evidence was adverse to the interest of the prosecution."

Second proposal would be -- or the alternate proposal would be: "The State of Ohio, Columbus police department had a duty to retain the three pairs of underwear. The State of Ohio and Columbus police department had destroyed that evidence. Therefore, you may, but are not required to consider that this evidence would have been unfavorable to the State of Ohio on the issue of the defendant's guilt to which the evidence would have been relevant."

Either one or something along those lines I would request. And this, obviously, relates to the fact that the undergarments were later destroyed.

THE COURT: Anything on behalf of the State of Ohio? I am not inclined to give that instruction.

MR. HUGHES: I will just say I was unable to locate it in a criminal context, Judge.

THE COURT: It is in the civil OJI, and its meaning -- the OJI spoliation issue is -- I took a look at that last night and I don't think it applies in this matter.

MR. BENTON: Because it is a civil section

of OJI, or --

THE COURT: The spoliation OJI jury instruction, it does not apply in this, because that makes an inference that something -- I mean, these are panties that were obtained, never tested, so there is no inference you can make one way or another -- and destroyed. So there is no evidentiary value both either for exculpation or inculpation. And I think it is for if they would have, you know, took a sample of dirt and thrown it away. So I am not going to give the spoliation instruction.

MR. BENTON: And the Court will note our exceptions?

THE COURT: I will note your objection and your request.

Any other things with respect to jury instructions?

MR. HUGHES: I don't think so at this time, Your Honor. I will probably want one more chance to go over the final.

THE COURT: I will get these typed up now. And then are you guys ready to do closing after your client testifies? And what evidence are you seeking to admit?

MR. HUGHES: I might just need a moment.

MR. BENTON: Before you go further with that, back to the jury instructions -- and this was not in my proposal. But in reviewing this again, in looking at this whole question regarding the burden of proof, there is really not a whole lot of discussion within the jury instructions about the burden of proof. It just says that the defendant must be acquitted of the offense unless the State produces evidence which convinces you beyond a reasonable doubt, and it goes on from there.

So I think that there has to be included within these jury instructions language that says that the burden of proof at all times rests with the State of Ohio as to each and every offense, and that the defendant has no burden of proof. There is a more expansive definition of burden of proof in the OJI that --

THE COURT: I mean, if you can provide me it, I will take a look at it. I just have been using these jury instructions.

MR. BENTON: Does the Court have its copy there?

THE COURT: Yes, this is it.

MR. BENTON: If I may?

(Pause in the proceeding.)

Your Honor, I can't find it right now.

THE COURT: See if you can find it over lunch.

MR. BENTON: I'll do that. All right.

THE COURT: I notice that you even had that on your proposal. I couldn't find it either. Do you want to come back at 12:45 or something and see what evidence you want to admit?

MR. HUGHES: I have been able to organize it in that brief recess, Your Honor, but I would also suggest in that time period that Mr. Benton will have available for his review that redacted copy that corresponds with what the times were in court. And if he finds any discrepancies, he can bring those to the Court's attention.

THE COURT: All right.

MR. BENTON: Are you going to make your laptop available?

MR. HUGHES: Yes.

I can't, because it has too much personal stuff on it.

THE COURT: You can use mine.

MR. HUGHES: The Court will make one available.

So, Judge, with that being said then, I just

have a few items of evidence that the State would move to admit.

THE COURT: Okay.

MR. HUGHES: State's Exhibits 4, 5, 6, 7, 8 --

THE COURT: Do you want to use this one or do you want my other laptop, Fred?

MR. BENTON: It doesn't make a difference, Judge. I would rather not sit at the bench.

MR. HUGHES: You can borrow that, or if you want to write those numbers down.

All right, Judge. I guess, are we doing the property or the evidence?

THE COURT: Yes.

MR. HUGHES: So State's Exhibits 4 through 14 are the photographs testified to by many witnesses.

THE COURT: Any objection?

MR. BENTON: My only objection I would have would be as to State's Exhibit 5.

MR. HUGHES: I'm sorry, it's 4 through 15. I apologize.

MR. BENTON: State's Exhibit 5 --

THE COURT: Is that the vodka bottle?

MR. BENTON: That's the vodka bottle. I would also object to State's Exhibit 6, which is the

photographs of the -- let me show you real quick. Six is the photograph of the cologne bottle, perfume bottle.

THE COURT: Yes. I will admit those over the objection. What else? The two videotapes?

MR. HUGHES: And the two videos, Your Honor, that is State's Exhibit 16 and 17. And I think that concludes the physical, tangible items.

MR. BENTON: Defense would object to the videos that are proposed to be admitted.

THE COURT: And I will note your objection and I will admit it, noting over your objection.

MR. HUGHES: And I believe that is it on behalf of the State, Your Honor.

\- - -

Thereupon, the exhibits last above offered were admitted into evidence on behalf of the Plaintiff, State of Ohio, and are hereby marked State's Exhibit Nos. 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16 and 17, and made a part hereof.

\- - -

THE COURT: Okay. I found the burden of proof, 405.05. "The defendant is presumed innocent until his guilt is established beyond a reasonable doubt. Defendant must be acquitted unless the State

Case: 2:22-cv-02229-MHW-MRM Doc #: 9-4 Filed: 09/15/22 Page: 125 of 274 PAGEID #: 1244

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



produces evidence which convinces you beyond a reasonable doubt of every essential element of the offense charged in the indictment."

MR. BENTON: I would just ask the Court to substitute "unless" for "until."

THE COURT: Let's do this --

MR. HUGHES: Judge, wouldn't that replace the bottom paragraph on page 1 then?

THE COURT: I don't have my instructions here now in front of me.

Oh, okay, that is already in there. No. I mean, that is essentially what it says.

Anything else?

MR. BENTON: Your Honor, you want to do the Rule 29 now?

THE COURT: Yes.

MR. BENTON: Your Honor, at this time defense will move for judgment of acquittal as to each of the 15 counts that have been charged within this indictment as relates to accusations made both by Tiona Arnold and Perrion Thompson.

My concern based upon the presentation made by the State is that there are so many "vaguenesses" with respect to when these incidents were supposed to have taken place, where they are supposed to have

taken place and what types of conduct it is that were supposed to have happened, to have occurred, that it is not established within the time frames outlined within the scope of the indictment and the bill of particulars. Any of these accusations fall within that parameter.

Also I would point out that there have been a number of inconsistencies. And I recognize that the State bears a huge advantage at this juncture. And some of my arguments -- well, and a huge advantage at this point. But I would still nonetheless make the argument that there has been an insufficiency of proof as to each of these counts and I would move for a judgment of acquittal.

THE COURT: Anything on behalf of the State?

MR. HUGHES: Just that, Judge, I know the Court is very well up to the standard under 29(A) and the Court shall not order an entry of judgment of acquittal where the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt.

And even Mr. Benton indicated that there is some discrepancies. That in itself would put it for the purview of the jury to decide, you know, whether

or not they believed these young girls and what they testified to.

So in a light most favorable to the State of Ohio, the State has put into evidence through its various witnesses, including Ms. Henderson, the dates and the times and the ages of her children and the places and the dates and the times approximately where they were residing and living as it relates to Mr. Almedom, in addition to the girls' own testimony in court, plus the substantive information contained in their medical records.

THE COURT: I will overrule it at this time.

MR. BENTON: Your Honor, what time will we resume?

THE COURT: 1:00, 1:15.

MR. BENTON: This will take me an hour to look at this.

MR. HUGHES: Well, you can watch the whole thing, or --

MR. BENTON: I need to watch the whole thing, so --

THE COURT: 1:30.

MR. BENTON: Okay, all right.

- - -

Case: 2:22-cv-02229-MHW-MRM Doc #: 9-4 Filed: 09/15/22 Page: 128 of 274 PAGEID #: 1247

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858





Thereupon, at 12:00 o'clock, p.m., a lunch recess was taken until 1:30 p.m.

- - -

Friday Afternoon Session,
July 21, 2017,
1:30 p.m.

- - -

Thereupon, the further trial of this cause was resumed following the lunch recess.

- - -

THE COURT: Everyone can have a seat. Did counsel for the State and counsel for the defense get a copy of the jury instructions and the verdict forms?

MR. BENTON: I just reviewed the verdict forms, still going through the instructions.

THE COURT: Okay. Do we need to put anything on the record prior to bringing in the jury?

MR. BENTON: Judge --

MR. HUGHES: Not from the State. I guess I would just rest in front of the jury then.

THE COURT: Okay.

MR. BENTON: Your Honor, I did have an opportunity to review the videotape that has been redacted. And I note the Court is aware of my objections, but I think I need to put on the record the specific portions of the CD that I still have an objection to. So if the Court would allow me, I would like to read that into the record.

THE COURT: Please do.

MR. BENTON: At 12:01 -- let me say this parenthetically. Dependent upon which machine you play it on, these times may vary by a minute or so. But based upon the times that I got using the Court's laptop, these are the times I have come up with. 12:01, the statement from the examiner, "How do you know he touched Kanijah?" And she responds, "Because she told me."

Between 12:24 and 12:29, Tiona describes the circumstance in which both she and Kanijah were taken to the bathroom. 12:41, the examiner asks: "Touching us, meaning you and Kanijah?" And she responds in the affirmative. She, being Tiona.

12:53: "Tell me about the time he took you and Kanijah to the bathroom, put duct tape over your mouth."

13:06 to 13:23: "Tell me about him touching you and Kanijah."

14:53: "That's when he put tape, duct tape over our mouth." And that is Tiona's response.

15:00: "That's when he touched us."

15:27, 15 minutes and 27 seconds: "Did he also touch Kanijah?"

Between 16:05 and 16:47: "You also said

Kanijah told you that he touched her." Then Tiona responds with a narrative concerning that circumstance.

12 -- excuse me. 21:12 through 21:37, the examiner says: "I'm confused. I thought you said he touched Nie-Nie one time," meaning Kanijah. And then there is Tiona's response.

21:46, "He said if we tried to help Kanijah, he would kill us."

21:53: "Tell me the second time you saw him touch Nie-Nie," meaning Kanijah. And then she goes on to describe that through 21:53. Yeah, at 21:53. Actually, I think it is 21:53 through 23:13.

23:26, Perrion said: "It started when we were on Beechcroft" -- I think that is the street. "Beachworth," excuse me.

25:15, "Because I know he touched all three of you," and that's the examiner making that declaration.

44:20, "She told him to stop, but he told her to shut up."

52:57 through 53 minutes even: "Did someone else ever see him put his pee-pee in your butt?" And she responds, "Perri."

And that's it. Thank you.

THE COURT: Okay. State's position on any of this? I mean, I don't even know if they are going to ask for the CD, and I did give a curative instruction to disregard any mention of Kanijah.

MR. HUGHES: Judge, I just want to point out that I would like the Court to recognize that, in fact, I did excise or stop the audio in the courtroom during the trial when I was playing at those agreed upon times which I placed on the record before I began to do that, and that that was done in accordance with our discussion prior to playing it. I just want the record to reflect that.

THE COURT: Okay.

MR. BENTON: I would just suggest, state to the Court that all of the portions that were played that were objected to were not based upon agreed upon times.

MR. HUGHES: One other thing, Judge. I did notice, I think on Count 1 in the jury instructions, I think Ms. Culp removed "purposely" instead of "knowingly." I believe it was the parties' intention at the bottom of page 5 to remove "knowing" as the element to GSI.

THE COURT: You are right.

MR. HUGHES: And so I did notice that. So

"knowing" should be -- that should be excised and the purposeful paragraph re-included. But the rest of them seem to have deleted "knowingly" from "previously have been defined."

THE COURT: Yes, I tried to get everything. Also, with respect to the taped interview of Tiona, the interview lasted for over an hour and four minutes. The references potentially to Kanijah I would estimate were about 15 to 20 seconds. Anything further?

MR. HUGHES: Judge, I just need to know when I rest on the record if Mr. Almedom will be taking the stand.

THE COURT: That will be his choice.

MR. HUGHES: But I need to contact another witness.

THE COURT: I understand. He makes the decision when he makes the decision.

MR. BENTON: Your Honor, I can tell the Court that Mr. Almedom will not be testifying.

THE COURT: Will not be? Then we need to change the jury instructions.

MR. HUGHES: And I'll make a phone call to --

THE COURT: Everyone can have a seat.

Mr. Benton, can you approach? Are we ready for the jury? And I will get you guys copies of the jury instructions.

MR. BENTON: Your Honor, I will have a chance also to likewise rest. Well, actually, I will do this now. Defense would rest now and subject to the admission of Defendant's Exhibit B, which I believe the Court indicated you would allow to be admitted. And I would renew my motion not only for a judgment of acquittal, but also I believe I am required by rule to renew all previous motions, and that includes motions for mistrial. And I neglected to do that the first round, but that was my intention. I want to emphasize for the record that is my purpose in renewing.

THE COURT: Did you e-mail the statement I need to read?

MR. HUGHES: Yes. Ms. Culp has it from yesterday. I e-mailed it to her like at 2:00 in the afternoon. It says, "Stipulation." I just sent it to Ms. Culp. And what about regarding this exhibit? I don't believe that you had admitted it in the case.

THE COURT: Exhibit B, I am going to allow them to be admitted over your objection.

MR. HUGHES: Well, Judge, there is no basis

for it. I mean, this is something that hasn't been testified to, it can't be authenticated. I mean, it has never been introduced in the trial. And the Court is taking something extrajudicial and just giving it to the jury. That would be just like pulling something out of discovery and giving it to the jury.

THE COURT: If I read your stipulation, I can give it. You are stipulating --

MR. HUGHES: I am not stipulating to those exhibits or contents, Your Honor. It doesn't make sense.

THE COURT: How are we going to address the fact that you failed to provide discovery to Mr. Benton?

MR. HUGHES: That is the point of the stipulation. It is spelled out.

THE COURT: And this will be the document attached to that stipulation. If you are not going to stipulate it, we will get Phillips or whoever back.

MR. HUGHES: He is available. I just texted him to come back. But without explaining that document, Your Honor, that was the point of the stipulation. The parties agree to what is in that stipulation. Not to the evidence. There is zero legal means to introduce that particular document

absent some authentication process or person to testify about it.

THE COURT: If you want me to do a mistrial and we can start back again and you can bring everyone back, it's up to you.

MR. HUGHES: Judge, this document has never been seen by anybody, and it is just going to be given to the jury absent any rule of evidence.

THE COURT: Okay. Bring Phillips back.

MR. HUGHES: I can call him right now, Your Honor.

THE COURT: All right. You have got about --

MR. HUGHES: I can call him right now, Your Honor.

THE COURT: And if the defense wants, I will do the sole questioning of Detective Phillips. I will call him on my own, my own witness.

MR. HUGHES: He just responded to my text when I indicated he did not need to come as a rebuttal witness, so I know he has to be close to the phone. Actually, he did not. That was another detective. I am sending an e-mail too, Your Honor. He didn't pick up my phone call, but he did text me at 1:20.

THE COURT: I don't see the problem.

MR. HUGHES: He is on the way, Judge.

\- - -

Thereupon, at 1:50 p.m., a recess was taken until 2:10 p.m.

\- - -

THE BAILIFF: All rise.

\- - -

Thereupon, the jury resumed their seats in the jury box.

\- - -

THE COURT: Everyone can have a seat. Courtney has informed me that you guys now somehow believe that when she says ten minutes, it is a half hour.

Any further witnesses on behalf of the State of Ohio?

MR. HUGHES: No, Your Honor. At this time the State of Ohio will rest its case before this jury.

\- - -

THEREUPON, THE PLAINTIFF, STATE OF OHIO, RESTED.

\- - -

THE COURT: Any witnesses on behalf of the defendant?

MR. BENTON: No, Your Honor. At this time

the defense would rest subject to the admission in evidence of Defendant's Exhibit B, and at this time we would renew all previous motions made up to this point in the trial.

\- - -

THEREUPON, THE DEFENDANT, SEFE A. ALMEDOM, RESTED.

\- - -

THE COURT: Okay. And pursuant to Evidence Rule 614, I will be calling a witness. I am going to call Detective Dave Phillips. Judges are allowed to call witnesses. I don't do it very often.

Detective, raise your right hand.

(Witness sworn.)

Have a seat.

\- - -

DAVID PHILLIPS

Called as a witness by the Court, being previously duly sworn, resumed the stand and testified further as follows:

EXAMINATION

BY THE COURT:

Q. Just a few quick questions. Do we have Exhibit B? After you testified in this case, which was Tuesday --

A. Yes, sir.
Q. -- did you go back and review the property records held by the Columbus police department?
A. I did.
Q. And what did you discover?
A. I discovered that I erred in my testimony and that I did, in fact, collect three pairs of underwear from Ms. Henderson.
Q. That is Shatyra Henderson as part of the investigation?
A. Yes, sir.
Q. And logged under property No. 13006559? And it is my understanding that none of the pairs of underwear were subjected to forensic testing?
A. That is correct, yes.
Q. And I am showing you what is marked as Defendant's Exhibit B. Do you recognize what that is?
A. I do.
Q. And what is that?
A. It is a property inventory slip that indicates that I submitted this property on April 2nd, 2013.
Q. And on January 3rd, 2015, a letter was sent to the owner in this matter and indicated that the property could be retrieved from the Columbus police

department?

A. Yes, sir.

Q. And then in accordance with policies and procedures of the Columbus police department, the three pairs of underwear were destroyed on July 13, 2015?

A. Yes, Your Honor.

THE COURT: Any questions on behalf of the State?

- - -

EXAMINATION

BY MR. HUGHES:

Q. Just, Detective, as soon as you realized that those items had been destroyed, what did you do?

A. I called you.

Q. Okay. And then I brought that to the Court's attention that very next morning?

A. Yes.

Q. And you were here for that?

A. I was.

Q. Okay. Did you obtain these items of underwear pursuant to the search warrant you lawfully executed?

A. No.

Q. Do you recall the circumstances under which

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



they came into your possession?

A. Yes. Ms. Henderson said that she had found those underwear in some dirty laundry and wanted to turn them in to me.

Q. And was that a normal course of thing that would normally happen in your investigation?

A. It is not unprecedented.

Q. And do you recall where or when you met her to get this underwear from her?

A. Would have been the day that I turned it in on April 2nd. I don't remember the exact place, but I did meet her and obtain it at that time.

Q. Did you as a detective in this case make a decision not to submit them for forensic testing?

A. Yes.

Q. And why is that?

A. Again, they have lived together. There would have been transference from dirty clothes that I feel would render the DNA moot.

MR. HUGHES: No other questions. Thank you.

THE COURT: Anything on behalf of the defense?

- - -

CROSS-EXAMINATION

BY MR. BENTON:

Q. Detective Phillips, if I understand your response to the last question, you concluded on your own that these items were of no evidentiary value?

A. Yes.

Q. If they were of no evidentiary value, then why collect them?

A. Ms. Henderson wanted to provide them to me. She told me twice she had them and she told me on the 2nd of April. I went ahead and collected them from her.

Q. But you remember in your prior testimony to this jury, you indicated that when investigating claims of sexual assault, rapes and gross sexual imposition and the like, having access to underwear that may have been worn by any one of the accusers would have been valuable; do you recall saying that?

A. I recall saying that in some cases it is important, yes.

MR. BENTON: Nothing further, Your Honor.

- - -

FURTHER EXAMINATION

BY THE COURT:

Q. And Defendant's Exhibit B, pages 1, 2, 3 and

4, those are documents created by the Columbus police department?

A. That is correct.

Q. Okay. And they are kept in the ordinary course of business?

A. Yes, Your Honor.

THE COURT: I have no further questions. Thank you.

MR. HUGHES: Thank you.

(Witness excused.)

THE COURT: Counsel, do you want to approach?

- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

THE COURT: And you are moving B into evidence?

MR. BENTON: I am, Your Honor.

MR. HUGHES: No objection.

THE COURT: All right.

- - -

Thereupon, the exhibit last above offered was admitted into evidence on behalf of the Defendant, and is hereto marked Defendant's Exhibit B and made a

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



part hereof.

- - -

MR. BENTON: I guess my only concern is that certainly not in the presence of the jury whether or not there should be additional questions of Detective Phillips outside of the presence of the jury, because, again, this case was a retry and as to whether he was aware of the active case, had some ongoing status. That would be my concern.

THE COURT: That's not what we need to be concerned with right now.

MR. BENTON: Okay. And then again for purposes of the record, I want to be make clear that not only was I moving for a judgment of acquittal as it relates to the close of the State's case and also my case as well, but also our motion for a mistrial as well as the other motions and objections previously made.

THE COURT: Denied.

- - -

THE COURT: Ladies and gentlemen, the case is submitted to you and at the present time counsel for the State and counsel for the defense have an opportunity to provide you with closing arguments. After they finish the closing arguments, I will

provide the final jury instructions in this matter.

So is there any closing arguments on behalf of the State of Ohio?

MR. HUGHES: There are, Your Honor.

THE COURT: You may.

MR. HUGHES: Thank you, sir, Mr. Benton, and Mr. Sefe Asfadi Almedom.

Good afternoon, ladies and gentlemen. I know it is hard to keep track of time in this building, but I want to thank you for your patience throughout this week. It has been a long week, I think, for everybody involved. It doesn't matter who you are, in this courtroom or in this building, your time as jurors some say is the most important thing you can do for civil service maybe next to serving in the military during a time of war.

And that time this week was well spent, because you have very important decisions to make in relation to this case. Important decisions in relation to Sefe Almedom, no doubt, but important decisions also as they relate to Tiona Arnold and Perrion Thompson.

This was their one chance to come in here and finally tell somebody about what had been happening. After all of these years, the end of the

legal process is here now when they come to court. When you are in the jury room, ask yourself and consider and think that those girls had conceptualized where they might be in four years, in 2013, when they first told their mom about the abuse they had been suffering at Mr. Almedom's hands. Children that age, do you think they have the foresight and the thought and the planning to know that four years later they would be sitting here in front of you recounting those most intimate things that occurred in their entire lives? Think about that and think if that's true or not, or consider the possibility given those two girls at their young age. Because these allegations made by these children to their mother, to medical providers, other persons, to you and everybody here in court, in public and in the open are made so people hopefully will listen. Not every person will listen. As jurors I am sure that each and every one of you were listening. So let's talk about some of the charges.

We began this case and I had mentioned, and I think if I can get the projector or my laptop output, there are 15 counts. Cases involving children are difficult because kids don't take -- they don't have day planners. They don't keep everything in an iPhone and have a calendar and a black book and some

way to keep track of everything for them. So you have to remember, you have to understand that children are not good about keeping dates and times, and that the law allows for there to be broad portions or periods of time when it involves sex abuse of children.

We talked in voir dire about setting aside any preconceived notions or prejudices that you might have before you come and sit as jurors. And oftentimes if you say to somebody, for example, this is a case of assault, or a sexual assault or something, oftentimes people think of stranger danger. Right? It was a boogie man in a van taking kids or selling candy or doing something nefarious.

That is not this case. And any preconceived notions of what you might think involved sexual abuse or people taking advantage of young children, this is the reality, ladies and gentlemen. A person close to these children, somebody who had access to these children through Ms. Henderson, she was the conduit for him to be able to engage in this abuse over these years. He used that relationship with her to foster, to continue to abuse these children. And he did what he could to prevent them from disclosing that abuse, whether it be through threats, physical force, threats of harming them, their family members, their loved

ones.

Who does a child depend on for everything? Their caregivers. They feed them, they house them, they take them to school, they get them dressed. They buy them their clothes. They do everything. If a child loses that, they have nothing.

You have heard from these girls about their special particular situation and their living arrangements. The single mother, working two jobs, doing everything she can possibly do to support these girls. And Mr. Almedom took advantage of that situation.

She unknowingly left them in his care. Everything seemed to be going fine for sometime. She had no reason to suspect or believe. And the girls didn't tell her. The girls didn't tell her because they were scared.

The evidence in this case in each one of these counts, 1 through 15, you have a legally sufficient basis to consider each one of these counts. If they were not valid, you wouldn't be here, we wouldn't all be here. You can consider each one of these charges.

MR. BENTON: Objection, Your Honor.

THE COURT: Overruled. It is closing

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



argument.

MR. HUGHES: Every single one of these charges contained in the indictment, contained in the jury instructions, it is for you to consider. And you should consider them independently. If you review -- and you will have the videos. Remember, everything that happened in court is evidence in this case. You will have the videos that were played in court to review for yourselves. And I submit to you, watching these videos alone will support the counts as charged in the indictment.

But you don't just have these girls' statements contained in their medical exam interviews. You also have their real live testimony here in trial, in court, in this courtroom to you. So let's talk about those charges.

Count 1. It can be confusing, understandably, not having taken or have notes or writing things down, so everything must be committed to memory. Your collective memory as jurors is what you rely on during the deliberation process. But some things are very well established.

Ms. Henderson testified about the time periods in which she lived at the various residences. And those time periods include Beachworth, Sefe

Almedom, 2009 through 2011. Dublin-Granville, she lived there by herself with her daughters, 2011 in August to January of 2013.

She also testified about living and residing at Lakeside. She was losing her house and she was going to be evicted from Dublin-Granville with her children. They moved at the end of the year, beginning of January '13 up through March, when the children disclosed what had been happening and they went to Children's Hospital.

Immediately upon disclosing, they went to Children's Hospital. She moved out immediately. After being involved with Mr. Almedom in a relationship for three, four or more years, she just left like that. Think about what it takes to just walk away from somebody you have been with, that you love, that you lived with for years and years on end, to just have it be over like that. Something trivial, something that doesn't matter, would you just leave like that, take your kids and go?

So she did do that in March in 2013. She testified about these date ranges. And the date ranges are important because the kids, while they remember often what grade they were in and where they were, are a little bit less exact about the dates.

But that is okay, because you can rely on Ms. Henderson's testimony about the dates, where she lived and the residences in which she lived. And the children testifying, we also know all of their birthdates. That was information in the record. And I know it is hard to commit to memory.

But let's talk about Count 1. Perrion Thompson, she is the oldest. She was born September 4th of 2000. Contained in Count 1, the time frame is from 2010 to 2011. That coincides with Ms. Thompson living at Beachworth from December of '09 through June of '11. That period overlaps.

She described sexual contact. Sexual contact, as I mentioned, would be defined for you. That involves erogenous zones of persons, touching buttocks, breasts if it is a female. There is evidence supporting gross sexual imposition with force or the threat of force.

I am only going to address the threat of force really in one particular instance here -- not just one instance, but I guess with one overall reaching kind of concept. First off, force is just, there is a simple, plain definition of force. It is contained in the jury instructions, and the Judge will read that force definition to you.

And force in this case, it is -- and I will quote, because I don't want to get it wrong. "Any violence, compulsion or constraint physically exerted by any means upon or against any person or thing."

So force could be pinning somebody down. Force could be duct taping their mouth. Force can be holding their head and forcing them to perform fellatio. Force can also be -- and I will continue, because I think this is one of the other overreaching and overriding concepts throughout this case -- "When a relationship between the alleged victims is one of a child and other parental or elder authority figure, the element of force need not be openly displayed or physically violent. In such relationship, force may be subtle, it may be slight, it may be psychological or emotionally powerful."

In that case, if you find beyond a reasonable doubt that the alleged victim's will was overcome by fear or duress, the element of force has been established. And that is contained as part of the law that is contained in your jury instructions.

And ask yourself in this case, I wonder what sort of psychological and emotional force was exerted on these girls that overcame any fears or duress that they have to be able for them not to tell.

So, ladies and gentlemen, rather than address the "submit by force or threat of force" as it relates to each count in this case, you have the definition, and I argue that it applies to each and every count as an overbroad concept of him abusing his authority figure, his parental figure. And there is also the direct physical threats about killing them, killing their mother, killing their uncle, killing family members if they were to tell.

There is also the direct force that actually, as you heard, pinning or holding her legs back while committing or engaging in vaginal penetration. That is force. That is exerting a force on somebody else. The taking of young girls' legs and moving them apart, holding them back or pinning them up, as she described, up near her chest, that is also force. So any of those concepts of force can be applied to each one of these counts.

So ladies and gentlemen, we have Perrion discussing and talking about these instances of being touched inappropriately during this time frame. Count 2, very similar, but the time is slightly different. Now we are looking through September 3rd of 2012. So there is an overlapping period of time when she would have lived at Beachworth and also would have lived at

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



Dublin-Granville Road. More importantly, we have established her birthday by her own testimony. Her mother knows how old she is. She was born in 2000. So if that happened in that time frame, she would have been either 10 or 11 years old. Again, you heard the questions. Exactly how old were you? What day of the week did this happen?

Perrion's recounting vaginal intercourse, again, if you recall, look simply at the interview, Perrion discusses in talking with Diane Lampkins -- this is, of course, contained within that video that you will have if you want. She recounts talking about her middle part, meaning -- and she refers to it and I wrote down, her "pee-pee," which we know is her vagina or vaginal area. And also Mr. Almedom's pee-pee, which would be his penis, his, quote, "middle part." And it went inside of her and it would hurt her; and that he would move and liquid stuff would come out, and that he would sometimes go to the bathroom afterwards. She would hear water running and it would last for minutes.

And when asked, she talked about it happening more than one night, quote, "mostly every night on Beachworth." That is around 19 minutes into the interview. Again, a child can't document every

single time this happened, but she recounted that it happened so frequently she couldn't keep track. Again, sexual contact.

Using force or the threat of force in Count 4, vaginal intercourse is the sexual contact in Count 4. Count 4, again, vaginal intercourse, she described him using bottles of stuff that say KY on them and that he kept in the cabinet. When asked about when this would happen, she indicated a little further in that interview that he would wake her up on school nights and make her go downstairs with him.

She was asked about specific instances that she remembered where he engaged in vaginal intercourse with her. She was able to recount several instances that it occurred during this timeline in her interview at Children's Hospital.

Now, did she know four or five years later that what she said would have to exactly match up with whatever the law might be? No, she is a kid. She doesn't know that there is some, quote, "police investigation" going on.

Again, Count 5, another instance of vaginal intercourse, and Count 5 involves fellatio. That is also clearly defined using any part involving the male sex organ and the mouth. She described to you

instance of fellatio as well. She talked about being forced to perform that.

You know, when you go back to Count 2, and I have noted here something else. And again, this is somewhat disjointed because the person conducting the medical interview isn't a law enforcement officer, not a prosecutor. They are not thinking about this when they talk with them. As a result of the indictment, Count 2, gross sexual imposition, that is that touching, and if you look and watch that video, at 25 minutes into it, she talks about how her hand was taken and placed and put into his pants and she could feel the skin there. And you would be remiss before signing your guilty verdict form in this case if you didn't fast-forward or at least watch the part at 25 minutes into the interview as Perrion Thompson sits there in the chair talking to an interviewer about the abuse, and she starts motioning with her hand and what she would have to do at that age, describing it. How does she know that if she is just making all of this up? So there is really no other alternative that we suggested to you that this entire narrative is false.

So think about how a young Perrion knows all about what that is. She doesn't. Watch the video. She doesn't even know what she is doing. She is

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



moving her hand up and down. As adults and jurors, you can use your common knowledge of growing up and what that entails. She talks about having to touch his penis and do that. She talks about feeling stuff coming out and tasting nasty at 26 minutes in. She reiterates how nasty it is and it is a weird, dirty yellow color. She didn't call it semen or sperm or ejaculate or anything like that because she doesn't know what she is dealing with. She is a child.

She uses the terms -- as you heard Ms. Wilkinson discuss, kids use different words. They call their vagina, "pee-pee." She describes ejaculate as this weird, dirty, yellow color fluid. When asked about how many times it happened, quote, she said at around 27 minutes, five times in her mouth. So you have multiple counts here of fellatio. She discussed it happening at least five times.

Now, Count 5 and Count 6 cover fellatio involving Perrion. And again, Count 7, Count 7 is another instance of vaginal intercourse. You will have the photographs of that residence on Lakeside, that brown couch. She talked about sexual abuse at Lakeside. And we know that the whole family lived on Lakeside starting in January 2013 up through when the disclosures were made and they went to Children's

Hospital in the very beginning of March. So that had to have occurred at Lakeside.

Even while they lived at Dublin-Granville and Mr. Almedom lived at Lakeside, they would sometimes visit him at Lakeside and there would be abuse and on limited instances there would be abuse at Dublin-Granville when visiting. But what is always in common with this abuse is that Ms. Henderson is absent, she is gone. He is the only adult in the house, period.

He also engaged in this behavior in front of each other. You heard testimony from both Perrion and also Tiona about how their sibling would be under a blanket on the couch, maybe on the other side of the room, and they knew something was going on. They could see something going on. But because they were threatened of being killed if they told, neither of them talked to each other about it or even told each other or disclosed it out of fear.

Count 8, finally, another instance of fellatio involving Perrion. Let's just -- this is an interesting place I think to note that Perrion gave some details about being threatened of being killed, being harmed, being hurt. But she also alluded as to why she would feel that he might actually do it,

because she recounted how Mr. Almedom, before he came to America in Africa would kill animals, bolstering his own, hey, I killed animals if you don't think I can kill you. How does she know Mr. Almedom had killed animals and things when he was in Africa before he came here? Why would he tell her that? How would she have that information? He told her to instill that fear in her that he was capable of killing another living being, and that is how she knew that.

The question isn't that she knew it. The question is, why would Mr. Almedom volunteer to a young child that he had killed anything while he was in Africa? It is not really an element to anything, unless you back it up with a threat to harm other people.

One other common thread throughout this case is -- and I'm sure there will be some comment on it. But, ladies and gentlemen, this ain't a whodunit. Oftentimes, you know, a lot of people, right, that is why I said to set aside speculation and TV shows. This isn't one single drop of blood in a murder scene and that's what we are trying to use to connect somebody to a crime.

Mr. Almedom is the only person ever identified as engaged in these acts described by these

girls to medical personnel, to social workers and to you here in court as forcing fellatio, forcing intercourse, and forcing touching on all of them. There is no other suspect.

I am sure much will be made about the underwear, the Detective Phillips' mea culpa. As anyone would hope a good police officer would do, is come in and set the record straight and own up to a mistake that he made. And that mistake is not dispositive of this case. And I ask you not to speculate, because the underwear wasn't ever tested. We don't know what it would have yielded. It could have OJ Simpson's DNA on it. But how would that change what these girls told happened to them at Children's Hospital? How would that change what these girls came in here and said? It doesn't. It is not dispositive. It is a red herring.

I am not saying you shouldn't consider it. It is what it is. It happened. It is a fact. The detective got up here and explained it. You will have the evidence of it. There is a property sheet that it happened and no one disputes that. It is just something that happened. But it is not dispositive of whether or not Mr. Almedom committed these crimes and did these things.

Let's talk a little bit and let's talk briefly then about Tiona. So the second portion, the last half of the jury instructions involve, of course, her younger sister. And I try as I can to make notes while I am in trial and do other things, but you have to rely on your collective memories about everything that Tiona said. It is difficult for me to write things down as I am asking questions. But I do have plenty of notes also from that same interview which you will be able to watch if you so choose or want to.

So again, we have Count 9, we start out -- I'm sorry, Count 10. I thought that was 9. Count 9. Somehow the screen wasn't -- more technical errors. But Count 9 is Tiona. And Count 9 is similar to Counts 1 and 2. It involves gross sexual imposition. It involves touching.

Well, we all had the luxury, I think, of just hearing from Tiona's discussion with Kerri Wilkinson at Children's Hospital. And when you think about a single count of gross sexual imposition, you can think about her talking about the areas of her body that she was touched.

You can also talk about involving a sexual organ, that part that, I don't know, it stuck out in my mind when she called, she described the word as I

think "squishy" when her hand was forced to touch Mr. Almedom's penis, a squishy feeling. And again, that is how a kid is going to describe a flaccid penis, squishy.

We also have to remember when she is making these disclosures, she is much younger than she is now, and that this abuse had been going on even prior to her disclosures in 2013. So she was born in 2004, and these things occurred to her when she was under 10 years old, eight or nine. So as it relates to Perrion Thompson, everything that happened to Perrion Thompson in the jury verdict forms are going to indicate -- and they ask you to circle, to find the appropriate age. Every allegation involving Perrion Thompson occurred when she was under the age of 13, as alleged. Every allegation and every count in the indictment involving Tiona occurred to her when she was under 10 years of age.

Now, if for some reason you would think that Perrion was 15 when this happened and Tiona, you know, was 22 or whatever, then don't circle that. But on the guilty verdict form you are going to be asked to indicate the age of the child or if it fit within that range of being under 15 or under 10. And every count of Perrion, she was under 13 when this happened to

her. And every time everything happened to Tiona, she was under 10 years of age.

You will also be asked in some instances whether or not you believe or find that force was used. I have already gone into that extensively, but I will ask when you are reviewing the verdict forms, that you find, in fact, that Mr. Almedom did utilize force to complete and perfect these acts of sexual abuse. And you will be asked to indicate so by circling that force was, in fact, used. I went into the broad definition of what force could entail.

Another count of sexual contact, again, touching, she was eight or nine years old, she lived with her mom at Dublin-Granville. They moved to Lakeside in early '13 for about a month, so there is overlapping residences. But what is important again is her age and the time period that this happened and the sexual contact that she described engaging in with Mr. Almedom while she was between those ages.

And if you find her testimony involved instances of sexual contact between her and Mr. Almedom during that time period and those ages -- and those ages, the time frame is what is important. The residences help you gauge that time frame, if that makes sense. So residences are a good way because

these young girls don't remember exactly every date, but they do remember when they were in school, what grade they were in, and mostly what keeps reoccuring is where they were living and who they were living with. And so that is why those are there to assist you in considering those counts.

Again, Count 11, in Count 11 the sexual contact is fellatio. Sexual contact in Count 11 is fellatio which is involving, of course, as we discussed before, a male sex organ and a mouth. And that would have occurred again when she was seven to nine years old. and it involved force. There is again a mental, emotional, psychological, and we also have the physical force. It could be any one of those, ladies and gentlemen. As I said, it doesn't have to be holding these young girls by the back of the head. And forcing her head down on your penis is force, that is one, that is a type of force. So is threatening to kill her.

Count 12, again, sexual contact, another instance of fellatio. And in Tiona's interview, this is around 33 minutes when she starts to discuss the several instances involving fellatio. She describes him holding her head. She describes another instance a minute or two later where Mr. Almedom pulled down

his pants and put his pee-pee into her mouth. She doesn't remember anything coming out of that. And she specifically recalled that happening when she was at Lakeside, which again, was contained within that time frame.

Thirteen, another instance of sexual contact. The contact in Count 13 is vaginal intercourse. And again, Tiona described multiple instances of vaginal penetration, particularly at Lakeside. Do you recall when I asked Ms. Arnold to look at some photographs, which you will have, and what her reaction was when I showed her a picture of that living room where she was abused on what she said almost a daily basis when left alone and her mother wasn't home? And when defense counsel suggests that these girls made all of this up, think about her reaction. Think about what a great actress young Tiona and young Perrion are, if you think they are acting.

Count 14, again, vaginal intercourse, and again, same time frame, she is under 10 years old and she lived primarily at Dublin-Granville, but later did move to Lakeside. And she described again specific instances of on more than one occasion vaginal penetration.

And finally, the very last instance here, Count 15, she talked about this at Children's Hospital and she talked about it on the stand. She talked about anal intercourse. She felt something in her butt. I think what is of note, if you recall when asked, Tiona Arnold -- you know, these are children. She said something I didn't expect. "Well, he didn't get to do it," or, "he tried, but it wasn't successful."

Well, that is not what she initially said to Children's Hospital, and that is what she said here on the stand. And you can separate or listen to the testimony and do what you want with it. But what she said next was, after she said, "Well, he didn't get to do it, it really hurt." If he was unable to penetrate her, why did it hurt so bad?

These are young children. It is hard to put things into words. They don't think like adults do. But ask yourself that, well, he didn't get to do it, he tried, for a kid who knows what that means, maybe he didn't get to, quote, finish that time; but she experienced pain in that part of her body. And you heard from nurse Hornor about the developmental stages of young girls and how the younger girl would be more sensitive in her vaginal area because that hymenal

area is not opened up as large. It has not been estrogenized. It is not as stretchy. That part of a woman's body is made to stretch, to give birth, pass a baby through. But when you are seven, eight or nine years old, it is not developed to that point yet; and if you insert something in there, it causes extreme pain.

So rather than cause pain in that area, where clearly there would be a reaction -- and you heard the girls testify about how they would ask him to stop almost every occasion, and he didn't and he wouldn't. But maybe there is less pain in the anal cavity. Apparently not, because Tiona testified that it hurt, too. So if you are thinking to yourself, well, she said he tried, but he didn't do it, what did she mean when she testified and talked about how much that hurt?

When, in fact, Mr. Almedom inserted his penis, ever so slight, there is a definition of penetration, which I read, I think, in the beginning. And it includes, "ever so slight." So you must rely on these girls as they recount to you here in court, in person, and what was clearly not an easy task for them to do, but they were willing to do it.

And ask yourself what kind of strength it

takes for a young girl to come in here and do what each one of them did and engage and look at the reactions, particularly also of Tiona when asked to confront Mr. Almedom. Would she even look at him? Again, let's give her an Emmy for her great acting throughout this trial.

With that, ladies and gentlemen, I will ask and I do ask you now to consider all of this evidence and return a guilty verdict form on each and every one of these counts for Mr. Almedom, signing your name at the end to a guilty verdict form. And I want to thank you for your time in listening.

THE COURT: Any closing argument by the defense?

MR. BENTON: Yes, Your Honor. May it please this Honorable Court, Mr. Almedom, Mr. Hughes, ladies and gentlemen of the jury, good afternoon.

I told you early in the beginning this is going to be a difficult case. It would be a case to challenge your senses, your emotions and your feelings. I told you that there might be certain emotions or feelings that arise. And I told you that this would be a case that would test your emotions and your feelings through this process, and I believe it has.

I have watched you, especially your faces. I have seen the tears that have been shed. But I would suggest to you that as jurors you have taken an oath to decide this case fairly and impartially based upon the evidence and the law as given to you by Judge Young. We are in a court of law. This is not a lynch mob outside of a jail cell, rioting to get entrance where prisoners are being held.

As I talked to a number of you, you have to decide this case in a way that you would want us to decide it if you were seated in that chair. You have to decide this case in an impassioned fashion. You have to decide this case following the law and you have to decide this case based upon the evidence that has been presented to you.

This is my final opportunity to talk to you. I may not necessarily remember to cover every single base. We have been in trial all week. But the fact that I may not cover every item of testimony, every item of evidence, that does not mean that I believe it not to be important. I simply want to highlight what you have heard through the course of these few days.

One of my concerns has always been a concern whenever a jury gets a case of any sort, but particularly in a case like this on a late Friday

afternoon at almost 3:00 o'clock, is that there might be a tendency and a desire to, a temptation to rush to judgment. You just want to get out of here, make a decision as a matter of convenience as opposed to a decision based upon the evidence. I urge you not to do that in this case. Take as much time as is required of you to arrive at an appropriate decision. If you have to come back Monday, come back Monday. If you have to come back Tuesday, come back Tuesday. But take as long as necessary and do not let the lateness of the hour or the impending weekend be a factor in your deliberations.

There are two accusers and 15 counts. You have to decide each and every count separate and distinct from your considerations and deliberations as to the remaining counts. You have to decide whether or not the State of Ohio has met its burden of proof as to Count 1 through Count 15. Whatever you decide on Count 1 may not necessarily, will not necessarily or should not necessarily dictate what you decide on Count 15.

And as to each case, each accusation, each count, the State of Ohio bears the burden of proof. Mr. Almedom has no proof -- has no obligation to prove anything. He does not have to prove his innocence.

He does not have to call a witness to come in and testify. He does not have to take the stand to testify. He does not have to present any evidence. He doesn't have to present answers to questions that might be wanting. He does not have to explain anything. And the fact that you may not call a witness and he did not take the stand to testify or may not provide you with adequate reasons as to why certain things may have occurred is not a factor for your consideration in this case.

And I would suggest to you that if you were to retire to that jury room and just sit in there and say why didn't Mr. Almedom do this, or why didn't his attorney call this witness, that you are impermissibly shifting the burden of proof from Mr. Hughes, who represents the State of Ohio, to Mr. Almedom. And that would be a violation of your oath and affirmation as jurors.

Let's talk about a few things. You will have within the instructions verbiage that talks about -- when I say, "verbiage," I don't mean to demean the purpose of what is being said as to what your duty is as jurors in this cause. And you must not be influenced by considerations of sympathy or prejudice.

Sure, it might be tempting to be sympathetic to two little girls. I get that. But that is not a factor for your consideration as jurors in this case. It is your duty to carefully weigh the evidence and decide all disputed questions of fact. And if you allow your decisions to be influenced, motivated by any degree of sympathy, you're violating your oath or obligation as jurors.

Similarly -- and this will be in your instructions. You must make a decision with intelligence and impartiality, without prejudice or bias. That is your duty. That is the oath that each and every one of you swore to uphold if you were called to serve as jurors in this case. You have an obligation to be fair to the State of Ohio, but you also have an obligation to be fair to Mr. Almedom. And a fair and impartial juror, that is your characterization, that is your description.

You have to take a pause. You have to sit back. You can't allow your emotions to overcome your evaluation of the facts in this case and the application of law that you are required to apply. You cannot allow a verdict based upon passion, anger, personal feelings or even disgust. It is not easy listening to a description of these accusations.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



Again, they are only accusations. But your response to those descriptions as relates to passion, anger, personal feelings or disgust have no place at all in your service as jurors in this particular cause.

Again, let's reiterate some of the fundamental purposes that make this a court of law that governs your deliberations and governs this process. First of all, Mr. Almedom is presumed innocent. You start out with that proposition. He is innocent unless the State of Ohio convinces you beyond a reasonable doubt as to his guilt as to any one or more of the counts that he has been charged with within this indictment.

He has pled not guilty. A lot of times over the voir dire process, there are conversations or comments about his side of the story. Well, what is Mr. Almedom's side of the story? I did not do it. That is why he pled not guilty. The fact that he has been charged has no bearing at all for your considerations in this case. You cannot go back into that jury room and say, well, he has been charged, he was arrested, therefore, he must be guilty of something. The law does not allow you to do that. The law does not allow you to consider his arrest or his charge or his indictment as a factor in your

deliberations.

And likewise, as indicated before, Mr. Almedom does not have to prove his innocence. He does not have to prove anything. And the presumption of innocence alone is sufficient for you to find him not guilty if you were to find that the State of Ohio had failed to meet its burden of proof in this case. The presumption of innocence in law, these are important principles, important principles that each and every one of you has taken an oath that you would uphold. And those principles apply to the best of us and it applies to the worst of us. It applies to every single case. It applies in cases that are most simplistic. If you get a speeding ticket, these principles apply. If you are charged with 15 counts of sexual assault against minors, they apply now as well. That is the law. That is what you are obligated to uphold.

Again, you have to decide this case for yourself. When you go back into that jury room, this is not a process of majority rules. One vote is not any more important than the other vote. Certainly you are encouraged to engage in deliberations and consult with one another, to share with each other your opinions and views regarding the evidence. But each

of you have to decide this case. You cannot walk out of that room and say, "Well, I had no choice." You can't walk out of that room and say, "Well, the majority voted this way." You can't walk out that room and say, "Well, I left it up to everyone else and that is what they thought. I am going to buy into it as well."

You have to decide this case. That is why the verdict forms that you will have have 12 separate lines. That is one line for each one of you jurors to take a pen in hand and sign your name in ink indicating your vote. While there will be a public proclamation of your vote as a collective body, each and every one of you will be asked: Juror No. 1, is this your vote? Juror No. 2, is this your vote? And so forth and so on down the line. And why do we do that? To further make clear that each and every one of you had a responsibility to decide this case for yourself.

Again, Mr. Almedom has no obligation to answer questions why. We might suggest a few things. In fact, I will suggest a few things on my closing presentation. But don't assume that because I am making a suggestion to you, that I am taking on the responsibility of proving anything on behalf of

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



Mr. Almedom. I am not. Because, again, Mr. Almedom has no burden of proof.

And there might be questions that are raised as to why would these girls come into this courtroom and make these accusations against him? A legitimate question. But there may be questions that perhaps you will never have an answer. For certain, Mr. Almedom has no obligation to provide such an answer. The only thing he can tell you with respect to the why's that have been raised in this case is that: I did not do it. I am not guilty. I am not the one who committed these offenses.

We talked about this early on. Merely because somebody makes an accusation doesn't make it true. It doesn't matter how often they repeat it. It doesn't matter to whom they repeat it. It does not matter the number of people that they may make their declaration to. It doesn't matter whether or not they say it in a most cool, calm and collective fashion or whether or not they are extremely emotional and tears are flowing down their eyes. The mere fact that an accusation has been made does not make it true. You have to find the facts in determining whether or not those facts are true in this matter.

Now, again, possible considerations as to

why these girls might be making these accusations. Can I say conclusively that they are? Absolutely not. But it's certainly worthy of your thought and consideration as you consider this case.

You heard testimony about the relationship between Mr. Almedom and Ms. Henderson. Ms. Henderson herself said this was a toxic relationship. They were arguing. They had their disagreements. One argument got to the point where she moved out of the house and moved into a shelter. Mr. Hughes only wants you to focus on one time she left the house after there was a problem. There was that other time as well.

Ms. Henderson told you that the children were aware of those arguments, those disputes. They argued about the fact that she was unfaithful to him. Perrion told you that she was aware of the fights and the arguments between her mother and Mr. Almedom. Tiona told you -- or Tiona told you that she was aware of the arguments between her mother and Mr. Almedom. Might that be a motivator for their desire to point a finger at him and make these accusations? That is something you may consider. That is something you may consider.

You also heard the girls say that each of them wanted to live with their father. Maybe if you

make these kind of accusations you can get something in motion so that you can go live with dad. Sometimes custody proceedings take place when you have circumstances like that. Well, sometimes that gives them the opportunity maybe to live in a different city or in a different circumstance where you are not moving from place to place in and out of shelters, looking for greater stability. Again, I am not here to say for certain, but I am saying it is worthy of your consideration.

You also heard there were discussions. Mom said this. Both girls said this. There was talk about their moving outside of Ohio, California, Hawaii. I forgot the other state that was mentioned. Again, is that something that may have motivated or been a factor for them in terms of their accusations? That is for you to decide.

Now, in the indictment that was outlined, Counts 1 through 8 deal with Perrion Thompson when she was either age 10 or 12. That is the accusations. Counts 9 through 15 deal with Tiona Arnold when she was either eight or nine. Those are the accusations.

But Perrion Thompson was interesting. The accusations span a time frame from September 4th, 2010 to March 1st, 2013, almost, what is that, about 18

months? Tiona's time span is much shorter, almost a year, from April 1st, 2012 to March 1st of 2013.

You also heard testimony about these three locations relevant to the State's charge as to when these offenses supposedly took place. Now, if you look at the time frame for these accusations, the first accusations or the first alleged incident occurs sometime -- and again, these are not exact dates. None of these girls can tell you about an exact date, time, place, location. But these are the timeframes that are outlined within the indictment.

So collectively you've got a time frame from September 4th, 2010 through March 1st of 2013, almost a three-year period. When they stayed at Beachworth Drive, you were told that that was approximately a time frame between December of 2009, January of 2010 to the end of 2011. Who lived there at that address? Of course you have Shatyra Henderson, Perrion Thompson, Tiona Arnold, Kanijah Thompson, Jabar Swift, that is the uncle; Ebony Arnold, that is the aunt, Tiona's aunt, and her two children. Then they moved from the Beachworth address location to a family shelter. Again, all of this was within this time frame between, in part the relevant time frame from September 4, 2010 to March 1st of 2013.

They are in the family shelter for 90 days. Mr. Almedom is not permitted to be in the family shelter. Presumably, basically if you consider the accusations, they are in a safe place, in the accompaniment of a number of individuals, including those professionals and staff who operate that particular facility, just mom and the three girls.

Then they move to a hotel. And they are there at the hotel for approximately another 30 days, and that would push this out to about April of 2011. Again, mom and her daughters. And you are told that Sefe would visit them sometimes while they were at the hotel. Certainly Sefe could not have stayed at the family shelter because he was not -- would not have been eligible. Remember, they stayed there because they needed to stay there for a requisite period of time in order to receive housing assistance.

Then you have 877 Dublin-Granville Road. That is where Shatyra ultimately was able to secure her own place of residence through the assistance of the family shelter program, and she stayed there from the end of 2011 until about January of 2013, upon her eviction. And again, she stayed there with her children, and Sefe did live there for a short period of time.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



Then you have the Lakeside address, 4519 Lakeside. Mr. Almedom secured that location in the early part of January during which time mom and daughters would come and stay periodically. In about February or March of 2012, mom moved in with her daughters at that location. But for the entire period of time that these children and mom either visited that location -- let me rephrase that.

For the entire period of time from February or March of 2012 until March 3rd of 2013 while they were at that Lakeside address, these children either lived there ultimately towards the conclusion or they stayed there periodically. Again, during the same period of these accusations, September of 2010 through March of 2013, not only was Sefe there, not only was Shatyra there with her children, but you also heard about Jim. You also heard about Sefe's mother staying there for extended periods of time; all during this while at least, in part, during the period of time in which they say some of these accusations took place.

You heard from the testimony not only in court but also what was said during the course of the interviews, these girls had access, contact, ongoing communication, ongoing dialog with a number of people in their day-to-day activities. Each of the girls had

their own dads that they were in communication with. Certainly they had communication with mom. There was their uncle, Jabar Swift, Sefe's mother. They went to school every day. They attended church. You had the minister there. You had Sunday school teachers. You had individuals who were over their different activities at church, the praise team, the dance team. They had staff, access to staff at the shelter. They talked to you about a number of friends that they had, friends from school, friends from church, friends from their neighborhood, friends in association with other family members. There was Ebony Arnold, who was the aunt of Tiona. You heard them talk about their grandmother. There was a babysitter at the Beachworth address.

Defendants have said that they took -- Ms. Henderson said she took her children to see the doctor for their regular scheduled visits. You get those shots at the beginning of the year. You have to show proof that your children have been immunized. And whatever other medical needs the children had, they went to see the doctor.

Perrion visited her dad, was in communication with her dad in Cincinnati. She would stay there for periods of time. And not only is dad

there, but also I believe she described it as dad's fiancee. Tiona, her dad lived in Columbus. She had contact with her father here. Any one of these people they had access to and did have access to and apparently communicated with them on a fairly regular basis. Now, I will come back to that.

What is reasonable doubt? And you will get an instruction from the Judge that talks about and will define for you reasonable doubt. But essentially reasonable doubt is doubt based upon reason and common sense. And what I ask you at this time and for purposes of your deliberation, ask yourself based upon what you have heard in this courtroom, does it make sense?

Again, we are talking about approximately a three-year time period between 2010 and 2013. Reasonable doubt. Although mom worked, she was intricately involved in her children's growth and development. She stayed in contact with them. These children were not abandoned by mom. Yet mom told you that at no time between this 2010 to 2013 did she ever make any observations that would have raised a concern to her regarding her children's well-being. None at all. She told you that. She told you that. She said, "I didn't see anything that caused me any

concerns."

She made no observations of pain or discomfort that she found to be unusual. You didn't hear her testify that she saw any blood anywhere. She didn't see anything that would suggest that her children were under any kind of emotional distress or disturbance. And this was a mother who knows her children. This is a mother who cares for her children. She saw nothing that would have said to her that anything was wrong.

Growing up, I used to hear this saying called, "Mother knows." Mothers know their children. Even without their children having to say anything, you know your children. You can look at them and see if something is wrong. The sound of their voice may alarm you. It may be their reticence to talk. Momma knows. I am not saying fathers don't know either, but momma knows for certain. You know your children. And Shatyra Henderson saw absolutely nothing that caused a concern for her as it relates to her children.

Now, keep in mind that -- and I will follow up with this later on. But if these things occurred as has been suggested, Gail Hornor said that the hymen part of the body at the ages that these girls would be would be so painful that even a Q-tip would put them

in pain. Now, these girls have gone through -- and she also said that pain could last for a couple of hours or could last for a couple of days.

Now if these things are happening as these girls are saying it happened as to the frequency that they are alleging, mom would notice if her daughters are in pain. These girls would still be expressing some level of discomfort if they were in pain.

Now, Mr. Hughes said, well, mom always worked. Well, yes, she worked. She worked a lot. But that doesn't mean that she was not in contact with her children. She spent time with them. They went out to dinner. They engaged in different activities. She would fix meals. And, of course, keep in mind there were periods of time in which mom was out of work. You heard the testimony I believe of Tiona saying her mother was looking for a job on the computer. But mom was there. Mom was there.

And Perrion said, "Well, Mom, even when she worked those 16-hour days, she always drove us to school," consistent with what Ms. Henderson said, always drove them to school. In fact, I think they went on to say that there were occasions where she maybe picked them up from school.

Again, that is what I remember. If you all

remember something different, by all means, rely upon what you remember. So if mom is always in contact with her children and mom is always driving them to school and mom is engaged with the children at various activities, surely she had the opportunity to make observations of her children. So don't buy into this notion that mom was so busy she couldn't have been cognizant as to what was going on. That simply is not true.

Again, between 2010 and 2013, that is what these girls are saying, that virtually from this, during this entire time period this was going on. I would suggest to you that doesn't make sense.

Again, going back to the circle of contacts, they would have you believe that for this entire three-year period, or the period between 2010 to 2013, with all the contact that they had, teachers, dads, coaches, uncles, church officials, shelters, doctors, neighbors, they never said a word.

Well, obviously they didn't, because you can be sure if they had made representations or any accusations to any one of these individuals -- and I have dads in twice because each of the girls had different dads. If they had said anything to any of these individuals, they would have been in court to

testify concerning those matters. Silence, three years, silence from each one of those individuals that are listed -- and that is only a representative list. I would suggest to you that there is many, many more. And absolute deafening silence.

And again, I would suggest to you that doesn't make sense. That if there were any problems that were going on as these girls would have you believe, somebody within this group would have heard of it. I don't care what the allegations of threats are. Somebody would have heard. Someone would have inquired. Someone would have made an observation that maybe there is something going wrong with these kids. No one, not a single one of these individuals came to court to testify to that. And again, a three-year period of absolute silence.

Now, here is the other thing about it. Despite all contacts and throughout this entire time period, you know, the statement is, well, they were afraid to say something because Sefe was around. Perrion goes to Cincinnati. That is 100 miles away from here. She is with her dad in complete safety. Doesn't say a word to dad. Doesn't say a word to dad.

And it is not like they go there and they are staying there with her. They drop her off. She

is left with dad. They drive back to Columbus. Then they drive back to Cincinnati to pick her up. So she is there by herself, but she is alone with her dad and dad's fiancee. What stopped her from saying anything then?

And here is the kicker. Tiona says that she tells her father during this 2010-2013 time period, she says she told her father that Sefe yelled at her. And you remember I asked her the question, I said, yeah, you told your dad and your dad came and confronted Sefe and he beat him up. And she said, yeah. She smiled about that.

Now, are you going to tell me that you know to tell your dad, you can tell your dad when somebody yells at you, but you can't say anything to your dad if you believe that you are being sexually assaulted, sexually abused? It doesn't make sense. It doesn't make sense. It simply does not make sense.

I would suggest that if you would tell dad -- let me say it this way. If you have enough confidence and security where you feel that you can tell a dad even the slightest thing, that you have been yelled at, there's absolutely no impediment to you telling dad you have been physically assaulted, sexually assaulted.

Case: 2:22-cv-02229-MHW-MRM Doc #: 9-4 Filed: 09/15/22 Page: 189 of 274 PAGEID #: 1308

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858





Also what I believe was worthy for your consideration -- and mom wrestled over this for a little bit, but ultimately she conceded after having listened to a telephone recording. These girls knew about child molestation. Mom and the family talked to them about that. They talked to them about the experiences that I believe it was Tiona's aunt had. They knew about the children who were molested when mom stayed in a foster home. So the idea of the concept of child molestation was not new to them. And in fact, Mom used that, as she told you, to counsel the girls about stranger danger.

Now, I am sure the prosecutor will say, well, Mr. Almedom is not a stranger and, therefore, that would not apply. That doesn't make sense. As you heard mom testify, "I encouraged my girls to talk at any time if anyone did anything to them."

So if you know about stranger danger, as these girls said that they do, or that they did, then they certainly would have known that if any of these acts had occurred as they have claimed, who to talk to and how to respond to it.

Then here is the other thing. If you say that you are being consistently abused, as these girls are saying, why do you go to a father-daughter dance,

go to dinner together, take walks together, or say, "Happy Father's Day"? It doesn't make sense. It doesn't make sense.

Both of the girls said Father's Day came and they told this man, "Happy Father's Day." You are not going to express those kinds of sentiment, those feelings to someone who was abusing you.

I would suggest to you that -- and I think we have all acknowledged that these are extremely serious and grave accusations. But there is no corroboration for these accusations. The children were taken to the Child Advocacy Center. First there was something about them going to the emergency room, but we don't have anybody coming from the emergency room department to testify. We don't even have any records from the emergency room.

But these children ultimately were seen by Gail Hornor. Gail Hornor says, "I saw nothing." Now, she tried to rationalize and say: "Well, even though I found nothing, that doesn't mean that nothing happened."

But as a scientist, as a nurse, you cannot draw a conclusion in the absence. If it is not there, at best all you can do is engage in a guess or speculation as to its absence. You cannot say

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



conclusively that the absence of something means that something still occurred. They come in with a title forensic interviewer, but there are no scientific principles, procedures or techniques employed in this process.

The State wants to cloak this within the concept that these are medical records, when the medical records are simply because they have a MRN number.

MR. HUGHES: Objection, Your Honor.

THE COURT: Overruled. It's closing arguments.

MR. BENTON: What they are is someone sitting down asking questions and allowing the girls to talk, and they pass notes on to someone else. And then they give it a stamp saying MRN.

Keep in mind, that as it relates to these interviews, it is part of an investigation, not a medical exam. Both Diane Lampkins and Kerri Wilkinson talked to you and said that when these girls are interviewed, as they do in countless number of other interviews that are conducted, they take at face value what is being said. It is not their role to challenge, to seek corroboration. They take at face value what these girls are saying as they do in each

and every other interview.

Then this information is passed on to Gail Hornor. Ms. Hornor told you she takes at face value the accounts that are recorded by Ms. Lampkins and Kerri Wilkinson. Someone goes to see a doctor, goes to a hospital. And they come in and the doctor says: Well, what is wrong?

Well, they take a history. That is what this is, a history. They are not there to say that you are lying. They are not there to say, well, do you have any witnesses? They just simply take down within their notes what is being told to them.

Then Detective Phillips, when asked whether or not he interviewed the girls, he said no. He relied upon the interview. So everyone is relying upon the face value declarations that are made by these girls. It is passed along from one person to the next person to the next person. And each time it is passed along, they gain apparently some level of authenticity because it is said that it is a medical record.

MR. HUGHES: Objection, again, to the characterization of medical record.

THE COURT: Overruled, closing argument.

MR. BENTON: Now, Detective Phillips says

Case: 2:22-cv-02229-MHW-MRM Doc #: 9-4 Filed: 09/15/22 Page: 193 of 274 PAGEID #: 1312

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858




that when he comes in and he wants to do an investigation that is fair and that is as complete and thorough as possible. You saw the photographs and you will see photographs where they are at the Lakeside apartment and those photographs are later testified to both by Perrion and Tiona.

There is a couch there. Now, if you follow the testimony, a lot if not all of these events supposedly took place on that couch. It would be logical to assume that on that couch would be some DNA, semen, blood, vaginal fluids that if tested could confirm that something did happen; or better yet, confirm that nothing did happen. They don't collect that. You didn't see any cushions being presented here. They didn't collect that. They said it is not important. All we need are face value statements of the girls.

You heard testimony about a blanket, and I think you will see that in one of the photographs. Where is the blanket? The blanket was supposedly used to cover the girls when these events took place. You heard the girls testify about during that time some fluids being ejected or coming out. Why not collect the blanket? Why not submit that for laboratory analysis where you can determine if there is DNA

evidence, where you can determine if there is a presence of semen, where you can determine if there is a presence of some vaginal discharge? Why not?

And then here is the kicker. You have undergarments that Mom says, "I think you ought to take a look at this." The detective said, "I think you are right."

The detective collects the undergarments and does absolutely nothing. Well, he does something with them. He doesn't submit it to a lab for analysis. And I believe it was Ms. Hornor -- at least it wasn't the detective, I am not quite sure. But sometimes you can collect information from underwear, DNA, evidence of sperm, evidence of vaginal fluid, blood.

What does Detective Phillips do with that? He has them destroyed. And I would suggest to you that if he thought that was a piece, an item that was vital to their investigation, to this prosecution, they would have submitted that to the lab and you would have seen those pairs of underwear presented in this trial. You don't have that. And Detective Phillips' explanation of that circumstance is rather contorted.

You will recall that when he first testified, I asked him questions about the underwear.

And I said: Well, if you had undergarments for purposes of an investigation involving sexual assault, would not that undergarment be important? And he said: Yes, it would be critically important.

I asked him, I said: Well, was one of the reasons it would be important because oftentimes you can gather from undergarments DNA, evidence of sperm, evidence of blood, evidence of vaginal fluid? He agreed. That's what we like. That's what we get. That's what we look for.

Did you collect that, Detective Phillips?

No, I didn't. There was none.

Then there is the oops. And to his credit, he came forward and said, look, I made a mistake. But suddenly, what was important then now becomes a matter under his consideration as the State would argue of little importance, of little value for your consideration.

If these items were made available, they may very well have established that my client is not guilty --

MR. HUGHES: Objection.

THE COURT: Closing argument is not evidence.

MR. BENTON: -- is not guilty of this

offense. It certainly would have given you the opportunity to consider whether or not these physical items corroborate in any degree what had been told to you over the course of these days. Again, we know that the underwear was destroyed. Whatever happened to the cushion and the blanket, we just simply don't know.

They show you pictures of these things, but they don't want you to believe that it is important. Well, if it is important, why not collect it? If it is important, why do you collect it and then not submit it to a laboratory? Don't just show you a picture. Follow through and do your job.

Detective Phillips had the opportunity to interview the babysitter. He was told by Ms. Henderson about the babysitter when they stayed on the Beachworth location, I believe it was. Somebody who was a potential eyewitness who could say I observed these things or I did not observe these things. They never talked to her.

Nor does he talk to any one of the other individuals who were staying either at the Lakeside property or any other location with these girls while my client was also there. They don't talk to my client's mother. They don't talk to Jim. They don't

talk to Jabar. They don't talk to Ebony.

Then there is the controlled call. Now, you remember Detective Phillips talked about a controlled call. And what is a controlled call? A controlled call is where the police, and in this instance, Detective Phillips have Perrion Thompson make a call to my client. And as Detective Phillips said, the idea behind the controlled call, you give them a narrative. In this case a narrative was given to Perrion. That narrative is designed to try to elicit a confession or some sort of admission on behalf of Mr. Almedom. And remember, I asked Detective Phillips, did it work? And he said no. So even when they try through the aid of a child to get an admission that this man has done something wrong, they fail in that attempt.

I would suggest to you that there are also inconsistencies in some of the testimony given by the girls. And again, what value you take of that or whether or not you agree that there are any inconsistencies is certainly something that you can make a determination; because, again, you are the judges of this case.

I will tell you how I think you ought to vote, as will Mr. Hughes, as he has already done. But

Case: 2:22-cv-02229-MHW-MRM Doc #: 9-4 Filed: 09/15/22 Page: 198 of 274 PAGEID #: 1317

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



none of us in this courtroom, not even the Judge can tell you how to vote. You all have to make this decision.

Now, when you look at Perrion's testimony, her testimony and her interview with Ms. Lampkins, she never said anything to Ms. Lampkins about being assaulted in the basement. She never described any aggressive looks. She never said that she was assaulted while she was at a refrigerator as she told you all when she testified. She never said anything about sitting on Sefe's lap while watching porn. She never said anything about she feared being sent to Nigeria. She pronounced it some other way, but I think she was trying to say Nigeria. She never said anything about being on her period, nor did she ever say anything about bleeding.

With Tiona, she was all over the place. She goes on about a number of incidents in court that I would suggest to you were not said during her interview with Ms. Wilkinson. As to each of these girls, when asked the question, can you give me a precise date, a day of the week, what time, you know, what month, they can't tell you. And now you're supposed to fill in the blanks. You are supposed to take a three-year time period and somehow crunch that

down to fit a narrative as suggested by the State of Ohio.

When asked these questions, their response was consistent: I don't know, I don't remember, I'm not sure. If they don't know, if they don't remember, if they are not sure, how can you be sure?

Oftentimes in a trial there is a tendency to -- there may be times in which jurors might develop certain suspicions. But under the law, suspicions do not equate with guilt. Sympathy does not equate with guilt. As sympathetic as these young ladies were, or they appeared to be, their sympathy -- I mean, their emotion and your sympathy for them is not evidence of guilt. If there was at any point in time in the trial you felt any degree of anger, that anger is not equivalent with guilt.

Finally, you don't have to like Mr. Almedom. You will have 30 verdict forms, 15 for not guilty and 15 for guilty. Not a single one of those verdict forms will ask you to vote whether or not you liked Mr. Almedom. Whether you do or whether you don't is not a valid factor for your consideration in deciding this case.

Ladies and gentlemen, I would urge you as to each count for which you will have a verdict form to

find Mr. Almedom not guilty. That vote will be consistent with your oath and affirmation as jurors in deciding this case fairly and impartially. That vote will be consistent with the facts of this case and the law as given to you by Judge Young. That vote will be the only just and proper vote, because not only has Mr. Almedom pled not guilty, the State of Ohio has failed to override that declaration of not guilty by any proof consistent with the standard that applies, and that is proof beyond a reasonable doubt.

It is a difficult case, difficult process you are about ready to engage in. But I do thank you for your time and for your attention. Thank you on behalf of my client as well as myself. And again, in deciding this case, do so in the same manner that you would want if you or a loved one were seated in this chair. Thank you very much.

Thank you, Your Honor.

THE COURT: Any further argument by the State of Ohio?

MR. HUGHES: Thank you, Your Honor. I always make notes here as defense counsel goes through, and I am not going to go through my entire first set of points or series of points I made. But I did make some highlights that I would just ask to call

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



to your attention.

It was suggested that to decide how you would decide the case if you were sitting in his chair. I imagine you would vote not guilty if you were sitting in his chair, and that is not the proper standard. You should be deciding this case using information here presented in court as you would to make the same decision on what is one of the most important affairs in your life.

So if you would, for example, take what Perrion had to say, take what Tiona had to say, take what Gail Hornor had to say, take what the detective had to say, take what Diane Lampkins had to say, and using that information, if you had to depend on that level and quality and volume of information to determine whether or not you would rely on it to, say, have a surgery for a family member, based on what they told you, do you believe the information to be sufficient enough and serious enough and believable enough and truthful enough to make those serious decisions, or do you just discount everything they say? You know, all of that stuff you told me? It doesn't matter. It does matter.

That is the sort of seriousness, as you sit in your individual chairs making a decision as a

juror, not pretending that you are the defendant sitting in the defendant's chair making a decision how you would want. The role as a juror is to sit here and separate sympathy, set aside prejudices.

As I sit here, I think, sympathy, these poor girls come in here, right, everybody is so moved by the horror stories that they told about what happened to them. So if you're sympathetic, don't let that result in a guilty verdict without giving all of the other evidence due consideration.

But you remember in voir dire everybody said they could be fair. And all of these rules apply to Mr. Almedom, too. So as you sit here and you look at him and you gauge his reaction, his demeanor, don't be sympathetic and vote not guilty for that reason.

Take all of the time you need just as you would if this same information you were to rely on to buy a house or sign your kid up for surgery that's serious, and look at in due diligence these videos which we watched, which you have, which despite the best assertions are labeled medical records of these children. And you will be able to watch the video as they correspond to these jury instructions and tick off gross sexual imposition, her butt was touched, her breasts were fondled. She sat on his lap, rubbed her

butt against his penis area; sitting on his lap watching the computer; fellatio, quote, "at least five times." There is the three counts of fellatio for Perrion right there.

So do your due diligence as jurors, because when you go home from this case, you can rest assured and rest easy that you have signed a guilty verdict form for somebody based on the evidence that you have. You can watch that video. You cannot sign a not guilty verdict form without reviewing these videos; because in addition to their testimony, these videos support and substantiate and corroborate each and every count that you will be asked to sign a guilty verdict form.

Don't speculate on evidence that wasn't presented in court. There is a lot of, I mean, I ran out of room writing down, thinking about what-ifs. What if we had ER records? What if we had DNA? What if the pastor came in here? What if the teacher came in here? What if the uncle came in here? What if the father came in here? What if we had a blanket? What if we had some semen? What if we had the DNA?

And then arguing, well, the absence of those things you should speculate on, because if you knew, then the outcome would somehow be different. But that

evidence is not here in court.

And I found it interesting because it occurred to me that you're, after being asked to speculate to the absence of a finding from Gail Hornor's exam -- you remember that? She said the findings were normal, no tears in the vaginal canal. That was a normal finding. But you are asked to speculate and say, well, in the absence of a finding, you don't have any evidence that this occurred. So don't speculate on evidence that is not in court, that was not presented and may not even exist, quite frankly.

But looking at the direct evidence here in court, the testimony of every witness is direct evidence, including the exhibits which we have labeled for your review. Circumstantial evidence can meet those things, such as moving out abruptly, the girls in school, their changes, their attitudes.

And to address, you know, turmoil, there is testimony and evidence describing turmoil in this home, that the kids really wanted to use this report of sexual abuse, you know, to get out of the home or somehow -- why wouldn't they just say that, you know, Mr. Almedom hits my mom, or my mom hits him? I mean, if turmoil worked one time, why would they suddenly

just change stories that this was a made-up thing? It is just not.

But what else I think was important to draw from this is that really, and at the end of the day, people who have been in attendance at this trial have learned that if anyone is to blame for this, it is not Mr. Almedom, it's these young girls for not reporting it sooner to a multitude of people. It is really their fault. That is what I got. It is not their fault -- it is their fault for not telling someone sooner. There is a list of people they could have reportedly told. And do you notice what is off that list? Their mother. You know who she told -- they told? Their mother.

You know, I was bit by a dog a few years ago, right here on the shin. I didn't think anything of it. It hurt, but I waited three days before I went to the doctor. It was starting to get a little tender and, you know, I thought I should go to the doctor. I talked to a friend of mine who is a doctor and he said, "Why would you not go to a doctor? You've got a dog bite. That's crazy."

Who knows what people's reasons are for not doing things right away. Just because one person upon being raped might call the police and report it

initially doesn't mean the next person will. But in this case there are more than plenty of factors for you to consider as to why these children did not disclose to other persons. Mainly because they would have been killed. At least they believed they would have been killed.

Who controls in each instance of abuse, the time, the place, the manner and who it happens to? Do those girls control any of those factors? No. Mr. Almedom does.

It is hard to think how could something like this go on right under your nose. But again, kids often don't know that their own parents are getting divorced. Kids often wouldn't know when you or me or anybody had sex in the next room. If you have kids, if you ever have had kids or roommates or anyone, it is not unreasonable that this could have occurred in this home at all. But it has been suggested to you it is entirely possible this could go on in a house and no one know about it. But that is not the reality of sexual abuse that occurs between close family members, as you heard in this trial.

The children also testified that as it relates to Tiona and somehow her dad punching Mr. Almedom at some point about physical discipline.

Case: 2:22-cv-02229-MHW-MRM Doc #: 9-4 Filed: 09/15/22 Page: 207 of 274 PAGEID #: 1326

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858





But what each one of these girls talked about, because they have such a close bond with the family, it is not that they were worried about themselves. They were worried about their sisters. What would happen to my sister if I told? What would happen to my sister? My sister could be killed.

Sure, there is self-preservation, but think about how a young kid feels if their siblings and mother and everyone they care about is threatened to be taken away from them, whether that be Children's Services, removal from the home. All of those things were talked about.

You can penetrate a vaginal opening without passing through the hymen. You should rely on nurse Horner's description of the hymen, the vaginal cavity area and your own personal experience and knowledge and the definition of penetration the Judge will give you regarding the rape counts.

And again, it makes sense for these girls to be scared that they could be homeless, taken away, removed from their school, their friends. The little that they had in that family life, that they had with their mom, what she has done for them, you see them here today or yesterday or the day before when they were here. If they were really disclosing all of this

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



abuse to get out of that home, to get away, why are they still with their mother and their mother alone? It's because to get away from Mr. Almedom. It's not that they didn't like, you know, the apartment wasn't big enough or something like that. And it's not to go live with their dad.

Here we are, three years later, they are with their mom. They have always been with their mom. There is no evidence that they ever went anywhere but with their mother. There is no effort to try to get away from their mom or go live with their dad. Again, there is no evidence of that. Nobody came in here to talk about that. It is another red herring.

So, ladies and gentlemen, ultimately at the end of the day -- the detective also, of course, did not order the evidence destroyed. He authorized it to be returned to the victim. It was not picked up for six months and it was destroyed subsequently.

Ms. Wilkinson testified and talked about how kids remember time differently than adults. It is very disjointed.

And I think finally and ultimately, as I mentioned before, when I asked about this in voir dire, not every case involves DNA. Not every case involves fingerprints. The law does not require there

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



to be those things for a conviction. You have legally sufficient information before you to be able to return guilty verdicts on each and every count, or we would not be having this conversation here right now. So the evidence is sufficient enough.

Now, whether you believe it to be true or not is your purview as jurors, and that is what this whole process is about. Based on what these girls and everyone said in court, would you rely on what they said to make some important decision in your life? Or would you just discount everything that they had to say? And everything they say from start to finish, from the hospital on all of the way through their testimony would have had to have been fabricated for you to return a not guilty verdict.

So I ask you to sign guilty verdict forms for Mr. Almedom for each count. Ms. Perrion Thompson is under 13 for every count. Tiona was under ten every time any of this abuse occurred. In each and every instance, there was force applied or force used, whether it was physical, psychological, mental. It is a position of power and authority in that home. Mr. Almedom is the one that got to choose when this would happen, when the mother was absent, at night.

You heard a little bit of testimony about

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



the knives near the bed. Another form of violence or threatening. It is a very serious case. It is also a very serious case for these two girls, as well as Mr. Almedom. And I ask you to review the evidence, and upon review of the evidence and your collective memories, sign the guilty verdict forms and do this in the interest of justice. Thank you.

THE COURT: Everyone doing all right? I have got to read 15 pages of instructions.

All right. You can approach.

\- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

Do they need a break? Okay. Five minutes.

\- - -

THE COURT: Do not discuss the case among yourselves. Do not permit anyone to discuss it with you or in your presence. It is your duty not to form or express an opinion in the case until it is finally submitted to you.

THE BAILIFF: All rise.

\- - -

Thereupon, at 4:10 p.m., the jurors exited the courtroom and the following proceedings were held

in open court, in the presence of the defendant:

THE COURT: Five minutes.

MR. HUGHES: I just want to make a record of something, that is all. Your Honor, I did not want to comment in front of the jury, but I thought for the record I would place on it that throughout the trial Mr. Almedom has sat quietly and patiently. But in Mr. Benton's closing he began to be tearful and crying and sniffling loudly enough that it caught my attention. I want to put it on the record since the stenographer, of course, can't capture that. Thank you.

THE COURT: All right.

\- - -

Thereupon, at 4:10 p.m., a recess was taken until 4:15 p.m.

\- - -

THE BAILIFF: All rise.

\- - -

Thereupon, the jury resumed their seats in the jury box.

\- - -

THE COURT: Everyone can have a seat.

\- - -

Thereupon, the Court charged the jury as follows:

IN THE COURT OF COMMON PLEAS OF FRANKLIN COUNTY, OHIO

CRIMINAL DIVISION

- - -

State of Ohio, :

Plaintiff, :

vs. : Case No. 13CR-1858

Sefe Almedom, : CHARGE

Defendant. : Given July 21, 2017

- - -

JUDGE YOUNG, D.

Members of the jury: You have heard the evidence and the argument of counsel. The Court and the jury have separate functions. You decide the disputed facts and the Court provides the instructions of law. It is your sworn duty to accept these instructions and to apply the law as it is given to you. You are not permitted to change the law, or to apply your own conception of what you think the law should be.

A criminal case begins with the filing of an indictment. The indictment informs the defendant that he or she has been charged with an offense. The fact that it was filed may not be considered for any other purpose. The plea of not guilty is a denial of the charge and puts in issue all of the essential elements

of each of the offenses.

The defendant is presumed innocent unless guilt is established beyond a reasonable doubt. A defendant must be acquitted of an offense unless the State produces evidence which convinces you beyond a reasonable doubt of every essential element of the offense.

Reasonable doubt is present when, after you have carefully considered and compared all of the evidence, you cannot say you are firmly convinced of the truth of the charge. Reasonable doubt is based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs.

Evidence is all of the testimony received from the witnesses, the exhibits admitted during the trial and the facts agreed to by counsel. Evidence may be direct or circumstantial or both. Direct evidence is the testimony given by a witness who has seen or heard the facts to which the witness testifies. It includes exhibits admitted into

evidence during the trial.

Circumstantial evidence is the proof of facts or circumstances by direct evidence from which you may reasonably infer other related or connected facts which naturally and logically follow, according to the common experiences of mankind.

To infer, or to make an inference is to reach a reasonable conclusion of fact which you may, but are not required to make from other facts which you find have been established by direct evidence. Whether an inference is made rests entirely with you.

Direct evidence and circumstantial evidence are of equal weight.

You may not make one inference from another inference, but you may draw more than one inference from the same set of facts or circumstances.

The evidence does not include the indictment or opening statements or closing arguments of counsel. The opening statements and closing arguments of counsel are designed to assist you. They are not evidence.

Statements or answers that were stricken by the Court or which you were instructed to disregard are not evidence and must be treated as though you never heard them.

You must not speculate as to why the Court sustained an objection to any question or what the answer to that question might have been. You must not draw any inference or speculate on the truth of any suggestion included in a question that was not answered.

You are the sole judges of the facts, the credibility of the witnesses and the weight of the evidence.

To weigh the evidence, you must consider the credibility of witnesses. You will apply the tests of truthfulness which you apply in your daily lives. These tests include the appearance of each witness upon the stand; the witness' manner of testifying; the reasonableness of the testimony; the opportunity the witness had to see, hear and know the things concerning the testimony; the accuracy of the witness' memory; frankness or lack of it; intelligence, interest and bias, if any; together with all of the facts and circumstances surrounding the testimony. Applying these tests you will assign to the testimony of each witness such weight as you deem proper.

You are not required to believe the testimony of any witness simply because he or she was under oath. You may believe or disbelieve all or any

part of the testimony of any witness. It is your province to determine what testimony is worthy of belief or what testimony is not worthy of belief.

The State need not prove motive.

It is not necessary that the defendant take the witness stand in his own defense. He has a Constitutional right not to testify. The fact that he did not testify must not be considered for any purpose.

Generally, a witness may not express an opinion. However, one engaged in a particular profession may express an opinion because of their education, knowledge, and experience. Such testimony is admitted for whatever assistance it may provide to help you arrive at a just verdict.

You must decide what weight, if any, should be given to the testimony of an expert. In determining its weight you may consider the expert's skill, experience, knowledge, veracity, familiarity with the facts of the case, and the usual rules for testing credibility and determining the weight to be given to the testimony.

You should not decide any issue merely on the basis of the number of witnesses who testify on each side of an issue. Rather, the final test in

judging evidence should be the force and weight of the evidence, regardless of the number of witnesses on each side who testify to an issue.

The testimony of one witness believed by you is sufficient to prove any fact.

Discrepancies in a witness' testimony or between his and her testimony and that of others does not necessarily mean you should disbelieve that witness, as people commonly forget facts or recollect them erroneously after the passage of time.

You are all aware of the fact that two people who are witnesses to an incident may often see or hear that incident somewhat differently. In considering a discrepancy, you should consider whether such discrepancy concerns an important fact or a trivial fact.

The charges set forth in each count of the indictment constitute a separate and distinct matter. You must consider each count and the evidence applicable to each count separately, and you must state your finding as to each count uninfluenced by your verdict as to any other count. Mr. Almedom may be found not guilty or guilty of any one or all of the charges.

Count 1. The defendant is charged with

gross sexual imposition in Count 1 of the indictment. Before you can find the defendant guilty of gross sexual imposition, you must find beyond a reasonable doubt that on or about September 4, 2010 to September 3, 2011, in Franklin County, Ohio, the defendant engaged in sexual contact with PT -- because Ms. Thompson was a juvenile, it will be referred to as PT -- not his spouse, and that the defendant purposely compelled PT to submit by force or threat of force, PT being less than 13, to wit: 10 years old.

The State need not prove that PT physically resisted.

Sexual contact. Sexual contact means any touching of an erogenous zone of another, including, without limitation, the thigh, genitals, buttocks, pubic region, or if the person is a female, a breast, for the purposes of sexually arousing or gratifying either person.

A person acts purposely when it is his specific intention to cause a certain result. To do an act purposely is to do it intentionally and not accidentally. "Purpose" and "intent" mean the same thing. The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct. Since you cannot look

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



into the mind of another, you must determine purpose from all of the facts and circumstances in evidence.

"Force" means any violence, compulsion, constraint physically exerted by any means upon or against a person or thing. When the relationship between the alleged witness is of a child and other parental or elder authority figure, the element of force need not be openly displayed or physically violent. In such a relationship force may be subtle, slight, psychological or emotionally powerful. In that case, if you find beyond a reasonable doubt that the alleged witness' will was overcome by fear or duress, the element of force has been established.

Count 2. The defendant is charged with gross sexual imposition in Count 2 of the indictment. Before you can find the defendant guilty of gross sexual imposition, you must find beyond a reasonable doubt that on or about September 4, 2010 to September 3, 2012, in Franklin County, Ohio, the defendant engaged in sexual contact with PT, not his spouse, and that the defendant purposely compelled PT to submit by force or threat of force, PT being less than 13, to wit: 10 or 11 years old.

The State need not prove PT physically resisted.

And I have already defined "sexual contact, purposely," and "force."

Count 3. The defendant is charged with rape in Count 3 of the indictment. Before you can find the defendant guilty of rape, you must find beyond a reasonable doubt that on or about September 4, 2011 to September 3, 2012, in Franklin County, Ohio, the defendant engaged in sexual conduct, vaginal intercourse with another, PT being less than 13, to wit: 11 years old, and/or the defendant purposely compelled PT to submit by force or threat of force.

The State need not prove PT physically resisted.

"Sexual conduct" means vaginal intercourse between a male and female, anal intercourse, fellatio, and cunnilingus between persons regardless of sex and without privilege to do so, the insertion, however slight, of any part of the body, or any instrument, apparatus or other object into the vaginal or anal cavity of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

"Vaginal intercourse" means penetration of the penis into the vagina. "Purposely" and "force" are already defined.

Count 4. The defendant is charged with rape

in Count 4. Before you can find the defendant guilty of rape, you must find beyond a reasonable doubt that on or about September 4, 2011 to September 3, 2012, in Franklin County, Ohio, the defendant engaged in sexual conduct, vaginal intercourse with PT; being less than 13, to wit: 11 or 12 years old and/or the defendant purposely compelled PT to submit by force or threat of force.

The defendant need not prove PT physically resisted.

"Sexual conduct, purposely, force" and "vaginal intercourse" have already been defined.

Count 5. The defendant is charged with rape in Count 5. Before you can find the defendant guilty of rape, you must find beyond a reasonable doubt that on or about September 4, 2010 to December 31, 2012, in Franklin County, Ohio, the defendant engaged in sexual conduct, fellatio with PT, being less than 13, to wit: 10 to 12 years old, and/or the defendant purposely compelled PT to submit by force or threat of force.

The State need not prove PT physically resisted.

"Fellatio" means a sexual act committed with the male sexual organ and the mouth.

"Sexual conduct" and "purposely" and "force"

have already been defined.

Count 6. The defendant is charged with rape in Count 6 of the indictment. Before you can find the defendant guilty of rape, you must find beyond a reasonable doubt that on or about September 4, 2010 to December 31, 2012, in Franklin County, Ohio, the defendant engaged in sexual conduct, fellatio with PT, being less than 13, to wit: 10 to 12 years old, and the defendant purposely compelled PT to submit by force or threat of force.

The State need not prove that PT physically resisted.

"Sexual conduct, fellatio" and "purposely" have already been defined.

Count 7. Defendant is charged with rape in Count 7 of the indictment. Again, before you can find the defendant guilty of rape, you must find beyond a reasonable doubt that on or about January 1, 2013 to March 1, 2013, in Franklin County, Ohio, the defendant engaged in sexual conduct, vaginal intercourse with PT, being less than 13, to wit: 12 years old, and/or the defendant purposely compelled PT to submit by force or threat of force.

The State need not prove PT physically resisted.

"Sexual conduct, vaginal intercourse" and "purposely" have already been defined.

Count 8. The defendant is charged with rape in Count 8 of the indictment. Before you can find the defendant guilty of rape, you must find beyond a reasonable doubt that on or about January 1, 2013 to March 1, 2012, in Franklin County, Ohio, the defendant engaged in sexual conduct, fellatio with PT, being less than 13, to wit: 12 years old, and/or the defendant purposely compelled PT to submit by force or threat of force.

The State need not prove that PT physically resisted.

"Sexual conduct, fellatio, purposely" and "force" have already been defined.

Count 9. The defendant is charged with gross sexual imposition in Count 9 of the indictment. Before you can find the defendant guilty of gross sexual imposition, you must find beyond a reasonable doubt that on or about April 1st, 2012 to March 1st, 2013, in Franklin County, Ohio, the defendant engaged in sexual contact with TA -- so we are on Tiona. I have moved the initials to TA -- not his spouse, and that the defendant purposely compelled TA to submit by force or threat of force, TA being less than 13 and/or

TA being less than ten years old, eight or nine.

The State need not prove that TA physically resisted.

"Sexual contact, purposely" and "force" have already been defined.

Count 10. The defendant is charged with gross sexual imposition in Count 10 of the indictment. Before you can find the defendant guilty of gross sexual imposition, you must find beyond a reasonable doubt that on or about August 1, 2011 to January 31, 2013, in Franklin County, Ohio, the defendant engaged in sexual contact with TA, not his spouse, and that the defendant purposely compelled TA to submit by force or threat of force, TA being less than 13 years, to wit: seven to nine years old.

The State need not prove that TA physically resisted.

"Sexual contact, purposely" and "force" have already been defined.

The defendant is charged with rape in Count 11 of the indictment. Before you can find the defendant guilty of rape, you must find beyond a reasonable doubt that on or about August 1st, 2011 to January 31, 2013, in Franklin County, Ohio, the defendant engaged in sexual conduct, fellatio, with

TA, being less than 13, to wit: seven to nine years old, and/or the defendant purposely compelled TA to submit by force or threat of force.

The State need not prove that TA physically resisted.

"Sexual conduct, fellatio" and "purposely" and "force" have already been defined.

Count 12. The defendant is charged with rape in Count 12 of the indictment. Before you can find the defendant guilty of rape, you must find beyond a reasonable doubt that on or about February 5, 2012 to March 1, 2013, in Franklin County, Ohio, the defendant engaged in sexual conduct, fellatio with TA, being less than 13 and/or TA being less than 10 years old, eight or nine years old and/or the defendant purposely compelled TA to submit by force or threat of force.

The State need not prove that TA physically resisted.

"Sexual conduct, fellatio" and "force" have already been defined.

Defendant is charged with rape in Count 13 of the indictment. Before you can find the defendant guilty of rape, you must find beyond a reasonable doubt that on or about April 1st, 2012 to March 1st,

2013, in Franklin County, Ohio, the defendant engaged in sexual conduct, vaginal intercourse with TA, being less than 13 and/or TA being less than 10 years old, eight or nine years old, and that the defendant purposely compelled TA to submit by force or threat of force.

The State need not prove that TA physically resisted.

"Sexual conduct, purposely, vaginal intercourse" and "force" are already defined.

Count 14. The defendant is charged with rape in Count 14 of the indictment. Before you can find the defendant guilty of rape, you must find beyond a reasonable doubt that on or about April 1st, 2012 to March 1st, 2013, in Franklin County, the defendant engaged in sexual conduct, vaginal intercourse with TA, being less than 13 and/or TA being less than 10 years old, eight or nine years old, and that the defendant purposely compelled TA to submit by force or threat of force.

The State need not prove that TA physically resisted.

"Sexual conduct, purposely, vaginal intercourse" and "force" are already defined.

Count 15. The defendant is charged with

rape in Count 15. Before you can find the defendant guilty of rape, you must find beyond a reasonable doubt that on or about April 1st, 2012 to March 1, 2013, in Franklin County, Ohio, the defendant engaged in sexual conduct, anal intercourse with TA, being less than 13 and/or TA being less than 10 years old, eight or nine years old, and/or the defendant purposely compelled TA to submit by force or threat of force.

"Anal intercourse" means penetration of the penis into the anal opening of a man or woman.

The State need not prove that TA physically resisted.

"Sexual conduct, purposely" and "force" have already been defined.

I will read you the verdict forms. You are not to place any emphasis on the order in which I read them. You will have 30 different jury verdicts. So you will see, you have the case caption up here. And then for each count you will have a guilty and not guilty.

So on Count 1 you see this is the guilty one. And then they will have certain findings that you are going to need to make. On this one, I will read: Jury finds the defendant guilty of gross sexual

imposition as charged in Count 1 of the indictment. And we, the jury, further find that PT was or was not -- and you will have -- it says circle which one -- being less than 13 years of age, and then there is the next one that says: Defendant did/did not (circle one) purposely compel PT to submit by force or threat of force.

And then the next one: We, the jury, upon our oaths and the law and evidence in this case, find the defendant not guilty of gross sexual imposition as charged in Count 1 of the indictment. You will see there are signature lines and everyone can sign on each of these. And that goes on for each count. There is a not guilty, guilty as to all of those.

MR. HUGHES: Your Honor, I just want to confirm with Mr. Benton. Since they are repetitive, I understand that he will waive reading every single jury instruction form.

MR. BENTON: Yeah. We will just read a not guilty there, too.

THE COURT: Yes, there is guilty and not guilty.

MR. HUGHES: You don't have to go through all of the 30 forms since you indicated they have to circle the age and the force. I wanted to put that on

the record, that that is waived. Thank you.

THE COURT: To let you guys know, I am going to give you a copy of all of these instructions, but I don't give them ahead of time because no one would listen to me while I sat here and read them.

You may not discuss or consider the subject of punishment. Your duty is confined to the determination of guilt or innocence of the defendant. In the event you find the defendant guilty, the duty to determine the punishment is placed by law upon the Court.

You must not be influenced by any consideration of sympathy or prejudice. It is your duty to carefully weigh the evidence, to decide all disputed questions of fact, to apply the instructions of the Court to your findings, and to render your verdict accordingly.

In fulfilling your duty, your efforts must be to arrive at a just verdict. Consider all the evidence and make your finding with intelligence and impartiality, and without bias, sympathy or prejudice, so that the State of Ohio and the defendant will feel that their case was fairly and impartially tried.

If, during the course of the trial, the Court said or did anything that you consider an

indication of the Court's view on the facts, you are instructed to disregard it.

And then these are important. Your initial conduct upon entering the jury room is important. It is not wise immediately to express a determination, to insist upon a certain verdict, because if your sense of pride is aroused, you may hesitate to change your position, even if you later decide you are wrong.

Consult with one another, consider each other's views, and deliberate with the objective of reaching an agreement if you can do so without disturbing your individual judgment. Each of you must decide this case for yourself, but you should do so only after a discussion and consideration of the case with your fellow jurors.

Do not hesitate to change an opinion if convinced that it is wrong. However, you should not surrender honest convictions in order to be congenial or to reach a verdict solely because of the opinion of other jurors. Before you can find the defendant guilty, you must unanimously agree on your verdict.

On behalf of the public and the parties, the Court expresses appreciation for your services in performing this important public function.

After your verdict is returned, you may

Case: 2:22-cv-02229-MHW-MRM Doc #: 9-4 Filed: 09/15/22 Page: 231 of 274 PAGEID #: 1350

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



discuss this case with anyone, but you are not required to do so. Whether you discuss the case with counsel or anyone else after you are discharged is a matter of your own free choice.

When you retire to the jury room, you should select a foreperson. The foreperson will be responsible for the exhibits and the verdict forms and return them to the courtroom. The foreperson will see that your discussions are orderly and that each juror has had the opportunity to discuss the case and to cast his vote or her vote. Otherwise, the authority of the foreperson is the same as any other juror.

Until your verdict is announced in open court, you are not to disclose to anyone else the status of your deliberations or the nature of your verdict.

If you have questions, write them on a piece of paper and give the paper to my bailiff.

When all 12 of you agree on a verdict, all of you should sign the appropriate verdict form in ink and advise the bailiff by turning on the green light. You will then be returned to the courtroom.

Alternate jurors, I know we have two. Alternate jurors were selected to serve in the event of any misfortune befalling any member of the panel.

It will not be necessary for you to serve further. You are not to discuss this case or tell anyone how you would have voted until your jury has returned a verdict. You should wait here for further instructions when the 12 regular jurors retire to the jury room.

That concludes my instructions, and we will get everything to you guys back there.

MR. BENTON: Your Honor, may we approach?

THE COURT: You may.

\- - -

Thereupon, the following discussion was held at the bench with the Court and counsel outside the hearing of the jury:

MR. BENTON: Your Honor, when reading Count 4, you said, "The defendant need not prove that PT physically resisted," as opposed to the State.

THE COURT: What did I --

MR. BENTON: You said "defendant" instead of "the State."

\- - -

THE COURT: On Count 4, I supposedly did not -- I said the defendant did not -- but the State need not prove that PT physically resisted, not the defendant.

Okay. We will get everything.

THE BAILIFF: All rise.

THE COURT: We will get you copies of these instructions.

\- - -

Thereupon, at 4:45 p.m., the jury retired to the jury room and proceeded to deliberate upon the case.

\- - -

Thereupon, the jurors exited the courtroom and the following proceedings were held in open court, out of the presence of the defendant:

THE COURT: How late do you guys want to stay?

MR. HUGHES: As long as the jury is here.

MR. BENTON: I am ready to go home now, Judge. I'm exhausted.

THE COURT: I'm okay with that. We have got to get a clean laptop.

MR. HUGHES: That is what I am working on.

THE COURT: I probably am going to let them go pretty soon.

MR. BENTON: And I don't need to wait for my client to do this, Your Honor. I just wanted to have --

THE COURT: I will bring them out and you guys can take off, or just wait outside.

MR. BENTON: Your Honor, what I wanted to put on the record, the original DVD before the redaction, I am asking that that be made a part of the record and so however you want it marked, as a Court exhibit or whatever.

THE COURT: Put it as Joint Exhibit. Put Joint Exhibit 1 or we will put that over the State sticker.

MR. HUGHES: No objection from the State. It is the original unedited version of Tiona's interview.

\- - -

Thereupon, Joint Exhibit 1 was marked for purposes of identification.

\- - -

THE COURT: I am going to get a feeling as to what they want to do. We have got to get a laptop. You guys can wait outside. Everything will be recorded, so --

\- - -

Thereupon, at 5:00 p.m., at the direction of the Court, the jury was returned to the courtroom, and the following proceedings were had in open court, out

of the presence of counsel and the defendant:

THE COURT: I just wanted to get an idea how late you guys want to go or what you want to do. We are trying to secure a laptop. I guess somebody wanted to listen to that. I don't know anything.

But you guys decide how long you want to stay. Do you want to -- can everyone come back Monday? Do you want to get started Monday?

A JUROR: My ride is here, so --

A JUROR: We kind of already got started.

THE COURT: Okay. Why don't you go back and discuss it? I just wanted to get an idea. If you have to go, then you can only deliberate with everyone present. So like Monday you can come back and then you have to wait until everyone gets here. If some people get here at 8:30, you can't deliberate until all 12 of you are in the room.

And if you want to, you guys just decide what you want to do. All right? Any questions?

A JUROR: Wait a minute. Shirley has to leave now. We can't do it.

A JUROR: My ride is here because we get -- but he is waiting. And I, you know, I have a brother-in-law that had a heart attack, but --

THE COURT: Can everyone come back Monday?

A JUROR: I don't want to decide for the whole jury. My husband is fine waiting.

A JUROR: There is no way we can get it done today.

A JUROR: I would like to get as much done and out in the open tonight because I have -- I was out of town for business last week and then I missed --

THE COURT: You know, if certain people have to leave, we have to adjourn. The building is locked now.

So I will probably bring you back on Monday morning. What time do you want to come back on Monday?

A JUROR: 9:00.

THE COURT: 9:00, okay. Just don't read anything in the paper. I didn't see any press or anything here in court.

So be back at 9:00 o'clock and we will have a laptop all ready in the jury room. All right? You guys have a good weekend. I heard some of you guys went to the Jazz and Rib Fest.

- - -

Thereupon, at 5:05 p.m., Friday, July 21, 2017, the further trial of this cause was adjourned until 9:00 o'clock, a.m., Monday, July 24, 2017.

\- - -

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



Monday Morning Session,
July 24, 2017,
9:15 a.m.

\- - -

Thereupon, at 9:15 a.m., the jury resumed further deliberation of this cause pursuant to adjournment.

\- - -

Thereupon, at 11:20 a.m., the Jury announced that it had arrived at a verdict, and at 11:42 a.m., the jury was returned into the jury box, and in the presence of all counsel and the defendant, and in open court, the following proceedings were held:

\- - -

THE COURT: Back on the record, 13CR-1858, State of Ohio versus Sefe Almedom. The jury appears to have reached a verdict in this matter. Is there anything we need to put on the record prior the bringing in the jury?

MR. HUGHES: Michael Hughes on behalf of the State of Ohio. No, sir.

MR. BENTON: Your Honor, Frederick Benton on behalf of Mr. Almedom. I have nothing to place on the record as well.

THE COURT: All right. Bring them in.

THE BAILIFF: All rise.

- - -

Thereupon, the jury resumed their seats in the jury box.

- - -

THE COURT: Everyone can have a seat.

Has the jury reached a verdict?

THE FOREPERSON: Yes.

THE COURT: On State of Ohio versus Sefe Almedom, we, the jury, upon our oaths and the law and evidence in this case, find the defendant guilty of gross sexual imposition, a felony of the third degree, as charged in Count 10 of the indictment.

We, the jury, further find that TA was being less than 13 and the defendant did purposely compel TA to submit by force or threat of force.

Count 2. We, the jury, upon our oaths and the law and evidence in this case, find the defendant guilty of gross sexual imposition, a felony of the third degree, as charged in Count 9 of the indictment. We further find that TA was being less than 13 years of age, and the defendant did purposely compel TA to submit by force or threat of force.

We, the jury, upon our oaths and the law and evidence in this case, find the defendant guilty of

rape, a felony of the first degree, as charged in Count 8 of the indictment. We, the jury, further find that PT was being less than 13 years of age, to wit: 12 years of age, and the defendant did purposely compel PT to submit by threat or force of threat.

We, the jury, upon our oaths and the law and evidence in this case, find the defendant guilty of rape, a felony of the first degree, as charged in Count 7 of the indictment. We, the jury, further find that PT was being less than 13 years of age. We, the jury, further find that PT was being less than 13 years of age, to wit: 12, and the defendant did purposely compel PT to submit by force or threat of force.

We, the jury, upon our oaths and the law and evidence in this case, find the defendant guilty of rape, a felony of the first degree, as charged in Count 6 of the indictment. We, the jury, further find that PT was being less than 13 years of age. We, the jury, further find that PT was being less than 13 years of age, to wit: 10 to 12 years of age, and that the defendant did purposely compel PT to submit by force or threat of force.

We, the jury, upon our oaths and the law and evidence in this case, find the defendant guilty of

rape, a felony of the first degree, as charged in Count 5 of the indictment. We, the jury, further find that PT was being less than 13 years of age. We, the jury, further find that PT was being less than 13 years of age, to wit: 10 to 12 years of age, and the defendant did purposely compel PT to submit by force or threat of force.

We, the jury, upon our oaths and the law and evidence in this case, find the defendant guilty of rape, a felony of the first degree as charged in Count 4 of the indictment. We, the jury, further find that PT was being less than 13 years of age. We, the jury, further find that PT was being less than 13 years of age, to wit: 11 or 12 years of age, and the defendant did purposely cause PT to submit by force or threat of force.

We, the jury, upon our oaths and the law and evidence in this case, find the defendant guilty of rape, a felony of the first degree, as charged in Count 3 of the indictment. We, the jury, further find that PT was being less than 13 years of age. We, the jury, further find that PT was being less 13 years of age, to wit: 11 years of age, and the defendant did purposely compel PT to submit by force or threat of force.

We, the jury, upon our oaths and the law and evidence in this case, find the defendant guilty of gross sexual imposition, a felony of the third degree, as charged in Count 2 of the indictment. We, the jury, further find that PT was being less than 13 years of age, and that the defendant did purposely compel PT to submit by force or threat of force.

We, the jury, upon our oaths and the law and evidence in this case, find the defendant guilty of gross sexual imposition, a felony of the third degree, as charged in Count 1 of the indictment. We further find that PT was being less than 13 years of age and the defendant did purposely compel PT to submit by force or threat of force.

We, the jury, upon our oaths and the law and evidence in this case, find the defendant guilty of rape, a felony of the first degree, as charged in Count 11 of the indictment. We, the jury, further find that TA was being less than 13 years of age. We, the jury, further find that TA was being less than 10 years of age, to wit: seven to nine years of age. The defendant did purposely compel TA to submit by force or threat of force.

We, the jury, upon our oaths and the law and evidence in this case, find the defendant guilty of

rape, a felony of the first degree as charged in Count 12 of the indictment. We, the jury, further find TA was being less than 13 years of age. We, the jury, further find that TA was being less than 10 years of age, to wit: eight or nine years of age, and the defendant did purposely compel TA to submit by force or threat of force.

We, the jury, upon our oaths and the law and evidence in this case, find the defendant guilty of rape, a felony of the first degree, as charged in Count 13 of the indictment. We, the jury, further find that TA was being less than 13 years of age. We, the jury, further find that TA was being less than 10 years of age, to wit: eight or nine years of age, and the defendant did purposely compel TA to submit by force or threat of force.

We, the jury, upon our oaths and the law and evidence in this case, find the defendant guilty of rape, a felony of the first degree, as charged in Count 14 of the indictment. We, the jury, further find that TA was being less than 13 years of age. We, the jury, further find that TA was being less than 10 years of age, to wit: eight or nine years of age, and the defendant did purposely compel TA to submit by force or threat of force.

We, the jury, upon our oaths and the law and evidence in this case, find the defendant guilty of rape, a felony of the first degree, as charged in Count 15 of the indictment. We, the jury, further find TA was being less than 13 years of age. We, the jury, further find that TA was being less than 10 years of age, to wit: eight or nine years of age. And that the defendant did purposely compel TA to submit by force or threat of force.

All of these verdicts are signed and dated the 24th day of July, 2017 by each and every juror.

Does the defense want the jury polled?

MR. BENTON: Yes, Your Honor.

THE COURT: We will start with you, and then we will go right down the list.

Juror No. 1, are each of these verdicts your verdicts?

JUROR NO. 1: Yes.

THE COURT: Juror No. 2, are each of these verdicts your verdicts?

JUROR NO. 2: Yes.

THE COURT: Juror No. 3, are each of these verdicts your verdicts?

JUROR NO. 3: Yes.

THE COURT: Juror No. 4, are each of these

verdicts your verdicts?

JUROR NO. 4: Yes.

THE COURT: Juror No. 5, are each of these verdicts your verdicts?

JUROR NO. 5: Yes.

THE COURT: Juror No. 6, are each of these verdicts your verdicts?

JUROR NO. 6: Yes.

THE COURT: Juror No. 7, are each of these verdicts your verdicts?

JUROR NO. 7: Yes.

THE COURT: Juror No. 8, are each of these verdicts your verdicts?

JUROR NO. 8: Yes.

THE COURT: Juror No. 9, are each of these verdicts your verdicts?

JUROR NO. 9: Yes.

THE COURT: Juror No. 10, are each of these verdicts your verdicts?

JUROR NO. 10: Yes.

THE COURT: Juror No. 11, are each of these verdicts your verdict?

JUROR NO. 11: Yes.

THE COURT: Juror No. 12, are each of these verdicts your verdicts?

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



JUROR NO. 12: Yes.

THE COURT: I want to thank you all for doing your jury service in this matter. It is wonderful that you can come down. I know it is a very difficult situation, but you are now relieved from all of the admonitions and instructions. All right? Thank you.

THE BAILIFF: All rise.

\- - -

Thereupon, the jurors exited the courtroom and the following proceedings were held in open court, in the presence of the defendant:

THE COURT: I am going to -- with the rendering of these verdicts -- do you want to take a look at them, Mr. Benton?

MR. BENTON: I don't need to, Your Honor.

THE COURT: I'm going to revoke bond in this matter. Are you available for sentencing August 22nd?

MR. BENTON: Yes, Your Honor. If I can address the matter of bond just briefly?

THE COURT: You may.

MR. BENTON: The Court is aware that he was convicted the last time. The case went up on appeal and he was released, bond was reinstated.

Knowing that he had a prior conviction and

knowing that he was facing the same allegations, he has remained consistent and compliant with all conditions of his bond, so I am asking the Court to, pending his appeal, allow him to remain free on bond.

THE COURT: State's position?

MR. HUGHES: We would ask to revoke bond at this time. He is facing life without parole. He is a very high flight risk now.

THE COURT: I'm going to revoke bond. No bond.

Are you available August 22nd?

MR. HUGHES: Yes, Your Honor.

THE COURT: All right. We will have it set then.

MR. HUGHES: Judge, one last thing. As I was keeping track, I think the Court may have misspoke and said one of the same counts twice. I would just ask the Court to make sure that, in fact, there is 15 guilty forms, one for each count. I know they came in out of order.

THE COURT: Fifteen.

MR. HUGHES: All right. Thank you, sir. I just wanted to confirm that.

MR. BENTON: Your Honor, just one final matter. I would renew my motion for judgment of

acquittal and mistrial.

THE COURT: At this time it is denied. I think you have 120 days to file a written motion.

MR. BENTON: Right.

THE COURT: Anything further?

MR. HUGHES: Not from the State.

\- - -

Thereupon, at 11:53 a.m., Monday, July 24, 2017, the further trial of this cause was adjourned until Tuesday, August 22, 2017.

\- - -

Wednesday Morning Session,
August 23, 2017.

- - -

THE COURT: Next matter, 13CR-1858, State of Ohio versus Sefe Almedom. Counsel, enter your appearance.

MR. HUGHES: Michael Hughes on behalf of the State of Ohio.

MR. BENTON: Your Honor, Frederick Benton here on behalf of Mr. Almedom.

THE COURT: We are here today for sentencing, as Mr. Almedom has been convicted of Counts 1 through 15 in this matter. Is there anything further on behalf of the State of Ohio?

MR. HUGHES: There is, Your Honor. Thank you very much. Mr. Almedom will be a Tier III sexually oriented registrant at this point. I believe defense counsel has reviewed and gone over those forms with him, which is essentially lifetime registration every 90 days.

Beyond that, Your Honor, of course, the victims, the children, their mother are safely back in New York. They can't be here today. And I have had great communication with them throughout the pendancy of this case in the several years that I have been the

prosecutor on the case. They are asking the Court to sentence Mr. Almedom to prison for life.

I have suggested the Court consider the same sentence as before. Quite frankly, I don't see any reason to deviate from it. If I can address the Court as to those reasons why, I would like to do so now.

I am not going to go into all of the facts of the case because you know, Your Honor, you heard the testimony of these young children. They are safely back in the state of New York with their mother, as I mentioned. And we have notified them and they are aware today of the sentencing hearing. They are very pleased. The girls are very happy that they will never have to see Mr. Almedom again, hopefully or to deal with him, even though they have had to go through this process twice.

They have been in counseling in New York, they have seen counselors. This whole experience with Mr. Almedom will affect them for the rest of their life. I know they are still going through a lot of trauma, as evidenced by the testimony during the course of this case and the trial.

When it comes to sentencing, I do have some suggestions. I have read the law in this matter. And I would like to start with the last count and work my

way forward, if I might.

As relates to Count 15, that was a single count of anal intercourse involving Ms. Tiona Arnold. She was very specific about describing during the course of the trial. That is the only count involving anal intercourse. I think it stands by itself on its own, and there is testimony on the time frame. So I would ask the Court to consider life without parole as it relates to that count; or, also the Court has the option of 25 to life in that count.

All of the jury findings and all of the verdict forms, Judge, indicate that the defendant in this case used force or a threat of force in conducting each one of these offenses. I would ask the Court to consider that when it comes to sentencing as well. The Court could as to each count issue consecutive sentences and it would be appropriate.

I think in reading 2907.02(B), the rape of a child with force and the rape of a child under ten is life without parole. If you do not impose life without parole, you could on a single rape count relating to Tiona Arnold under 2971.03 (B)(1)(c), that could be life, or 25 to life is the mandatory sentence. If the Court were to choose not to do life without parole, however, as to Count 15, I am asking

the Court to consider life without parole because it does stand on its own.

It is very specific about being anally penetrated. That is the case where Ms. Arnold describes specifically how it hurt inside of her butt and on one side part and it was extremely painful for her. And, of course, at the time that Mr. Almedom anally raped her, she was only eight or nine years old. He forced himself on her. He used force, and he also threatened to use force by having her killed or telling her mom or killing her mother. The Court heard all of this testimony during the trial, so I think life without parole is more than justified in this Count 15 and it stands on its own as a distinct count amongst all of the others, specifically.

Second, there is a vaginal rape count in Count 14. That time span overlaps the last residence and also includes Mr. Almedom's residence there on Lakeside. As you recall from the trial, Your Honor, Ms. Arnold testified specifically about that residence. They were all shown photographs, the victims in this case, regarding the bedroom, the brown sheet, the towel that Mr. Almedom used to cover or was used during or would be present during the sex acts and the couch where many of these sex acts occurred.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



As relates to Count 14 in this matter, that is vaginal rape. Again, I think that's specific enough to stand on its own as it relates to Ms. Arnold in the residence at Lakeside and the time frame and her age. And that too could be a consecutive count if the Court chose.

Looking at Count 12, Your Honor, and 13, Count 12 involves fellatio. And that is specific. Ms. Arnold described when she was eight or nine years old about performing fellatio. And again, that is separate and distinct from anal rape and separate and distinct from vaginal rape and could carry its own consecutive sentence. So I would ask the Court to consider running Count 11 concurrent with Count 10 and Count 12 concurrent with Count 13.

Then we have GSI counts as relates to Ms. Arnold. Working backwards again, that is 9 and 10. Those counts are gross sexual impositions, I believe. And in relation to those counts, Your Honor, I'm asking the Court again, that could be a one-to-five year sentence given their ages at that time. They are not necessarily mandatory, because there has been a change in the law since the first case happened.

But gross sexual impositions do not merge specifically. I will cite 2013 Westlaw, 3808173.

That's a Tenth District case. The different counts of sexual conduct don't merge. Another Tenth District case number is 2013 Westlaw, 1200255. And so again, the Court could issue those consecutive to one another if it so chose.

Now we move on to Ms. Thompson, Your Honor. In the next counts, Ms. Thompson was under the age of 13 during all of the sexual acts that occurred to her. There were also findings, of course, involving her, so let's look at some of those counts, if we might.

Looking at Count 8, that is the fellatio count. That encompasses the time span where she would have lived at Lakeside, and that is where the brown couch also is located and the orange blanket that is depicted in some of those photographs as well. There is specific details from Ms. Thompson about oral sex and being forced to perform the oral sex and also the force and threat of the use of force. I would ask that Count 8 be considered as 25 to life, to run consecutive to Counts 12 or 14 or 15.

Count 7, again, working backwards, Your Honor, that would occur during the spring of 2013. Ms. Henderson indicated that there is some timing about when she lost her home, but she also had been living with Mr. Almedom. And the important thing is

to look at the girls' age during that count. That is a vaginal intercourse count. The Court can recall from Ms. Perrion Thompson's testimony about specific incidences and acts of vaginal intercourse as relates to Count 7.

Additionally, Count 6, same sort of a situation involving Ms. Thompson. Ms. Thompson probably would have been, I think, between 10 and 12 years of age at that time when she was forced to perform fellatio on Mr. Almedom.

As to the remaining counts, I think 5, 4, and 3, working all of the way down, those are overlapping counts and those involve the same time frame or time period, Counts 3, 4, and 5 as it relates to Ms. Thompson. And then Counts 1 and 2 as relates to Ms. Thompson, those are gross sexual imposition, and I think the same thing applies as previously mentioned about not merging necessarily.

Having said all of that, Your Honor, I know the original sentence in this matter was Counts 1 and 2 were run concurrent to one another. However, they are no longer mandatory under the law. Counts 3 and 4 and 5 and 6 were also concurrent, and those were 25 to life. Count 7 was 25 to life, and that was run consecutive to Count 15, which was a life without

parole with a $20,000 fine.

A felony of the first degree carries a maximum $20,000 fine. There is not a mandatory fine in this matter, Your Honor. But Mr. Almedom was able to post, I believe, a 200 -- approximately 200 or $250,000 bond in this case and he has been out on bond and retained counsel for this trial. So I think the fine is appropriate given the severity and nature of this particular crime.

So in essence, Your Honor, the original sentence in this case essentially ran a 25 to life sentence in Count 7 consecutive to a life without parole sentence in Count 15, and all of the other counts were basically run concurrent by the original judge in this matter.

I see no reason to further punish or deviate from the original sentence. I think the original sentence was a just sentence. Mr. Almedom does deserve life without parole for sexually abusing these young girls for several years.

Now that we are at the sentencing portion, the youngest child is not part of this indictment, but was tangentially referenced by Tiona Arnold. You recall her testimony about being sexually abused in the bathroom with Kanijah present when the sexual

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



abuse is actually happening. And now that we are at the sentencing phase, I believe I am free to discuss that Kanijah is also in counseling and does not -- she freezes up. She will not openly talk about it. She is so traumatized by it that I would be unable to call her as a witness in trial, and that is why the State dismissed that last count as it relates to Kanijah.

Whenever it is brought up, she totally freezes and can't talk and can't discuss it and it is still that traumatic for her. So I think now that we are at sentencing, the Court can consider those other additional factors, and I know that Ms. Henderson would want you to know those facts, and I talked to her about it before.

So, these girls are still in counseling. They are doing remarkably well. They have a very strong support network and mother in New York, and hopefully they will eventually get through this and get over it. But the Court was able to observe the demeanor of these children during the course of the trial and how it has affected them, and I ask you to take that into consideration, Judge, in imposing the life sentences consecutive to one another. Thank you, sir.

THE COURT: Anything on behalf of the

defense?

MR. BENTON: Thank you, Your Honor. Your Honor, may it please the Court. First of all, as relates to the potential penalties here, in looking at Counts 1 through 8, specifically with respect to the GSI counts, the statute now is that he faces, because of the age being less than 13, a potential penalty range of 12 to 60 months as opposed to the one to three years that would otherwise apply. These are all as to Perrion Thompson.

As it relates to the rape offenses, the statute provides that the Court may impose a prison term. There is no 25 minimum mandatory sentence. However, because of the age of the child, any sentence that this Court would impose would be, in fact, a mandatory sentence, and that would hold true with respect to even the GSI counts.

The Court has as an option a prison term of prison or life imprisonment as it relates to the rape offenses concerning Perrion Thompson. With respect to Tiona Arnold, the same penalty ranges apply with respect to the GSI counts, that's Counts 9 and 10, again, 12 to 60 months. But with regard to the rape counts, the Court has the option again of prison, a life sentence, or life without parole. Those are

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



optional with the Court in terms of the Court's exercise of its discretion.

The statute is very clear that when you have an offense, looking at 2907.02(A)(1)(b), is an offense whereby the person is less than the age of 13, and clearly that would be applicable to both Perrion as well as Tiona. And in that regard, looking specifically at paragraph (b) of that provision, it is clear that statute says that if the offender during or immediately after commission of the offense causes serious physical harm to the victim, or if the victim under (A)(1)(b) of this section is less than 10 years of age -- that would apply only as to Tiona Arnold -- in lieu of sentencing the offender to a prison term for a term of life imprisonment pursuant to 2907.03, the Court may impose upon the offender a term of life without parole. So those are the options as outlined within 2907.02.

In this case, as the Court is well aware, among many things hotly contested is the very broad and vague range by which the indictment charged as to the dates of these specific occurrences. You have as it relates to, for example, Counts 1 and 2, a date range of September 4th, 2010 to September 3rd of 2011. You have similar wide ranges, for example, as relates

to Count 11, August 1st of 2011 to January 31st, 2013.

When each of these girls were questioned as to the specific dates and times and even locations of the various offenses, they by their own admission could not provide any details relative to that. So what this jury heard over the objection of the defense was a series of recitations where it was not clear whether or not they were repeating the same offense as having occurred at different times or whether or not they were talking about the singular offense and they were just confused as it relates to the dates.

Now, the reason why I mention that is this. I would argue that with respect to each of these offenses and as relates to each of these young ladies, that all of these counts should, in fact, merge for purposes of sentencing. If the Court does not agree with the argument in favor of merger, we would certainly contend that all of the sentences in this particular count should, in fact, be run concurrent.

We recognize the severity of the offenses. Mr. Almedom, notwithstanding his conviction, still vehemently maintains his innocence as relates to each of these counts and certainly desires and intends to prosecute his appeal. But given what this Court has heard, the evidence that has been presented and

certainly the vagueness at which these allegations are made as to both conduct, location, and most importantly, as to when these offenses were supposedly to have taken place, I don't know that this Court can have any absolute certainty as to whether or not we are talking about a single event or multiple events that is being replicated as having occurred at different times. And so for those reasons, we would ask again that the Court either consider a merger; or in the alternative, that the Court would look at a concurrent sentence.

Now, as it relates to Mr. Almedom, the Court should note that here is a young man who is 39 years of age, and it's interesting as you listen to the testimony -- and I recognize my argument may be somewhat against as it relates to the verdict itself. But if you listen to the testimony, here is a situation where, in contradiction to their allegations, Father's Day they present him with a Father's Day card, Father's Day greeting. They spent time with him at a father-daughter dance. They are engaged in walks around the complex on Lakeside. They engage in a number of other activities where he has otherwise provided support as it relates to these young ladies and certainly was there in providing a

place for them to stay as well as when they were certainly in dire circumstances of not having a place to stay.

So he is not the animal that they would wish him to make. And I would suggest that it is their contradiction in terms of these descriptions of activities that also raises very serious questions with respect to the accuracy and the veracity of the accusations that have been lodged against him. But again, I understand at this juncture we have a conviction that we have to deal with.

He's 39 years of age. He has two children of his own. He has graduated from high school, the Hoover High School in San Diego. He attended the San Diego State University for a period of three years where he was studying aerospace engineering. He continued that course of study at Columbus State. He has been residing in Columbus since 1999. He is a native of Eritrea. He is a U. S. citizen, obtaining his citizenship sometime in 1999 to 2000. He was involved in the Army ROTC while he was in high school.

During the time of the pendancy of this case, he remained gainfully employed at a local carryout in Whitehall. And the Court also -- well, it was certainly not in the first trial, not mentioned in

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858



this trial. You have to show the character of this man. At the time that he lived at the Lakeside complex, there was an unfortunate incident that apparently was repeated again just yet this year where a young boy fell into the water. There was another man who went in after that young boy to try to save him, along with Sefe. Unfortunately, the little boy drowned. The man who went in after him, who might have been his uncle, also drowned. But Sefe risked his life in an attempt to try to save those two individuals. So again, I think that this is certainly a point of fact for this Court to consider as it relates to his character.

With respect to the allegations regarding the third child, first of all, I would vehemently object to the Court taking that into consideration for any purposes at all. The charges were dismissed. Whatever rationale the State wishes to proffer now I think is too little too late. There has certainly not been any documentation submitted to the Court to establish that that was a factor or is a factor as it relates to that child.

Mr. Almedom was incarcerated for a period of 53 days at the time of his initial sentence that was granted as jail-time credit. When he was convicted,

his bond was revoked on April 24, 2014, and he was sent to prison; and he was subsequently released once his conviction was overturned on April 29th, 2016. That is an additional 737 days. Then on this conviction, his bond was revoked on July 24, 2017, and he is being sentenced today, obviously, August 23rd, 2017, that is an additional 31 days. So we are asking that the Court award total jail-time credit in the amount of 821 days.

THE COURT: Mr. Almedom, is there anything you would like to tell me?

THE DEFENDANT: Yes, sir. I just feel bad and sorry those girls go through it again by Mr. Hughes, the prosecutor, Ms. Shatyra Henderson, trying to come to court under oath and lie. I just feel bad for them, sir.

And I didn't touch them. I didn't rape them. They knows, I knows, and God knows, sir.

Whatever comes out, even the jury said guilty, I am free inside me, sir. I am free inside my heart and God knows.

So that is all I can say, sir. But I just feel bad they go through that for no reason, sir.

MR. BENTON: Your Honor, if I can say one other thing. As was pointed out, although the

original sentencing entry indicated that there was a mandatory fine, the law does not provide for a mandatory fine in this matter. Nonetheless, I have from Mr. Almedom an affidavit. He does not have the financial means by which to pay any fines or costs. I am a bit taken aback that simply because someone exercises their Constitutional right to counsel and their right to bail, that somehow that means that they are to be penalized with respect to any financial sanctions.

And the Court certainly has to look at his financial sanctions. As it stands now, he is obviously going to face a long prospect of prison, he's not going to have the financial resources. While he was out on bond he was working a modest job at a local convenience store. And it is not his financial -- and to support his ability to make bond, his ability to obtain counsel is because of those resources provided to him by his family, not out of his own pocket.

So the Court cannot impose -- should not impose a financial sanction upon him based upon his family's resources, but the Court needs to look exclusively at that belonging to Mr. Almedom.

And again, for the record, I do have an

affidavit which I will introduce if the Court feels it is necessary in order to support my argument.

THE COURT: First of all, I assume the State in what you were proposing is that Counts 1 through 15 are separate and distinct and do not merge for purposes of sentencing. Is that the State's position?

MR. HUGHES: Yes, sir, and I stated some case law for that support.

THE COURT: I will find that Counts 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, and 15 do not merge for purposes of sentencing.

My sentence in this case is based upon the overriding principles and purposes of felony sentencing stated in 2929.11, specifically, to protect the public from future crime by you and others, to punish you using the minimum sanctions that I determine will accomplish these purposes without imposing any unnecessary burden on state and local government resources, to ensure that the sentence is consistent with other similar offenses committed by like offenders, that the sentence is proportionate to the harm you caused and the impact upon the victims, and that your sentence is not based upon any impermissible purpose. Finally, in determining your sentence I have considered all seriousness and

recidivism factors of 2929.12 (B) through (E).

With respect to 2929.12 (B), I do find the factor that the injury was exacerbated by the victim's physical or mental condition or age. I will also find that the victims suffered serious physical, psychological harm; that the offender's relationship with the victims facilitated the offense. Offender's conduct is less serious, I do not find any factors.

Recidivism is more likely, I do not find any factors. Recidivism is less likely, I do not find any factors.

On Counts 1, 2, 9 and 10, I will impose a term of 60 months incarceration. They will be run concurrent with each other. On Counts 3, 4, 5, 6, and 8, I will impose a 25 to life sentence on each of those matters. They will be run concurrent with each other.

On Count 7, I will impose a 25 to life that will run consecutive to Count 15. Counts 11, 12, 13, 14, and 15, I will impose a life without parole. Those will run concurrent with each other. The rape charges will all be mandatory.

There is a, for what it's worth, a mandatory five years post-release control if you are ever released from the penitentiary.

I will find that you are a Tier III sex offender, registration for lifetime, with in-person verification every 90 days.

I will alter the sentence and not impose any fine in this matter, given the amount of jail-time credit. I will impose 821 days of jail-time credit.

I will advise you, Mr. Almedom, you have a right to appeal. If you are unable to pay the cost of an appeal, you have the right to appeal without payment. If you are unable to obtain counsel for an appeal, counsel will be appointed without cost. If you are unable to pay the costs of documents necessary to an appeal, such documents will be provided without cost.

And you have the right to have a notice of appeal timely filed on your behalf, which is within 30 days. Upon your request, the Court shall forthwith appoint counsel for your appeal.

Does counsel request that I appoint the public defender in this matter?

MR. BENTON: Your Honor, can we defer for right now?

THE COURT: We can defer.

MR. BENTON: Yes, thank you.

THE COURT: If I need to, Mr. Almedom, if

you need to have me appoint counsel, I will appoint appellate counsel on your behalf.

And so you have essentially a 25 to life that will be consecutive to the life without parole.

Anything further on behalf of the State of Ohio?

MR. HUGHES: Just that the only thing I disagree with is I believe the GSIs are no longer mandatory under law.

THE COURT: That is why I --

MR. HUGHES: Mr. Benton mentioned that he thought they were, so it doesn't change --

THE COURT: No. That's the reason -- the mandatory sentences only relate to all of the rape charges and not the four GSIs.

MR. HUGHES: I have nothing else to add at this time. We went over the Tier III forms, the rights of appeal, mandatory PRC, life without parole. I think that you covered everything that the statute requires, sir. Thank you.

THE COURT: Anything further on behalf of the defense?

MR. BENTON: Yes, Your Honor, a few matters. He has executed a notice of prison imposed, also executed the acknowledgment of his appellate rights.

I also would move to renew all previous motions and objections that were made during trial, including the motions for mistrial.

I disagree with -- I understand the Court's rationale, but I do not believe that statutorily there is a 25 to life range of sentencing because of the changes in the law subsequent to his initial indictment. But I guess that is something the Court of Appeals would have to address. I believe that's it.

THE COURT: All right. That will be all.

MR. HUGHES: Oh, yes. The court reporter has relinquished to me the evidence used and admitted at this trial, and so I will retain it for our office and our office will have it for appellate purposes, for the record.

THE COURT: That will be all.

\- - -

Thereupon, at 11:15 a.m., the hearing in this matter reconvened, as follows:

THE COURT: Back on the record on 13CR-04-1858, State of Ohio versus Sefe Almedom. Counsel, enter your appearances.

MR. HUGHES: Michael Hughes, State of Ohio.

MR. BENTON: Your Honor, Frederick Benton

here on behalf of Mr. Almedom.

THE COURT: My understanding is that defense counsel wants to supplement the record?

MR. BENTON: Yes, Your Honor. At this time we would move for the Court to establish a bond for purposes of an appeal. The Court is well aware that Mr. Almedom was out on bond after his previous conviction was reversed. He complied with all terms and conditions of bond. Notwithstanding his prior conviction, certainly he was aware of the risks that he stood as he faced a second trial.

He assures the Court that he will likewise abide about all terms and conditions of bond and ask the Court to respectfully give consideration to his request for a bond to be set pending his appeal.

THE COURT: Anything on behalf of the State of Ohio?

MR. HUGHES: Yes, Judge. The State believes that a no bond situation is appropriate. Mr. Benton just represented that his client is indigent, so I don't know how he would, you know, post a $500,000 or million dollar bond. But he was out, I believe, as I mentioned, on I think it was a $200,000 or $250,000 bond pending this trial. He is extremely high flight risk now, having been convicted twice of the same 15

counts involving sexual abuse of two young girls, facing life without parole.

So this is a situation, Your Honor, where an appellate bond would not be appropriate. The Court is within its rights to have no bond, to revoke bond and not issue an appellate bond. Thank you.

THE COURT: I will not issue an appellate bond. It will be a no bond matter. Take up the matter of bond with the Court of Appeals if they want to set it.

MR. BENTON: Thank you, Judge.

- - -

Thereupon, the hearing in this matter concluded.

- - -

CERTIFICATE

I do hereby certify that the foregoing is a true and correct transcript of the proceedings held in this matter on July 17 - 21, 2017, July 24, 2017 and August 23, 2017, taken by me in machine shorthand and thereafter reduced to computerized transcription under my direction and supervision.

Linda S. Shupe, RPR, RMR
Assistant Official Court Reporter

- - -

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Jan 12 1:37 PM-13CR001858